# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES OWENS, et al.** | |
|      **Plaintiffs** | |
|      v. | **Civil Action No. 01-2244** |
| | **(JDB)/(JMF)** |
| **REPUBLIC OF SUDAN, et al.** | |
|      **Defendants** | |

| | |
|---|---|
| **RIZWAN KHALIQ, et al.** | |
|      **Plaintiffs** | |
|      v. | **Civil Action No. 04-1536** |
| | **(JDB)/(JMF)** |
| **REPUBLIC OF SUDAN, et al.** | |
|      **Defendants** | |

| | |
|---|---|
| **JUDITH ABASI MWILA, et al.** | |
|      **Plaintiffs** | |
|      v. | **Civil Action No. 08-1377** |
| | **(JDB)/(JMF)** |
| **REPUBLIC OF SUDAN, et al.** | |
|      **Defendants** | |

| | |
|---|---|
| **MILLY MIKALI AMDUSO, et al.** | |
|      **Plaintiffs** | |
|      v. | **Civil Action No. 08-1361** |
| | **(JDB)/(JMF)** |
| **REPUBLIC OF SUDAN, et al.** | |
|      **Defendants** | |

| | |
|---|---|
| **WINFRED WAIRMU WAMAI, et al.** | |
|      **Plaintiffs** | |
|      v. | **Civil Action No. 08-1349** |
| | **(JDB)/(JMF)** |
| **REPUBLIC OF SUDAN, et al.** | |
|      **Defendants** | |

| | |
|---|---|
| **MARY ONSONGO, et al.** | |
|      **Plaintiffs** | |
|      v. | **Civil Action No. 08-1380** |
| | **(JDB)/(JMF)** |
| **REPUBLIC OF SUDAN, et al.** | |
|      **Defendants** | |

# PLAINTIFFS' CONSOLIDATED
# PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

*Page*

I. **INTRODUCTION**……………………………………..…….4

II. **STATEMENT OF THE CASE**…………..…………………….... 4

III. **FINDINGS OF FACT**……....………………………….……….9

    **A. ISLAMIC REPUBLIC OF IRAN'S SUPPORT FOR BIN LADEN AND AL QAEDA**……..……………………………………9

        1.  THE IRANIAN GOVERNMENT'S RELATIONSHIP WITH HEZBOLLAH……………………………………………..10

        2.  IRANIAN SUPPORT FOR AL QAEDA………………………11

    **B. THE REPUBLIC OF SUDAN'S SUPPORT FOR BIN LADEN AND AL QAEDA**………………………………………….……...19

        1.  SAFE HARBOR……………………………….……...19

        2.  DOING BUSINESS IN SUDAN……………………….………31

        3.  BIN LADEN AND AL QAEDA SPREAD INTO KENYA, SOMALIA AND OTHER TARGETS– KHARTOUM THE BASE FOR AL QAEDA TERRORISM…………………………………...………41

        4.  SUDAN'S GOVERNMENT AGENCY SUPPORT FOR AL QAEDA...48

    **C. THE AUGUST 7, 1998 EMBASSY BOMBINGS**……………...58

IV. **CONCLUSIONS OF LAW**……………….…..……………………..60

    A.  **THE COURT MAY ASSERT JURISDICTION OVER THIS CASE**....60

    B.  **28 U.S.C. § 1605A(c) PROVIDES A FEDERAL CAUSE OF ACTION TO DETERMINE SUDAN AND IRAN'S LIABILITY FOR THE WRONGFUL DEATHS AND PERSONAL INJURIES SUFFERED BY PLAINTIFFS**……………………………….....................................67

**C. 28 U.S.C. § 1605A(c) ALLOWS IMMEDIATE FAMILY MEMBERS OF FOREIGN SERVICE NATIONALS TO RECOVER DAMAGES FOR THEIR EMOTIONAL INJURIES** …………………………………...67

**D. STATE LAW PROVIDES A CAUSE OF ACTION FOR ANY PLAINTIFFS NOT ALLOWED TO BRING A CLAIM UNDER THE FEDERAL CAUSE OF ACTION**…………………………………..77

   1. The District of Columbia Allows Immediate Family Members to Recover For Their Emotional Injuries…………………………84

   2. Kenyan Law Allows Immediate Family Members to Recover For Their Emotional Injuries…………………...…………..…86

   3. Tanzanian Law Allows Immediate Family Members to Recover For Emotional Injuries Sustained By Decedent……………86

**CONCLUSION**…………..……………………...………………...88

## I.      <u>INTRODUCTION</u>

This action seeks damages for acts of state-sponsored terrorism that resulted in simultaneous suicide bombings of United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania on August 7, 1998.  These truck bombings were carried out by Al Qaeda terrorists operating with the material aid and support provided by the Defendants: the Republic of Sudan ("Sudan"), the Ministry of the Interior of the Republic of Sudan, the Islamic Republic of Iran ("Iran"), the Iranian Revolutionary Guards Corps (IRGC) and the Iranian Ministry of Information and Security (MOIS) (collectively "Defendants").[1]  Acting through its principals, the governments of Sudan and Iran provided material support and resources, aided and abetted and conspired with Osama Bin Laden and Al Qaeda.  Sudan and Iran provided this support for Bin Laden and his terrorist network with the knowledge that such support would be used for terrorist attacks against U.S. interests.

## II.     <u>STATEMENT OF THE CASE</u>

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, ("FSIA"), codified at 28 U.S.C. § 1602, *et seq*.  The Defendants were properly served as required by the FSIA in all cases consolidated for purposes of the October, 2010 liability hearing.  In *Amduso v. Republic of Sudan*, CA 08-1361 (JDB), the Sudanese Defendants were served with process on February 1, 2009 under 28 U.S.C. § 1608(a)(3), [Docket Entry #27] and the Iranian Defendants were served on June 26, 2009 under 28 U.S.C. § 1608(a)(4).  [Docket Entry #33].

---

[1] Both Iran and Sudan were state sponsors of terrorism at the time of the attack.  49 Fed. Reg. 2,836 (Jan. 23, 1984); 58 Fed. Reg. 52,523 (Oct. 8, 1993).

In *Owens v. Republic of Sudan,* CA 01-2244 (JDB), service of process was completed, per the returns made to this Court, upon the Defendant, the Republic of Sudan, on February 25, 2003 (Docket #9), upon the Defendant the Ministry of the Interior of the Republic of Sudan (Docket #9) on February 25, 2003, upon the Defendant the Islamic Republic of Iran on March 5, 2003 (Docket #10), and upon the Defendant rhe Iranian Ministry of Information and Security on October 14, 2002 (Docket #6).

In *Wamai v. Republic of Sudan*, Case No. 1:08-cv-01349 (JDB), Plaintiffs properly achieved service of process on each of the named Defendants. (1) The Ministry of the Interior of the Republic of Sudan (MOIS) was served with process on February 12, 2009, pursuant to  28 U.S.C. 1608(a)(3) [Docket Entry # 15]; (2) The Republic of Sudan was served with process on April 22, 2009  through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry #23] which was transmitted/delivered under diplomatic note on November 12, 2009 [Docket Entry #28]; (3) The Iranian Ministry of Information and Security was served with process on February 14, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry # 15]  and (4) The Islamic Republic of Iran and the Iranian Revolutionary Guards were served with process on April 22, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608 (a)(4) [Docket Entry # 23] which was transmitted/delivered under diplomatic notes on November 18, 2009 [Docket Entry #29].  Default Judgments were entered against each of the Defendants on June 4, 2010 [Docket Entry # 34, #35].

In *Onsongo v. Republic of Sudan*, Case No. 1:08-cv-01380 (JDB) the Sudanese defendants the Ministry of the Interior of the Republic of Sudan and the Republic of Sudan were served with process on  December 17, 2009 pursuant to 28 U.S.C.

1608(a)(4).  [Docket Entry # 16] The Iranian Ministry of Information and Security was

served with process on February 14, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket

Entry # 8)  and the Islamic Republic of Iran and the Iranian Revolutionary Guards were

served with process on November 18, 2009 pursuant to 28 U.S.C. 1608(a)(4) [Docket

Entry #17]. Defaults were entered against each of the named defendants on June 2, 2010

[Docket Entry #21 , #22 and 23].

Though served, none of the Defendants have answered, and the Clerk of Court

entered defaults against Defendants in each case.  The Court then proceeded to a default

setting under the FSIA as provided by 28 U.S.C. § 1608(e):

> A court shall not enter a default judgment against a foreign state "unless
> the claimant establishes his claim or right to relief by evidence satisfactory
> to the court." 28 U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran*, 333
> F.3d 228, 232, 2003 WL 21495185 (D.C. Cir. 2003). This "satisfactory to
> the court" standard is identical to the standard for entry of default
> judgments against the United States in Federal Rule of Civil Procedure
> 55(e). *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). In
> evaluating the plaintiffs' proof, the court may "accept as true the plaintiffs'
> uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp.
> 2d 97, 100 (D.D.C. 2000). In FSIA default judgment proceedings, the
> plaintiffs may establish proof by affidavit. *Weinstein v. Islamic Republic
> of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).  In a

default setting, therefore, the Plaintiffs' burden of proof is "evidence satisfactory to the

court." *Id.*  All uncontroverted evidence is accepted as proof.  *Id.*

A three-day hearing on liability and damages was held beginning on October 25,

2010.  At this hearing, this Court accepted evidence in the form of live testimony,

videotaped testimony, affidavit, and original documentary and videographic evidence.

The Court applied the Federal Rules of Evidence.  The Court also accepted credible

expert testimony from eight well-qualified experts on various specialties related to the issues in this matter.

Evan Kohlmann gave expert testimony on the history, state-sponsorship, leadership, infrastructure of Al Qaeda, its operations and modus operandi, and the use of the internet as a medium for the distribution and dissemination of propaganda by Bin Laden and Al Qaeda.  (Kohlmann, 28, p. 224).  He consults for U.S. government agencies including the Federal Bureau Enforcement and Department of Justice among others, has published books and peer-reviewed articles and has given prior expert testimony, under cross-examination, regarding these issues in fifteen U.S. federal trials and at least eight times in foreign jurisdictions.  (Kohlmann, 28, p. 218-22; Exhibit M).  His expert opinion in this case was based upon original evidence collected and archived by Kohlmann from open source information, including Al Qaeda communiqués, books and information produced during interviews with members of Al Qaeda, evidence produced and admitted during the 2001 criminal trial for the Al Qaeda bombers in the Southern District of New York, which resulted in convictions for all defendants, and particular internet websites which are original and distinct sources of information from Bin Laden and Al Qaeda. (Kohlmann, 28, p.222).

Dr. Matthew Levitt submitted an expert report, (Exhibit L-2), and gave expert testimony on the state sponsorship of terrorism generally, as sponsored by Iran specifically, Hezbollah and its terrorist operations, and Al Qaeda.  (Levitt, 26, p. 164). Dr. Levitt formerly worked in counter-terrorism as an analyst with the Federal Bureau of Investigation and as the "deputy assistant secretary for intelligence and analysis" at the U.S. Department of Treasury and is now a director of Counter Terrorism Intelligence

Studies and Senior Fellow at the Washington Institute of Near East Policy and has written peer-reviewed articles, published books, given expert testimony under cross examination in at least eight U.S. federal trials and to both Houses of Congress numerous times regarding the issues that he testified regarding in court.  (Levitt, 26, p. 149-63; Exhibit L-1).  Dr. Levitt's methodology has been described as "the gold standard in the field of international terrorism" by a U.S. federal district court, *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005), and the Supreme Court recently cited his book on Hamas and its Iranian state-sponsorship in its decision regarding the constitutionality of 18 U.S.C. § 2339B and its prohibition on the provision of material support or resources to designated foreign terrorist organizations.  *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010); (Levitt, 26, p. 162-63).

Steven Simon submitted an expert report, (Exhibit W-2), and gave expert testimony on this report as an expert on Al Qaeda's history and operations.  Mr. Simon has studied, researched and analyzed the politics of the Middle East for nearly 25 years during his public and private sector careers. He has taught courses, written books and articles, shaped public policy and given professional advice to US government agencies, commercial firms and allied governments on these issues.  In 2002 he wrote a book entitled *The Age of Sacred Terror*, which dealt with several terrorism-related-topics, including Sudanese government support for al Qaeda in the 1990s.  This book was published by Random House and won the Council on Foreign Relations Arthur C. Ross Prize for best book on international relations.

A longtime official with the U.S. Department of State 1985, Mr. Simon joined the National Security Counsel ("NSC") staff and served there from 1994 to October 1999 as

the Director for Global Issues and Multilateral Affairs and later the Senior Director for Transnational Threats on the NSC.

Lorenzo Vidino, Ph.D., is an academic and security expert who specializes in Islamism and political violence. He has held fellowship positions at the Belfer Center for Science and International Affairs, Kennedy School of Government, Harvard University, the US Institute of Peace, and the Fletcher School of Law and Diplomacy and has published books and peer-reviewed articles on this topic. Dr. Vidino also testified as a witness on the issue of Sudanese state support for al Qaeda and Sudan's responsibility for al Qaeda attack on the USS *Cole* in *Rux v. Republic of Sudan*, CA 04-0428 in the United States District Court for the Eastern District of Virginia before the Honorable Robert G. Doumar. Dr. Vidino was accepted as an expert witness by that court.

Plaintiffs established their claim to relief by "evidence that is satisfactory to the Court" as required by 28 U.S.C. § 1608(e). This Court finds the following facts were established by Plaintiffs.

## III.   FINDINGS OF FACT

### A.   ISLAMIC REPUBLIC OF IRAN'S SUPPORT FOR BIN LADEN AND AL QAEDA

The government of the Islamic Republic of Iran ("Iran") has a long and established history of providing material aid and support to terrorist organizations including Al Qaeda, which claimed responsibility for August 7, 1998 Embassy bombings. Iran had been the preeminent state sponsor of terrorism against U.S. interests for decades. Throughout the 1990s, at least, Iran regarded Al Qaeda as a useful tool to destabilize U.S. interests.

The government of Iran aided, abetted and conspired with Hezbollah, Bin Laden and Al Qaeda to launch large scale bombing attacks against U.S. interests by utilizing the sophisticated delivery mechanism of large suicide truck bombs.  Hezbollah, an infamous terrorist organization principally based in Lebanon, had mastered the use of this type of bombing and leaders of Al Qaeda praised the 1983 Iranian/Hezbollah attack on the U.S. Marine barracks in Beirut, Lebanon that led to the withdrawal of U.S. forces from that country.  Bin Laden hoped to accomplish the same result in East Africa by attacking two major U.S. Embassies, and the terrorist attacks at issue in this case were a means to this end.

Iranian support for Bin Laden and Al Qaeda was critical leading up to the Embassy bombings because Bin Laden and Al Qaeda did not possess the technical expertise required to carry out the Embassy bombings prior to their meetings with Iranian officials and agents, and they therefore required Iranian assistance to learn how to destroy large buildings.  Prior to those attacks, Al Qaeda had not been the principal actor in any large scale bombing plots.  The Iranian Defendants provided material aid and support in the form of critically important expert explosives training to Bin Laden and Al Qaeda and so are legally and civilly responsible for damages suffered by the Plaintiffs.  While Iran authorized the provision of this support through its proxy, Hezbollah, Iran also rendered direct assistance to Al Qaeda operatives.

1.    THE IRANIAN GOVERNMENT'S RELATIONSHIP WITH HEZBOLLAH

1.  Iranian support began in the 1980s and Iran actively encouraged, if not directed, the formation of Hezbollah, and the relationship was "quite close" in the 1990s.

2.  The Iranian government and the Iranian intelligence service provided "provided substantial financial support and lots of other services" to Hezbollah.  (Clawson, 26, p.122).

3.  At all times relevant to this case, Iran was a state sponsor of terrorism[2] that supported terrorist groups that U.S. intelligence feared capable of attacking U.S. interests.  The declassified 1991 National Intelligence Estimate produced by the CIA stated that: "Iranian support for terrorism will remain a significant issue dividing Tehran and Washington. Tehran is unlikely to conduct terrorism directly against U.S. or Western interests during the next two years, but it is supporting radical groups that might do so."  (Exhibit DD at p.20).

4.  Hezbollah possessed "extraordinary knowledge of explosives" in the mid-to-late 1990s.  (Clawson, 26, p.126).  Iran trained Hezbollah in counterintelligence and explosives such that Hezbollah is considered the "A-team of terrorists", Hezbollah operatives are trained in Iran and Iranian Revolutionary Guard Corp ("IRGC") trainers are present both in Lebanon and Hezbollah training camps.  (Levitt, 26, p.169).

2.  <u>IRANIAN SUPPORT FOR AL QAEDA</u>

5.  Bin Laden and Al Qaeda relocated to Khartoum, Sudan in 1991.  (Levitt, 26, p.165).  Hassan al-Turabi, the head of the National Islamic Front, "which ruled Sudan at the time", wished to launch a worldwide Islamic revolution from the Sudan.  (Levitt, 26,

---

[2] The United States Secretary of State designated Iran as a state sponsor of terrorism through 49 Fed. Reg. 2836, on January 23, 1984.

p.165).  To that end, al-Turabi organized a meeting where "[g]roups like HAMAS and Palestinian Islamic Jihad, Egyptian Islamic Jihad, Al Qaeda, Sudanese radicals, Iranians, Lebanese Hezbollah were all invited and attended."  (Levitt, 26, p.166). Such a conglomeration of different terrorist groups and governments such as Iran had been very unusual prior to al-Turabi's conferences.  (Levitt, 26, p.166).  At these meetings, Iranian government officials and leaders of Hezbollah and Al Qaeda "first began to have serious meetings."  (Levitt, 26, p.166).  There were several meetings between representatives of Hezbollah, Al Qaeda and the governments of Sudan and Iran.  (Kohlmann, 28, p. 240).  The purpose of these meeting according to Al Qaeda Shura council member Abu Hajer al-Iraqi was to "focus on the common enemy", meaning the West and the United States.  (Kohlmann, 28, p. 240).

6.  Al-Turabi's policies therefore resulted in "the exchange of ideas and sharing of resources by groups that would not have communicated otherwise, such as Hizballah and al Qaeda."  (Exhibit W-2 at p. 3).

7.  The Iranian government played a "very active role" in the Sudan during the time that Bin Laden operated from Khartoum.  (Clawson, 26, p.124).  This included playing a "prominent role" in a conference of those resisting the Israeli-Arab peace plan, which had been organized by the Sudanese government.  (Clawson, 26, p.124).  Hezbollah had a base of operations in Khartoum, Sudan.  (Kohlmann, 28, p. 233).

8.  Iran's role in Sudan grew at the same time that the Sudanese government invited Bin Laden to Khartoum.  Turabi invited the President of Iran, Hojatoleslam Rafsanjani to visit Sudan in 1991 to support Turabi's goal of mending the Shia and Sunni divide in Islam to present a united front against the West.  (Exhibit V at p. 5).  During his visit,

9.  Iran maintained a delegation office in Khartoum that was run by Sheik Nomani to
    facilitate relations between the governments and convert Sunni Arab Muslims to the
    Shia sectarian view.  (Kohlmann, 28, p. 234).  The two governments shared
    information and intelligence between their militaries and intelligence services.
    (Kohlmann, 28, p. 234).

10. This included a connection between the Sudanese intelligence service and the IRGC.
    (Kohlmann, 28, p. 234).  The IRGC was an Iranian state organization that funneled
    assistance to terrorist organizations abroad, such as Hezbollah in Khartoum.
    (Kohlmann, 28, p. 235).  The IRGC was founded shortly after the 1979 Iranian
    revolution and, along with MOIS, is one of the two major organizations through
    which Iran carries out its terrorism support.  (Clawson, 130-131).  Hezbollah's
    presence in Khartoum was facilitated by the government of Iran.  (Kohlmann, 28, p.
    240).  The Sudanese intelligence service also facilitated the linkage between Al
    Qaeda and Hezbollah and representatives of Iran.  (Kohlmann, 28, p. 270).  Prior to
    Al Qaeda's move to Sudan, it did not have relations with Hezbollah and
    representatives of Iran, therefore Sudanese intelligence played an important role in
    bringing the groups together.  (Kohlmann, 28, p. 270).

11. The State Department's Annual Report entitled "Global Patterns of Terrorism" for

1993, published in April of 1994, states:

> Sudan's ties to Iran, the leading state sponsor of terrorism, continued to
> cause concern during the past year. Sudan served as a convenient transit
> point, meeting site and safe haven for Iranian-backed extremist groups.
> The Iranian ambassador in Khartoum, Majid Kamal, was involved in the
> 1979 takeover of the U.S. embassy in Tehran and guided Iranian efforts in
> developing the Lebanese Hezbollah group, while he served as Iran's top
> diplomat in Lebanon during the early 1980s. His presence illustrated the
> importance Iran places on Sudan.

(Exhibit GG; Kohlmann, 28, p. 258-59).

12. One prominent meeting between Hezbollah's chief external operations officer, Imad

Mughniyah, and Bin Laden and Al Qaeda officials was coordinated by Ali

Mohammed in the Sudan.  (Levitt, 26, p.170; Exhibit A).

13. At Mr. Mohammed's plea hearing in the United States District Court for the Southern

District of New York on October 20, 2000, Ali Mohamed was asked by Judge

Leonard B. Sand to tell in his own words what he did that lead him to believe that he

was guilty of the crimes charged arising out of the attack. In his response he stated:

> I was aware of certain contacts between al Qaeda and al Jihad
> organization, on one side, and Iran and Hezbollah on the other side. I
> arranged security for a meeting in the Sudan between Mughaniya[3],
> Hezbollah's chief, and Bin Laden. Hezbollah provided explosives training
> for al Qaeda and al Jihad. Iran supplied Egyptian Jihad with weapons.
> Iran also used  Hezbollah to supply explosives that were disguised to look
> like rocks .

(Exhibit A at p. 19; Clawson, 26, p. 115-19).

14. Iran was "helping train Al Qaeda operatives and Al Qaeda personnel" in Sudan in the

early 1990s.  (Clawson, 26, p.125).

---

[3] The spelling of this name used in the transcript from the United States District Court for
the Southern District of New York.

15. Mustafa Hamid was an Al Qaeda operative who served as the primary point of
contact for between Al Qaeda and the IRGC.  (Levitt, 26, p.170).  In 2009, the
Department of Treasury designated Hamid as a terrorist or one who provides support
to terrorists, "noting specifically that he was one of Al Qaeda's senior leadership
living in Iran and working closely with IRGC, the Islamic Revolutionary Guards
Corps."  (Levitt, 26, p.171-72; Exhibit CC).  "In the mid-1990s, Mustafa Hamid
reportedly negotiated a secret relationship between Usama Bin Laden and Iran,
allowing many al Qaida members safe transit through Iran to Afghanistan."  (Exhibit
CC).

16. Iran had supported Sunni terrorist organizations in the past.  (Clawson, 26, p.129).  It
is not surprising that Hezbollah, located in Lebanon, would cooperate with Hamas, a
Sunni organization, to oppose Israel.  (Levitt, 26, p.166).  Hezbollah cooperation with
or support for Al Qaeda is an especially delicate matter, however, as the Al Qaeda
organization is an especially hard-line Sunni sect of the Salafi ideology, which
considers  the Shia community to be heretic and therefore a worse enemy than
Christians or Jews.  (Clawson, 26, p.129; Levitt, 26, p.166).  Despite their differences,
Iran and Al Qaeda saw the United States as a common enemy and decided to work
together.  (Clawson, 26, p.129; Levitt, 26, p.168).

17. As a result of the meetings that took place between representative of Hezbollah and
Al Qaeda in Sudan, Hezbollah and Iran agreed to provide advanced training to a
number of Al Qaeda members, including shura council members, at Hezbollah
training camps in South Lebanon.  (Kohlmann, 28, p. 241).  Those trained in
Hezbollah camps included Saif al-Adel, who was and remains the head of Al Qaeda

18. Before Sudanese intervention, these camps would have been off limits to Al Qaeda members.  (Kohlmann, 28, p. 241).  During the time period of 1992-1996, senior Al Qaeda operatives trained in Iran, in at least one instance, and in Hezbollah training camps in Lebanon.  (Levitt, 26, p.169).  IRGC trainers regularly operate in Hezbollah camps in Lebanon.  (Levitt, 26, p.169).  After one of the training sessions in Hezbollah camps in Lebanon, Al Qaeda operatives later tied to the Nairobi bombing, including a financier and a bomb-maker, returned to Sudan with videotapes and manuals "specifically about how to blow up large buildings."  (Levitt, 26, p.169).

19. Bin Laden sought Iranian expertise as a result of Al Qaeda's interest in replicating the success enjoyed by Iran and Hezbollah in their 1983 Beirut Marine barracks suicide bombing and Al Qaeda desire to learn how to blow up large buildings.  (Levitt, 26, p.176).  Prior to Al Qaeda members' training in Iran and Lebanon, Al Qaeda had not carried out any successful large scale bombings, but in a very short time Al Qaeda acquired the capabilities to carry out the 1998 Embassy bombings, (Levitt, 26, p.177), which killed hundreds and injured thousands by detonation of very large and sophisticated bombs.  The acquisition of such technical expertise over such a short time period was a surprising development.  (Levitt, 26, p.177).

20. Hezbollah does not engage in international terrorist operations without operating in close tactical and strategic cooperation with the Iranian government.  (Levitt, 26,

- 16 -

21. The Supreme Leader of Iran, Ayatollah Khameni, controls oversight of the media, the

military, the Ministry of Intelligence, the IRGC, the Basji militia, the IRGC's Qods

force – all the entities that oversee the training and support of, cooperation with

terrorist groups, and that grant approval of terrorist attacks conducted with other

groups.  (Levitt, 26, p.179).  Hezbollah's assistance to Al Qaeda would not have been

possible without the authorization of the Iranian government.  (Levitt, 26, p.179;

Exhibit W-2 at p.3).

22. Dr. Levitt testified that Iranian government authorization would be required for

several reasons:

> The first is again the getting in bed with Al Qaeda. After Al Qaeda had
> issued not one but two fatwas, religious edicts, in '92 and '96, announcing
> its intent to target the West, it was a dangerous proposition. As I
> mentioned earlier, Iranian leaders have their own version of rationality,

but they are rational actors. And that is something that I believe had to be approved, again, so there would be reasonable or plausible deniability. Overcoming this deep mistrust between the most radical Salafi jihadi Sunnis, who, as we saw in the context of the aftermath of the war in Iraq, are sometimes all too eager to kill Shia in particular, and for the Shia on the other side to overcome their historical animosity towards these radical Sunnis, is no small feat. And I think it is only because of their shared interest at that point, in the 1990s and the immediate -- to target U.S. interests, that they were able to decide to overcome this animosity and mistrust. And I think it's quite clear, because it was for the express purpose of targeting the United States, it shouldn't surprise then that the type of training they received was specifically of the type used in the East Africa embassy bombings. They expressed interest in, we know they received at least videos and manuals about, blowing up large buildings.

(Levitt, 26, p.179-80; Exhibit L-2).

23. The declassified 1990 National Intelligence Estimate produced by the CIA stated the

following regarding President Rasfanjani's role in the government's sponsorship of

terrorism, the purpose of which was to:

target the enemies of the regime. The terrorist attacks carried out by Iran during the past year were probably approved in advance by President Rafsanjani and other senior leaders. The planning and implementation of these operations are, however, probably managed by other senior officials, most of whom are Rafsanjani's appointees and/or allies. Nonetheless, we believe Rafsanjani and Khomeini would closely monitor and approve the planning for an attack against U.S. or Western interests.

(Exhibit EE at p.7; Kohlmann, 28, p.238-40).

24. Dr. Levitt testified to a reasonable degree of certainty that Iranian and Hezbollah aid,

as approved by the Iranian government, was critical to the success of the 1998

Embassy bombings.  (Levitt, 26, p.181).  Al Qaeda had praised the 1983 Beirut attack

and expressed interest in receiving training in how to destroy large buildings, but did

not possess such knowledge prior to the training it received in Iran and Lebanon and

then returned from such training with manuals and videos on how to destroy large

buildings.  (Levitt, 26, p.188; Kohlmann, 28, p. 314-15).

**B.     THE REPUBLIC OF SUDAN'S SUPPORT FOR BIN LADEN AND AL QAEDA**

Sudanese government support for Bin Laden and Al Qaeda was critical to the success of the two 1998 Embassy bombings because Sudan provided the ultimate safe haven in a country near the two U.S. Embassies.  There are several ways in which the Sudanese Defendants ("Sudan") gave material aid and support as to be legally and civilly responsible for damages suffered by the Plaintiffs.  The types of support Bin Laden and Al Qaeda received from Sudan fall into several categories: (1) harboring and providing sanctuary to terrorists and their operational and logistical supply network; (2) the support of and protection by Sudanese intelligence and military from foreign intelligence services and rival militants; (3) the provision of hundreds of Sudanese passports and (4) untrammeled and unregulated route of travel over the Sudan-Kenya border provided by the Sudanese intelligence service to allow for the passage of weapons and money to supply the Nairobi terrorist cell.

Finally, Sudanese support was official Sudanese government policy.

1.     S<small>AFE</small> H<small>ARBOR</small>

25. Osama Bin Laden and a very small group of supporters founded Al Qaeda, which translates as the solid foundation or base, in Afghanistan in September 1988. (Kohlmann, 28, p. 225).  Bin Laden was at all times the undisputed leader of Al Qaeda.  (Kohlmann, 28, p. 225-26).  The purpose of Al Qaeda was to defend the Muslim community by waging war against any of its enemies.  (Kohlmann, 28, p. 225).  It was at this time a very small, compartmentalized group with centralized leadership composed of a shura council, each member of which head a subcommittee.

26. At the end of the war in Afghanistan, Al Qaeda was a small organization that faced

dangers arising from the eruption of a civil war among the Afghan mujahedeen that

had previously fought and defeated the Soviet Union.  (Kohlmann, 28, p. 226-29).

The multi dimensional civil war involved numerous factions and was extremely

violent, with shifting front lines, which made it a difficult place for Al Qaeda to

maintain a safe and secure base.  (Simon, 28, p. 332).  The Pakistani government also

began to pressure to foreign mujahedeen fighters to leave Pakistan.  (Kohlmann, 28,

p. 229).

27. In 1990, Al Qaeda was not located in Sudan, Somalia or Kenya.  (Kohlmann, 28, p.

228).

28. In late 1991, Al Qaeda began to move to Sudan.  (Kohlmann, 28, p. 228).  The

Sudanese government had been courting Bin Laden and Al Qaeda to convince them

to relocate to Sudan.  (Kohlmann, 28, p. 242-43).  This included Hassan al-Turabi, the

head of the National Islamic Front ("NIF"), the only political party in Sudan, and

President Omar al-Bashir, who sent a letter of invitation to Bin Laden.  (Kohlmann,

28, p. 242-43; Simon, 28, p. 333-34; Exhibit V at p. 7).  This letter later played an

29. In 1989 the Sudanese government had been overthrown by a military coup led by al-Turabi and al-Bashir.  (Exhibit W-2 at p. 1).  Al-Turabi, as the head of the NIF, and al-Bashir, as the head of the military and the President of Sudan, combined to rule Sudan.  (Exhibit W-2 at p. 2).  Al-Turabi's policies had the full backing of the Sudanese military and security forces until President al-Bashir had al-Turabi arrested to complete al-Bashir's seizure of power.  (Exhibit W-2 at p. 2).

30. Al-Turabi and the NIF sought to implement Sharia law throughout Sudan, and then in Muslim majority countries.  (Simon, 28, p. 334-35).  The NIF felt the Muslim world was endangered, primarily by Western encroachment, which had to be resisted. (Simon, 28, p. 335).  This resulted in the Sudanese government's welcoming of a number of terrorist organizations into Sudan.  (Simon, 28, p. 335; Exhibit V at p. 5). The NIF also believed in ending the split between the Sunni and Shi'ite branches of Islam.  (Simon, 28, p. 335; Exhibit V at p. 5).

31. Al Qaeda respected and supported the ideological program of the new government of Sudan, and the two sides had much to offer each other.  (Simon, 28, p. 333; Exhibit V at p. 5-6).  The leadership of Sudan guaranteed Al Qaeda a base from which it could operate with impunity, with a minimum risk of foreign interference, and Al Qaeda agreed to support the war in south Sudan against the Christian and animists, and to invest in the Sudanese economy.  (Simon, 28, p. 333; Exhibit V at p. 5-6).

32. As Dr. Vidino testified, "From April 1991 to May 1996, Osama bin Laden, along with hundreds of al Qaeda members, lived in Khartoum, building the foundations for

33. One of the members of Al Qaeda who played an important role in the move was

Jamal al-Fadl, who later directly worked with the Sudanese intelligence service under

the approval of Bin Laden. (Kohlmann, 28, p. 244). Mr. Fadl later defected to the

United States and became an official source for the Federal Bureau of Investigation

and the U.S. Justice Department. (Kohlmann, 28, p. 244).

34. The "Bill of Particulars addressing the provision of material support by defendant and

his co-conspirators to individuals associated with al Qaeda", filed by the U.S.

Attorney's Office in 2003, indicated that al-Fadl had direct knowledge of efforts by

others to provide "material support to al Qaeda efforts in the Sudan."[4] According to

that Bill of Particulars:

> The defendant worked with the BIF Enterprise (hereafter 'BIF') in the
> Sudan to provide financial support to training camps and fighters for the
> Popular Defense Force ('PDF') militia who were working under the
> direction of al Qaeda… BIF was aligned with 'the base', the English
> translation for al Qaeda, after an agreement between al Qaeda nd the
> Sudanese government. Al Fadl will describe that agreement: an accord
> between the National Islamic Front ('NIF') (the party with de facto control
> over the Sudan) and al Qaeda by which al Qaeda would provide, among
> other things, training and support to the Popular Defense Force ('PDF') in
> guerilla warfare and other tactics for use against the people of Southern
> Sudan. Al Fadl will testify that after a meeting attended by Bin Laden and
> many others (including Bayazid), it was agreed that a camp for training the
> PDF would be opened by al Qaeda. Al Fadl will identify a photograph
> recovered from BIF's Illinois office of that camp in the Sudan… That

---

[4] "Bill of Particulars." *United States of America v. Enaam M. Arnaout*. United States
District Court Northern District of Illinois Eastern Division. Case #: 02 CR 892.
February 3, 2003. Page 1.

photograph shows a sign in the background of the camp bearing the logo of BIF stating it was 'feeding a Mujahid with the Mujahideen.' Among others, Saif ul Islam (an Egyptian who was a member of al Qaeda's military committee and later a BIF officer) trained others at that camp to train the PDF, according to al Fadl. Al Fadl will testify that BIF located its office in Khartoum near the office of the PDF and persons managing the PDF frequently visited BIF. The foregoing corroborates Bin Laden's statement that BIF was being used to support al Qaeda in countries where it had operations… The meeting was also attended by an influential member of the NIF named Dr. Abdel Salaam Saad Suliman who exerted considerable inference[sic] in the NIF and over the Sudanese intelligence service and PDF. Al Fadl will identify a photograph of defendant meeting with Dr. Abdel Salaam Saad Suliman in Khartoum, Sudan, in Suliman's office, which al Fadl recognizes from the furniture… In return for the assistance provided to the PDF, al Fadhl explains, the Sudanese intelligence service facilitated the free movement of al Qaeda members and weapons in the Sudan.[5]

35. Al-Fadl later provided testimony for the United States government during the criminal trial against Bin Laden in 2001. On February 6, 2001, al-Fadl recalled that when Al-Qaida initially was considering moving from Afghanistan to the Sudan, questions were raised among the Al-Qaida leadership over whether Hassan al-Turabi's ruling National Islamic Front (NIF) party in the Sudan would make a suitable and appropriate ally. According to al-Fadl, "The people, they say we have to be careful with that and we have to know more about Islamic Front… I remember Abu Abdallah [Usama Bin Laden]… he decide to send some people to Sudan at that time, to discover, to see what going on over there, and they bring good answer or clean answer." Al-Fadl indicated that Bin Laden had dispatched several senior Al-Qaida members on this mission, including "Abu Hammam al Saudi, Abu Hajer al Iraqi, and Abu Hassan Al Sudani. And Abu Rida al Suri." Afterwards, "we got

---

[5] "Bill of Particulars." *United States of America v. Enaam M. Arnaout.* United States District Court Northern District of Illinois Eastern Division. Case #: 02 CR 892. February 3, 2003. Pages 1-4.

lecture by Abu Hajer al Iraqi, and he ask about what in the Sudan and what this

relationship… He said he went over there and I met some of the Islamic National

Front in Sudan and they are very good people and they very happy to make this

relationship with al Qaeda, and they very happy to have al Qaeda if al Qaeda come

over there."[6]

36. Mr. al-Fadl personally interviewed and vetted those who sought to travel with Al

Qaeda to Sudan.  (Kohlmann, 28, p. 244).  He was also Sudanese himself, which led

to his role as a go-between Al Qaeda and the Sudanese intelligence service.

(Kohlmann, 28, p. 245).

37. During testimony on February 6, 2001, al-Fadl described his role in facilitating Al-

Qaida's subsequent move to the Sudan at the end of 1990: "I went with some

members and we start rent houses and farms over there… In Khartoum, because they

going to bring the members in Sudan, so I went with other members to rent

guesthouses and we established to rent houses for the single people and some houses

for the people married that got family.  And also we bought farms for the training and

refresh training…  When we were Sudan, we focus on the people that got training

already.  If they need any operation or anything for the military purpose, the people

got trained already, they just give them refresh in these farms."  Al-Fadl further

testified that he spent approximately $250,000 of Al-Qaida's own finances on

---

[6] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 216-
218.

acquiring various properties in the Sudan.[7]  On the direct orders of Usama Bin Laden

and other Al-Qaida commanders, al-Fadl purchased large farms in Damazine, Port

Sudan, and Soba.[8]  Later, al-Fadl testified that he personally witnessed senior Al-

Qaida commanders—including Salem al-Masri, Saif al-Islam al-Masri, Saif al-Adel,

and Abu Talha al-Sudani—supervising training courses in explosives being offered at

the farm in Damazine.[9]

38.  The majority of Al Qaeda's assets made the move, including the entire shura council.

(Kohlmann, 28, p. 230).  The government of Sudan had encouraged the move for

several reasons:  the government envisioned Sudan as a "new haven for Islamic

revolutionary thought and would serve as a base not just for Al Qaeda but for Islamic

revolutionaries of every stripe and size", to gain leverage against its antagonistic

neighbor Egypt through the use of these groups that were opposed to the Egyptian

government and to gain resources from its partnership with the groups, especially Bin

Laden who was rumored to be very wealthy.  (Kohlmann, 28, p. 231).  Sudan invited

"Palestinian HAMAS movement, the Palestinian Islamic Jihad, Hezbollah from south

Lebanon, which is an Iranian sponsored Shi'ite movement, Al Qaeda, the Egyptian

Islamic Jihad, the Libyan Islamic Fighting Group, dissident groups from Algeria,

---

[7] *United States v. Usama bin Laden,* S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 219-
221.

[8] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 222-
223.

[9] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 239-
245.

Morocco, the Eritrean Islamic Jihad movement, literally every single jihadist style group, regardless of what sectarian perspective they had, was invited to take a base in Khartoum" to further its goal of organizing and launching a worldwide Islamic revolution.  (Kohlmann, 28, p. 232).  Dr. Ayman al-Zawahiri headed the Egyptian Islamic Jihad—the purpose of which was to start an Islamic revolution in Egypt—but also was Al Qaeda's number two commander and Bin Laden's personal physician. (Kohlmann, 28, p. 232-33).  Dr. Zawahiri also relocated to Sudan.  (Kohlmann, 28, p. 233).

39.  Sudan's open door policy for militant Islamic revolutionary groups and goal to foster worldwide Islamic revolution resulted in an unprecedented annual meeting held in Khartoum known as the Popular Arab and Islamic Congress ("PAIC").  (Exhibit V at p.5).  As Dr. Vidino testified:

> The creation of the PAIC was "the culmination of a quarter-century of study, political activity, and international travel by Turabi," was described by Turabi himself in grandiose terms as "the most significant event since the collapse of the Caliphate." The list of participants to the PAIC's first assembly, which was held in Khartoum in April of 1991, reads like a who's who of modern terrorism. It encompasses groups such as the Philippines' Abu Sayaf, the Algerian FIS, the Egyptian Islamic Jihad, and the Palestinian Hamas. The participants voted a resolution pledging to work together to "challenge and defy the tyrannical West."

(Exhibit V at p.5).

40.  Al Qaeda sought the safe sanctuary of Sudan but also wished to take the fight to its enemies in a more direct manner.  (Kohlmann, 28, p. 245-46).  Saudi, Yemeni, and Egyptians nationals formed the majority of the ranks of Al Qaeda at the time and these individuals sought regime change in their home countries and Afghanistan and Pakistan were much further away than Sudan.  (Kohlmann, 28, p. 246). Sudan was an

41. Al Qaeda has released official audio and video recordings and books through its media wing, which is called As-Sahab.  (Kohlmann, 28, p. 246-47).  The videos produced and released through As-Sahab document Al Qaeda history and propaganda.  (Kohlmann, 28, p. 247).  Al Qaeda has identified As-Sahab as their official media wing and the As-Sahab produced media is released through official Al Qaeda channels such as websites known as reliable sources for authentic Al Qaeda media or via Al Jazeera.  (Kohlmann, 28, p. 247-48).  The videos include footage and recordings of Bin Laden that no one but Al Qaeda would be able to produce.  (Kohlmann, 28, p. 247).  The video contains the official watermark of As-Sahab, which is not used by other terrorist groups without Al Qaeda's permission.  (Kohlmann, 28, p. 250).

42. In July 2008, As-Sahab produced a video entitled "The Life of" or "The Will of Abul-Hassan al-Misri" regarding the life and death of Abul-Hassan al-Misri, a shura council member, founder of Al Qaeda in 1988 and who fought in Somalia as Al Qaeda began to spread out from Khartoum after 1991.  (Kohlmann, 28, p. 248).

43. In this video, (Exhibit FF), either the official Al Qaeda narrator or an Al Qaeda member named Khalid al-Habib state that:

- after the Afghanistan war ended "the Mujahideen decide to migrate to the Sudan", Ex. FF transcript at p.4;

- "[s]haykh Usama (may Allah protect him) chose the Sudan, and many of the Mujahideen accompanied him.  So he went to the Sudan, and among those who

- 27 -

- "[t]he migration to the Sudan isn't just to build that impoverished country, but also for the Sudan to be a launching ground for the management of the Jihad against the forces of tyranny in a number of corners of the world, especially after the House of Saud colludes with the Americans in their entrance to the land of the Two Sanctuaries, in a blatant contradiction of the command of the Prophet (peace be upon him)", Ex. FF transcript at p.5; and

- **"[t]he Shaykh was keen to build the Sudan, which is a sound objective, but [also], the Sudan was a factory and production cell for a generation of Mujahideen who would spread to other countries."** Ex. FF transcript at p.5.

(Exhibits FF, FF transcript, Kohlmann, 28, p. 250).

44. Bin Laden financed terrorist training camps in Northern Sudan.  (Kohlmann, 28, p. 252-53, Exhibit V at p 15-16, 21).

45. During the criminal trial against Bin Laden, Al-Fadl also offered lengthy testimony about the specific activities taking place at Al-Qaida's farm in the town of Soba:

> In Soba town we got big farm also belong to the group… It's got four farms, but later on we buy another one and one of the farms, we use it -- we call it hangar inside the farm… we build it over there and we use it for our supplies… We got meeting every Thursday… Every Thursday after the sunset prayer, if any of al Qaeda membership they are in Khartoum that day, they have to come to the meeting in the farm.  And it's lecture by Bin Laden and other membership about jihad and our agenda… We [also] got refreshed training… For the people, they have training over from before, and if they want to just refresh some of weapons, they can do that,

but without use of explosives… just to show you how to put it together, how to save it, how to use it, put it together like that.[10]

46. Other Al Qaeda members who played key roles in the move to Sudan were Abu Hajer al-Iraqi and Ali Mohammed.  (Kohlmann, 28, p. 251).

47. Bin Laden's presence in Sudan and partnership with Sudan was openly touted by the Sudanese government.  (Kohlmann, 28, p. 255).  This included television broadcasts of Bin Laden in the company of both Hassan al-Turabi and President Omar al-Bashir.  (Kohlmann, 28, p. 255).

48. Sudan rejected U.S. pressure in the early 1990s to eject several infamous terrorist organizations from its territory.  (Kohlmann, 28, p. 257-58).

49. The State Department's Annual Report entitled "Global Patterns of Terrorism" for 1991, published in April of 1992, under the section entitled "Middle East Overview", states:

> In the past year Sudan has enhanced its relations with international terrorist groups, including the Abu Nidal Organization, ANO. Sudan has maintained ties with state sponsors of terrorism such as Libya and Iraq, has improved its relations with Iran. The National Islamic Front, NIF, under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese president, General Bashir, and has been the main advocate of closer relations with radical groups and their sponsors.

(Exhibit KK-1; Kohlmann, 28, p. 307-08).

50. The State Department's Annual Report entitled "Global Patterns of Terrorism" for 1993, published in April of 1994, states:

> In August the Secretary of State placed Sudan on the list of state sponsors of terrorism.  Despite several warnings to cease supporting radical extremists, the Sudanese government continues to harbor international

---

[10] *United States v. Usama bin Laden*,  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 245-246; 260.

> terrorist groups in Sudan.  Through the National Islamic Front party which
> dominates the Sudanese government, Sudan maintained a disturbing
> relationship with a wide range of Islamic extremists.  The list includes the
> ANO, which is the Abu Nidal organization, the Palestinian HAMAS, the
> Palestinian Islamic Jihad, otherwise known as PIJ, Lebanese Hezbollah,
> and Egypt's al-Gama'a al-Islamiya.

(Exhibit GG; Kohlmann, 28, p. 258).

51. Al Qaeda operatives remained in Sudan after the expulsion of Bin Laden in 1996, as

attested to by a declassified CIA report dated December 4, 1998.  (Exhibit AA;

Levitt, 26, p.173-74).  Another declassified CIA report dated May 12, 1997, entitled

"Sudan: A Primer on Bilateral Issues With the United States" states that "[d]espite

some positive steps over the past year, Khartoum has sent mixed signals about cutting

its terrorist ties and has taken only tactical steps."  (Exhibit BB; Levitt, 26, p.175-76).

52. While a large part of the organization left Sudan after the expulsion of Bin Laden,

operatives remained.  (Kohlmann, 28, p. 305).

53. The State Department's Annual Report entitled "Global Patterns of Terrorism" for

1997, published in April of 1998, under the section entitled "Middle East Overview",

states:

> Sudan in 1997 continued to serve as a haven, meeting place and training
> hub for a number of international terrorist organizations, primarily of
> Middle East origin. The Sudanese government also condoned many of the
> objectionable activities of Iran, such as funneling assistance to terrorists
> and radical Islamic groups operating in and transiting through Sudan.

(Exhibit KK-2; Kohlmann, 28, p. 308).

54. The State Department's Annual Report entitled "Global Patterns of Terrorism" for

1998, published in April of 1999, states:

> Sudan continued to serve as a meeting place, safe haven, and training hub
> for a number of international terrorist groups, particularly Osama bin
> Laden's Al Qaeda organization. The Sudanese government also condoned

> many of the objectionable activities of Iran, such as funneling assistance to
> terrorists and radical Islamic groups operating in and transiting through
> Sudan.

(Exhibit KK-3; Kohlmann, 28, p. 309).

55. The State Department's Annual Report entitled "Global Patterns of Terrorism" for

1999, published in April of 2000, states:

> Sudan in 1999 continued to serve as a central hub haven for several
> international terrorist organizations, including Osama bin Laden's Al
> Qaeda organization. The Sudanese government also condoned many of the
> objectionable activities of Iran, such as funneling assistance to terrorists
> and radical Islamic groups operating in and transiting through Sudan.

(Exhibit KK-4; Kohlmann, 28, p. 309-10).

56. The State Department's Annual Report entitled "Global Patterns of Terrorism" for

2000, published in April of 2001, under the section entitled "Middle East Overview",

states:

> Sudan, however, continued to be used as a safe haven by members of
> various groups, including associates of Osama bin Laden's Al Qaeda
> organization, the Egyptian al-Gama'a al-Islamiya, the Egyptian Islamic
> Jihad, the Palestine Islamic Jihad, and HAMAS

(Exhibit KK-5; Kohlmann, 28, p. 310).

57. As Mr. Simon concluded, "From 1991 to 1996 bin Laden operated without any

limitation inside Sudan, while under the protection of the Sudanese security forces.

This freedom of action gave bin Laden and the members of his organization a useful

extra-legal status in the Sudan."  (Exhibit W-2 at p. 2).

2.    DOING BUSINESS IN SUDAN

58. Al Qaeda developed several official looking businesses in Sudan as soon as it settled

in Khartoum.  As Dr. Vidino testified, "Bin Ladin also formed symbiotic business

relationships with wealthy NIF members by undertaking civil infrastructure

59. Al Qaeda settled in Sudan's capital city, Khartoum, in several offices, including a business office on McNimr Street with a two story guesthouse designed to house Al Qaeda operatives in transit.  (Kohlmann, 28, p. 252).  Al Qaeda also purchased several farms spread across Sudan from outside Khartoum to Soba and Port Sudan, which is port on the Red Sea.  (Kohlmann, 28, p. 252).

60. The purpose of the farms was to provide income from commercial enterprise and to provide space for training for Al Qaeda terrorists – including producing mock-ups to plan assassinations and blowing up test explosives, which was confessed by Jamal al-Fadl.  (Kohlmann, 28, p. 252-53, Exhibit V at p 15-16).

61. Al Qaeda set up a number of businesses and charities in Sudan, and later Kenya, for the purpose of commercial profit and employment for its operatives, which provided essential cover for Al Qaeda terrorist activities.  (Exhibit HH; Kohlmann, 28, p. 253-55 Exhibit V at p.8-11).

62. Aside from the activities taking place in the farms during the Bin Laden criminal trial testimony, al-Fadl also demonstrated intimate knowledge of Al-Qeada's corporate and commercial presence in the Sudan, including their main offices and payroll located in a prominent neighborhood of the Sudanese capital Khartoum.  Al-Fadl explained:

> First company we establish Wadi al Aqiq, and after that we make Wadi al Aqiq as mother of other companies, and we establish Ladin International

Company…   Ladin International Company for if you want to buy stuff outside from Sudan or you want to remove something, export it to outside… [Also,] Taba Investment… Taba Investment, when we sell our stuff, we sell it in local money, Sudanese pounds.  When we sell the stuff, we change the Sudanese pounds to dollars or sterling… We change the Sudanese pounds to dollars or sterling so the company exchange the money… [Also,] Hijra Construction… it built roads and bridge…  They build a road 83 miles between the Damazine, the Damazine City and Kormuk City… They buy supplies for the road and bridge and at the same time they buy explosive to open the road and bridge.  [Also,] Al Themar al Mubaraka… Themar al Mubaraka company is run the Damazine farm… They grow sesame and peanuts and white corn over there and at the same time they use back of the farm for refresh training for the Qaeda members… Refreshed for general weapons and for explosives.[11]

63. During his testimony, al-Fadl explained how he managed to learn so much about the corporate operations of Al-Qaida in the Sudan: "I work in Taba Investments in McNimr Street, and most of the time when people travel for that business or that company I know, because I do the paperwork and we make the money for the traveling."[12]  Al-Fadl also demonstrated intimate knowledge of the operations of another local Bin Laden commercial enterprise, Wadi al-Aqiq: "They are in Riyadh City in Khartoum and near the Riyadh Street… It's residential area but they got some offices for organization, relief organization like al Barr International Organization and Islamic Relief Organization."[13]

---

[11] *United States v. Usama bin Laden*,  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 239-245.

[12] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 7, 2001.  Page 368.

[13] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 13, 2001.  Pages 419-420.

64. Asked to further detail Al-Qeada's facilities inside Khartoum, al-Fadl responded, "We have some guesthouses and farms and houses for the people, the organization, residential houses… We have office in McNimr Street… In the office some people, they are not al Qaeda membership but they are from Islamic National Front."[14]

65. According to al-Fadl, Bin Laden was aware that his Sudanese commercial enterprises were hopelessly unprofitable—however, he pressed on with them in order to maintain his privileged access to the Sudanese government, military, and intelligence services. Al-Fadl recalled a conversation that took place in Khartoum in 1992 with Bin Laden himself: "We asked him if we have to make money because the business is very bad in Sudan, because the pounds go down and the dollar is strong.  The Sudanese pounds always go weak against the dollars… He say our agenda is bigger than business.  We not going to make business here, but we need to help the government and the government help our group, and this is our purpose."[15]

66. As Plaintiffs' expert Mr. Kohlmann elaborated:

> Al Qaeda was looking for a way of self-sustaining, providing a means of income for its membership, its leadership, and also to provide an excuse for why Al Qaeda operatives would be traveling to various different countries. It makes a good excuse if you show up at a foreign country at an immigration desk and someone asks you, why are you here, I'm here to help sell peanuts. I'm here to provide humanitarian relief. It sounded a lot better than saying I'm here to foment Islamic revolution.

(Kohlmann, 28, p. 255).

---

[14] *United States v. Usama bin Laden*,  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 262-263.

[15] *United States v. Usama bin Laden*,  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 7, 2001.  Pages 352-353.

67. The many different companies and charities provided cover for a number of subsequently indentified Al Qaeda terrorists and terrorist activities:

- Wadi al-Aqiq, opened sometime in 1991, was the mother company for all Al Qaeda businesses in Sudan.  Nearly half of its employees were Sudanese nationals, (Exhibit HH; Kohlmann, 28, p. 278; Exhibit V at p. 9);

- Ladin International was an import/export company that allowed Al Qaeda to import containers into Sudan, (Exhibit HH; Kohlmann, 28, p. 278-79);

- Al-Themar al Mubaraka, a farming company, employed known Al Qaeda members Abu Hassan al-Masri, Dr. Mubarak al Doori, (Exhibit HH; Kohlmann, 28, p. 279; Exhibit V at p. 9);

- Al-Themar al Mubaraka ran the farms in Sudan where Al Qaeda performed explosives training, (Exhibit HH; Kohlmann, 28, p. 279)

- Salem al-Masri, Saif al-Islam al-Masri, Saif al-Adel[16], and Abu Talha al-Sudani[17] provided or participated in explosives training on farms run by Al-Themar al Mubaraka, (Exhibit HH; Kohlmann, 28, p. 279);

- Al Qaeda opened al-Hijrah Construction for major infrastructure projects in Sudan, projects that involved a partnership with the Sudanese government, (Exhibit HH; Kohlmann, 28, p. 280; Exhibit V at p. 9);

---

[16] Saif al-Islam al-Masri and Saif al-Adel were among the Al-Qaeda operatives that received further explosives training in south Lebanon.  (Kohlmann, 28, p. 279).  Saif al-Adel was later a member of the Kenya Al Qaeda cell that performed the Nairobi bombing in 1998.  (Kohlmann, 28, p. 280).

[17] Abu Talha led an initial Al-Qaeda delegation to Somalia and was paid a reward by Bin Laden for his role in the Battle of Mogadishu.  (Kohlmann, 28, p. 279).

- al-Hijrah Construction obtained explosives for road building and for clearing obstacles during road building projects, (Kohlmann, 28, p. 281-82);

- Abu Hassan al-Sudani[18], Abu Hammam al-Saudi[19], Abu Rida Suri[20] and Abu Hajer al-Iraqi[21] were directly involved in the administration and operations of al-Hijrah Construction, (Exhibit HH; Kohlmann, 28, p. 280-81);

- Al Qaeda opened Taba Investments, which was run by Abu Hassan al-Sudani, for currency conversions, (Exhibit HH; Kohlmann, 28, p. 282; Exhibit V at p. 9);

- Al Qaeda opened Al-Qudurat Transportation to supply vehicles for various purposes, (Exhibit HH; Kohlmann, 28, p. 282; Exhibit V at p. 9);

- Al Qaeda opened an office on McNimr Street, which shared half the building with the National Islamic Front[22], (Exhibit HH; Kohlmann, 28, p. 282); and

- Most of Al Qaeda's senior leadership had offices at McNimr Street, including several shura council members, Al Qaeda's treasurer and Bin Laden himself, (Exhibit HH; Kohlmann, 28, p. 283-84).

---

[18] Abu Hassan al-Sudani was responsible for the logistics operations at Al Farouq, Al-Qaeda's main terrorist training camp while the group was located in Afghanistan. (Kohlmann, 28, p. 280).  While in Sudan he performed a role as a key conduit between the Sudanese government and Al-Qaeda.  (Kohlmann, 28, p. 280).

[19] Abu Hammam al-Saudi was a Saudi al-Qaeda operative.  (Kohlmann, 28, p. 280).

[20] Abu Rida Suri was an Al-Qaeda shura council member and played a key role as a go-between etween the Sudanese government and Al-Qaeda.  (Kohlmann, 28, p. 280).  He acted as Al-Qeada's representative in its attempted purchase of nuclear materials from a Sudanese government representative.  (Kohlmann, 28, p. 280).
[21] Abu Hajer al-Iraqi was an Al-Qaeda shura council member and traveled overseas on Al-Qaeda missions.  (Kohlmann, 28, p. 281).

[22] The National Islamic Front was the sole political party in Sudan, and was led by Dr. Hassan al-Turabi.  (Kohlmann, 28, p. 230).

68. Sudan also opened its banking system to Al Qaeda, which was very useful for "[l]aundering money and facilitating other financial transactions that stabilized and ultimately enlarged Bin Laden's presence in the Sudan."  (Simon, 28, p.337).

- Bin Laden invested $50 million in Al Shamal Islamic Bank, a Sudanese bank, and opened two accounts there, (Exhibit V at p.11);

- Several Al Qaeda members opened accounts at Al Shamal Islamic Bank, which were used to fund Al Qaeda operations, (Exhibit V at p.11-14); and

- Al Qaeda also utilized another Sudanese bank, the Tadamon Islamic Bank, which not only held accounts for Al Qaeda members but also served as a main shareholder of Al Shamal Islamic Bank from 1986 onward and joined the Provisional Board of Directors in 1988.  (Exhibit V at p.14-15).

69. On September 26, 2001, Senator Carl Levin, then-Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee, testified before the US Senate Committee on Banking, Housing, and Urban Affairs.  (Exhibit V at p.14).  He stated that al Shamal Islamic Bank operations continue to finance terror and that as recently as 2004, there were indications that Osama bin Ladin remained the leading shareholder of that bank.[23]  (Exhibit V at p.14).

70. Al Qaeda and the Sudanese government jointly attempted to acquire nuclear materials and develop chemical weapons.  (Kohlmann, 28, p. 284-85; Exhibit V at p. 16-17).

[23] Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee, Testimony Before the US Senate Committee on Banking, Housing, and Urban Affairs on Money Laundering and Terrorism, Hearing on the Administration's, "National Money Laundering Strategy for 2001," September 26, 2001.

The chemical weapons project was carried out at in Hilat Koko in Khartoum, and was

partially overseen by a Sudanese military officer by the name Muqadem Abdul Basit

Hamza.  (Kohlmann, 28, p. 285; Exhibit V at p. 16-17).

71. Al Qaeda also opened and operated a number of purported charities to provide

income for jihad, launder such funds and otherwise operate as front for terrorist

operations.  (Exhibit II; Kohlmann, 28, p. 285-86).  As fronts for Al Qaeda activity,

these charities served as depots for Al Qaeda communications and records and as safe

meeting houses.  (Kohlmann, 28, p. 286).  The charities often had offices in

Khartoum, and were active across East and Central Africa, including Somalia and

Kenya.  (Kohlmann, 28, p. 286).

72. Mercy International was an actual charity organized to provide relief to Muslims in

Pakistan and Afghanistan.  (Exhibit II; Kohlmann, 28, p. 287).  Wadih el-Hage

opened an office of Mercy International in Nairobi Kenya.  (Exhibit II; Kohlmann,

28, p. 287).  Al Qaeda used this office to hide documents, plan operations and hosue

members of the group.  (Kohlmann, 28, p. 287).  Al Qaeda members used Mercy

International ID cards to pose as relief workers.  (Kohlmann, 28, p. 287).

73. Help Africa People did not engage in any actual charity work.  (Exhibit II; Kohlmann,

28, p. 287).  Wadih el-Hage created this "charity" in Nairobi to provide cover for Al

Qaeda operatives and it provided ID cards to Al Qaeda operatives.  (Kohlmann, 28, p.

288).  Aside from el-Hage, Haroun Fazul, Ali Mohammed and Abu Ubaidah al-

Banshiri were also affiliated with Help Africa People.  (Kohlmann, 28, p. 288-89).

These Al Qaeda operatives were given Help Africa People ID cards.  (Kohlmann, 28,

p. 289).  Haroun Fazul played a key role in the 1998 bombings of the U.S. Embassies,

74. The charity ID cards were especially important for Al Qaeda operatives in Kenya because the Kenyan government was not sympathetic to Al Qaeda.  (Kohlmann, 28, p. 293).  Kenyan police were actively looking for Al Qaeda members from early 1995 onward.  (Kohlmann, 28, p. 293).

75. Wadih el-Hage[24], who had U.S. citizenship, emerges as a key Al Qaeda operative in both Khartoum and Nairobi.  (Kohlmann, 28, p. 287-88).  In Khartoum he acted as Bin Laden's personal secretary and played a large role in Al Qaeda's business and financing activity there.  (Kohlmann, 28, p. 287-88).

76. Benevolence International Foundation and the International Islamic Relief Organization were two further charities operated by Al Qaeda, which used them to launder millions of dollars.  (Exhibit II; Kohlmann, 28, p. 289).  Both "charities" maintained offices on the same street as Bin Laden's Wadi al-Aqiq offices in Khartoum.  (Kohlmann, 28, p. 289).

77. The U.S. Department of Treasury later designated Benevolence International Foundation as a financier of terrorism under Executive Order 13224.[25]  (Kohlmann, 28, p. 290).

---

[24] Wadih el-Hage was a defendant in the 2001 criminal trial United States v. Osama Bin Laden in the Southern District of New York.  El-Hage's Help Africa People ID card was admitted as evidence in the criminal trial against him.

[25] http://www.treas.gov/press/releases/po3632.htm

78. Another Al Qaeda charity in Sudan, the Qatar Charitable Foundation under the

leadership of Dr. Abdullah Mohammed Yousef, provided significant funds to the

Eritrean Islamic Jihad Movement.  (Exhibit II; Kohlmann, 28, p. 290).  Dr. Abdullah

Mohammed Yousef was a Sudanese member of Al Qaeda and was affiliated with the

National Islamic Front.  (Kohlmann, 28, p. 290).

79. These "charities" were effective at hiding terrorist fundraising and activity because

the regional governments, even those adverse to Sudan, were reluctant to heavily

regulate humanitarian relief charities.  (Kohlmann, 28, p. 285-86).

80. After the 1998 Embassy bombing in Nairobi, Kenya, the offices of the charities in

Nairobi were raided, which uncovered Al Qaeda records.  (Kohlmann, 28, p. 293).

81. The commercial enterprises served Al Qaeda's ultimate goal of organizing jihad

against the United States and the West.  As Dr. Vidino testified:

> During its time in Sudan, al Qaeda grew into a sophisticated organization.
> Several key figures in the organization portrayed al Qaeda at the time as a
> multinational corporation complete with a finance committee,
> investments, worldwide operations, and well-organized, concealed
> accounts. *These activities were clearly facilitated by the Sudanese
> government. Complacent banks, customs exemptions, tax privileges, and,
> more generally, full support by the Sudanese government, allowed Bin
> Laden's commercial activities to flourish. But money has never been Bin
> Laden's highest aspiration. He used his newfound advantageous position
> to solidify his nascent organization, Al Qaeda.* As Don Petterson, US
> Ambassador to Sudan during the Bin Laden era, explains in his memoir,
> Inside Sudan, "the support [Bin Laden] received from Bashir, Turabi, and
> the Sudanese intelligence services and military was crucial to both his
> business and his terrorist activities." [26] Al Qaeda's commercial activities
> were to be used simply as a tool for the more important goal of building a
> stronger al Qaeda, not to generate profits. If profits were made, they were
> reinvested in the organization.

(Exhibit V at p. 15) (emphasis added).

---

[26] Don Petterson, "Inside Sudan: Political Islam, Conflict, and Catastrophe," Boulder,
CO: Westview, 2003. Page 116.

3.      BIN LADEN AND AL QAEDA SPREAD INTO KENYA, SOMALIA AND
OTHER TARGETS– KHARTOUM THE BASE FOR AL QAEDA
TERRORISM

82. In late 1991 and early 1992, Al Qaeda began investigative missions into Kenya and

Somalia for the purpose of intervening in the U.S. relief mission to Somalia, which

the U.S. government had declared in late 1991.  (Kohlmann, 28, p. 259-60).  Al

Qaeda viewed the relief mission as an extension of the stationing of U.S. troops on

the Arabian Peninsula, to colonize East Africa and eventually invade Sudan and

decided to commit resources to meet this perceived threat.  (Kohlmann, 28, p. 261).

83. The easiest route to Somalia is through Kenya, (Exhibit T), as the Ethiopian

government was hostile to Somalia factions.  (Kohlmann, 28, p. 261).  Kenya shared

a long land border with Somalia, including southern Somalia where the Islamic

groups with the greatest affinity for Al Qaeda resided.  (Kohlmann, 28, p. 262).

84. In 1992, Al Qaeda began carrying out attacks against UN personnel in southern

Somalia.  (Kohlmann, 28, p. 263).  Al Qaeda trained Islamic militants in southern

Somalia.  (Kohlmann, 28, p. 263).  A number of Al Qaeda operatives, from Abul

Hassan al-Misri to Bin Laden, claimed that Al Qaeda fighters attacked U.S. forces,

including playing a role in the October, 1993 Battle of Mogadishu wherein U.S.

Black Hawk helicopters were downed.  (Kohlmann, 28, p. 263).

85. These were the first direct claims of credit for an attack on U.S. forces by Al Qaeda.

(Kohlmann, 28, p. 263).  Al Qaeda had attempted to attack U.S. soldiers in Aden,

Yemen in December, 1992 as they prepared to go to Somalia but the bombs injured a

terrorist and a tourist but did not find the U.S. soldiers.  (Kohlmann, 28, p. 263;

Exhibit V at p. 20).  Former FBI Director Louis Freeh confirmed al Qaeda's role in

27

86. The presence of U.S. soldiers on the Arabian Peninsula and in Somalia spurred Al Qaeda into action and now that Al Qaeda was firmly and safely established in Khartoum, it gained the resources necessary to launch such attacks. (Kohlmann, 28, p. 264).

87. Al Qaeda's public hostility to the United States was communicated in its publications and books. (Kohlmann, 28, p. 264). Bin Laden had communicated his hostility to the presence of U.S. soldiers on the Arabian Peninsula directly in a letter to the Saudi government. (Kohlmann, 28, p. 265).

88. Dr. Vidino testified about the effect of a fatwa on Al Qaeda operatives. "The glue that keeps al Qaeda's operatives together is their religious fanaticism. Fatwas (Islamic religious decrees) issued by al Qaeda's religious committee, bind all its operatives." (Exhibit V at p. 29). Bin Laden's "first fatwa condemning the presence of US troops in the Arabian Peninsula was issued in 1992, when Bin Ladin was in Sudan." (Exhibit V at p. 29). Bin Laden issued fatwas from his guesthouse in Khartoum to members of Al Qaeda that outlined his strategy to "cut the head off the snake", meaning to attack the United States directly. (Kohlmann, 28, p. 265).

89. The Sudanese government had numerous reasons to support Bin Laden's attacks on U.S. interests. Sudan's hosting of several infamous terrorist organizations, in its effort to launch a global Islamic revolution, had brought it into direct conflict with the United States. (Kohlmann, 28, p. 265). The United States supported and continues to

---

[27] Testimony of Louis Freeh, Former Director Federal Bureau of Investigation, Before the National Commission on the Terrorist Attacks Upon the United States, April 13, 2004.

support Egypt, Sudan's avowed enemy at the time, as well as supported a peaceful

resolution between the Israelis and Palestinians and continued to maintain a large

military presence on the Arabian Peninsula, policies that the Sudanese government

opposed.  (Kohlmann, 28, p. 265-66).  Sudan also felt threatened by the U.S. landings

in Somalia, which was a short distance from Sudanese borders.  (Kohlmann, 28, p.

266).

90. Al Qaeda publicized its alleged involvement in attacks on U.S. soldiers, first within

the organization itself and then publicly in Arab press articles.  (Kohlmann, 28, p.

267; Simon, 28, p.339).  A very senior Al Qaeda member, Abu Hafs al-Masri,

traveled from Somalia to Bin Laden's guesthouse in Khartoum to announce the

attacks to Al Qaeda members.  (Kohlmann, 28, p. 267).  Al Qaeda also gave rewards

to its operatives who had participated in the Somali actions.  (Kohlmann, 28, p. 267).

Abu Talha al-Sudani, another high-ranking Al Qaeda member, told Jamal al-Fadl that

he purchased a large residence in Sudan using such reward money.  (Kohlmann, 28,

p. 267).

91. The Sudanese government would have known about such claims, even those made in

Bin Laden's guesthouse in Khartoum, because Sudanese intelligence officers were

assigned to the guesthouse.  (Kohlmann, 28, p. 268).  Additionally, Abu Hafs al-

Masri flew back to Sudan in a Cessna, an event which the Sudanese authorities would

have been aware of.  (Kohlmann, 28, p. 268).  Finally, Al Qaeda was quite proud of

its purported achievements in Somalia, which would have made very useful recruiting

propaganda and proof that Al Qaeda is not just a "phantom threat."  (Kohlmann, 28,

p. 268).

92. Mr. Simon concluded:

> Considering what we know about the range of terrorist activities directed
> by al Qaeda from Khartoum against US interests in the Middle East in the
> early and mid 1990s and about al Qaeda's publicly stated animosity
> toward "the head of snake", bin Laden's term for the United States, it is
> impossible for the Sudanese government to have been unaware of al
> Qaeda's violent intentions toward the United States during this period.
> The Sudanese government's knowledge of bin Laden's hostility toward
> the United States did not cause hesitation in the Sudanese government's
> embrace of bin Laden from 1992-1996, which is reflected by the Sudanese
> government's record on ties to terrorist groups and links to terrorist plots.

(Exhibit W-2 at p. 4).

93. The Sudanese government further was itself involved in terrorism activities, often

alongside Al Qaeda operatives:

- in Eritrea, a Sudanese NIF member laundered Al Qaeda money to send to EJIM in
  Eritrea, (Kohlmann, 28, p. 291);

- in Bosnia-Herzegovina "NIF charities provided hundreds of millions of dollars
  worth of illegal weapons and financing to foreign fighters and to Muslim militants
  fighting in Bosnia-Herzegovina",  (Kohlmann, 28, p. 291);

- the corpse of a suicide bomber who carried out a suicide bombing in 1995 in
  Rijeka, Croatia in retribution for the U.S. capture of a ranking Egyptian jihadi
  revealed a NIF ID card in his name.  (Kohlmann, 28, p. 292);

- a member of the Sudanese "delegation office", a Sudanese intelligence officer
  who was also a NIF member, assisted Al-Fadl[28] in the shipments of a crate of
  weapons from the Al Qaeda terrorist training camp at Soba Farms to Yemen,
  through Port Sudan, abroad an Al Qaeda boat to assist Yemeni Islamist fighters[29],
  (Exhibit V at p. 21-24);

- There is extensive proof of a long term relationship between the Sudanese
  government and Yemeni Islamists in their fight against during the 1990s, (Exhibit
  V at p. 25-29);

---

[28] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg.
336-340, February 6, 2001.
[29] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg.
336-340, February 6, 2001.

- As Dr. Vidino testified, "[t]he Sudanese government and Yemeni Islamists cooperated for several years. Al Qaeda, which was headquartered in Sudan and had a strong foothold in Yemen, often served as the go-between, facilitating the contacts between them."  (Exhibit V at 27).

94. The Sudanese government failed to protect U.S. diplomatic personnel in Khartoum from a series of physical attacks that led to a decision to close the U.S. Embassy and to issue a warning to the 2,100 U.S. citizens residing or traveling to Sudan that their safety could be in danger.  (Exhibit W-2 at p. 4).

95. Sudanese diplomatic personnel were implicated in two terrorism plots on U.S. soil in the early 1990s, resulting in their expulsion and Sudan's listing as a state sponsor of terrorism by the U.S. State Department.[30]  (Simon, 28, p. 341; Exhibit V at p. 30-31; Exhibit W-2 at p. 4).

96. Sudan acted as the base for Al Qaeda terrorism throughout Central and East Africa and Europe:

> Al Qaeda operatives based in Sudan launched aggressive missions into a number of countries, including Morocco, Algeria, Tunisia, Libya, even Uganda, Ethiopia, Yemen, basically all across the region, even as far as Bosnia-Herzegovina, which is all the way across the Mediterranean.

(Kohlmann, 28, p. 291).

97. By 1994, active Al Qaeda cells spread to Somalia, Kenya, Tanzania, Libya, Azerbaijan, Bosnia-Herzegovina, Afghanistan and Pakistan.  (Kohlmann, 28, p. 297).

98. In June 1995, individuals associated with the Egyptian Islamic Jihad movement and al-Gama'a al-Islamiya, an Egyptian Islamic group, attempted to assassinate the Egyptian President, Hosni Mubarak, in Addis Ababa, the capital of Ethiopia. (Kohlmann, 28, p. 297; Exhibit W-2 at p. 3).  Sudanese intelligence officers provided

---

[30] 58 Fed. Reg. 52,523.

key logistical support.  (Kohlmann, 28, p. 297).  Both Egypt and Ethiopia identified

Sudan as a culprit behind the attacks, (Kohlmann, 28, p. 297), and Secretary of State

Madeleine K. Albright presented the UN council with evidence implicating the

Sudan.  (Exhibit W-2 at p. 3).  This resulted in United Nations Security Council

Resolutions 1044 of January 31, 1996, 1054 of April 6, 1996 and 1070 of August 16,

1996 against Sudan.  (Simon, 28, p. 342; Exhibit W-2 at p. 3).

99. Egyptian Islamic Jihad members also staffed a majority of senior Al Qaeda leadership

spots due to their greater experience in terrorist operations at that time.  (Kohlmann,

28, p. 298).  By late 1994, Egyptian Islamic Jihad, which was led by Dr. Zawahiri, is

synonymous with Al Qaeda, so a plot to kill President Mubarak would have been

known by Bid Laden.  (Kohlmann, 28, p. 298).

100.    Al Qaeda had established a cell in Nairobi during its efforts in Somalia against

U.N. and U.S. troops in Somalia.  After the U.S. withdrawal, the Kenya cell began to

look for U.S. targets, under orders from the leadership in Khartoum.  (Kohlmann, 28,

p. 299).  Bin Laden had previously ordered Ali Mohammed to travel to Nairobi to

conduct research on potential targets.  (Exhibit A at p. 19; Kohlmann, 28, p. 299-

300).

101.    In late 1993, Bin Laden ordered Ali Mohammed, a key Al Qaeda operative, to go

to Nairobi—where his actions were supported by the Al Qaeda cell located there—to

survey U.S. targets, including the U.S. Embassy:

> In late 1993, I was asked by bin Laden to conduct surveillance of
> American, British, French, and Israeli targets in Nairobi. Among the
> targets *I did surveillance for was the American embassy in Nairobi,* United
> States AID building in Nairobi, the United States Agricultural Office in
> Nairobi, the French Cultural Center and French embassy in Nairobi. These
> targets were selected to retaliate against the United States for its

> involvement in Somalia. I took pictures, drew diagrams, and wrote a
> report. Khalid al Fawwaz paid for my expenses and the photo enlarging
> equipment. He was in Nairobi at this time.

(Exhibit A at p. 19; Clawson, 26, p. 117-18) (emphasis added).

102.    Ali Mohammed traveled to Khartoum to meet with the Al Qaeda leadership after

he finished his surveillance and showed the pictures to Bin Laden during meetings

with him.  (Kohlmann, 28, p. 301; Exhibit A at p. 29; Clawson, 26, p. 118).  Bin

Laden personally chose the targets while poring over a map with the attack planners.

(Simon, 28, p. 341; Exhibit A at p. 29; Clawson, 26, p. 118).  After this meeting Al

Qaeda devoted more resources to the Kenya cell.  (Kohlmann, 28, p. 301; Exhibit A

at p. 29; Clawson, 26, p. 118).

103.    L'Houssaine Kherchtou, an Al Qaeda member in the 1990s until his decision to

cooperate with the US government, later testified that he encountered Al Qaeda

members a few hundreds yards from the U.S. Embassy in Nairobi as they

photographed the surrounding area.  (Kohlmann, 28, p. 300).

104.    A report produced by the Nairobi cell in August 1997 fell into the hands of the

FBI after its agents raided the Mercy International offices after the Embassy

bombings.  (Exhibit JJ; Kohlmann, 28, p. 302-03).

105.    The report revealed that the Nairobi cell was not an autonomous operation, and

that it was dependant on orders from the senior leadership:

> The work we are doing, the return of the Islamic state is a team effort and
> not an individual one. We are all participating in it. We the East Africa
> crew do not want to know how work plans are operated because we are
> not fit for planning; we are just implementers.

(Exhibit JJ at p.4; Kohlmann, 28, p. 303).

4.    S<small>UDAN</small>'<small>S</small> G<small>OVERNMENT</small> A<small>GENCY</small> S<small>UPPORT FOR</small> A<small>L</small> Q<small>AEDA</small>

106.    Sudan made various state agencies available to Al Qaeda for whatever

requirements it had.  When Al Qaeda relocated to Sudan it needed transport for some

of its weapons and the Sudanese government made available an airliner from Sudan

Airways.  (Kohlmann, 28, p. 270).  Al-Fadl testified that the Sudanese government

cooperated in providing Al-Qaida with the temporary use of a Sudanese Airways jet

in order to illegally transport European and U.S.-built missile launchers from the

battlefield in Afghanistan to Al-Qaida's storage facilities in the Sudan.  He recalled a

specific conversation with senior Al-Qaida leader Abu Fadhl al-Makee: "He tell me

that we have Milan and Stinger, we need to bring it from Pakistan to Sudan… He tell

me they rent one of the Sudan airways plane and it's cargo plane, to help them, and

he tell me we want to take some supplies from Sudan, sugar for Afghani people, and

when the cargo come back, we want to bring our supplies, our weapons."[31]

107.    The airliner transported Al Qaeda Milan anti-tank missiles and stinger missiles

from Afghanistan to Sudan, which are extremely rare and expensive weapons.

(Kohlmann, 28, p. 274-75).

108.    There is at least one recorded instance of Al Qaeda later using these weapons

in operations in East Africa, during a failed attempt to down an Israeli airliner in 2002.

(Kohlmann, 28, p. 275).

109.    Sudan Airways also transported resources and explosives to Ethiopia for an

assassination plot against President Hosni Mubarak, a fierce foe of Egyptian Islamic

revolutionary movements.  (Kohlmann, 28, p. 296).

---

[31] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Page 274.

110.    Sudanese intelligence officers provided hundreds of Sudanese passports to Al

Qaeda, which were very useful for an organization comprised of individuals who

were subject to potential arrest and extradition to their home country were the

individual to submit authentic identification while traveling through East Africa,

Europe and the Middle East.  (Kohlmann, 28, p. 269-70; Exhibit V at p. 8).  As

described by Mr. Simon:

> This was vital for al Qaeda members many of whom would be subject to
> arrest and detention in their home countries.  The use of Yemeni or Saudi
> passports while traveling between Kenya and Sudan, or Sudan and Egypt,
> while preparing for carry out terrorist attacks risked attracting the attention
> of the border control and security services.  Access to legitimate passports
> is essential for a terrorist organization, whose members need to avoid
> detection while traveling for operational purposes.

(Exhibit W-2 at p. 3-4).  Some Al Qaeda members were also given Sudanese

citizenship.  (Exhibit V at p. 8).

111.    According to al-Fadl 2001 tesimony, the Sudanese government also provided Al-

Qaida with "a couple hundred… real passports… and Sudanese citizenships" in order

to provide members of Al-Qaida a means to travel outside of the Sudan.  Al-Fadl

confirmed that those individuals from Al-Qaida who had received the passports and

citizenship papers were not actually citizens of the Sudan.[32]

112.    The Sudanese intelligence had a delegation office for use by Al Qaeda, which

provided services to Bin Laden and Al Qaeda.  (Kohlmann, 28, p. 271; Exhibit V at p.

19).  As described by Mr. Simon:

> The Sudanese intelligence service coordinated with al Qaeda operatives to
> vet the large numbers of Islamic militants entering the country to ensure

---

[32] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 13, 2001.  Pages 441-
442.

that they were not seeking to infiltrate bin Laden's organization on behalf
of a foreign intelligence service.

(Exhibit W-2 at p. 4).  The Sudanese intelligence service viewed Al Qaeda as a proxy
in the way that Iran viewed Hezbollah as a proxy, meaning that "by sharing resources,
information, and by assisting Al Qaeda, the Sudanese could Al Qaeda to attack their
mutual enemies."  (Kohlmann, 28, p. 268-69).

113.    During testimony during the criminal trial against Bin Laden on February 6, 2001,
upon being directly asked by prosecutors, al-Fadl expanded into much greater detail
regarding "the relationship between the intelligence service in the Sudan and al Qaeda
after al Qaeda relocated to the Sudan."  Al-Fadl described a meeting that took place in
Peshawar, Pakistan "when few members from Islamic National Front came to
Peshawar to meet Bin Laden and al Qaeda members… At that meeting three guys,
they came over there and they talk about if the al Qaeda members come over there we
help them, and also they make agreement with the group."[33]

114.    Al-Fadl's initial impressions were confirmed after he arrived in the Sudan and
allegedly acquired a copy of an official private letter written by the President of the
Sudan Omar Hassan Ahmad al-Bashir regarding the ongoing relationship with Al-
Qaida.[34]

115.    Bashir's letter invitation to Bin Laden also acted as a free pass through Sudanese
immigration and customs controls and with Sudanese local police, which gave Al

---

[33] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 232-
236.

[34] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 232-
236.

Qaeda operatives a quasi-diplomatic immunity.  (Kohlmann, 28, p. 243; Exhibit V at p. 9-10).

116.    According to al-Fadl, the letter was given to him by Abu Hassan al-Sudani, another Al-Qaida member in charge of Taba Investments, a Bin Laden commercial enterprise based in the Sudan which helped served as a cover for Al-Qaida's international terrorist operations.  He explained that the purpose of the letter was to publicly verify Al-Qaida's extra-judicial status in the Sudan: "Like when we go to Port of Sudan and we bring some stuff that comes -- when we have some guys from outside Sudan to go inside Sudan, that letter, we don't have to pay tax or custom,  or sometime the Customs, you don't have to open our containers… Also when we go from Port Sudan to Khartoum, it's a lot of local checking for the Custom and police. Every time I show them the letter and they say okay, no problem."[35]

117.    Al-Fadl also indicated that his dealings with the Sudanese intelligence service were directly approved by Usama Bin Laden himself: "Yes… He approve… He tell me that… He tell me if you work with the delegation office… because he tell me a lot of people… try to get information to other country and we want to make sure, we don't want any problem, we don't want anybody come, and he work for other country… He say that the Sudanese government and the Islamic National Front, they open the door for all the groups come to Sudan, and some group, we don't know, and we afraid somebody come besides those groups and he take information about going on in the work in Sudan and he give it to other country."

---

[35] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 237-239.

118.    On the witness stand, al-Fadl testified that Bin Laden instructed him to assist the

Sudanese intelligence service in weeding out potential spies and informants: "If

intelligence office they find somebody they don't know, he was in Afghanistan but

they don't know him very well, they ask me if I know him, if I saw him over there,

and sometimes we make interview for him, we ask him about jihad, about fatwah,

when he in began which group he work, if inside work over there, which company he

train.  After that, I make report and I put my analysis, if what he said is correct or

wrong, and if I say this guy problem guy…  I worked for them as -- anytime they ask

me to.  If they call me, I go to the office and whatever they ask me, I try, I put time

and I finish the work and I go back to work for other thing in the [Al-Qaida] group."[36]

119.    When an Al Qaeda member or operative arrived in Khartoum airport, Sudanese

intelligence would greet them and escort them around customs and immigration so

their bags were not searched and their passports were not stamped.  (Kohlmann, 28, p.

271).  A passport stamp from Sudanese customs was important to avoid for an Al

Qaeda operative because Khartoum had a reputation for being "a center for intrigue,

espionage and terrorist activity" and those with such passport stamps could come

under suspicion of being involved in international terrorism.  (Kohlmann, 28, p. 271).

120.    This was important because a number of different countries were interested in

locating these operatives, especially Egypt, which was actively searching for

Egyptian militants in Al Qaeda that were plotting against the Egyptian government.

(Kohlmann, 28, p. 272; Simon, 28, p.337).  The Egyptian intelligence attempted to

---

[36] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 232-
236.

assassinate Dr. Zawahiri in Khartoum with explosives but he was saved by Sudanese intelligence officers.  (Kohlmann, 28, p. 272-73).  The Egyptian intelligence was also feared for its interrogation methods.  (Kohlmann, 28, p. 272).

121.    The Sudanese intelligence service facilitated the transport of Al Qaeda operatives and funds from Sudan to the Nairobi cell.  (Kohlmann, 28, p. 294).  On at least one occasion, L'Houssaine Kherchtou, smuggled $10,000 from Sudan to Kenya, in violation of Kenyan customs regulations.  (Kohlmann, 28, p. 294).  A Sudanese intelligence officer enabled the smuggling operation.  (Kohlmann, 28, p. 294).

122.    In court, on February 21, 2001 during the 2001 criminal trial against Bin Laden, L'Houssaine  Kherchtou admitted serving on several occasions as an Al-Qaida courier, bringing cash from Al-Qaida's base in the Sudan to Al-Qaida terrorist cells operating in Nairobi, Kenya: "From Sudan I brought some money to Kenya, yes… I remember twice… It was $10,000 once… They gave it to me from the guest house in Khartoum… Al Qaeda guest house."[37]  He also acknowledged that this sum exceeded the normal legal limit for travelers leaving Sudan, explaining, "It was with the help of one of the Sudanese securities… You go and he take your passport and your tickets and your bag, and he do all check in, and he don't check your bag and stuff and he just, he do everything, all check in with for you, and he just give you the ticket and your passport, and you go in on the airplane."[38]

---

[37] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 21, 2001.  Pages 1183-1185.

[38] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 21, 2001.  Pages 1183-1185.

123.    Under cross-examination, Kherchtou agreed with the premise that there were

"Sudanese intelligence officers that regularly worked between Bin Laden and the

government of the Sudan like a liaison."  He offered to provide "the names of the guy

who was taking me myself to the airport sometimes… Abdul Hallek… Sometimes

you can travel by yourself if you don't have anything, carrying money or something,

you can travel by yourself to the airport and you do the whole check-out and you

go… Sudanese, their role is to take you from your guesthouse in the morning to the

airport and just to make sure you cross the immigration in the airport."[39]

124.    The Sudanese intelligence officers provided security for Al Qaeda, which saved

Dr. Zawahiri's life and Bin Laden's as well.  (Kohlmann, 28, p. 273).  The Sudanese

intelligence officers protected Bin Laden from an assassination attempt in Khartoum

in 1994.  (Kohlmann, 28, p. 273-74).

125.    Sudanese intelligence officers provided Al Qaeda with weapons and explosives.

(Kohlmann, 28, p. 270).

126.    Sudanese intelligence officers rescued Al Qaeda operatives, including Saif al-

Adel, arrested by local Sudanese police who had been detained after detonating

explosives near Port Sudan.  (Kohlmann, 28, p. 270).

127.    During the criminal trial against Bin Laden, Al-Fadl admitted that he was nearly

once arrested in 1991 by unwitting Sudanese police officers who were drawn to one

of the farms by reports of suspicious explosions:

I remember the Egyptian Jihad Group, they got training inside the farm,
and the explosive make noise, and the residential not far from the farm,

---

[39] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District
Court, Southern District of New York.  Trial Transcript, February 26, 2001.  Pages 1363-
1365.

they complain about that and they go to the local police and tell them it's a big noise come from the farm, and the police come to the farm, but we call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that.[40]

128.　The Sudanese military also offered assistance to Al Qaeda in return for Al Qaeda's support for the Popular Defense Force ("PDF"), which was the Sudanese militia fighting the war in southern Sudan.  (Kohlmann, 28, p. 295).  Muqadem Abdul Basit Hamza, a high ranking Sudanese military officer, was a key conduit between the Sudanese military and was a key figure in their joint effort to obtain chemical weapons.  (Kohlmann, 28, p. 295).

129.　The Sudanese military also provided security for Bin Laden in his compound in Khartoum.  During *United States v. Usama Bin Laden*, (2001), the U.S. Attorney's Office for the Southern District of New York (SDNY) called Essam al-Ridi to testify as a cooperating witness.  Among the topics he discussed at length during his sworn testimony was his personal, unique knowledge of Usama Bin Laden's purchase of a private jet for his use in the Sudan and his use of Sudanese soldiers as guards.

130.　On Feb. 14, 2001, Essam al-Ridi, an al Qaeda member and pilot, testified as to his knowledge of material support provided by Sudan, with the use of Sudanese soldiers acting as personal guards of bin Laden while staying at a residence in Khartoum.

131.　Under direct examination, Essam al-Ridi was asked if he was aware what Bin Laden intended to do with the aircraft.  Al-Ridi responded:

They have some goods of their own they want to ship from Peshawar to Khartoum… Again, I'm referring to Wadih [El Hage] and Usama [Bin Laden]… Stinger missiles…   I said it's possible as long as we have

---

[40] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  Pages 222-223.

arrangements from the departing country to the arriving country…   I meant the legality, because it's clearly air policy…   We have to have a legal permit to depart Peshawar with that equipment on board, and the legal permit to land in Khartoum, which is not a problem because they could ally people in Peshawar and also in Khartoum.   However, the problem with allies, once we have to divert or land for any fuel or any emergency in the countries in between, then it will be definitely exposed and then it will be absolutely a chaos.[41]

132.    Upon reaching Khartoum with the jet, Al-Ridi also recalled being summoned to

an audience with Usama Bin Laden: "It must have been the same day, at night, we

were offered dinners on his behalf… at his guest house."  Al-Ridi testified that

several individuals seated with Bin Laden at that dinner were wearing "military

uniforms and of course from their complexions they are Sudanese."[42]

133.    Additionally, in a private deposition conducted by Plaintiffs attorneys, al-Ridi

gave more specific details concerning the Sudanese military acting as personal guards

for Osama bin Laden at a guesthouse in Khartoum, Sudan in the early to mid 1990s.

(Exhibit H).

134.    The Sudanese government resisted foreign pressure to turn over Bin Laden.  The

1996 withdrawal of U.S. embassy personnel from Khartoum resulted in a meeting

between Sudanese vice president, Ali Osman Mohammed Taha, and U.S.

Ambassador Tim Carney.  (Exhibit W-2 at p. 4-5).  The ensuing dialogue between the

two governments led to a Sudanese request for U.S. demands for normalization of

relations, the U.S. submission of a list of demands that included the expulsion of Bin

---

[41] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 14, 2001.  Pages 562-563.

[42] *United States v. Usama bin Laden*, S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 14, 2001.  Pages 567-570.

Laden and access to Al Qaeda training camps.  (Exhibit W-2 at p. 5).  The Sudanese

responses were insufficient and "blatantly insincere", it became apparent that, "[t]he

negotiation was a charade."  (Exhibit W-2 at p. 5).

135.    After Bin Laden's later expulsion from the Sudan, senior level Al Qaeda members

continued to visit Khartoum, even months after the 1998 Embassy bombings.

(Exhibit W-2 at p. 5).

136.    Mr. Kohlmann testified to a reasonable degree of certainty that Sudanese

government support was critical to the success of the 1998 Embassy bombings:

> The presence, the safe haven that Al Qaeda had in the Sudan was
> absolutely integral for its capability of launching operations not just in
> Kenya, but in Somalia, in Eritrea, in Libya. Without this base of
> operations, none of this would have happened.

(Kohlmann, 28, p. 316-19).  Mr. Kohlmann testified to a reasonable degree of certainty

that without the support of Sudanese intelligence, the safe haven provided by the

Sudanese government to base Al Qaeda's leadership and train its operative and varied

types of support from the provision of passports to allowing Al Qaeda to open businesses

and charities, Al Qaeda would not have been able to build its terrorist cells in Kenya,

Somalia or Tanzania.  (Kohlmann, 28, p. 316-19).

137.    Dr. Vidino testified that the twin 1998 Embassy attacks were part of a decade

long plan conceived by Bin Laden to attack US interests in the Middle East, for which

Bin laden had created a worldwide terrorist organization known as Al Qaeda.

(Exhibit V at p. 34).  Al Qaeda could not have launched these attacks without the long

[43] (Exhibit V at p. 34-35).

138.    Mr. Simon testified that:

> The Republic of Sudan supplied al Qaeda with important resources and support during the 1990s knowing that al Qaeda intended to attack the citizens, or interests of the United States.  This support encompassed the safe haven of the entire country for bin Laden and the top al Qaeda leadership. This enabled bin Laden and his followers to plot against the US and build their organization free from US interference.  Sudanese shelter enabled Bin Laden to create training camps, invest in – and use – banking facilities, create business firms to provide cover for operatives, generate funds for an array of terrorist groups, provide official documents to facilitate clandestine travel, and enjoy the protection of Sudan's security service against infiltration, surveillance and sabotage.

(Exhibit W-2 at p. 6).  Mr. Simon offered an expert opinion, to a reasonable degree of

certainty, that "it's difficult to see how" the 1998 Embassy "attacks could have been

carried out with equal success" . . . "in the absence of the safe haven provided by Sudan

to Al Qaeda", as well as "active support and freedom of action that Bin Laden enjoyed in

Sudan . . . ."  (Simon, 28, p. 344).

###    C.    THE AUGUST 7, 1998 EMBASSY BOMBINGS

139.    Bin Laden's expulsion from Sudan accelerated the timing of the plot because he

could not execute the plot without fearing immediate retribution reaching him and the

principal leadership of Al Qaeda in Khartoum, which was close to Kenya.

(Kohlmann, 28, p. 310-11).

---

[43]  As Dr. Vidino testified, "[e]arly during its stay in Sudan, al Qaeda publicized its intent to attack American interests. This was demonstrated by several fatwas and by attacks on US contractors in Riyadh, Saudi Arabia, an attempted attack on US soldiers in Aden, Yemen, as they were en route to Somalia to carry out Operation Restore Hope, and al Qaeda's infamous campaign against the US forces in Somalia during the Operation Restore Hope."  (Exhibit V at p. 34).

140.    The United States Embassy at Dar es Salaam was situated on the North side of

that city, in a residential neighborhood of large homes, surrounded by other

diplomatic missions and within yards of the point where a small tributary flowed into

an inlet of the Indian Ocean. Although the adjacent street had only moderate amounts

of traffic, there was no restriction of access to the United States Embassy by vehicular

or pedestrian traffic.

141.    Both embassies could be easily and clearly observed from nearby streets open to

the public. At both embassies a small detachment of Marines was assigned for guard

duties, however, at both, the security duties at the point of entry of the persons

carrying out the assault were handled by persons from the local population employed

through contracts with private security companies.

142.    On August 7, 1998, at each location the contract guards alertly determined that

the truck utilized by Al Qaeda to carry the explosives should not be allowed to

penetrate the building basement garage and acted heroically to stop each vehicle,

saving a number of lives, unfortunately at the cost of their own. Although the

explosion at each location badly damaged the embassy building, neither embassy

suffered structural collapse.

143.    In September, 2006, the Al Qaeda media wing As-Sahab released a two part

documentary entitled "Knowledges for Acting Upon" meant to document the history

of the organization from the period prior to the 9/11 attacks through the attacks.

(Exhibits LL, MM, NN, OO; Kohlmann, 28, p. 311-12).

144.    In Part 1 of this video, Dr. Zawahiri and Bin Laden take credit for the bombing of

the U.S. Embassies in 1998.  (Exhibit LL, NN; Kohlmann, 28, p. 313).  Nairobi was

145.  In Part 2 of this video, Bin Laden discusses the actions of the Nairobi cell as they

assembled the bomb:  "Your brother in Nairobi spent nine months in an apartment

while their brothers smuggled them the TNT and they pounded it."  (Exhibit MM, OO

at p.8; Kohlmann, 28, p. 316).

146.  Bin Laden and Al Qaeda plotted the bombings with the 1983 Beirut, Lebanon

Marine barracks bombing, which had caused the withdrawal of U.S. forces from

Lebanon, in mind.  (Kohlmann, 28, p. 314).  Hezbollah terrorists sponsored by Iran

blew the Marine barracks in 1983.[44]  (Kohlmann, 28, p. 314).  Al Qaeda wished to

cause the United States to withdraw from East Africa.


IV.  **CONCLUSIONS OF LAW**

**A.  THE COURT MAY ASSERT JURISDICTION OVER THIS CASE**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*,

provides the exclusive basis for subject matter jurisdiction over civil actions against

foreign state defendants. 28 U.S.C. §§ 1330, 1602-1611.  A federal district court may

obtain jurisdiction over a foreign sovereign where one of the FSIA's enumerated

exceptions applies.

---

[44] *See generally, Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003)
(finding Iran and its Ministry of Information and Security were jointly and severally
liable for the 241 deceased servicemen and injured survivors of the October 23, 1983
suicide bombing attack carried out by Hezbollah of a Marine barracks in Beirut,
Lebanon).

The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7), among other revisions.

The Court may assert personal jurisdiction over the Defendants as a result of the completion of service.  Proper service under the FSIA allows the Court to assert personal jurisdiction over a foreign sovereign or its instrumentalities, provided subject matter jurisdiction can be established.  28 U.S.C. § 1330(b); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987) ("The FSIA authorizes the exercise of personal jurisdiction whenever subject matter jurisdiction exists under § 1330(a) and service of process has been made according to § 1608.  28 U.S.C. § 1330(b).").

Significantly, the enactment of § 1605A (1) broadened the jurisdiction of federal courts to include claims by members of the U.S. armed forces and employees and/or contractors of the U.S. government; and (2) created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for acts committed by the State and its agents.  Despite the significant changes in the scope of allowable plaintiffs under the new law, the requirements for the Court to assert its subject matter jurisdiction[45] over this case has not changed from those cases brought under 28

---

[45] The substitution of 28 U.S.C § 1605A for 28 U.S.C. § 1605(a)(7) does not change the Court's test for subject matter jurisdiction, which is clear upon a comparison of the two statutory provisions.  Subsection (a)(1) states that "a foreign state shall not be immune from suits in which money damages are sought against the foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency."  Aside from the expansion of the class of potential claimants,

U.S.C § 1605(a)(7).  The requirements for subject matter jurisdiction under 28 U.S.C. §

1605A allow Plaintiffs to seek money damages for personal injury or death if the

damages were caused by:

1.   the provision of "material support or resources", as defined by 18 U.S.C. §

     2339A(b)[46], for hostage taking, torture, and an extrajudicial killing, as defined

     by 28 U.S.C. § 1350 note;

2.   if the provision of material support was engaged in by an official while acting

     within the scope of his office;

3.   the defendant was a "state-sponsor of terrorism" at the time the act

     complained of occurred; and

4.   the claimant or the victim was a "U.S. national" or "an employee of the

     Government of the United States, or of an individual performing a contract

     awarded by the United States Government" at the time of the act of terrorism.

28 U.S.C. § 1605A(a)(1), (a)(2).  As set forth below, Plaintiffs have satisfied each of the

requirements for the establishment of subject matter jurisdiction.  Plaintiffs' injuries were

caused by Defendants acts of "extrajudicial killing" and provision of "material support"

to their agents.  Defendants were designated as state sponsors of terrorism at the time of

the filing of these actions.  Finally, all Plaintiffs were either themselves U.S. Government

employees or contractors at the time of the attacks or their claims are derived from claims

---

this language matches the language from 28 U.S.C. § 1605(a)(7), the former section that
established the Court's subject matter jurisdiction in this case.

[46] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given
that term in section 2339A of title 18."

where the victims were U.S. Government employees at the time of the attack as required by § 1605A(a)(2)(A)(ii).

Proof of the first two elements is inextricably intertwined with the requirements of proof for Plaintiffs' causes of action.  Plaintiffs proved at the hearing beyond their burden under 28 U.S.C. § 1608(e) that the governments of Sudan and Iran provided material support and resources to Bin Laden and Al Qaeda for acts of terrorism, including extrajudicial killings.  18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

Defendants provided several different kinds of material support to Al Qaeda without which it could not have carried out the 1998 suicide bombings.  Sudan provided safe haven for Bin Laden and Al Qaeda and its training, organizational and logistical hub from 1991 to 1996 at least.  When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks -- as the complaint unambiguously alleges -- Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

*Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006).  The Sudanese government also provided passports, which qualify as "false documentation or identification" under 18 U.S.C. § 2339A(b).  The evidence submitted also proves that the

Iranian government both trained Al Qaeda members and authorized the provision of training by Hezbollah in explosives, specifically in how to destroy large buildings.  This training qualifies as "training, expert advice or assistance" under 18 U.S.C. § 2339A(b).

The statute also requires that the extrajudicial killings be "caused by" the provision of material support, which introduces the concept of causation in order to appropriately restrict civil liability.  Plaintiffs are only required to meet a proximate cause standard to satisfy the "caused by" requirement imposed by 28 U.S.C. § 1605A(a)(1). *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (weighing the import of the phrase "caused by" from 28 U.S.C. § 1605(a)(7), the predecessor statute to 28 U.S.C. § 1605A) *citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536-38, (1995).  Proximate causation may be established by a showing of a "reasonable connection" between the material support provided and the ultimate act of terrorism.  *Valore*, 700 F. Supp. 2d at 66.  "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'"  *Id. quoting Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) (construing causation element in 28 U.S.C. § 1605A by reference to cases decided under 28 U.S.C. § 1605(a)(7)) *quoting Kilburn*, 376 F.3d at 1128.  Plaintiffs have demonstrated several reasonable connections between the material support provided by Defendants and the two embassy bombings.  Sudan provided the safe harbor necessary to allow the fledging entity to train and organize its members for acts of terrorism on an ever increasing scale of murderousness from 1992 to 1996.  Sudan facilitated its safe harbor through the

constant vigilance by its security services and the provision of documentation required to shelter Al Qaeda from foreign intelligence services and competing terrorist groups. Iran's support was specifically required for the successful execution of Al Qaeda's plot to bomb the two embassies.  Thus the first and second elements to allow the Court to assert subject matter jurisdiction are satisfied.

The third element is whether the defendant foreign sovereign was a "state-sponsor of terrorism" at the time the act complained of occurred.  28 U.S.C. § 1605A(a)(2)(A)(i)(I).  The term "state-sponsor of terrorism" is defined by the statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

Iran and Sudan were designated by the U.S. Department of State as state sponsors of terrorism on January 19, 1984 and August 12, 1993, respectively. U.S. Department of State, State Sponsors of Terrorism List.[47]

Sudan was originally designated a state sponsor of terrorism in 1993.  58 Fed. Reg. 52,523 (Oct. 8, 1993).   Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act ("EAA").  50 App. U.S.C. § 2405(j)(4).  The Sudan has never been taken off of the list of state sponsors of terrorism, pursuant to the EAA.

---

[47] Available at http://www.state.gov/s/ct/c14151.htm (last retrieved December 6, 2010).

Iran was formally declared a "state sponsor of terrorism" by U.S. Secretary of State George P. Schultz in accordance with section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j), 49 Fed. Reg. 2836 (Jan. 23, 1984) (statement of Secretary of State George P. Schultz), and continues to this day be designated as a state sponsor of terrorism.

The fourth element required is imposed by 28 U.S.C. § 1605A(a)(2)(A)(ii), which allows only certain plaintiffs to bring claims under the FSIA.  The "victim or claimant" must be a U.S. national or "an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government" at the time of the act of terrorism.  28 U.S.C. § 1605A(a)(2)(A)(ii).  28 U.S.C. § 1605A(h)(5) defines a U.S. national as it is defined in 8 U.S.C. § 1101(a)(22) as "a citizen of the United States."  In this case, some victims were citizens of the United States, but most victims were "an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government".

Tobias Otieno worked for the United States Department of Commerce at the U.S. Embassy in Nairobi, Kenya on August 7, 1998.  (Otieno, 26, p. 206).  He testified that he knew a number of Kenyan co-workers at the Embassy and they were employed either directly by a U.S. government agency, as he was, or indirectly through a private organization that held a U.S. government contract.  (Otieno, 26, p. 207).  George Mimba further testified by sworn affidavit that he was an employee of the United States Embassy in Nairobi, Kenya at the time of the bombing, as well as the President of the Foreign Service Nationals Employee Association, which was comprised of all non-U.S. nationals employed at the U.S. Mission in Nairobi.  (Exhibit PP at p.1).  He also testified that all

non-U.S. nationals were employed either directly by a U.S. government agency, as he

was, or indirectly through a private organization that held a U.S. government contract.

(Exhibit PP at p.1).

Plaintiffs will be forced to produce individualized evidence of their employment

status during the damages proceedings to prove they meet the standing requirements of

the statute.

### B.    28 U.S.C. § 1605A(c) PROVIDES A FEDERAL CAUSE OF ACTION TO DETERMINE SUDAN AND IRAN'S LIABILITY FOR THE WRONGFUL DEATHS AND PERSONAL INJURIES SUFFERED BY PLAINTIFFS

Once the immunity of a foreign state has been lifted and the Court asserts subject

matter jurisdiction, 28 U.S.C. § 1606 defines the sources of law that may be applied

against a foreign sovereign.

> Once a foreign state's immunity has been lifted under Section 1605 and
> jurisdiction is found to be proper, Section 1606 provides that "the foreign
> state shall be liable in the same manner and to the same extent as a private
> individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts
> as a "pass-through" to substantive causes of action against private
> individuals that may exist in federal, state or international law.

*Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 265-266 (D.D.C. 2006) *quoting*

*Dammarell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C.

Mar. 29, 2005).  In this case, a federal cause of action exists, along with state law causes

of action where they would not lead to an impermissable duplicative recovery.

Recent amendments to the FSIA expanded the legal mechanisms for combating

state-sponsors of terrorism.  These amendments create a new private right of action under

federal law at 28 U.S.C. § 1605A(c)[48] that operates against any foreign state that is or

was a state sponsor of terrorism as described in subsection 28 U.S.C. § 1605A(a)(2)(A)(i)

and any official, employee or agent of that foreign state while acting within the scope of

his or her office, employment or agency.  The wording of this provision[49] matches the

wording of the Flatow Amendment[50], except that 28 U.S.C. § 1605A(c) explicitly

provides a cause of action directly against the foreign state itself.

_____

[48] 28 U.S.C. § 1605A(c) is the effective recodification of the prior understanding of the
Flatow Amendment that existed prior to the *Cicippio-Puleo* decision. Thus, the language
of the new federal private right of action nearly matches the language of the Flatow
Amendment.

[49] P.L. 110-181: Private Right of Action.--A foreign state that is or was a state sponsor of
terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of
that foreign state while acting within the scope of his or her office, employment, or
agency, shall be liable to--
  "(1) a national of the United States,
  "(2) a member of the armed forces,
  "(3) an employee of the Government of the United States, or of an individual
performing a contract awarded by the United States Government, acting within the scope
of the employee's employment, or
  "(4) the legal representative of a person described in paragraph (1), (2), or (3), for
personal injury or death caused by acts described in subsection (a)(1) of that foreign state,
or of an official, employee, or agent of that foreign state, for which the courts of the
United States may maintain jurisdiction under this section for money damages. In any
such action, damages may include economic damages, solatium, pain and suffering, and
punitive damages. In any such action, a foreign state shall be vicariously liable for the
acts of its officials, employees, or agents.

[50] P.L. number 104-208:  Liability of agents of state sponsors of terrorism to U.S.
nationals. Act Sept. 30, 1996, P.L. 104-208, Div A, Title I, § 101(c) [Title V, § 589], 110
Stat. 3009-172, provides:
  "(a) An official, employee, or agent of a foreign state designated as a state sponsor of
terrorism designated under section 6(j) of the Export Administration Act of 1979 [50
USCS Appx § 2405(j)] while acting within the scope of his or her office, employment, or
agency shall be liable to a United States national or the national's legal representative for
personal injury or death caused by acts of that official, employee, or agent for which the
courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28,
United States Code, for money damages which may include economic damages,
solatium, pain, and suffering, and punitive damages if the acts were among those

Claims may be brought under 28 U.S.C. § 1605A(c) for "personal injury or death caused by" the acts of terrorism as described in 28 U.S.C. § 1605A(a)(1), such as when the "official, employee or agent of that foreign state" engages in the "provision of material resources or support" for "extrajudicial killing" "while acting within the scope of his or her office, employment, or agency."  For these acts by a foreign state's officials, employees or agents the "foreign state shall be vicariously liable for the acts of its officials, employees or agents . . . ."  28 U.S.C. § 1605A(c).

In this case, Plaintiffs proved that Sudan and Iran provided material support, as defined by 18 U.S.C. 2339A[51], to Al Qaeda, for the purpose of extra-judicial killings, which resulted in the hundreds of wrongful deaths and thousands of personal injuries suffered at the two U.S. Embassy bombings in 1998.  There is no question that Al Qaeda carried out the two bombing attacks.  Bin Laden himself admitted as much during an Al Qaeda documentary history released by the Al Qaeda media wing.  (Exhibit LL, NN; Kohlmann, 28, p. 313; Exhibit MM, OO at p. 8; Kohlmann, 28, p. 316).  The FSIA defines extra-judicial killings by borrowing[52] from the Torture Victim Protection Act of 1991:

---

described in section 1605(a)(7).

  "(b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. § 1605(f) and (g) shall also apply to actions brought under this section. No action shall be maintained under this action if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.".

[51] For discussion of various forms of material support rendered by Defendants, *see infra* at p. 67, 81-86.

[52] 28 U.S.C. § 1605A(h)(7).

> (a) Extrajudicial killing. For the purposes of this Act, the term
> 'extrajudicial killing' means a deliberate killing not authorized by a
> previous judgment pronounced by a regularly constituted court affording
> all the judicial guarantees which are recognized as indispensable by
> civilized peoples. Such term, however, does not include any such killing
> that, under international law, is lawfully carried out under the authority of
> a foreign nation.

28 U.S.C. § 1350 note, Pub. L. No. 102-256, § 3(b), 106 Stat. 73, 73 (1992).  The mass

suicide bombings of the two embassies were unauthorized and deliberate acts of wanton,

mass murder, which is illegal under any conceivable body of law.  *See e.g.*, *Valore v.*

*Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) (finding the suicide

bombing performed by the Iranian government and Hezbollah of the Marine Barracks in

Beirut, Lebanon in 1983 to be an extra-judicial killing); *Dammarell v. Islamic Republic*

*of Iran*, 281 F. Supp. 2d 105, 192 (D.D.C. 2003) ("The deadly bombing was 'clearly

contrary to the precepts of humanity as recognized in both national and international

law,', and constitutes an act of 'extrajudicial killing,' within the meaning of 28 U.S.C. §§

1605(a)(7)and 1605(e)(1), and the Torture Victim Protection Act of 1991.") *quoting*

*Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 107 (D.D.C. 2000).  The wrongful

deaths and personal injuries suffered by Plaintiffs arise from extrajudicial killings for

which the Defendants provided material support.

     The extrajudicial killings were "caused by" the Defendants' provision of material

support.  28 U.S.C. § 1605A(c) allows plaintiffs to sue "for personal injury or death

caused by acts described in subsection (a)(1)", which is the same causation standard as

required by the subject matter jurisdiction portion of the statute.  Thus, "liability under

section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A

are met."  *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d

441, 460 (D.P.R. 2010) *citing Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (explaining that the elements of immunity and liability are "essentially the same [under the new amendments] in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action" under § 1605A(c)).  As discussed earlier, Plaintiffs have demonstrated a "reasonable connection" between the Defendants' provision of material support and the bombings.

Plaintiffs also proved that Sudanese and Iranian provision of material support and resources to Al Qaeda was conducted by as part and parcel of government policy, thus the actions of the Sudanese and Iranian government officials who provided the support were within the scope of their employment.  The most powerful officials in Sudan explicitly invited Al Qaeda to relocate from war torn Afghanistan to Sudan and the coordination between the IRGC, Hezbollah and Al Qaeda for spectacular actions against the United States and its allies required authorization by the top leadership of Iran.

In a material support case a court must "determine whether a defendant country has provided material support to terrorism, courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act."  *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 68 (D.D.C. 2008) *citing Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008).  Plaintiffs are not required to prove that the Defendants provided the material support for the specific purpose of assisting the particular terrorist attacks at issue.  *E.g.*, *Valore*, 700 F. Supp. 2d at 74.  "[T]his Court has found that 'a plaintiff need not establish that the material support or resources provided by a foreign

state for a terrorist act contributed directly to the act from which his claim arises.'" *Id.*
*citing to* Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 19 (D.D.C. 1998).

      While the evidence does not prove that the Sudanese leadership and the Iranian
leadership knew that Al Qaeda would bomb the U.S. Embassies, the evidence does prove
that material assistance was rendered because Al Qaeda was a violent jihadist
organization that had targeted U.S. interests for terrorist attacks and would continue to do
so.  Sudan provided material support to Al Qaeda for the principal reason that Al Qaeda
shared the same political and ideological goals as the leadership of Sudan; Al Qaeda
would not have been invited to Khartoum otherwise.  And while Al Qaeda's relationship
with Iran was more complicated, Iran shared its technical expertise and authorized the
links between Hezbollah and Al Qaeda because it shared the same political goals as Al
Qaeda, to destabilize the policies of the United States and its allies through terrorist
attacks.  Iran and Hezbollah would not have taught Al Qaeda operatives how to destroy
buildings otherwise.  Not only did Defendants know that Al Qaeda would take their
support and pound it into swords to wield against the United States, but the foreign policy
of Defendants desired and intended such an outcome.

      Sudan provided critical material support or resources to Bin Laden and Al Qaeda
by providing:

- safe haven for Al Qaeda's training, organizational and logistical hub inside
  Sudan, which allowed Al Qaeda to subsequently build its network in Somalia and
  Kenya;

- license to open businesses and charities that provided cover for Al Qaeda
  operatives in their travels across Africa, Europe and the Middle East;

- safe haven for Al Qaeda operatives who carried out terrorist attacks on targets in Yemen, Somalia, Ethiopia and eventually Kenya and Tanzania;

- Sudanese intelligence officers to facilitate the transport of Al Qaeda operatives into Sudan, which assisted in the buildup of the base and springboard in Khartoum for the attacks in Kenya and Tanzania;

- Sudanese intelligence officers to facilitate the transport of Al Qaeda operatives, weapons and cash to the Nairobi, Kenya cell, which caused the Nairobi attack;

- Sudanese intelligence officers and the military to protect Bin Laden and Al Qaeda, even obstructing two assassination attempts on Bin Laden and Dr. Zawahiri, which would have disrupted the Kenya and Tanzania bombings;

- hundreds of Sudanese passports, which allowed Al Qaeda operatives to travel under false identities;

- contacts and alliances with powerful networks of terrorists, such as Hezbollah and the Iranian government, firmly allied with the Sudanese regime, without which Al Qaeda may never have acquired the technical expertise required to build the bombs that were used in the attacks;

- free passage through Sudanese customs and immigration, which assisted in the buildup of the base and springboard in Khartoum for the attacks in Kenya and Tanzania; and

- use of Sudan airways to transport key weapons systems from Afghanistan to Sudan.

The most powerful officials in Sudan explicitly invited Al Qaeda to relocate from war torn Afghanistan to Sudan.  This was important because in 1990 Al Qaeda was a small

ineffective organization, which faced serious dangers had it remained in Afghanistan.
The safety and sanctuary provided by Sudan allowed Al Qaeda to train, reorganize and
plot its attacks on U.S. interests, unimpeded by foreign governments or the civil war
raging in Afghanistan.  This allowed Al Qaeda to build, supply and direct the Nairobi
cell, which first acted as a way station for successful attacks against U.S. forces in
Somalia, and then directly against the U.S. Embassy in Nairobi.  Prior to Sudan's
provision of sanctuary to Al Qaeda, there were no Al Qaeda operatives in Nairobi.

The "expulsion" of Bin Laden from Khartoum in 1996 can not ameliorate Sudan's
liability under the FSIA.  By the time Sudan made the empty show of requiring Bin
Laden to leave the country, rather than turning him over to Saudi Arabia or the United
States, Al Qaeda had already grown into a lethal, full blown epidemic, with lethal cells
entrenched in Nairobi and elsewhere where necessary to carry out these bombings.  Nor
did Sudan root out every element of Al Qaeda from Khartoum, as senior leaders
continued to operate there after Bin Laden's expulsion.  Sudan's late action had no effect
on the bombing plots, as the completed terror cells merely waited for the order to act
irrespective of Bin Laden's location.  The plans had already been hatched in Khartoum,
the operatives had already crisscrossed Sudan and Kenya to train in explosives, survey
Nairobi and Dar es Salaam and carry cash and supplies across the border into Nairobi.
Years of Sudanese cooperation and active support, which had allowed the cells to grow
and spread across East Africa to a fatal, final stage, was not even slightly mitigated by
Bin Laden's 1996 flight to Afghanistan.

Nor should the amount of time that passed between the presence of Al Qaeda's
leadership in Khartoum and the day of the bombings mitigate the civil liability for Sudan.

- 74 -

As discussed earlier, the plot and its agents that would destroy the embassies and kill and injure Plaintiffs was already set and lay waiting for the opportune moment for execution. The indispensible and long term nature of the support provided by Sudan allowed Al Qaeda to strike the embassies two years later.  Indeed, the court in *Rux v. Republic of Sudan*, found Sudan liable for its material support to Al Qaeda for a plot that culminated an additional two years later, in 2000, with the attack on the U.S.S. Cole:

> Based on the expert testimony and documentary evidence, the Court FINDS as a fact that Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the U.S.S. Cole. Each of the expert witnesses testified that the strike against the Cole would likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe haven, military training, diplomatic passports, business partnerships, and lax banking and accounting systems that facilitated money laundering.

495 F. Supp. 2d 541, 553 (E.D. Va. 2007).[53]

Iran provided critical material support or resources to Bin Laden and Al Qaeda with specialized explosives training in Iran and in Lebanon through elements of its government, the IRGC, under the direct control of the top leadership of Iran and its proxy Hezbollah, without which Al Qaeda did have an ability to attack large buildings such as the U.S. Embassies.

These activities occurred with the authorization, agreement and support of the governments of Iran and Sudan.  Sudan's support for Al Qaeda resulted from its official policy to invite terrorist groups into Sudan for the purpose of organizing worldwide

---

[53] Sudan chose to enter an appearance in the *Rux* case and had counsel throughout the 28 U.S.C. § 1608 hearing.

Islamic revolution and to defend the Muslim world, which Sudan believed was under threat from the Western world.  Sudanese government agents worked with Al Qaeda operatives on many different issues:  NIF members staffed Bin Laden's office on McNimr Street, Sudanese intelligence and military officers worked closely with Al Qaeda operatives in their attempts to procure nuclear and chemical weapons, Sudanese intelligence officers interceded in behalf of Al Qaeda members who were investigated by local police after engaging in explosives training, Al Qaeda assisted the Sudanese military in its effort against the Christian and animists in southern Sudan, Sudanese intelligence and military officers provided protection to Al Qaeda and Sudanese intelligence officers effectively created open borders by allowing Al Qaeda members to bypass Sudanese customs and immigration and to move over the Sudan-Kenya border with illegal amounts of cash.  The Sudanese government mobilized every available resource to provide Al Qaeda with whatever support it needed.

The Iranian government had a longtime policy of using terrorist proxies such as Hezbollah to carry out its goals of indirectly attacking U.S. interests.  While Iran did not authorize all Hezbollah activity, the authorization of the top leadership was required for Hezbollah to engage in contacts and training with a group as radical as Al Qaeda, which planned to attack U.S. interest and sought training to attack buildings.

Iran and Sudan therefore are liable for personal injuries and death under the federal cause of action found at 28 U.S.C. § 1605A(c) for their provision of material support to Al Qaeda, which engaged in "extra judicial killings" as required by 28 U.S.C. § 1605A(a)(1).  The federal cause of action entitles Plaintiffs to the following damages: "economic damages, solatium, pain and suffering, and punitive damages".  28 U.S.C. §

1605A(c); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) ("the defendants are liable for economic, solatium, and pain and suffering damages for the personal injury and subsequent death of Peter Kilburn because they materially supported the acts described in § 1605A(a)(1), as carried out by Hizbollah.").  Plaintiffs must present evidence of these damages during the damages proceedings ordered by this Court.

The issue of whether remains of whether all plaintiffs have standing under 28 U.S.C § 1605A to bring claims under the federal cause of action provided by 28 U.S.C § 1605A(c), which is addressed below.

### C.    28 U.S.C. § 1605A(c) ALLOWS IMMEDIATE FAMILY MEMBERS OF FOREIGN SERVICE NATIONALS TO RECOVER DAMAGES FOR THEIR EMOTIONAL INJURIES

Whether family members of "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" may recover damages against the Defendants in this case is answered by the relevant portions of the Foreign Sovereign Immunities Act ("FSIA").  The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7), among other revisions.   The 2008 amendments to the FSIA expanded the legal mechanisms for determining the civil liability of state-sponsors of terrorism and created a new private right of action under federal law that operates against any foreign state that is or was a state sponsor of terrorism as described in subsection 28 U.S.C. §

1605A(a)(2)(A)(i).  28 U.S.C. § 1605A(c).  The legislative history of these amendments demonstrate the intent of Congress to strengthen the available tools to all victims of terrorism.  The legislation was "essential to providing justice to those who have suffered at the hands of terrorists."  154 Cong. Rec. S54 (Jan. 22, 2008).

One of the most powerful reasons for the creation of a federal cause of action was to create parity among victims' damages via a single federal cause of action, rather than looking to the laws of fifty different states, and those of other countries.  *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 66 (D.D.C. 2008) ("By providing for a private right of action and by precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in these cases when they are decided under state law.").  Forcing the family members of a Kenyan foreign service national killed in the embassy bombing to look outside the federal cause of action for relief will deny the Congressional intent behind the statute.

The first question that must be answered is whether a court may assert subject matter jurisdiction of the Court over the claims brought by the family members of family members of "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment".  28 U.S.C. § 1605A(a)(2)(ii) defines the class of potential claimants:

> (ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--
>> (I) a national of the United States;
>> (II) a member of the armed forces; or
>> (III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration;

This provision creates subject matter jurisdiction for a lawsuit based upon the death or injury to "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" brought by a "claimant or the victim".  28 U.S.C. § 1605A(a)(2)(ii).  The "claimant or the victim" language was also included in 28 U.S.C. § 1605(a)(7), the subject matter jurisdiction provision that preceded 28 U.S.C. § 1605A. We can look to precedent that interpreted the language from 28 U.S.C. § 1605(a)(7) to inform the analysis of 28 U.S.C. § 1605A.

Congress's purpose behind the "claimant or the victim" language in 28 U.S.C. § 1605(a)(7) was to allow non-US national family members the right to sue state sponsors of terrorism:

> Defendants' first argument--that because LRA is not a "national of the United States" it cannot sue Libya--is contradicted by the statute's plain language. *The immunity waiver provision only requires that the victim (or the claimant) was a U.S. national at the time of the terrorist act*, and there is no dispute that the victim decedents so qualified. Indeed, Congress specifically amended the state-sponsored-terrorism exception shortly after its first enactment to reject the very position advocated by defendants here. See Jurisdiction for Lawsuits Against Terrorist States: Technical Correction, Pub. L. No. 105-11, 111 Stat. 22 (1997) (amending the 1996 amendment by replacing the phrase "the claimant or victim was not" with "neither the claimant nor the victim was"); see also H.R. Rep. No. 105-48, at 2 (1997) ("*The intent of the drafters was that a family should have the benefit of these provisions if either the victim of the act or the survivor who brings the claim is an American national*.").

*La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 477 F. Supp. 2d 131, 135 (D.D.C. 2007) (emphasis added); *Anderson v. Islamic Republic of Iran*, 90 F. Supp.

2d 107, 113 (D.D.C. 2000) (asserting subject matter jurisdiction over the claim of a foreign national wife of an American victim as "the FSIA confers subject matter jurisdiction over a claim under 28 U.S.C. § 1605(a)(7) if '*either* the plaintiff *or* the victim [is] a United States national'").  The "claimant or the victim" language in 28 U.S.C. § 1605(a)(7) acted as a modifier on the term U.S. national, thereby creating a class of cognizable plaintiffs.  The "claimant or the victim" language functions in the same manner in 28 U.S.C. § 1605A(a)(2)(ii), where the language modifies the following terms:

> (I) a national of the United States;
> (II) a member of the armed forces; or
> (III) otherwise an employee of the Government of the United States, or
> of an individual performing a contract awarded by the United States
> Government, acting within the scope of the employee's employment.

When Congress inserts the same language into two successive statutes that were drafted for the same purpose, applicable precedent arising from the interpretation of the former statute should inform the interpretation of the subsequent statute.  *See e.g.*, *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 71, 71 n.16 (D.D.C. 2008).  Thus, pursuant to § 1605A(a)(2)(A)(ii), jurisdiction lies over claims where the *victim* was an employee of the U.S. Government acting within the scope of employment. In this case, the claims of immediate relatives, whether foreign or U.S. citizens, arise from wrongful death and personal injury to U.S. Government employee "victims."

  If family members of "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" may bring a lawsuit under 28 U.S.C. § 1605A, the next question to be answered is "what source of law provides a cause of action?"  *See FDIC v. Meyer*, 510 U.S. 471, 484 (1994) ("The first inquiry is whether

there has been a waiver of sovereign immunity. If there has been such a waiver, as in this case, the second inquiry comes into play -- that is, whether the source of substantive law upon which the claimant relies provides an avenue for relief.").

In this case, a federal cause of action exists under 28 U.S.C. § 1605A(c), along with causes of action from other sources where they would not lead to an impermissible duplicative recovery.  It is unlikely that Congress created subject matter jurisdiction for the family members of a U.S. government employee, such as the family member Plaintiffs in this case, but did not create a cause of action at 28 U.S.C. § 1605A(c).  28 U.S.C. § 1605A(c) specifically allows solatium damages.  Solatium damages compensate plaintiff family members' emotional injuries suffered as a result of the horrific murders resulting from the devastating bomb blast. "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998).  The inclusion of the single word, solatium, furnishes the right of recovery for an immediate family member.

Furthermore, under 28 U.S.C. § 1605A(c)(4), a "legal representative" of a foreign national U.S. government employee may recover damages.  The words "the legal representative of a person" are not defined by 28 U.S.C. § 1605A should allow any family member with the standing to act as a legal representative the standing to recover solatium damages.  In Kenya, a spouse, child, sibling or parent has such a right. (Attachment A at p. 13).  Allowing plaintiff family to recover for their emotional injuries under the federal cause of action would be consistent with the fact that NDAA is a classically "remedial" statute and serves the purpose of aiding and assisting victims of the

acts of state sponsors of terrorism, and therefore the court should interpret the statute liberally, all for the purpose of fulfilling the intention of Congress. *Reyton v. Rowe*, 391 U.S. 54 (1968).

28 U.S.C. § 1605A(c)(4) specifically allows the "legal representatives" of a victim to recover for personal injury or death. The term "legal representative" does not possess a fixed and narrow meaning in the law. Courts have held that the term "legal representative" in the Act applies to "any person who, whether by virtue of testamentary act or (by) operation of law, stands in the place of the decedent with respect to his property . . . ." *In re Air Crash Disaster Near Saigon, South Vietnam on April 4, 1975*, 476 F. Supp. at 525 *quoting Strother v. Dist. of Columbia*, 372 A.2d 1291, 1296 (D.C. 1977)); *see also Thomas v. Doyle*, 187 F.2d 207, 210 (D.C. Cir. 1951); *New York Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 597, 6 S. Ct. 877, 879 (1886) (holding the term "legal representative" is sufficiently broad to cover all persons who, with respect to his property, stand in his place and represent his interests, whether transferred to them by his act or by operation of law). Simply put, "the law of this jurisdiction is that 'legal representative' is not synonymous with "personal representative," and it includes, at least, heirs-at-law. *Young v. Firemen's Ins. Co.*, 463 A.2d 675, 677 (D.C. 1983).

In enacting 1605A, Congress specifically declined to limit recovery to the personal representative of an estate which has been strictly construed to encompass the decedent's executor or administrator, to the exclusion of all other persons. Rather, Congress allowed any person who qualifies as a legal representative, whether by operation of law or as an assignee by contract, to stand in the place of the victim and seek recovery. *See Thomas*, 187 F. 2d at 210. Should the Court decide that 28 U.S.C. § 1605A(c) does not furnish a

federal right of recovery to the family members of "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment", then Plaintiffs may look to any other available causes of action.

### D.     STATE LAW PROVIDES A CAUSE OF ACTION FOR ANY PLAINTIFFS NOT ALLOWED TO BRING A CLAIM UNDER THE FEDERAL CAUSE OF ACTION

After their immunity has been stripped under 28 U.S.C. § 1605A, foreign states are also liable under state law, where the recovery is not duplicative.[54]  "In the wake of the D.C. Circuit's opinion in *Cicippio-Puleo*, district courts in this jurisdiction have uniformly held that state law may be used to hold foreign states liable for acts of terrorism."  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, Civil Action 02-02026 (HHK), 2006 U.S. Dist. LEXIS 58033 at *49-50 (D.D.C. May 11, 2006) *citing Holland*, Civil Action No. 01-1924 (CKK), 2005 U.S. Dist. LEXIS 40254, at *63-65 (D.D.C. October 31, 2005); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d

---

[54] The federal cause of action at 28 U.S.C. § 1605A(c) does not preempt a plaintiff who falls outside of the scope of the cause of action from utilizing alternate sources of law. *See Damarrell v. Islamic Republic of Iran*, CA 01-2224 (JDB), 2005 U.S. Dist. LEXIS 5343 at *48-53 (D.D.C. Mar. 29, 2005) (ruling that the Flatow Amendment did not preempt state law causes of action).  *Contra Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 66 (D.D.C. 2008) (dismissing plaintiffs' duplicative state law claims under 28 U.S.C. § 1605A, in favor of the cause of action at 28 U.S.C. § 1605A(c), without engaging in a preemption analysis).  Congress's concern with parity among victims was addressed by the federal cause of action, which can not be construed as a preemption of state law causes of action.  It would be illogical—and monstrously cruel—for Congress to create subject matter jurisdiction for a class of plaintiffs that includes the family members in this case and then to create a federal cause of action, that not only precluded their recovery under its terms, but also denied them *any remedy*.  Thus, one can not find any evidence of Congressional intent to preempt, which is required before a court may find that a federal statute is preemptive.

120, 132 (D.D.C. 2005); *Dammarell*, Civil Action No. 01-2224 (JDB), 2005 U.S. Dist.

LEXIS 5343, at *55-56 (D.D.C. May 11, 2006).

The Court must engage in a choice of law analysis to decide which state law

would provide recovery for Plaintiffs.  In *Dammarell v. Islamic Republic of Iran*, the

Court held that District of Columbia choice of law principles would dictate which source

of state law would be applied to each of the plaintiffs.  Civil Action No. 01-2224 (JDB),

2005 U.S. Dist. LEXIS 5343, at *57 (D.D.C. March 29, 2005).  The District of

Columbia's choice of law principles instruct that the court should utilize "constructive

blending" of two distinct analysis; the "governmental interests" analysis and the "most

significant relationship".  Id. at 58.  The *Dammarell* court determined that the law of the

state of the domicile should supply the law to determine a plaintiffs' cause of action:

"Given the strong and recognized interest of the domicile state in ensuring that its citizens

are compensated for harm, and the intrinsic interest of the lex loci in deterring attacks

within its jurisdiction, the law of the forum state must give way to one of these options

under the choice of law rule of the District of Columbia."  *Id.* at 61-62.  Both the law of

the forum and the law of domicile provide all immediate family member plaintiffs with a

claim for relief for their emotional damages.

      1.  **THE DISTRICT OF COLUMBIA ALLOWS IMMEDIATE FAMILY MEMBERS TO RECOVER FOR THEIR EMOTIONAL INJURIES**

The United States has a strong interest in the adjudication of this case, which

provides a strong justification for the use of the law of the forum, where the federal

statute does not control.  *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 22

(D.D.C. 2005) *citing Restatement (Third) of Foreign Relations Law* § 402(3) (1987)

(noting that the United States has an interest in projecting its laws overseas for "certain

conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests") & cmt. g. (this principle is "increasingly accepted as applied to terrorist and other organized attacks on a "state's nationals by reason of their nationality, or to assassination of a state's diplomatic representatives or other officials").  The terrorist attacks in this case directly targeted U.S. Embassies and U.S. diplomatic personnel[55] in an effort to drive the United States out of East Africa, patterned after the successful Iranian suicide bombing of the Marine Barracks in Beirut, Lebanon in 1983, this is sufficient to support the application of the law of the forum.  *Damarrell v. Islamic Republic of Iran*, CA 01-2224 (JDB) 2005 U.S. Dist. LEXIS 5343 at *63 (D.D.C. Mar. 29, 2005) ("The injuries in this case are the result of a state-sponsored terrorist attack on a United States embassy and diplomatic personnel. The United States has a unique interest in its domestic law, rather than the law of a foreign nation, determining damages in a suit involving such an attack.").

The interest in preventing disparate outcomes among the hundreds plaintiffs who were domiciled in several different nations at the time of then attack also supports the application of the law of the forum.  The reason for the emotional trauma suffered by every immediate family member was the same no matter which country they resided in. A United States federal agency, invariably headquartered in this forum, employed their close family member at the embassy in Nairobi or Dar es Salaam and Al Qaeda attacked them in its effort to strike at the United States.  The law of the District of Columbia, which provides venue in all state sponsor of terrorism cases via 28 U.S.C. § 1391(f)(4), is an ideal source of law to decide those claims that fall outside the ambit of 28 U.S.C. §

---

[55] Nairobi was thought by Bin Laden to be "the nest of American intelligence in East Africa".  (Kohlmann, 28, p. 313).

1605A(c).  The law of the District of Columbia allows an immediate family member to recover damages for emotional injuries occasioned by the death or personal injury of a close family member.  *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 42-43 (D.D.C. 2007).

### 2. KENYAN LAW ALLOWS IMMEDIATE FAMILY MEMBERS TO RECOVER FOR THEIR EMOTIONAL INJURIES

The *Dammarell* court determined that the law of the state of the domicile should supply the law to determine a plaintiffs' cause of action:  "Given the strong and recognized interest of the domicile state in ensuring that its citizens are compensated for harm, and the intrinsic interest of the lex loci in deterring attacks within its jurisdiction, the law of the forum state must give way to one of these options under the choice of law rule of the District of Columbia."  CA 01-2224 (JDB), 2005 U.S. Dist. LEXIS 5343, at *57 (D.D.C. March 29, 2005) at 58.  The Kenyan Plaintiffs are domiciled in the place that they suffered their injuries, thus Kenyan law should be utilized to answer whether the family members have a cause of action for their emotional injuries, if the Court precludes their use of 28 U.S.C. § 1605A(c).

Kenyan law provides a explicit statutory vehicle for the recovery of emotional damages by the close family member.  *See* Kenyan Legal Opinion, Attachment B.

### 3. TANZANIAN LAW ALLOWS IMMEDIATE FAMILY MEMBERS TO RECOVER FOR EMOTIONAL INJURIES SUSTAINED BY DECEDENT

Pursuant to The Probate And Administration Of Estates Act (Lexis 2010) (hereinafter the **"Probate Act"**) of Tanzania:

> Where the deceased has died intestate, letters of administration of his estate may be granted to any person who, according to the rules for the distribution of the estate of an intestate applicable in the case of such deceased, would be entitled to the whole or any part of such deceased's estate.

- 86 -

(*See* Probate Act par. 33, at p. 13).  The Grant of Letters entitles the administrator "to all rights belonging to the deceased as if the administration had been granted at the moment after his death."  (*See* Probate Act par. 44, at p. 15).  Importantly, under Tanzanian law, letters of administration may be granted to numerous individuals with an interest in the estate of the deceased. (Probate Act, par. 22, 33 p. 11, 13).

The power to file suit is specifically enumerated allowing the administrator:

> …the same power to sue in respect of all causes of action that survive the deceased, and may exercise the same powers for the recovery of debts due to him at the time of his death, as the deceased had when living.

 (*See* Probate Act par. 100, at p. 26).  In Tanzanian legal parlance, the "causes of action that survive the deceased" include wrongful death, as provided in Chapter 310 of the Tanzania Law Reform (Fatal Accidents and Miscellaneous Provisions) Act, Cap. 310, Revised Edition 2002, (hereinafter the "Law Reform Act"):

> (O)n the death of any person . . . all causes of action subsisting against or vested within him shall survive against, or, as the case may be, for the benefit of his estate.

(*See* Law Reform Act Pt. III sec. 9—(1), at p. 3).  The definitions section includes  "loss of life" as a type of damage recoverable in a claim that "survives the decedent."  (*See* Law Reform Act, Pt. I sec. 2, at p. 1).  Furthermore, unlike in the United States, the estate administrator need not be the only contemporaneous spouse of the deceased: "'Dependant' means the wife or, where the marriage was a polygamous marriage, each of the wives . . ." (Law Reform Act, Pt. I sec. 2, at p. 1.)  Therefore any legitimate spouse in this case will have standing in an American court as an immediate relative according to the plaintiffs' domestic laws.

## <u>CONCLUSION</u>

Sudan's cooperation and support enabled Al Qaeda to evolve from a nascent

terrorist entity that perilously and barely subsisted in Afghanistan in the late 1980s,

equipped with only with grand ambitions, into a full blown epidemic that had spread

entrenched lethal cells across East Africa, including Nairobi, Kenya.  Sudan's

cooperation and support of Al Qaeda's goals and ideology further facilitated its

acquisition of the technical capabilities, from the Iranian government and its proxies,

required to destroy the two embassies and killed hundreds and wound thousands.  Iran's

leadership provided direct support and authorized the critical links between Hezbollah,

the world's foremost terrorist organization, and Al Qaeda because they shared Al

Qaeda's foremost foreign policy goal, to target U.S. interests for large scale terrorist

attacks.

Respectfully submitted,                          _/s/ **Thomas Fortune Fay**___
                                                 Thomas Fortune Fay, Esq
                                                 D.C. Bar No. 23929
                                                 601 Pennsylvania Ave., N.W
                                                 #900 – South Building
                                                 Washington, D.C. 20004

                                                 **/s/ Steven R. Perles**
                                                 Steven R. Perles (No. 326975)
                                                 Edward MacAllister (No. 494558)
                                                 Perles Law Firm, PC
                                                 1146 19th Street, N.W.
                                                 Fifth Floor
                                                 Washington, DC  20036
                                                 Tel: 202-955-9055

                                                 **/s/ Michael J. Miller**
                                                 Michael J. Miller, Esq.
                                                 THE MILLER FIRM, LLC
                                                 108 Railroad Avenue
                                                 Orange, VA 22960
                                                 Tel: (540) 672-4224
January 14, 2011                                 Fax: (540) 672-3055