## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JAMES OWENS, et al.,**

    **Plaintiffs,**

    **v.**                                **Civil Action No. 01-2244 (JDB)**

**REPUBLIC OF SUDAN, et al.,**

    **Defendants.**

**WINFRED WAIRIMU WAMAI, et al.,**

    **Plaintiffs,**

    **v.**                                **Civil Action No.   08-1349 (JDB)**

**REPUBLIC OF SUDAN, et al.,**

    **Defendants.**

**MILLY MIKALI AMDUSO, et al.,**

    **Plaintiffs,**

    **v.**                                **Civil Action No.   08-1361 (JDB)**

**REPUBLIC OF SUDAN, et al.,**

    **Defendants.**

**JUDITH ABASI MWILA, et al.,**

    **Plaintiffs,**

    **v.**                                **Civil Action No.   08-1377 (JDB)**

**THE ISLAMIC REPUBLIC OF IRAN,**

    **et al.,**

    **Defendants.**

| | |
|---|---|
| **MARY ONSONGO, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No.   08-1380 (JDB) |
| **REPUBLIC OF SUDAN, et al.,** | |
| Defendants. | |
| **RIZWAN KHALIQ, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 10-0356 (JDB) |
| **REPUBLIC OF SUDAN, et al.,** | |
| Defendants. | |

## MEMORANDUM OPINION

Over thirteen years ago, on August 7, 1998, the United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were devastated by simultaneous suicide bombings that killed hundreds of people and injured over a thousand.   Now, in this civil action under the Foreign Sovereign Immunities Act ("FSIA"), plaintiffs — victims of the bombings and their families — seek to assign liability for their injuries to the Republic of Sudan ("Sudan"), the Ministry of the Interior of the Republic of Sudan, the Islamic Republic of Iran ("Iran"), the Iranian Revolutionary Guards Corps ("IRGC") and the Iranian Ministry of Information and Security ("MOIS") (collectively "defendants").

The Court will proceed in two steps.   First, it will present findings as to the causes of the bombings — specifically, findings that defendants were indeed responsible for supporting, funding, and otherwise carrying out this unconscionable attack.   Second, the Court will set forth

legal and remedial conclusions to bring this litigation to a close.[1]   Most recently, and relevant

here, the National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA" or "Act")

amended the FSIA to permit foreign national employees of the United States government killed or

injured while acting within the scope of their employment and their family members to sue a state

sponsor of terrorism for injuries and damages resulting from an act of terrorism.   Here, the

majority of plaintiffs are foreign national employees of the U.S. Government and their immediate

family members who, as the Court will explain below, lack a claim under the 2008 NDAA

amendments to FSIA but may proceed under applicable state law.

## Background

Plaintiffs bring this case pursuant to section 1083 of the National Defense Authorization

Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 341 (2008) (codified at 28 U.S.C.

§1605A (2009)).   Several cases were consolidated for purposes of the Court's October 25-28,

2010 evidentiary hearing on liability.   In each case, as described below, defendants were properly

served according to the FSIA. Defendants failed to respond, and the Clerk of Court entered

defaults against defendants in each case.   In Owens v. Republic of Sudan, No. 1:01-cv-02244

(JDB), service of process was completed upon each defendant: the Republic of Sudan on February

25, 2003 [Docket Entry 9]; the Ministry of the Interior of the Republic of Sudan on February 25,

2003 [Docket Entry 9]; the Islamic Republic of Iran on March 5, 2003 [Docket Entry 10]; and the

Iranian Ministry of Information and Security on October 14, 2002 [Docket Entry 6].   Defaults

were entered against the Iranian defendants on May 8, 2003, [Docket Entry 11], and defaults were

---

[1]   The Court enters the findings and conclusions below pursuant to 28 U.S.C. § 1608(e).   That provision requires plaintiffs under the FSIA to "establish [their] claim or right to relief by evidence satisfactory to the court" even where, as here, defendants have failed to appear after proper service.

entered against the Republic of Sudan and the Ministry of the Interior of the Republic of Sudan on
March 25, 2010 [Docket Entry 173].

In Wamai v. Republic of Sudan, No. 1:08-cv-01349 (JDB), service of process was
completed on each of the named defendants: the Ministry of the Interior of the Republic of Sudan
was served with process on February 12, 2009, pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry
15]; the Republic of Sudan was served with process on April 22, 2009 through the U.S.
Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 23], which was delivered
under diplomatic note on November 12, 2009 [Docket Entry 28]; the Iranian Ministry of
Information and Security was served with process on February 14, 2009 pursuant to 28 U.S.C.
1608(a)(3) [Docket Entry 15]; and the Islamic Republic of Iran and the Iranian Revolutionary
Guards were served with process on April 22, 2009 through the U.S. Department of State pursuant
to 28 U.S.C.1608(a)(4) [Docket Entry 23], which was delivered under diplomatic notes on
November 18, 2009 [Docket Entry 29]. An entry of default was filed against each of these
defendants on June 4, 2010 [Docket Entries 34, 35].

In Amduso v. Republic of Sudan, No. 1:08-cv-01361 (JDB), the Sudanese defendants were
served with process on February 1, 2009 under 28 U.S.C. § 1608(a)(3) [Docket Entry 27], and the
Iranian defendants were served on June 26, 2009 under 28 U.S.C. § 1608(a)(4) [Docket Entry 33].
Defaults were entered against the Republic of Sudan and the Ministry of the Interior of the
Republic of Sudan on April 22, 2010 [Docket Entry 29] and against the Islamic Republic of Iran
and the Iranian Ministry of Information and Security on October 6, 2009 [Docket Entry 40].

In Mwila v. Islamic Republic of Iran, No. 1:08-cv-01377 (JDB), service of process was
completed on each of the named defendants: the Ministry of the Interior of the Republic of Sudan
was served with process on March 17, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry 3]; the

Islamic Republic of Iran and the Iranian Ministry of Information and Security were served with process on September 8, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 16]; and the Republic of Sudan was served with process on November 12, 2009 through the U.S. Department of State pursuant to 28 U.S.C.1608(a)(4) [Docket Entry 19].   Defaults were entered against the Islamic Republic of Iran, the Republic of Sudan, and the Ministry of the Interior of the Republic of Sudan on February 18, 2010 [Docket Entries 20, 21 and 22] and against the Iranian Ministry of Information and Security on April 21, 2010 [Docket Entry 23].

In Khaliq v. Republic of Sudan, No. 1:10-cv-00356 (JDB), the Sudanese defendants were served with process on October 13, 2010 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 16]. The Islamic Republic of Iran was served with process on October 11, 2010 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 20].   Defaults were entered against the Republic of Sudan on December 15, 2010 [Docket Entry 18] and against the Islamic Republic of Iran on December 22, 2010 [Docket Entry 21].

Finally, in Onsongo v. Republic of Sudan, No. 1:08-cv-01380 (JDB), the Sudanese defendants were served with process on December 17, 2009 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 16].   The Iranian Ministry of Information and Security was served with process on February 14, 2009 pursuant to 28 U.S.C. 1608(a)(3) [Docket Entry 8], and the Islamic Republic of Iran and the Iranian Revolutionary Guards were served with process on November 18, 2009 pursuant to 28 U.S.C. 1608(a)(4) [Docket Entry 17].   Defaults were entered against each of the named defendants on June 2, 2010 [Docket Entries 21, 22, and 23].

Before plaintiffs can be awarded any relief, this Court must determine whether they have established their claims "by evidence satisfactory to the court."   28 U.S.C. § 1608(e); see also

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003).   This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e).   Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003). In evaluating the plaintiffs' proof, the court may "accept as true the plaintiffs' uncontroverted evidence." Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit. Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).   A three-day hearing on liability and damages was held beginning on October 25, 2010. At this hearing, the Court received evidence in the form of live testimony, videotaped testimony, affidavit, and original documentary and videographic evidence. The Court applied the Federal Rules of Evidence. Based on the record established herein, the Court makes the following findings of fact and conclusions of law.

I.   FINDINGS OF FACT

     A.   **Islamic Republic of Iran's Support for Bin Laden and Al Qaeda**

The government of the Islamic Republic of Iran ("Iran") has a long history of providing material aid and support to terrorist organizations including al Qaeda, which have claimed responsibility for the August 7, 1998 embassy bombings. See, e.g., Tr. Vol. II at 124-25.[2] Iran had been the preeminent state sponsor of terrorism against United States interests for decades.   See id. at 123. Throughout the 1990s — at least — Iran regarded al Qaeda as a useful tool to destabilize U.S. interests.   As discussed in detail below, the government of Iran aided, abetted and conspired with Hezbollah, Osama Bin Laden, and al Qaeda to launch large-scale bombing attacks against the United States by utilizing the sophisticated delivery mechanism of powerful suicide truck bombs. Hezbollah, a terrorist organization based principally in Lebanon, had utilized this type of bomb in the devastating 1983 attacks on the U.S. embassy and Marine barracks in Beirut, Lebanon.   Prior to their meetings with Iranian officials and agents, Bin Laden and al Qaeda did not possess the technical expertise required to carry out the embassy bombings in Nairobi and Dar es Salaam. The Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al Qaeda and rendered direct assistance to al Qaeda operatives.   Hence, for the reasons discussed below, the Iranian defendants provided material aid and support to al Qaeda for the 1998 embassy bombings and are liable for damages suffered by the plaintiffs.

1.      The Iranian Government's Relationship with Hezbollah

Iranian support of Hezbollah began in the 1980s.   Id. at 123.   Iran "actively encouraged, if not directed, the formation of Hezbollah," and the relationship was "quite close" during the 1990s.   Id.   Iran was formally declared a "state sponsor of terrorism" on January 19, 1984, by

---

[2]   "Tr. Vol." refers to the transcript for each day of the bench trial in this case, beginning on October 25, 2010.   Accordingly "Tr. Vol. I" refers to the transcript for the first day of testimony on October 25, 2010, "Tr. Vol. II" refers to the transcript of day two of the bench trial, and so on.   "Ex." refers to those exhibits admitted into evidence during the trial.

U.S. Secretary of State George P. Schultz in accordance with section 6(j) of the Export

Administration Act of 1979, 50 App. U.S.C. § 2405(j), see 49 Fed. Reg. 2836-02 (statement of

Secretary of State George P. Schultz, Jan. 23, 1984), and remains designated as a state sponsor of

terrorism today.   The Iranian government and the Iranian intelligence service "provided

substantial financial support and lots of other services" to Hezbollah.   Tr. Vol. II at 122.

At all times relevant to this case, Iran was a state sponsor of terrorism that supported

terrorist groups that U.S. intelligence agencies believed were capable of attacking U.S. interests.

The declassified 1991 National Intelligence Estimate produced by the CIA stated that: "Iranian

support for terrorism will remain a significant issue dividing Tehran and Washington. Tehran is

unlikely to conduct terrorism directly against U.S. or Western interests during the next two years,

but it is supporting radical groups that might do so."   Ex. DD at 20.

Hezbollah possessed "extraordinary knowledge of explosives" in the mid-to-late 1990s. Tr.

Vol. II at 126.   Iran trained Hezbollah "in counterintelligence and in explosive capability" such

that Hezbollah "is often described as the A-team of terrorists."   Id. at 169.   Hezbollah operatives

were trained in Iran, and Iranian Revolutionary Guard Corp ("IRGC") trainers were present in

Lebanese Hezbollah training camps.   Id.   Indeed, as terrorism expert Evan Kohlmann testified,

"Hezbollah is a proxy force of Iran.   Its primary foreign sponsor is Iran, both financially and

otherwise.   Almost all of Hezbollah's activities are well known to the Iranian government.   In

some cases they're planned by the Iranian government."   Tr. Vol. III at 240.

2.   <u>Iranian Support for Al Qaeda</u>

In the 1990s, Iranian support for terrorist groups extended beyond Hezbollah to al Qaeda.

Dr. Matthew Levitt, an expert witness on the state sponsorship of terrorism, and specifically Iran,

Hezbollah and al Qaeda, explained how al Qaeda came into contact with the Iranian government:

8

"Hassan al-Turabi, the head of the National Islamic Front, which ruled Sudan at the time, was keen not only on instituting Islamic sharia law in Sudan at home, but in making the Sudan a place from which worldwide Islamic revolution could flow."   Tr. Vol. II at 165.   To that end, "Hassan al-Turabi hosted numerous meetings, some large summits with radical extremist groups, including one, for example, in April 1991.   Groups like HAMAS and Palestinian Islamic Jihad, Egyptian Islamic Jihad, al Qaeda, Sudanese radicals, Iranians, Lebanese Hezbollah were all invited and attended."   Id. at 165-66. Such a conglomeration of different terrorist groups and governments such as Iran had been very unusual prior to al-Turabi's conferences.   Id. at 166.   And "it was at these meetings where Iranian officials, Hezbollah officials, al Qaeda officials and others first began to have some serious meetings."   Id.   Several meetings took place between representatives of Hezbollah, al Qaeda and the governments of Sudan and Iran.   Tr. Vol. III at 240.   The purpose of these meetings, "in the words of a ranking al Qaeda shura council member Abu Hajer al-Iraqi, . . . was to focus on a common enemy, that being the West, the United States." Id.

Al-Turabi's policies therefore resulted in the exchange of ideas and sharing of resources by groups that would not necessarily have communicated otherwise, including Hezbollah and al Qaeda.   Ex. W-2 at 3, 6.   Bin Laden and al Qaeda relocated to Sudan in 1991.   Tr. Vol. II at 165. The Iranian government played a "very active" role in Sudan during the time that Bin Laden operated from Khartoum.   Id. at 124. This included playing a "prominent role" in a conference of those resisting the Israeli-Arab peace process, which had been organized by the Sudanese government.   Id.   Hezbollah also had a base of operations in Khartoum, Sudan.   Tr. Vol. III at 233.

Iran's role in Sudan grew at the same time that the Sudanese government invited Bin Laden

to Khartoum. Al-Turabi invited the President of Iran, Hojatoleslam Rafsanjani, to visit Sudan in 1991 to support Al-Turabi's goal of mending the Shia and Sunni divide in Islam in order to present a united front against the West.   Ex. V at 5.   Iran also maintained a delegation office in Khartoum that was run by Sheik Nomani to facilitate relations between the governments and convert Sunni Arab Muslims to the Shia sectarian view. Tr. Vol. III at 234.   The two governments shared information and intelligence between their militaries and intelligence services.   Id.

In addition, the IRGC, an Iranian state organization that funneled assistance to terrorist organizations abroad — such as Hezbollah in Khartoum — also maintained connections with the Sudanese intelligence service.   Id. at 234-35.   The IRGC was founded shortly after the 1979 Iranian revolution and, along with MOIS, is one of the two major organizations through which Iran carries out its support of terrorism.   Tr. Vol. II at 130-31.   Indeed, "Hezbollah's presence in Khartoum was made possible by the relationship between the government of Sudan and the government of Iran."   Tr. Vol. III at 240.   The Sudanese intelligence service also facilitated the linkage between al Qaeda and Hezbollah and representatives of Iran, which was strengthened by al Qaeda's move to Sudan.   Id. at 270.   The State Department's annual report on "Patterns of Global Terrorism" for 1993 states:

> Sudan's ties to Iran, the leading state sponsor of terrorism, continued to cause concern during the past year. Sudan served as a convenient transit point, meeting site and safe haven for Iranian-backed extremist groups. Iranian ambassador in Khartoum Majid Kamal was involved in the 1979 takeover of the U.S. embassy in Tehran and guided Iranian efforts in developing the Lebanese Hizballah group while he served as Iran's top diplomat in Lebanon during the early 1980s.   His presence illustrated the importance Iran places on Sudan.

Ex. GG; Tr. Vol. III at 258-59.

Iran provided substantial training and assistance to al Qaeda leading up to the embassy

attacks in 1998.   For example, Ali Mohammed provided security for one prominent meeting

between Hezbollah's chief external operations officer, Imad Mughniyah, and Bin Laden in Sudan.

Tr. Vol. II at 170; Ex. A at 28.   At Ali Mohammed's plea hearing in the United States District

Court for the Southern District of New York on October 20, 2000, he was asked to describe, in his

own words, why he believed that he was guilty of the crimes charged arising out of the embassy

attack.   Ali Mohammed responded:

> I was aware of certain contacts between al Qaeda and al Jihad organization, on one
> side, and Iran and Hezbollah on the other side. I arranged security for a meeting in
> the Sudan between Mughaniya, Hezbollah's chief, and Bin Laden. Hezbollah
> provided explosives training for al Qaeda and al Jihad. Iran supplied Egyptian
> Jihad with weapons. Iran also used Hezbollah to supply explosives that were
> disguised to look like rocks.

Ex. A at 28; Tr. Vol. II at 115-19.

Iran was "helping train al Qaeda operatives and al Qaeda personnel" in Sudan in the early

1990s. Tr. Vol. II at 124-25.   Dr. Matthew Levitt explained that known al Qaeda operatives had

significant relationships with Iran.   For example, "Mustafa Hamid, throughout the period we're

talking about here, throughout the 1990s, was one of al Qaeda's primary points of contact

specifically to Iran's Islamic Revolutionary Guard Corps."   Id. at 170.   In 2009, the Department

of Treasury designated Hamid as a specially designated global terrorist, "noting specifically that

he was one of al Qaeda's senior leadership living in Iran and working closely with the IRGC, the

Islamic Revolutionary Guards Corps."   Id.; Ex. CC. "In the mid-1990s, Mustafa Hamid

reportedly negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al

Qaida members safe transit through Iran to Afghanistan."   Ex. CC.

Following the meetings that took place between representatives of Hezbollah and al Qaeda

in Sudan in the early to mid-1990s, Hezbollah and Iran agreed to provide advanced training to a

number of al Qaeda members, including shura council members, at Hezbollah training camps in South Lebanon. Tr. Vol. III at 241.   Saif al-Adel, the head of al Qaeda security, trained in Hezbollah camps. Id.   During this time period, several other senior al Qaeda operatives trained in Iran and in Hezbollah training camps in Lebanon. Tr. Vol. II at 169.   After one of the training sessions at a Lebanese Hezbollah camp, al Qaeda operatives connected to the Nairobi bombing, including a financier and a bomb-maker, returned to Sudan with videotapes and manuals "specifically about how to blow up large buildings."   Id.

Al Qaeda desired to replicate Hezbollah's 1983 Beirut Marine barracks suicide bombing, and Bin Laden sought Iranian expertise to teach al Qaeda operatives about how to blow up buildings.   Id. at 176. Prior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings.   Id. at 177.   However, in a short time, al Qaeda acquired the capabilities to carry out the 1998 Embassy bombings, which killed hundreds and injured thousands by detonation of very large and sophisticated bombs. See id.   Dr. Levitt concluded that "it would not have been possible for al Qaeda to a reasonable degree of certainty to have executed this type of a bombing attack, which it had never previously executed, without this type of training it received from Iran and Hezbollah." Id. at 181.

Hezbollah engages in international terrorist operations in close tactical and strategic cooperation with the Iranian government.   Id. at 179.   The Supreme Leader of Iran, Ayatollah Khameni, controls oversight of the media, the military, the Ministry of Intelligence, the IRGC, the Basji militia, and the IRGC's Qods force; all the entities that oversee the training and support of and cooperation with terrorist groups and that grant approval of terrorist attacks conducted with other groups answer to Khameni.   Id.   Hezbollah's assistance to al Qaeda would not have been possible without the authorization of the Iranian government. Id.; Ex. W-2 at 3.

Dr. Levitt testified that Iranian government authorization of Hezbollah's assistance would be required for several reasons:

> The first is again the getting in bed with al Qaeda. After al Qaeda had issued not one but two fatwas, religious edicts, in '92 and '96, announcing its intent to target the West, it was a dangerous proposition. As I mentioned earlier, Iranian leaders have their own version of rationality, but they are rational actors. And that is something that I believe had to be approved, again, so there would be reasonable or plausible deniability. Overcoming this deep mistrust between the most radical Salafi jihadi Sunnis, who, as we saw in the context of the aftermath of the war in Iraq, are sometimes all too eager to kill Shia in particular, and for the Shia on the other side to overcome their historical animosity towards these radical Sunnis, is no small feat. And I think it is only because of their shared interest at that point, in the 1990s and the immediate — to target U.S. interests, that they were able to decide to overcome this animosity and mistrust. And I think it's quite clear, because it was for the express purpose of targeting the United States, it shouldn't surprise then that the type of training they received was specifically of the type used in the East Africa embassy bombings. They expressed interest in, we know they received at least videos and manuals about, blowing up large buildings.

Tr. Vol. II. at 179-80; Ex. L-2 at 14-19.   The declassified 1990 National Intelligence Estimate produced by the CIA stated the following regarding President Rasfanjani's role in the government's sponsorship of terrorism:

> The terrorist attacks carried out by Iran during the past year were probably approved in advance by President Rafsanjani and other senior leaders. The planning and implementation of these operations are, however, probably managed by other senior officials, most of whom are Rafsanjani's appointees or allies. Nonetheless, we believe Rafsanjani and Khomeini would closely monitor and approve the planning for an attack against U.S. or Western interests.

Ex. EE at 7; Tr. Vol. III at 238-40.

Support from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings.  See Tr. Vol. II at 181.   Prior to its meetings with Iranian officials and agents, al Qaeda did not possess the technical expertise required to carry out the embassy bombings.   In the 1990s, al Qaeda received training in Iran and Lebanon on how to destroy large buildings with

sophisticated and powerful explosives.   Id. at 188; Tr. Vol. III at 314-15.   The government of

Iran was aware of and authorized this training and assistance.   Hence, for the reasons described

above, the Court finds that the Iranian defendants provided material aid and support to al Qaeda for

the 1990 embassy bombings and are liable for plaintiffs' damages.

**B.**      **The Republic of Sudan's Support for Bin Laden and al Qaeda**

Sudanese government support for Bin Laden and al Qaeda was also important to the

execution of the two 1998 embassy bombings.   Critically, Sudan provided safe haven in a country

near the two U.S. embassies. The Sudanese defendants ("Sudan") gave material aid and support to

Bin Laden and al Qaeda in several ways.   Sudan harbored and provided sanctuary to terrorists and

their operational and logistical supply network.   Bin Laden and al Qaeda received the support and

protection of the Sudanese intelligence and military from foreign intelligence services and rival

militants.   Sudan provided Bin Laden and al Qaeda hundreds of Sudanese passports.   The

Sudanese intelligence service allowed al Qaeda to travel over the Sudan-Kenya border without

restriction, permitting the passage of weapons and money to supply the Nairobi terrorist cell.

Finally, Sudan's support of al Qaeda was official Sudanese government policy.

1.      Safe Harbor

Osama Bin Laden and a small group of supporters founded al Qaeda in Afghanistan in

September 1988. Tr. Vol. III at 225.   Al Qaeda is Arabic for "the solid foundation" or "base."   Id.

at 224. Bin Laden was "the primary financier" and the "primary creative genius behind al Qaeda,"

a group that sought to "create a worldwide network of individuals who would defend the Muslim

community by waging . . . a low-intensity war against any of its enemies, including . . . the United

States and other Western countries."   Id. at 225.   When al Qaeda was formed, it was a very small,

compartmentalized group with centralized leadership composed of a shura council, and each

member was head of a subcommittee.   Id. at 226.   Around 1990, as the war in Afghanistan

neared its end, al Qaeda faced dangers arising from the eruption of a civil war among the Afghan

mujahedeen that had previously fought and defeated the Soviet Union.   Id. at 228-29.   The

multi-dimensional civil war involved several factions and was extremely violent, with shifting

front lines, which made it a difficult place for al Qaeda to maintain a secure base.   Id. at 332-33.

The Pakistani government also began to pressure the foreign mujahedeen fighters to leave

Pakistan.   Id. at 229.   Hence, al Qaeda needed to find a new base of operations, and Sudan was an

eager host.

In 1989, the Sudanese government was overthrown by a military coup led by General

Omar al-Bashir and Hassan al-Turabi, the head of the National Islamic Front ("NIF"). See Ex. W-2

at 1.   Al-Turabi, as the head of the NIF, and al-Bashir, as the head of the military who became the

President, joined forces to rule Sudan.   Ex. W-2 at 2.   Under their leadership, the Sudanese

government courted Bin Laden and al Qaeda to convince them to relocate to Sudan.   Tr. Vol. III at

242-43.   Al-Bashir even sent a letter of invitation to Bin Laden. Id. at 243, 333-34; Ex. V at 7.

Al-Turabi and the NIF sought to implement Sharia law throughout Sudan, and then in

Muslim majority countries.   Id. at 334-35.   The NIF felt the Muslim world was endangered,

primarily by Western encroachment, which had to be resisted.   Id. at 335.   This resulted in the

Sudanese government's welcoming of a number of terrorist organizations into Sudan.   Id. at 335;

Ex. V at 5.   The NIF also believed in ending the split between the Sunni and Shi'ite branches of

Islam.   Tr. Vol. III at 335; Ex. V at 5.

Al Qaeda accepted Sudan's invitation and in late 1991 began to move to Sudan. Tr. Vol. III

at 242-44. Al Qaeda respected and supported the ideological program of the new government of

Sudan. Tr. Vol. III at 333; Ex. V at 5-6.   The leadership of Sudan guaranteed al Qaeda a base from

which it could operate with impunity, with a minimum risk of foreign interference.   In turn, al

Qaeda agreed to support the war in south Sudan against the Christians and animists, and to invest

in the Sudanese economy.   Tr. Vol. III at 333; Ex. V at 5-15.

One of the members of al Qaeda who played an important role in the move was Jamal

al-Fadl, who later worked directly with the Sudanese intelligence service under the approval of Bin

Laden. Tr. Vol. III at 244.   Al-Fadl was Sudanese, and he served as an intermediary between al

Qaeda and the Sudanese intelligence service.   Id. at 244-45.   Al-Fadl later defected to the United

States and became an official source for the Federal Bureau of Investigation and the U.S. Justice

Department.   Id. at 244.

Al-Fadl provided testimony for the United States government during the criminal trial of

Bin Laden.   He recalled that when al Qaeda considered moving from Afghanistan to Sudan

initially, questions were raised among the al Qaeda leadership over whether Hassan al-Turabi's

ruling National Islamic Front party in Sudan would make a suitable and appropriate ally.

According to al-Fadl: "The people, they say we have to be careful with that and we have to know

more about Islamic Front . . . I remember Abu Abdallah [Usama Bin Laden] … he decide to send

some people to Sudan at that time, to discover, to see what going on over there, and they bring

good answer or clean answer." United States v. Usama Bin Laden, No. 98-1023, Tr. Trans. at

216-17 (S.D.N.Y. Feb. 6, 2001). Al-Fadl indicated that Bin Laden had dispatched several senior al

Qaeda members on this mission, including "Abu Hammam al Saudi, Abu Hajer al Iraqi, and Abu

Hassan Al Sudani. And Abu Rida al Suri." Id. at 217.   Afterwards, "we got lecture by Abu Hajer

al Iraqi, and he ask about what in the Sudan and what this relationship… He said he went over

there and I met some of the Islamic National Front in Sudan and they are very good people and

they very happy to make this relationship with al Qaeda, and they very happy to have al Qaeda if al

Qaeda come over there."  Id. at 217-18.

Al-Fadl personally interviewed and vetted those who sought to travel with al Qaeda to Sudan.  Tr. Vol. III at 244.  During testimony on February 6, 2001, al-Fadl described his role in facilitating al Qaeda's subsequent move to Sudan at the end of 1990: "I went with some members and we start rent houses and farms over there . . . . In Khartoum, because they going to bring the members in Sudan, so I went with other members to rent guesthouses and we established to rent houses for the single people and some houses for the people married that got family. And also we bought farms for the training and refresh training." Usama Bin Laden, Tr. Trans. at 219-20. Al-Fadl further testified that he spent approximately $250,000 of al Qaeda's own finances on acquiring various properties in the Sudan. On the direct orders of Bin Laden and other al Qaeda commanders, al-Fadl purchased large farms in Damazine, Port Sudan, and Soba.  Id. at 221. Later, al-Fadl testified that he personally witnessed senior al Qaeda commanders — including Salem al-Masri, Saif al-Islam al-Masri, Saif al-Adel, and Abu Talha al-Sudani — supervising training courses in explosives being offered at the farm in Damazine. Id. at 243-45.

Terrorism expert Evan Kohlmann explained that the government of Sudan had encouraged al Qaeda to move for several reasons.   The government envisioned that Sudan "would become the new haven for Islamic revolutionary thought and would serve as a base not just for al Qaeda but for Islamic revolutionaries of every stripe and size."  Tr. Vol. III at 231.  Also, al Qaeda's presence allowed Sudan to gain leverage against its antagonistic neighbor Egypt through the use of these groups that were opposed to the Egyptian government and to gain resources from its partnership with the groups, especially Bin Laden who was rumored to be very wealthy. Id. Sudan invited "Palestinian HAMAS movement, the Palestinian Islamic Jihad, Hezbollah from south Lebanon, which is an Iranian sponsored Shi'ite movement, al Qaeda, the Egyptian Islamic Jihad, the Libyan

17

Islamic Fighting Group, dissident groups from Algeria, Morocco, the Eritrean Islamic Jihad movement, literally every single jihadist style group, regardless of what sectarian perspective they had, was invited to take a base in Khartoum" to further the goal of organizing and launching a worldwide Islamic revolution. Id. at 232.

Sudan's open door policy for militant Islamic revolutionary groups and goal of fostering worldwide Islamic revolution resulted in an unprecedented meeting held in Khartoum known as the Popular Arab and Islamic Congress ("PAIC"). Ex. V at 5.   As Dr. Lorenzo Vidino testified, "[t]he creation of the PAIC was 'the culmination of a quarter-century of study, political activity, and international travel by Turabi,' and was described by Turabi himself in grandiose terms as 'the most significant event since the collapse of the Caliphate.'"   Id. (quoting J. Millard Burr and Robert O. Collins, Revolutionary Sudan: Hasan al-Turabi and the Islamist State, 1989-2000, at 56-7 (2003)).   Indeed, "[t]he list of participants to the PAIC's first assembly, which was held in Khartoum in April of 1991, reads like a who's who of modern terrorism' . . . encompass[ing] groups such as the Philippines' Abu Sayaf, the Algerian FIS, the Egyptian Islamic Jihad, and the Palestinian Hamas [who] voted a resolution pledging to work together to 'challenge and defy the tyrannical West.'"   Id.

Al Qaeda thrived "[f]rom 1991 to 1996 [when] bin Laden operated without any limitation inside Sudan, while under the protection of the Sudanese security forces. This freedom of action gave bin Laden and the members of his organization a useful extra-legal status in the Sudan."   Ex. W-2 at 2.   Al Qaeda has released official audio and video recordings and books through its media wing, As-Sahab, which explain the organization's tactical decision to move to Sudan.   See Tr. Vol. III at 246-47. In one official As-Sahab video, an al Qaeda member explains that "[t]he migration to the Sudan isn't just to build that impoverished country, but also for the Sudan to be a

launching ground for the management of the Jihad against the forces of tyranny in a number of

corners of the world, especially after the House of Saud colludes with the Americans in their

entrance to the land of the Two Sanctuaries, in a blatant contradiction of the command of the

Prophet (peace be upon him)."  Ex. FF. The al Qaeda narrator continues, "[t]he Shaykh was keen

to build the Sudan, which is a sound objective, but [also], the Sudan was a factory and production

cell for a generation of Mujahideen who would spread to other countries."  Id. (second alteration

in original); see also Tr. Vol. III at 249-51.

Bin Laden's presence in Sudan and partnership with Sudan was openly touted by the

Sudanese government, including television broadcasts of Bin Laden in the company of both

al-Turabi and President al-Bashir. Tr. Vol. III at 255.   The United States monitored this alliance

throughout the 1990s.   The State Department's 1991 Patterns of Global Terrorism report detailed

Sudan's growing connection with terrorist organizations:

> In the past year Sudan has enhanced its relations with international terrorist groups,
> including the Abu Nidal Organization, ANO. Sudan has maintained ties with state
> sponsors of terrorism such as Libya and Iraq and has improved its relations with
> Iran. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi,
> has intensified its domination of the government of Sudanese president General
> Bashir and has been the main advocate of closer relations with radical groups and
> their sponsors.

Ex. KK-1; Tr. Vol. III at 307-08.   The 1993 Report explained that Sudan had been placed on the

list of state sponsors of terrorism.   Ex. GG.   The report continued:

> Despite several warnings to cease supporting radical extremists, the Sudanese
> government continued to harbor international terrorist groups in Sudan. Through
> the National Islamic Front (NIF), which dominates the Sudanese government,
> Sudan maintained a disturbing relationship with a wide range of Islamic extremists.
> The list includes the ANO, the Palestinian HAMAS, the [Palestinian Islamic
> Jihad], Lebanese Hizballah, and Egypt's al-Gama'at al-Islamiyya.

19

Id.; see also Tr. Vol. III at 257-59.

Even after Sudan expelled Bin laden in 1996, al Qaeda operatives remained in

Sudan.   Ex. AA; see also Tr. Vol. II at 173-75; Tr. Vol. III at 305.   A declassified CIA

report dated May 12, 1997 indicated that Sudan's support for terrorist groups such as al

Qaeda continued, despite the considerable international pressure prompting the expulsion

of Bin Laden: "[d]espite some positive steps over the past year, Khartoum has sent mixed

signals about cutting its terrorist ties and has taken only tactical steps."   Ex. BB; see also

Tr. Vol. II 175-76.

The State Department's 1997 Patterns of Global Terrorism report detailed Sudan's

continued support for terrorist organizations: "Sudan in 1997 continued to serve as a haven,

meeting place, and training hub for a number of international terrorist organizations,

primarily of Middle East origin. The Sudanese Government also condoned many of the

objectionable activities of Iran, such as funneling assistance to terrorists and radical

Islamic groups operating in and transiting through Sudan."   Ex. KK-2; see also Ex. KK-3

(stating that Sudan continued to serve as a haven of international terrorist organizations in

1998 and noting "[in] particular[] Usama Bin Ladin's al-Qaida organization"); Tr. Vol. III

at 308-09. Hence, the evidence strongly supports the conclusion that Sudan harbored and

provided sanctuary to terrorists and their operational and logistical supply network leading

up to the 1998 terrorist attacks on U.S. embassies in East Africa.

2.   Financial, Military and Intelligence Services

As explained in more detail below, Sudan also provided critical financial, military,

and intelligence services that facilitated and enabled al Qaeda to strengthen its terrorist

network and infiltrate nearby countries. Al Qaeda set up a number of businesses and

charities in Khartoum, Sudan to finance its terrorist activities and provide employment and

cover for its operatives.   The government of Sudan also provided passports and Sudanese

citizenship for al Qaeda operatives. Additionally, the Sudanese military and intelligence

service coordinated with al Qaeda operatives frequently, providing protection for al Qaeda

and sharing resources and information to coordinate attacks on their mutual enemies.

### i.  Financial Support

Al Qaeda set up several businesses and charities in Sudan as its financial and

operative base for terrorist activities.   Tr. Vol. III at 253-55.   Once al Qaeda settled in

Khartoum, it opened business offices and bought a guesthouse designed to house al Qaeda

operatives in transit.   Id. at 252.   Al Qaeda's businesses included companies that imported

and exported containers, farm products, and construction materials.   See Ex. HH; Tr. Vol.

III at 278-80; Ex. V at 8-9.   Al Qaeda's farms provided income and offered space for

terrorist training camps.   Tr. Vol. III at 252-53.   The expansive space allowed for testing

explosives, producing mock-ups and planning attacks and assassinations.   Id.; Ex. V at

15-16.

These businesses produced some commercial profit but, more critically, provided

employment for al Qaeda operatives and cover for terrorist activities.   Tr. Vol. III at

253-55.   The commercial operations also provided an avenue for exchanging currency and

purchasing imported goods without raising international suspicion.   Usama bin Laden, Tr.

Trans. at 239-46 (testimony of al-Fadl).   As Mr. Kohlmann explained:

> Al Qaeda was looking for a way of self-sustaining, providing a means of income for
> its membership, its leadership, and also to provide an excuse for why al Qaeda
> operatives would be traveling to different countries.   It makes a good excuse if you
> show up at a foreign country at an immigration desk and someone asks you, why
> are you here, I'm here to help sell peanuts.   I'm here to provide humanitarian relief.

It sounded a lot better than saying I'm here to foment Islamic revolution.

Tr. Vol. III at 255.

Al Qaeda also opened and operated a number of purported charities to provide income for jihad, launder such funds and otherwise operate as a front for terrorist operations.   Ex. II; Tr. Vol. III at 285-86.   Most of the charities had offices in Khartoum and were active across West and Central Africa, including in Somalia and Kenya.   Tr. Vol. III at 286.   As fronts for al Qaeda activity, these charities served as depots for al Qaeda communications and records and as safe meeting houses for operatives.   Id.   For example, al Qaeda used the office of Mercy International in Nairobi, Kenya to hide documents, plan operations, and house members of al Qaeda. Id. at 287. Al Qaeda members used Mercy International ID cards to pose as relief workers.   Id.   Another charity in Nairobi, Help Africa People, did not engage in any relief work and was utilized similarly as a cover organization for al Qaeda members.   Id. at 288-89.

Bin Laden and al Qaeda also invested in Sudanese banks.   Id. at 337.   This access to the formal banking system was useful for "laundering money and facilitating other financial transactions that stabilized and ultimately enlarged bin Laden's presence in the Sudan."   Id.   For example, Bin Laden invested $50 million in the Sudan's Al Shamal Islamic Bank, and these funds were used to finance al Qaeda operations. Ex. V at 11-14. Al Shamal Islamic Bank was known for financing terrorist operations, and bin Laden remained a leading investor of the bank long after he was expelled from the Sudan.   Id.

The commercial enterprises served al Qaeda's ultimate goal of organizing jihad against the United States and the West.   As Dr. Vidino testified:

> During its time in Sudan, al Qaeda grew into a sophisticated organization. Several
> key figures in the organization portrayed al Qaeda at the time as a multinational
> corporation complete with a finance committee, investments, worldwide
> operations, and well-organized, concealed accounts. These activities were clearly
> facilitated by the Sudanese government. Complacent banks, customs exemptions,
> tax privileges, and, more generally, full support by the Sudanese government,
> allowed Bin Laden's commercial activities to flourish. But money has never been
> Bin Laden's highest aspiration. He used his newfound advantageous position
> to solidify his nascent organization, al Qaeda. . . . . Al Qaeda's commercial
> activities were to be used simply as a tool for the more important goal of building
> a stronger al Qaeda, not to generate profits. If profits were made, they were
> reinvested in the organization.

Ex. V at 15.

ii.   <u>Governmental/Military Support</u>

The Sudanese government, through al-Turabi and al-Bashir, invited al Qaeda

members to leave Afghanistan and come to Sudan in the early 1990s.   Tr. Vol. III at

242-43.   President al-Bashir followed up on this general invitation with a letter

specifically inviting several al Qaeda members to come to Sudan.   <u>Id.</u> at 243.   Al Qaeda

members used the letter to "avoid having to go through normal immigration and customs

controls" and resolve any "problems with the local police or authorities."   <u>Id.</u>   This letter

served as a "free pass" throughout the Sudan: "Upon viewing this letter, whether it was

customs or immigration or Sudanese police officers, they backed off.   They understood

that these individuals were here in an official quote-unquote diplomatic role."   <u>Id.</u>

During the 2001 trial of Bin Laden, Jamal al-Fadl, the former high-ranking al

Qaeda member from Sudan, testified that the letter served to publicly verify al Qaeda's

extra-judicial status in the Sudan:   "Like when we go to Port of Sudan and we bring some

stuff that comes — when we have some guys from outside Sudan to go inside Sudan, that

letter, we don't have to pay tax or custom, or sometime the Customs, you don't have to open

our containers." <u>Usama Bin Laden</u>, Tr. Trans. at 238.   The letter and governmental

support provided al Qaeda unchecked access throughout Sudan.   Tr. Vol. III at 243.

Al-Fadl also testified that the Sudanese government provided al Qaeda members —

including those who were not Sudanese — with "a couple hundred . . . real passports . . .

and Sudanese citizenships" to facilitate travel outside of the Sudan. <u>Usama bin Laden</u>, Tr.

Trans. at 441-42.

Al Qaeda and the Sudanese government jointly attempted to acquire nuclear

materials and develop chemical weapons.   Tr. Vol. III at 284-85.   The Sudanese military

"was directly engaged in trying to develop regular conventional weapons into

nonconventional chemical weapons with al Qaeda's assistance."   <u>Id.</u> at 285.   Al Qaeda

also had the support of Sudanese soldiers to facilitate the transport of weapons.   Essam

al-Ridi, an al Qaeda member and pilot, testified as to his knowledge of the use of Sudanese

soldiers to protect Bin Laden and al Qaeda members.   Ex. H at 25; <u>see also</u> <u>Usama bin</u>

<u>Laden</u>, Tr. Trans. at 569-70.   Al-Ridi explained that members of the Sudanese military

acted as personal guards for Bin Laden at his guest house in Khartoum.   Ex. H at 25-27.

Although Sudan eventually expelled Bin Laden in 1996, the government strongly

resisted foreign pressure to turn him over to the United States or grant access to the al

Qaeda training camps.   Ex. W-2 at 4-5.   Steven Simon, an expert on the state sponsorship

of terrorism, concluded that the Sudanese government's negotiation with the United States

regarding Bin Laden as a terrorist threat "was a charade," with Sudan not providing "useful

information on bin Laden's finances or the terrorist training camps."   <u>Id.</u> at 5.

Furthermore, "[t]he Sudanese government never offered intelligence regarding al Qaeda

cells that might have helped the U.S. unravel the plots to attack the two East African U.S.

embassies."   Id.

iii.   <u>Support from Sudan's Intelligence Services</u>

The Sudanese intelligence service had a delegation office that provided services to

Bin Laden and al Qaeda. Tr. Vol. III at 271; Ex. V at 19.   As described by Mr. Simon:

> The Sudanese intelligence service coordinated with al Qaeda operatives to
> vet the large numbers of Islamic militants entering the country to ensure that they
> were not seeking to infiltrate bin Laden's organization on behalf
> of a foreign intelligence service.

Ex. W-2 at 4.   Bin Laden himself was closely involved with the Sudanese intelligence

service and aware of its operations.   Tr. Vol. III at 271.   When al Qaeda members or

operatives arrived at the Khartoum airport, Sudanese intelligence would greet them and

escort them around customs and immigration to prevent their bags from being searched and

their passports from being stamped.   Id.   Al Qaeda operatives tried to avoid passport

stamps from Sudanese customs, because of Khartoum's reputation for terrorist activity and

the concern that a member with a stamped passport could come under suspicion of being

involved in international terrorism. Id. at 271-73.

The Sudanese intelligence service facilitated the transport of al Qaeda operatives

and funds from Sudan to the Nairobi cell. Id. at 294.   For example, in violation of Kenyan

customs regulations, the Sudanese intelligence service enabled al Qaeda operative

L'Houssaine Kherchtou to smuggle $10,000 from Sudan to Kenya. Id.   The intelligence

service also provided security for al Qaeda, which included protecting Bin Laden from an

assassination attempt in Khartoum in 1994.   Id. at 274.   Additionally, the Sudanese

intelligence service provided al Qaeda with weapons and explosives. Id. at 270.

The relationship between al Qaeda and the Sudanese intelligence was close and

25

mutually beneficial.   See id. at 268-270.   Indeed, "[t]he Sudanese intelligence service

viewed al Qaeda as a proxy, much the way that Iran views Hezbollah as a proxy." Id. at

268-69.   As a means of increasing their influence, the Sudanese intelligence service

considered that "by sharing resources, information, [and] by assisting al Qaeda, the

Sudanese could use al Qaeda to attack their mutual enemies." Id. at 269.

### 3.   Sudan's Support Essential to 1998 Embassy Bombings

Sudanese government support was critical to the success of the 1998 embassy bombings:

"The presence, the safe haven that Al Qaeda had in the Sudan was absolutely integral for its

capability of launching operations not just in Kenya, but in Somalia, in Eritrea, in Libya. Without

this base of operations, none of this would have happened." Id. at 317.   The support of Sudanese

intelligence, the safe haven provided by the Sudanese government to house al Qaeda's leadership

and train its operatives, and the provision of passports allowing al Qaeda to open businesses and

charities enabled al Qaeda to build its terrorist cells in Kenya, Somalia and Tanzania.   Id. at

316-19.   Indeed, Mr. Simon asserted:

> The Republic of Sudan supplied al Qaeda with important resources and
> support during the 1990s knowing that al Qaeda intended to attack the
> citizens, or interests of the United States. This support encompassed the
> safe haven of the entire country for bin Laden and the top al Qaeda
> leadership. This enabled bin Laden and his followers to plot against the
> U.S. and build their organization free from U.S. interference. Sudanese
> shelter enabled Bin Laden to create training camps, invest in – and use –
> banking facilities, create business firms to provide cover for operatives,
> generate funds for an array of terrorist groups, provide official documents
> to facilitate clandestine travel, and enjoy the protection of Sudan's security
> service against infiltration, surveillance and sabotage.

Ex. W-2 at 5-6.   Sudan's support thus facilitated and enabled the 1998 terrorist bombings on the

two U.S. embassies in East Africa.

With the support of Sudan and Iran, al Qaeda killed and attempted to kill thousands of

individuals on site in the 1998 U.S. embassy attacks in Nairobi, Kenya and Dar es Salaam,

Tanzania.   The evidence overwhelmingly supports the conclusion that al Qaeda carried out the

two bombing attacks, and Bin Laden himself claimed responsibility for them during an al Qaeda

documentary history released by the al Qaeda media wing.   See Exs. LL, MM, NN, OO; Tr. Vol.

III at 313-16.

II.     CONCLUSIONS OF LAW

The "terrorism exception" to the FSIA was first enacted as part of the Mandatory

Victim's Restitution Act of 1996, which was itself part of the larger Antiterrorism and Effective

Death Penalty Act of 1996.   See Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1241, 1241

(formerly codified at 28 U.S.C. §1605(a)(7)).   The exception permitted claims against foreign

state sponsors of terrorism that resulted in personal injury or death, where either the claimant or the

victim was a United States citizen at the time of the terrorist act.   See 28 U.S.C. § 1605(a)(7)

(2007).   Shortly thereafter, Congress passed the so-called "Flatlow Amendment" in the Omnibus

Consolidated Appropriations Act of 1996.   See Pub. L. No. 104-208, § 589, 110 Stat. 3009-1,

3009-172 (codified at 28 U.S.C. §1605 note).   Initially, some courts construed § 1605(a)(7) and

the Flatlow Amendment, read in tandem, as creating a federal cause of action against the foreign

state sponsor of terrorism.   See, e.g., Flatlow v. Islamic Republic of Iran, 999 F. Supp. 1, 27

(D.D.C. 1998).

In Cicippio-Puleo v. Islamic Republic of Iran, the D.C. Circuit concluded that neither §

1605(a)(7) nor the Flatlow Amendment itself created a cause of action against the foreign state.

353 F.3d 1024, 1027 (D.C. Cir 2004).   Instead of a federal cause of action, the D.C. Circuit

directed plaintiffs to assert causes of action using "some other source of law, including state law."

Id. at 1036; see, e.g., Dammarell v. Islamic Republic of Iran, 2005 WL 756090, at *33 (D.D.C.

Mar. 25, 2005) (requiring plaintiffs post-Cicippio-Puleo to amend their complaint to state causes

of action under the law of the state in which they were domiciled at the time of their injuries).

Hence, following Cicippio-Puleo, the FSIA "terrorism exception" began to serve as "a

'pass-through' to substantive causes of action against private individuals that may exist in federal,

state or international law."   Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 83 (D.D.C.

2006).

        In some cases, applying relevant state law created practical problems for litigants and the

courts.   Under applicable choice of law principles, district courts applied the state tort law of each

individual plaintiff's domicile, which in many cases involved several different states for the same

terrorism incident.   See, e.g., Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261,

275-324 (D.D.C. 2005) (applying the law of six states and the District of Columbia).   This

analysis resulted in different awards for similarly-situated plaintiffs, based on the substantive tort

law distinctions among states for intentional infliction of emotional distress claims.   See, e.g.,

Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007) (dismissing

intentional infliction of emotional distress claims of those family members domiciled in

Pennsylvania and Louisiana, whose laws required the claimant to be present at the site of the event

causing emotional distress).

        To address these issues, Congress enacted section 1083 of the 2008 NDAA, which

amended the "terrorism exception" and other related FSIA provisions.   The Act repealed

§1605(a)(7) of Title 28 and replaced it with a separate section, §1605A, which, among other

things: (1) broadened the jurisdiction of federal courts to include claims by members of the U.S.

armed forces and employees or contractors of the U.S. government injured while performing their

duties on behalf of the U.S. Government; and (2) created a federal statutory cause of action for

those victims and their legal representatives against state sponsors of terrorism for terrorist acts committed by the State, its agents, or employees, thereby abrogating Cicippio-Puleo.   See Simon v. Republic of Iraq, 529 F.3d 1187, 1190 (D.C. Cir. 2008), rev'd on other grounds, 129 S. Ct. 2183 (2009).

This case is the second to apply §1605A to non-U.S. national plaintiffs who worked for the U.S. government (and their non-U.S. national family members), who are now entitled to compensation for personal injury and wrongful death suffered as a result of the terrorist attacks on the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania.   The first was this Court's recent decision in Estate of Doe v. Islamic Republic of Iran, 2011 WL 3585963 (D.D.C. Aug. 16, 2011), dealing with claims arising out of the 1983 and 1984 bombings of the U.S. embassy in Lebanon.

### A.  Jurisdiction Under The FSIA

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, is the sole basis for obtaining jurisdiction over a foreign state in the United States.   Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 50 (D.D.C. 2009).   Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, see 28 U.S.C. § 1604, a federal district court can obtain personal and subject matter jurisdiction over a foreign entity in certain circumstances.   A court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608.   See 28 U.S.C. § 1330(b).   Moreover, subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity.   See 28 U.S.C. §§ 1330(a) & 1604.   Here, this Court has jurisdiction because service was proper and defendants' conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. §

1605A.

      1.    <u>Service of Process</u>

      Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608.   <u>See</u> 28 U.S.C. § 1330(b); <u>TMR Energy Ltd. v. State Prop. Fund of Ukr.</u>, 411 F.3d 196, 199 (D.C. Cir. 2005).   "A foreign state or its political subdivision, agency or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1).   "The FSIA prescribes four methods of service, in descending order of preference.   Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on."   <u>Ben-Rafael v. Islamic Republic of Iran</u>, 540 F. Supp. 2d 39, 52 (D.D.C. 2008); <u>see also</u> 28 U.S.C. § 1608.   As described above, plaintiffs in each case here properly effected service on all defendants.   <u>See</u> <u>supra</u> at 2-4. And in each case, defendants did not respond or make an appearance within 60 days, and thus, pursuant to § 1608(d), the Clerk entered default against defendants.   Hence, as defendants were properly served in accordance with § 1608, this Court has personal jurisdiction over them.

      2.  <u>Subject Matter Jurisdiction</u>

      The provisions relating to the waiver of immunity for claims alleging state-sponsored terrorism, as amended, are set forth at 28 U.S.C. § 1605A(a).   Section 1605A(a)(1) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in a case where

> money damages are sought against [it] for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605A(a)(1).   For a claim to be heard in such a case, the foreign state defendant must have been designated by the U.S. Department of State as a "state sponsor of terrorism" at the time the act

complained of occurred.  <u>Id.</u>  Finally, subsection (a)(2)(A)(ii) requires that the "<u>claimant or the</u>

<u>victim</u> was, at the time the act . . . occurred

> (I) a national of the United States;
>
> (II) a member of the armed forces; or
>
> (III) otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment . . . .

28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III)(emphasis added).

As explained in more detail below, plaintiffs satisfy each of the requirements for subject matter jurisdiction.   First, Iran and Sudan were designated as state sponsors of terrorism at the time all of the related actions in this case were filed.   Second, plaintiffs' injuries were caused by the defendants' acts of "extrajudicial killing" and provision of "material support" for such acts to their agents.   Third, plaintiffs presented evidence that they were either themselves nationals of the United States or U.S. Government employees at the time of the attacks, or their claims are derived from claims where the victims were either U.S. nationals or U.S. Government employees at the time of the attacks, as required by section 1605A(a)(2)(A)(ii).   As the case progresses to the damages phase, individual plaintiffs will be required to produce evidence of their employment or familial relationship to establish their standing under the statute.

### i.  Iran and Sudan Designated As State Sponsors of Terrorism

A foreign state defendant must have been designated as a state sponsor of terrorism at the time the act complained of occurred. 28 U.S.C. § 1605A(a)(2)(A)(I). The statute defines "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)),

section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms

Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has

repeatedly provided support for acts of international terrorism . . . ." 28 U.S.C. § 1605A(h)(6).

Iran and Sudan were designated by the U.S. Department of State as state sponsors of

terrorism on January 19, 1984 and August 12, 1993, respectively.   Iran was formally declared a

state sponsor of terrorism by Secretary of State Schultz, see 49 Fed. Reg. 2836 (Jan. 23, 1984), and

today remains designated as a state sponsor of terrorism.   Sudan was originally designated a state

sponsor of terrorism in 1993.   See 58 Fed. Reg. 52,523 (Oct. 8, 1993). Once a country has been

designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President

submits to Congress a proper report, as described in the Export Administration Act.   See 50

U.S.C. app. § 2405(j)(4).   Iran and Sudan have never been removed from this list of state sponsors

of terrorism.   Hence, the requirements set forth in section 1605A(a)(2)(A)(i) are satisfied.

### ii.   Extrajudicial Killing and Provision of Material Support

The FSIA, as amended, strips immunity "in any case . . . in which money damages are

sought against a foreign state for personal injury or death that was caused by an act of . . .

extrajudicial killing . . . or the provision of material support or resources for such an act if such

an act or provision of material support or resources is engaged in by an official, employee, or

agent or such foreign state while acting within the scope of his or her office, employment, or

agency." 28 U.S.C. § 1605A(a)(1). The FSIA refers to the Torture Victim Protection Act of

1991 ("TVPA") for the definition of "extrajudicial killing." See 28 U.S.C. § 1605A(h)(7). The

TVPA provides that

> the term "extrajudicial killing" means a deliberated killing not authorized by a previous
> judgment pronounced by a regularly constituted court affording all of the judicial
> guarantees which are recognized as indispensable by civilized peoples. Such term,

however, does not include any such killing that, under international law, is lawfully
carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note; <u>see also</u> <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 74

(D.D.C. 2010) (adopting the TVPA definition of "extrajudicial killing" in bombing of U.S.

Marine barracks in Beirut, Lebanon).

Plaintiffs have satisfied their burden under 28 U.S.C. § 1608(e) to show that the

governments of Sudan and Iran provided material support and resources to Bin Laden and al

Qaeda for acts of terrorism, including extrajudicial killings.   Targeted, large-scale bombings of

U.S. embassies or official U.S. government buildings constitute acts of extrajudicial killings.

<u>Estate of Doe</u>, 2011 WL 3585963, at *10 ("[T]he 1983 and 1984 Embassy bombings both qualify

as an 'extrajudicial killing.'"); <u>Dammarell v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 105, 192

(D.D.C. 2003)("[T]he evidence is conclusive that [the victims of the 1983 embassy bombing in

Lebanon] were deliberately targeted for death and injury without authorization by a previous court

judgment . . . and [the 1983 bombing] constitutes an act of 'extrajudicial killing.'"); <u>Wagner v.</u>

<u>Islamic Republic of Iran</u>, 172 F. Supp. 2d 128, 134 (D.D.C. 2001) (finding the September 1984

bombing of the U.S. embassy annex in Lebanon was a "deliberate and premeditated act" that killed

14 people and "[t]here is no evidence that it was judicially sanctioned by any lawfully constituted

tribunal"); <u>Brewer</u>, 664 F. Supp. 2d at 52-53 (same); <u>Welch v. Islamic Republic of Iran</u>, 2007 U.S.

Dist. LEXIS 99191, at *26 (D.D.C. Sept. 20, 2007) (finding that an embassy attack "clearly

qualifies as an extrajudicial killing").

With the support of Sudan and Iran, al Qaeda killed hundreds of individuals — and

attempted to kill thousands more — on site in the 1998 U.S. embassy attacks in Nairobi and Dar es

Salaam.   No one questions that al Qaeda carried out the two bombing attacks, and Bin Laden

himself claimed responsibility for them during an al Qaeda documentary history released by the al

Qaeda media wing.   See Exs. LL, MM, NN, OO; Tr. Vol. III at 313-16.   Such acts of terrorism

are contrary to the guarantees "recognized as indispensable by civilized persons."   Hence, the

1998 embassy attacks in Kenya and Tanzania, and the resulting deaths and injuries, qualify as an

"extrajudicial killing."

The statute defines "material support or resources" to include "any property, tangible or

intangible, or service, including currency or monetary instruments or financial securities, financial

services, lodging, training, expert advice or assistance, safehouses, false documentation or

identification, communications equipment, facilities, weapons, lethal substances, explosives,

[and] personnel." 18 U.S.C. § 2339A(b).   As described in detail above, defendants provided

several kinds of material support to al Qaeda without which it could not have carried out the 1998

bombings.   Sudan provided — at least — safe haven for Bin Laden and al Qaeda, and functioned

as its training, organizational and logistical hub, from 1991 to 1996.   When a foreign sovereign

allows a terrorist organization to operate from its territory, this meets the statutory definition of

"safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or
> encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its
> borders, and thus provided a base of operations for the planning and execution of
> terrorist attacks — as the complaint unambiguously alleges — Sudan provided a
> "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C.
> § 1605(a)(7).

Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 108 (D.D.C. 2006). The Sudanese government

also provided inauthentic passports, which qualify as "false documentation or identification" under

18 U.S.C. § 2339A(b).   Plaintiffs also established that the Iranian government both trained al

Qaeda members and authorized the provision of training by Hezbollah in explosives, and

specifically in how to destroy large buildings.   This support qualifies as "training, expert advice or assistance" under 18 U.S.C. § 2339A(b).   See id. § 2339A(b)(2) and (3) (defining "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge").

The statute also requires that the extrajudicial killings be "caused by" the provision of material support.   The causation requirement under the FSIA is satisfied by a showing of proximate cause.   See 28 U.S.C. § 1605A(a)(1); Estate of Doe, 2011 WL 3585963, at *11; Valore, 700 F. Supp. at 66; Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (weighing the import of the phrase "caused by" from 28 U.S.C. § 1605(a)(7), the predecessor statute to 28 U.S.C. § 1605A).   Proximate causation may be established by a showing of a "reasonable connection" between the material support provided and the ultimate act of terrorism.   Valore, 700 F. Supp. 2d at 66. "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" Id. (quoting Brewer, 664 F. Supp. 2d at 54 (construing causation element in 28 U.S.C. § 1605A by reference to cases decided under 28 U.S.C. § 1605(a)(7)). Plaintiffs have demonstrated several reasonable connections between the material support provided by defendants and the two embassy bombings. Sudan provided the safe harbor necessary to allow al Qaeda to train and organize its members for acts of large-scale terrorism from 1992 to 1996. Sudan facilitated its safe harbor through constant vigilance by its security services and the provision of documentation required to shelter al Qaeda from foreign intelligence services and competing terrorist groups.   Iran's training and technical support was specifically required for the successful execution of al Qaeda's plot to bomb the two embassies.   Hence, plaintiffs have

established that the 1998 embassy bombings were caused by Iran and Sudan's provision of material support.

### B.      Federal Cause of Action

Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if "satisfactory to the Court." 28 U.S.C. § 1608(e). Plaintiffs' claims are brought under section 1605A(c), the newly created federal cause of action, or, in the alternative, under applicable state or foreign law.   Section 1605A(c) authorizes claims against state sponsors of terrorism to recover compensatory and punitive damages for personal injury or death caused by acts described as follows.

> (c) Private right of action.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—
>
> (1) a national of the United States,
>
> (2) a member of the armed forces,
>
> (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
>
> (4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

The plain meaning approach to statutory construction governs the Court's interpretation of § 1605A(c). See Estate of Doe, 2011 WL 3585963, at *13-*14.   A straightforward reading of §

36

1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of

the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor,

or a legal representative of such a person. Absent from these four categories are non-U.S. national

family members of the victims of terrorist attacks. The statutory language that follows the listing

of the four categories of individuals in § 1605A(c) does not expand the private right of action

beyond those four categories. The cause of action is further described as "for personal injury or

death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee

or agent of that foreign state, for which the courts of the United States may maintain jurisdiction

under this section for money damages."   Id.

Plaintiffs argue that the statutory language creates a cause of action for any individual

victim or claimant "for which the courts of the United States may maintain jurisdiction."   But the

plain language of the statute does not support this construction.   Indeed, the text refers back to the

waiver of sovereign immunity as to a foreign state for terrorist acts as provided in section (a)(1).

Nonetheless, the family member plaintiffs contend that, even if they do not fit expressly within the

four categories listed in § 1605A(c)(1)-(4), once the immunity of the defendants has been waived

as to their claims, the intent of Congress indicates that the immediate family members of U.S.

government employees, despite their status as foreign nationals, are entitled to bring claims

through a federal statutory cause of action and seek damages for their losses, including for

solatium and pain and suffering.

Plaintiffs explain that the legislative history reveals that a purpose of the 2008 amendments

to the FSIA was to "fix[] the inequality" of rights between U.S. citizens and non-U.S. citizens to

seek relief from the perpetrators of terrorist acts. See 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008)

(statement by Sen. Lautenberg). And, plaintiffs continue, Congress was prompted to create a

37

federal statutory cause of action that would resolve the disparity among the various state laws regarding the recovery of emotional distress by immediate family members that existed prior to the statutory amendments.   See 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg) (noting that the amendments would fix the problem of "judges hav[ing] been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law"). Indeed, if foreign national immediate family members of victims do not have a cause of action under § 1605A(c), then Senator Lautenberg did not completely "fix" the problem of disparate damages standards for this particular category of claimants. But it is not the court's role to fix a problem that Congress failed to address. See Estate of Doe, 2011 WL 3585963, at *14.   As Cicippio-Puleo instructed, "the Supreme Court has declined to construe statutes to imply a cause of action where Congress has not expressly provided one." 353 F.3d at 1033.

Some courts have found jurisdiction and a cause of action under §1605A and, in so doing, have noted that because § 1605A(c) incorporates the elements required to waive the foreign state's immunity and vest the court with subject matter jurisdiction under section 1605A, "liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met." Calderon-Cardona v. Democratic People's Republic of Korea, 723 F. Supp. 2d 441, 460 (D.P.R. 2010); see also Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (explaining that the elements of immunity and liability are "essentially the same [under the new amendments] in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action" under § 1605A(c)); Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 72 (D.D.C. 2010) (analyzing liability and jurisdiction together); Brewer, 664 F. Supp. 2d at 52 ("[I]f immunity is waived, the Act provides for economic damages, solatium, pain and suffering, and punitive

damages."); <u>Gates v. Syrian Arab Republic</u>, 580 F. Supp. 2d 53, 64-69 (D.D.C. 2008) (analyzing liability under the same elements required for jurisdiction and finding liability where extrajudicial killing and material support elements satisfied). But that is not true here. In each of those cases, the claimants fit within the four categories of individuals who are explicitly provided a cause of action under § 1605A(c) of the statute. The elements for a waiver of immunity and for liability, then, may indeed be the same.   But not for individuals who do not fit within the four categories listed in § 1605A(c).   <u>See</u> <u>Estate of Doe</u>, 2011 WL 3585963, at *15.

Hence, those plaintiffs who are foreign national family members of victims of the terrorist attacks in Nairobi and Dar es Salaam lack a federal cause of action. Nonetheless, they may continue to pursue claims under applicable state and/or foreign law. Although § 1605A created a new federal cause of action, it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity. <u>See</u> <u>Estate of Doe</u>, 2011 WL 3585963, at *15 (citing <u>Simon</u>, 529 F.3d at 1192).   Indeed, plaintiffs injured or killed as a result of state-sponsored terrorist attacks have pursued claims under both the federal cause of action and applicable state law, and are precluded only from seeking a double recovery. <u>See id.</u>

### C.    Choice of Law

In circumstances where the federal cause of action is not available, courts must determine whether a cause of action is available under state or foreign law and engage in a choice of law analysis. Federal courts addressing FSIA claims in the District of Columbia apply the choice of law rules of the forum state. <u>Oveissi v. Islamic Republic of Iran</u>, 573 F.3d 835, 840 (D.C. Cir. 2009); <u>Dammarell</u>, 2005 WL 756090, at *18. This Court will therefore look to the choice of law rules of the District of Columbia in this case.

Under District of Columbia choice of law rules, the court must first determine whether a

39

conflict exists between the law of the forum and the law of the alternative jurisdiction.    If there is

no true conflict, the court should apply the law of the forum. See USA Waste of Md, Inc. v. Love,

954 A.2d 1027, 1032 (D.C. 2008) ("A conflict of laws does not exist when the laws of the different

jurisdictions are identical or would produce the identical result on the facts presented."). If a

conflict is present, the District of Columbia employs a "'constructive blending' of the 'government

interests' analysis and the 'most significant relationship' test" to determine which law to apply.

Oveissi, 573 F.3d at 842; Dammarell, 2005 WL 756090, at *18 (citation omitted).

      In Dammarell, an FSIA case that involved the 1983 bombing of the U.S. embassy in

Beirut, Lebanon, this Court explained that "under the governmental interests analysis as so refined,

we must evaluate the governmental policies underlying the applicable laws and determine which

jurisdiction's policy would be most advanced by having its law applied to the facts of the case

under review." 2005 WL 756090, at *18. For the "'most significant relationship' component of the

analysis, the D.C. Court of Appeals directs courts to section 145 of the Restatement of the Conflict

of Laws, which identifies four relevant factors: (i) 'the place where the injury occurred'; (ii) 'the

place where the conduct causing the injury occurred'; (iii) 'the domicile, residence, nationality,

place of incorporation and place of business of the parties'; and (iv) 'the place where the

relationship, if any, between the parties is centered.'" Id. (citing Restatement (Second) of Conflict

of Laws § 145 (1971)). The Restatement also references the "needs of the interstate and the

international systems, the relevant policies of the forum, the relevant policies of other interested

states, certainty, predictability and uniformity of result, and ease in the determination and

application of the law to be applied." Id.; see also Oveissi, 573 F.3d at 842; Estate of Heiser v.

Islamic Republic of Iran, 466 F. Supp. 2d 229, 266 (D.D.C. 2006). As a general rule, the law of the

forum governs, "unless the foreign state has a greater interest in the controversy."

Kaiser-Georgetown Cmty. Health Plan v. Stutsman, 491 A.2d 502, 509 (D.C. 1985).

Three conceivable choices of law are presented in this case: the law of the forum state (the District of Columbia), the laws of the place of the tort (Kenya and Tanzania), or the law of the domicile state or country of each plaintiff (including domestic and foreign locations). See Dammarell, 2005 WL 756090, at *18. In previous FSIA terrorism cases involving U.S. citizen plaintiffs, this Court ruled that the law of the domicile state of each plaintiff should provide the rule of decision, noting each state's interest in the welfare and compensation of the surviving family members of individuals killed in the terrorist attacks. See id. at *21 (citing cases). Here, as in Estate of Doe, the choice of law analysis pertains only to non-U.S. national family members of victims of the terrorist attacks (who lack a federal cause of action), and the balance of interests suggests a different outcome from the FSIA cases involving U.S. citizen plaintiffs.

Consistent with Dammarell and other FSIA cases, United States domestic law remains more appropriate in state-sponsored terrorism cases than foreign law. Furthermore, in light of the 2008 amendments to FSIA that seek to promote uniformity and extend access to U.S. federal courts to foreign national immediate family members of victims of terrorism, the law of the forum state, the District of Columbia, should provide the rule of decision.

1.     Domestic Law

As in Dammarell, the choice of law analysis here points away from the place of the injury, and toward applying the laws of a United States forum. First, no clear conflict of law is present between the laws of the forum (District of Columbia) and the laws of Kenya and Tanzania.   Like District of Columbia law, Kenyan law allows immediate family members to recover for their emotional distress.   See Pl.'s Att. B, Kenyan Legal Opinion.   Tanzanian law also permits immediate family members to recover for some emotional injuries. Tanzanian Probate and

Administration of Estates Act, ¶ 33 (Lexis 2010).   When "the laws of the different jurisdictions . . . would produce the identical result on the facts presented," USA Waste, 954 A.2d at 1032, it tilts the balance of this Court's choice of law analysis towards domestic law.

Second, to the extent that United States law and the law of Kenya and Tanzania (or another foreign jurisdiction) conflict, the District of Columbia's "governmental interests" choice of law test in state-sponsored terrorism cases strongly favors the application of United States law over foreign law. Although "[t]he law of a foreign country has provided the cause of action in some cases arising out of mass disasters that occurred on foreign soil," Dammarell, 2005 WL 756090, at *19 (citing Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1004 (9th Cir. 1987) (applying Polish law to airplane crash occurring in Poland), and Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China, 923 F.2d 957, 962-64 (2d Cir. 1991) (applying Chinese law to airplane crash occurring in China)), such a result is less appropriate in state-sponsored terrorism-related cases. In terrorism cases, "[t]he United States has a unique interest in having its domestic law — rather than the law of a foreign nation — used in the determination of damages in a suit involving such an attack." Holland v. Islamic Republic of Iran, 496 F. Supp. 2d 1, 22 (D.D.C. 2005) (citing Restatement (Third) of Foreign Relations Law § 402(3) (1987)).

Here, just as in Dammarell, "the particular characteristics of this case heighten the interests of a domestic forum and diminish the interest of the foreign state. The injuries in this case are the result of a state-sponsored terrorist attack on a United States embassy and diplomatic personnel. The United States has a unique interest in its domestic law, rather than the law of a foreign nation, determining damages in a suit involving such an attack." Dammarell, 2005 WL 756090, at *20; see also Restatement (Third) of Foreign Relations Law § 402(3) (1987) (recognizing that the United States has an interest in projecting its laws overseas for "certain conduct outside its territory by

persons not its nationals that is directed against the security of the state or against a limited class of other state interests"). These considerations "elevate the interests of the United States to nearly its highest point." Dammarell, 2005 WL 756090, at *20; see also Kaiser-Georgetown Cmty. Health Plan, 491 A.2d at 509 n.10 (suggesting that unless a foreign state has a greater interest in the application of its law than the forum state, the interests of efficiency only serve to further "tilt the balance in favor of applying the law of the forum state"). Hence, the "governmental interest" prong of the District of Columbia choice of law analysis counsels against applying the law of Kenya and Tanzania, or other foreign laws, and suggests that domestic law should control.   Cf. Estate of Doe, 2011 WL 3585963, at *17.

> 2. District of Columbia Law

In addition to the strong governmental interest in applying United States law in this case, the interests of uniformity of decision among the foreign national family members points to the application of the law of the forum. Most of these plaintiffs are domiciled in Kenya and Tanzania, although some are domiciled in other countries.   In previous FSIA decisions, this Court has applied the laws of the several domiciliary states. See, e.g., Dammarell, 2005 WL 756090, at *21. Here, however, the interests of uniformity provided by the law of the forum state, which also has a significant interest in the underlying events, provides the most appropriate choice of law for all foreign national family members who lack a federal cause of action. See Kaiser-Georgetown Cmty. Health Plan, 491 A.2d at 509 n.10 ("'The forum State's interest in the fair and efficient administration of justice' together with the 'substantial savings [that] can accrue to the State's judicial system' when its judges are 'able to apply law with which [t]he[y are] thoroughly familiar or can easily discover,' tilt the balance in favor of applying the law of the forum." (quoting Allstate Ins. Co. v. Hague, 449 U.S. 302, 326 & n.14 (1981)).

In the recent amendments to the FSIA, Congress has sought to strengthen enforcement of United States terrorism laws and to extend their protections to foreign nationals who are employees of United States embassies targeted by terrorists and their immediate family members, as well as to correct the problem of disparity among the various state laws regarding recovery of emotional distress by family members.   See Estate of Doe, 2011 WL 3585963, at *18.   As discussed above, Congressional desire to promote uniformity does not, by itself, create a federal cause of action for non-United States national family members where the statutory text fails to do so. But efficiency and uniformity are appropriate and meaningful factors in a choice of law analysis. Without doubt, applying District of Columbia law will provide greater uniformity of result, as individual plaintiffs domiciled in different states and foreign nations will all be subject to the same substantive law. Although "the D.C. Court of Appeals has emphasized that concerns of uniformity and familiarity cannot prevail when another location otherwise has 'a significantly greater interest than does the District' in the cause of action," Dammarell, 2005 WL 756090, at *20 (citing Mims v. Mims, 635 A.2d 320, 324-25 (D.C. 1993)), the recent amendments — and the stated goal of those amendments to promote uniformity — serve to increase the interest in applying District of Columbia substantive law to this case.

The District of Columbia's connection to the terrorist attacks in this case further supports this choice of law conclusion. To be sure, the 1998 embassy bombings took place in Kenya and Tanzania, the nationalities and domiciles of the various victims and plaintiffs are disparate and varied, and the defendants have no connection to the United States. But a unifying factor in this case is that all of plaintiffs' claims derive from employment with a federal agency headquartered in the District of Columbia, the seat of the federal government. The application of District of Columbia substantive law best promotes the United States' interest in applying domestic law rather

than the law of a foreign nation, Congress's intent to promote uniformity of result, and the District of Columbia's real connection to the attacks in this case.   See Estate of Doe, 2011 WL 3585963, at *19.   Hence, this Court will apply the law of the District of Columbia to plaintiffs' claims that do not arise under the federal cause of action at § 1605A(c).

III.     CONCLUSION

For the foregoing reasons, final judgment on liability will be entered in favor of plaintiffs and against defendants.   Plaintiff's claims, under federal[3] or state law, will be referred to a special master, who will receive evidence and prepare proposed findings and recommendations for the disposition of each individual claim in a manner consistent with this opinion.   A separate order will be issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:   November 28, 2011

---

[3] For plaintiffs' federal claims under § 1605A(c), "[t]he Court is presented with the difficulty of evaluating these claims under the FSIA-created cause of action, which does not spell out the elements of these claims that the Court should apply." Valore, 700 F. Supp. 2d at 75. Hence, the Court "is forced . . . to apply general principles of tort law — an approach that in effect looks no different from one that explicitly applies federal common law"; but "because these actions arise solely from statutory rights, they are not in theory matters of federal common law." Heiser, 659 F. Supp. 2d at 24; see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003) (discussing that the term "federal common law" under the FSIA "seems to us to be a misnomer" because "these actions are based on statutory rights"). District courts thus look to Restatements, legal treatises, and state decisional law "to find and apply what are generally considered to be the well-established standards of state common law, a method of evaluation which mirrors — but is distinct from — the 'federal common law' approach." Heiser, 659 F. Supp. 2d at 24.