1

1  UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4

5  JAMES OWENS,                    :  CA Nos. 01-2244
                                   :          14-2090
6              Plaintiff,          :          14-2118
                                   :          15-1954
7  v.                              :          08-1349
                                   :
8  REPUBLIC OF SUDAN,              :
                                   :
9              Defendant.          :
   ------------------------------------------------------

10

11            TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE JOHN D. BATES
12            UNITED STATES DISTRICT JUDGE
              Friday, December 18, 2015

13

14  APPEARANCES:

15    For the Plaintiffs:   CROWELL MORING, LLP
                            BY STUART H. NEWBERGER, ESQ.
16                             JOHN L. MURINO, ESQ.,
                            1001 Pennsylvania Avenmue, NW
17                          Washington, D.C.  20004-2595

18                          MILLER FIRM, LLC
                            BY:  MICHAEL J. MILLER, ESQ.
19                             EDWARD MAC ALLISTER, ESQ.
                            108 Railroad Avenue
20                          Orange, VA   22960

21                          PERLES LAW FIRM, P.C.
                            BY:  STEVEN R. PERLES, ESQ.
22                          1050 Connecticut Avenue, NW
                            Suite 500
23                          Washington, D.C. 20036

24

25

2

```
 1    APPEARANCES (Continued):

 2      For the Plaintiffs:   JOHN VAIL LAW, PLLC
                              BY:  JOHN VAIL, ESQ.
 3                            777 6th Street, NW, Suite 410
                              Washington, D.C. 20001
 4

 5    For the Defendant:     WHITE & CASE, LLP
                             BY:  CHRISTOPHER M. CURRAN, ESQ.
 6                                NICOLE E. ERB, ESQ.
                                  CLAIRE A. DE LELLE, ESQ.
 7                           701 13th Street, NW
                             Washington, D.C. 20005
 8

 9    ALSO PRESENT:  Alrashid Adam

10                   Judge Awn Khasawneh

11                   Aiman Odeh

12                   Ambassador Khalid

13

14

15    Proceedings reported by machine shorthand, transcript

16    produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25
```

3

1    <u>PROCEEDINGS</u>

2            DEPUTY CLERK:  Your Honor, we have

3    Civil Action 01-2244 and related cases, Civil Action

4    14-2090, 14-2118, 15-1945, and 08-1349, James Owens v.

5    Republic of Sudan and related cases.

6                Counsel, please approach the lectern

7    and identify yourself and the party you represent,

8    please.

9            MR. NEWBERGER:  Good morning,

10   Your Honor.  Stuart Newberger and John Murino from

11   Crowell & Moring.  We represent the Aliganga and Bartley

12   plaintiffs.

13           THE COURT:  Good morning.

14           MR. MILLER:  Good morning, Your Honor.

15   Michael Miller on behalf of Ansango [phon.] and Wamai.

16           THE COURT:  Good morning.

17           MR. VAIL:  Good morning, Your Honor.

18   John Vail on behalf of all plaintiffs in the Owens,

19   Mowilla [phon.] and Kalik [phon.] cases.

20           THE COURT:  Thank you.

21           MR. MAC ALLISTER:  Good morning,

22   Your Honor, on behalf of the plaintiffs in the Enduso

23   and Opati cases, along with Steve Perles.

24           THE COURT:  Good morning.

25           MR. CURRAN:  Good morning, Judge Bates.

4

1   I'm Christopher Curran from the law firm of White & Case

2   representing Sudan.  I'm accompanied by two of my law

3   firm colleagues and Claire DeLelle.

4                   And then with Your Honor's indulgence,

5   I'd like to introduce visitors from Sudan.

6                   First, the state minister for

7   presidential affairs, Minister Alrashid Adam.  The state

8   minister for presidential affairs is essentially the

9   chief of staff to the president of Sudan.

10                   Also the ambassador, Ambassador Khalid,

11   who is the Sudan ambassador to the United States.

12                   Two other distinguished guests, part of

13   the Sudanese team.  First, Judge Awa Khasawneh, a former

14   judge of the International Court of Justice, who has

15   been appointed and has been acting as the senior legal

16   advisor to the Sudanese governor in connection with this

17   litigation.

18                   And he is assisted by Mr. Aiman Odeh, a

19   former minister of justice of Jordan.  Both

20   Judge Khasawneh and Mr. Odeh are Jordanians but are part

21   of the legal team responsible for this.

22                   THE COURT:  All right.  Good morning.

23                   We're here to address a number of

24   issues that have been raised by the motions that have

25   been filed beginning, I guess, in April of 2014.  And

5

1    these motions, for the most part, are under Rule 60(B)

2    and have been brought by Sudan; and therefore, I will

3    hear first from counsel for Sudan.

4                    I assume that's going to be you,

5    Mr. Curran?

6                    MR. CURRAN:  That's right, Your Honor,

7    for the most part.

8                    THE COURT:  Pardon me?

9                    MR. CURRAN:  For the most part.

10                    THE COURT:  What's "the most part"

11   mean?

12                    MR. CURRAN:  If Your Honor allows it,

13   there may be certain discreet issues where I may ask for

14   the help of Ms. Erb and Ms. DeLelle.

15                    THE COURT:  We'll cross those bridges

16   when we come to them, if we come to them.

17                    MR. NEWBERGER:  Your Honor, just to

18   follow up on your notice to the parties and counsel the

19   other day about the allocation of time on either side,

20   we have a lot of different lawyers and a lot of

21   different cases.  We have worked as a group to try and

22   assign particular issues to particular lawyers.

23                    What I would hope is that perhaps after

24   Mr. Curran's presentation, we would just take a

25   five-minute break, and that may allow us to organize

6

 1   ourselves even more efficiently to maybe even reduce the

 2   number of people who have to stand up and address

 3   particular issues -- depending on Your Honor's

 4   discretion, of course.

 5                    THE COURT:  Reduction is always

 6   appreciated.  We will cross that bridge when we come to

 7   it, but I don't see any problem allowing a couple of

 8   minutes.

 9                    MR. NEWBERGER:  Thank you, Your Honor.

10                    MR. CURRAN:  Shall I proceed,

11   Your Honor?

12                    THE COURT:  You shall.

13                    MR. CURRAN:  Your Honor, first, at the

14   outset, I'd like to acknowledge, of course, the tragic

15   circumstances that bring us all together in this

16   courthouse.  No one disputes that there were these

17   terrorist bombings of the U.S. embassies in Africa.

18                    Sudan, of course, denies having any

19   complicity in connection with those bombings; but

20   nonetheless, that does not reduce at all its sympathy

21   for the victims of those bombings.

22                    Your Honor, this case comes to

23   Your Honor at this stage in a very interesting posture.

24   We're here today in an interesting posture in that --

25                    THE COURT:  "Interesting" is one word

7

1    for it.

2                        MR. CURRAN:  You're right.  We at

3    White & Case were retained in April of 2015 and began

4    filing the motions to vacate at that time.

5                        THE COURT:  20 --

6                        MR. CURRAN:  -- 15, this year.

7                        And the reason why I -- I think, in

8    some respects, this is an odd procedural posture is

9    we're on appeal as well, and we have already filed an

10   initial brief in the Court of Appeals.

11                       So the proceedings here, I think, are

12   governed by Rule 62.1 and -- because it's the unique

13   situation where the District Court may be divested of

14   jurisdiction to do certain things, given the pendency of

15   the appeal.

16                       We are here today and our motions ask

17   this Court for an indicative ruling that the motions to

18   vacate should be granted.  And then under the order from

19   the D.C. Circuit, we would inform the D.C. Circuit of

20   that indicative order and then proceed accordingly in

21   this court.

22                       So I just wanted to at the outset

23   acknowledge those somewhat unusual procedural --

24                       THE COURT:  Are you aware of any other

25   case that has had this kind of a procedural posture

8

1   where defaulting defendant has come back in only after

2   the entry of judgment and filed an appeal of that

3   judgment?

4              MR. CURRAN:  Well, I don't know if they

5   are the exact same procedural scenarios; but, of course,

6   there are a number of cases where a foreign sovereign

7   has defaulted and then appeared late, sought a motion to

8   vacate, had it denied, and then the D.C. Circuit

9   reversed that.

10             I think of *Practical Concepts* as one of

11  the leading cases in that area.  *FG Hemisphere* is

12  another one, and *Bell Helicopter*.  Those are three cases

13  we cite in our papers.  In each one of those cases --

14             THE COURT:  *Practical Concepts* does

15  limit what can be raised on appeal, however.

16             MR. CURRAN:  Well, *Practical Concepts*

17  says that jurisdictional issues can be raised without

18  restriction.

19             THE COURT:  Not merits arguments.

20             MR. CURRAN:  Well, I don't know if it

21  forecloses that, Your Honor.  I think that depends --

22             THE COURT:  Because that's what it

23  said.  Didn't it say that the defendant can choose to

24  ignore the District Court's proceedings and still

25  collaterally attach jurisdiction, but the defendant

9

1      loses the chance to make their merits arguments.

2                    MR. CURRAN:  Well, I don't know if that

3      forecloses an argument under 60(B)(1) -- yeah, 60(B)(1)

4      for excusable neglect.  I think *Practical Concepts* and

5      Judge Ginsberg -- then-Judge Ginsberg in that case was

6      saying that a foreign sovereign doesn't have the right,

7      the categorical right, to raise nonjurisdictional

8      arguments.

9                    THE COURT:  So we won't stay on this

10     for very long, but what do you think the D.C. Circuit is

11     going to do with the nonjurisdictional arguments?  How

12     are they going to review them?

13                    Are they going to review them -- I know

14     that you believe that the jurisdictional arguments will

15     be reviewed de novo in the D.C. Circuit.

16                    What about the nonjurisdictional

17     arguments?  De novo?  Full review by the D.C. Circuit?

18                    MR. CURRAN:  Well, I think now --

19                    THE COURT:  No consequence to the

20     conduct of Sudan with respect to participation in the

21     litigation; they get to raise everything fully on appeal

22     just as if they had been in the case all along?

23                    MR. CURRAN:  No, I don't think it's --

24                    THE COURT:  So what's the consequence?

25     What's the consequence in terms of what can be raised in

10

1   the D.C. Circuit and the standard of review that the

2   D.C. Circuit applies?

3             MR. CURRAN:  The consequence is that a

4   party that doesn't appear, as Sudan did not here, runs

5   the risk that they will not be able to satisfy the

6   standards of excusable neglect or perhaps other grounds

7   such as 60(B)(6).  And if they can't satisfy those

8   standards, they lose those arguments.

9             THE COURT:  I'm actually not asking the

10  Rule 60 question.  I'm asking the merits appeal that you

11  filed.  You filed a direct appeal.

12            Do you think you'll be able to

13  challenge nonjurisdictional issues through that direct

14  appeal?  That's what *Practical Concepts* is talking

15  about.

16            MR. CURRAN:  Yes, but as a practical

17  matter, if I may, whatever Your Honor decides as a

18  result of this, the pending motions now, will -- if

19  Your Honor denies relief on the motion to vacate, I

20  would suspect that that would be appealed and

21  consolidated with the pending direct appeal.

22            So maybe the direct answer to your

23  question is on the direct appeal, we might not be able

24  to raise nonjurisdictional arguments, but we will have

25  the opportunity to raise arguments under 60(B)(1),

11

1    60(B)(6) after Your Honor enters --

2                    THE COURT:  That's an appeal from my

3    determination of you --

4                    MR. CURRAN:  That's right.

5                    THE COURT:  -- the Rule 60 motion?

6                    MR. CURRAN:  So the practical result is

7    the issues get reviewed, but we don't have a right.

8                    THE COURT:  That's under a different

9    standard than Rule 60.  Rule 60 review is different than

10   a direct appeal.

11                   MR. CURRAN:  That's right.  That's

12   right.

13                   THE COURT:  Let's go on to excusable

14   neglect.  Let's talk about excusable neglect for a

15   second.

16                   MR. CURRAN:  Sure.

17                   THE COURT:  Now, there's no claim that

18   Sudan didn't know about all of these cases, is there?

19                   MR. CURRAN:  There's no claim --

20   there's no dispute about service being proper.

21                   THE COURT:  So there's no claim that

22   Sudan didn't know about the case's history?

23                   MR. CURRAN:  I think that's right

24   that -- it's clear that in the 2004 time frame, Sudan

25   was aware of these cases.  There may have been different

12

1   people than are in the Sudanese government now.

2                   THE COURT:  That's true with any

3   foreign sovereign.

4                   MR. CURRAN:  That's right.  That's

5   right.

6                   THE COURT:  Full change.

7                   MR. CURRAN:  That's right.

8                   So I guess the direct answer to your

9   question is yes, at the time that Sudan initially

10  appeared in this case, of course they knew about the

11  case.  We're certainly not claiming that the counsel

12  that appeared back in 2004 was unauthorized; so, yes.

13                  THE COURT:  And it's actually

14  interesting in the papers that you do choose your words

15  carefully.  Lawyers should be commended for that.

16                  But I noticed that you said that the

17  absence of Sudan from the litigation coincided with

18  certain problems in Sudan.  You didn't say what's caused

19  by.  You said "coincided."  Maybe a meaningful choice of

20  words.

21                  But can you say that those problems in

22  Sudan caused Sudan to be absent from these cases?

23                  MR. CURRAN:  Yes.  And, Your Honor --

24                  THE COURT:  And on what do you base

25  that?  You didn't say it in your papers or in an

13

1   affidavit.  You're standing here today now saying it,

2   but you haven't said it in your papers.

3                         Why?

4                         MR. CURRAN:  Well, first of all, you're

5   giving us too much credit on wordsmithing.  The

6   "coinciding" was not meant to disclaim the fact of

7   causation there.

8                         And, Your Honor, our intent with the

9   ambassador's declaration to Your Honor was to show that

10  it was those distractions that caused Sudan not to

11  address the issues accurately.

12                        Your Honor, in that vein, it was in

13  January of 2005 that Hunton & Williams first moved to

14  withdraw from the representation of Sudan in this case.

15  That was before Your Honor even ruled on the first

16  motion to dismiss.

17                        To me, that sequencing is important

18  here.

19                        THE COURT:  Well, we're going to look

20  at sequencing.  When we talk about sequencing, we're not

21  going to talk just about this case because Sudan was

22  participating more actively in another case.

23                        MR. CURRAN:  Can I address that?  Might

24  I address that, Your Honor?  That's the *Rux* case with

25  Judge Doumar.

14

1          THE COURT:  That's the *Rux* case, and

2     you're not going to tell me that it wasn't an

3     intentional choice by Sudan of what it was doing in each

4     case.

5          MR. CURRAN:  I do tell you that,

6     Your Honor, and I'd like to explain why.

7          In that case, counsel -- in the *Rux*

8     case, counsel asked to withdraw at roughly the same time

9     as here.  And Judge Doumar, in a transcript we supplied

10    to Your Honor, would have none of it.  He told counsel

11    for Sudan, I don't care if you're not getting

12    instructions.  You're in this case to stay.

13         That is not a genuine attorney-client

14    relationship, just like the relationship with Hunton &

15    Williams was not a genuine attorney-client relationship

16    once communications broke down.

17         In both cases, in both *Rux* and here in

18    *Owens* -- and, by the way, *Owens* is the only case --

19         THE COURT:  You're going a little bit

20    beyond the record.  You're trying to tell me what the

21    level of communications were between Sudan and lawyers

22    for this case or another case.  Don't go beyond the

23    record that we have.  I don't want to hear your

24    observations of what you think happened.  Stick to the

25    record that's before me.

15

1          MR. CURRAN:  I believe I'm doing that,

2    Your Honor.

3          THE COURT:  Right.

4          MR. CURRAN:  So every statement I've

5    made so far is based on facts of evidence.

6          In particular, the Hutton & Williams

7    declarations that were submitted to Your Honor in

8    January of 2005, they later moved again to withdraw; and

9    when they did move to withdraw, eventually successfully,

10   they had declarations then as well.

11         And those declarations said that

12   communication breakdown that was first reported in 2005

13   continued and got worse.  Those are in sworn

14   declarations by counsel, members of the bar of this

15   court.

16         And with regard to the *Rux* case, I only

17   know what's in the record.  That's my only source of

18   information.  And I've read the transcripts of the

19   proceedings before Judge Doumar.

20         THE COURT:  And that includes -- that

21   includes Judge Doumar ultimately saying at the end of

22   September of 2009 that counsel for Sudan advised that

23   Sudan objects to the Court's subject matter jurisdiction

24   but has instructed counsel not -- by communication --

25   not to defend or otherwise participate in the

16

1    proceedings on the merits.  Seemingly, Sudan is making

2    decisions with respect to the litigation.

3                    MR. CURRAN:  That's a pretty

4    substantial inference to draw from that one statement.

5                    THE COURT:  It's not an inference.

6    It's what the words say, "as instructed us."

7                    MR. CURRAN:  That does not mean that

8    there's ongoing communication.  To me, in fact, in the

9    context of what Mr. Stillman, I think it was, in the *Rux*

10   case was reporting and what the counsel in this case was

11   reporting, that seems to be like a one-off communication

12   or a confirmation that Sudan is not participating.

13                    THE COURT:  It sounds like, Mr. Curran,

14   you want me to conclude that the lawyers who were

15   representing Sudan, sophisticated legal counsel from

16   very well-respected firms, that that's meaningless, that

17   Sudan was not communicating with them, that Sudan didn't

18   understand anything about these proceedings and didn't

19   understand that its immunity was at risk.

20                    That's the conclusion you want me to

21   reach.

22                    MR. CURRAN:  Well, Your Honor, I don't

23   know if I'd put it in exactly those terms.  The

24   conclusion I'd like you to reach is, first of all, it's

25   clear beyond any dispute that Sudan has been

17

1    experiencing turmoil and upheaval on a par unmatched by

2    virtually any country in the world over the last decade.

3    It had a civil war.

4                    THE COURT:  And there was the secession

5    of South Sudan.

6                    MR. CURRAN:  Right.

7                    THE COURT:  That didn't, by the way

8    occur, in 2015, didn't occur in 2014, didn't occur in

9    2013, didn't occur in 2012.  It occurred in 2011.

10                   MR. CURRAN:  That's when the referendum

11   was passed.

12                   THE COURT:  And yet the entry of Sudan

13   in these cases occurred only when a judgment was

14   entered, a final judgment was entered against them in

15   2014.  That's when they chose to enter.  Not after

16   secession in 2011, but three-plus years later.

17                   MR. CURRAN:  Well, secession isn't an

18   instantaneous thing.  When a country partitions in half,

19   there are all sorts of problems.  When the government

20   gets split in half, the populace gets split in half.

21   Assets, borders are in dispute.  Things don't end

22   overnight.  Just like in our country when we had a civil

23   war which did not result in a partition, we still had

24   reconstruction that lasted for years.  It's not the kind

25   of thing that stopped right away.

18

1      And it's not just the South Sudan

2  incident.  There's also all sorts of upheaval in that

3  country on virtually every side of it.  In Darfur, with

4  rebel uprisings elsewhere, with floods and droughts,

5  it's been a country that has been ridden with human and

6  natural disasters for quite some time.

7      And as I said, the breakdown of

8  communications with counsel preceded any adverse ruling.

9  And it seems to me -- I credit the statements of all

10 those counsel that talked about the breakdown.

11     Now, Your Honor and Judge Doumar in

12 Norfolk both declined, denied motions to withdraw by

13 those counsel.  Those counsel were therefore duty bound

14 to do something further, and I suppose they did, but

15 that does not undermine a claim of excusable neglect.

16 This was a country that was extremely distracted.

17     THE COURT:  One of the things that you

18 say is that Sudan had a fundamental lack of

19 understanding about the litigation process in the

20 United States notwithstanding that they were represented

21 by very sophisticated counsel and particularly that they

22 didn't understand the limits of foreign sovereign

23 immunity and developments in that area of law.

24     Now, of course, developments that I'm

25 aware of were a 2008 D.C. Circuit decision, and they

19

1    participated in getting that decision because there was

2    a decision denying -- affirming the denial of their

3    motion to dismiss, 2008, and then the liability decision

4    in these cases in 2011.

5                    What other developments in the law are

6    you referring to that they were not familiar with?

7                    MR. CURRAN:  Okay.  A couple of things,

8    Your Honor.  First of all, remember that counsel

9    appeared only in the *Owens* case, not in any of the

10   subsequent cases.

11                   THE COURT:  So what?  They were on

12   notice of all the cases, and the *Owens* case was sort of

13   the lead of the wave of the cases.

14                   The *Owens* case was under 1605(A)(7),

15   prior to the 2008 amendment that changed dramatically --

16                   THE COURT:  The D.C. Circuit case

17   included those amendments.

18                   MR. CURRAN:  Okay.  But, Your Honor,

19   the counsel that asked to withdraw from this case in

20   2005 also asked the D.C. Circuit to withdraw, and they

21   were told they had to stay through the argument.

22                   We had counsel doing things without

23   communication with the client.  Both the courts in this

24   building instructed counsel to go forward,

25   notwithstanding the complete breakdown of communication.

20

1    That is not a bona fide attorney-client relationship.

2                    THE COURT:  Now it sounds like you're

3    blaming not only Judge Doumar and me but also the

4    D.C. Circuit for failing to listen to counsel and taking

5    some step other than what was --

6                    MR. CURRAN:  I'm not blaming anyone.

7    I'm trying to explain the circumstances in a way that is

8    fair to Sudan, because --

9                    THE COURT:  What are the developments

10   in the law other than what I've referred to?

11                   MR. CURRAN:  The statute.  The statute

12   that allowed for punitive damages, the statute that

13   otherwise greatly enhanced the exposure of foreign

14   sovereigns.

15                   Also, Your Honor, in most countries in

16   the world including Sudan -- and now I'm talking just

17   beyond the record --

18                   THE COURT:  You are well beyond the

19   record when you say that they were not aware of that

20   statute.

21                   MR. CURRAN:  Well, Ambassador Khalid's

22   declaration to Your Honor says that.

23                   THE COURT:  Particularly with decisions

24   that were rendered with them, whether through full

25   communication with counsel or not, it was with Sudan as

21

1   the defendant in the case -- decisions that discussed

2   that statute.  And I have no reason to believe -- and

3   you can correct me if my belief is wrong -- that I have

4   no reason to believe that those weren't provided to

5   Sudan.

6                    Are you going to tell me those

7   decisions weren't provided to Sudan?

8                    MR. CURRAN:  Well, I don't know that,

9   Your Honor.  I don't recall that being reflected in any

10  of the affidavits that counsel submitted to Your Honor.

11                    I do remember one of the affidavits

12  submitted to Your Honor on a renewed motion to withdraw,

13  counsel said that they had forwarded the new statute to

14  Sudan.  So I credit that statement.

15                    But other than that, I mean, we have a

16  government that is -- was in flux, and communications

17  with the government were ineffective.

18                    The sworn statements of counsel said --

19  they didn't even have an e-mail address in Khartoum to

20  receive communications.  Phones went unanswered.  Things

21  were sent by fax.  This is like a drop box.

22                    THE COURT:  It's all on the record?

23                    MR. CURRAN:  That's all on the record.

24  Every sentence, every point I just made is in sworn

25  declarations of counsel.

22

1          THE COURT:  I'm going to get you off

2     this subject and not have the whole morning taken with

3     it, but I'll ask one last question.

4               The case that you referred to relied,

5     on for the most part -- excuse the neglect -- the

6     *FG Hemisphere* case.

7               Do you really think that's close to

8     these facts and circumstances?

9          MR. CURRAN:  If I remember correctly,

10    that case involved the civil war.

11         THE COURT:  We're talking about a

12    couple of months there in terms of what happened.

13         MR. CURRAN:  Yes.  I agree that the

14    time frame isn't the same, but the acknowledgment --

15         THE COURT:  That's a pretty important

16    difference, isn't it?

17         MR. CURRAN:  I guess.  But, Your Honor,

18    the time frame in this case between the final default

19    judgment and Sudan's appearance was, I think, on par

20    with what it was in *Bell Helicopter*.

21         THE COURT:  Final default judgment.  I

22    suppose that's right, the final default judgment, but

23    not with respect to the liability determination and all

24    the interim judgments, default judgments, with respect

25    to groups of plaintiffs.

23

1          Only is it a shorter time period when

2     you wait until that last --

3               MR. CURRAN:  That's right.  And that's

4     why I relied not just on *FG Hemisphere* but on the fact

5     that the concepts --

6               THE COURT:  The courts -- actually,

7     Sudan had counsel and had appeared in the D.C. Circuit

8     before that.  Before they filed the Rule 60 motions in

9     this case, they had actually entered an appearance in

10    the D.C. Circuit a year earlier, hadn't they?

11              MR. CURRAN:  I don't know.  I don't

12    know about that.  They appeared to file -- they filed a

13    notice of appeal, if that's what you mean, here.

14              THE COURT:  Right.

15              MR. CURRAN:  Yeah.  And so --

16              THE COURT:  All right.  I'll let you

17    get off excusable neglect and go on to -- what's the

18    next topic you want to address?

19              MR. CURRAN:  Well, the next one I'd

20    like to address is what we think ought to be the

21    dispositive issue here, and that is the meaning of

22    extrajudicial killing.

23              As Your Honor knows, all of the

24    plaintiffs' claims are based now on 1605A.  One of the

25    predicate acts, the one they rely upon, is extrajudicial

24

1    killing.  That means the bombings by Al Qaeda were

2    extrajudicial killings, and the allegation is that Sudan

3    provided material support for those.

4                    THE COURT:  Give me the benefit --

5    because it's a little hard to discern from the

6    filings -- give me the benefit in a very crisp statement

7    of your position.

8                    The bombings were not extrajudicial

9    killings because of what?

10                   Because "extrajudicial killing" refers

11   to a summary execution by government agents.  That is

12   a --

13                   THE COURT:  By government agents?

14                   MR. CURRAN:  Yes.  By state actors.

15                   THE COURT:  So now you're saying -- is

16   that in your briefs, that the state actor, the

17   perpetrators, have to be state actors?

18                   Is that in your briefs, in your motion,

19   or in the D.C. Circuit brief?

20                   MR. CURRAN:  Yes.  Absolutely.

21                   THE COURT:  You stand on that issue?

22                   MR. CURRAN:  Yeah.  We reference there

23   that under the TVPA, which, of course --

24                   THE COURT:  You reference.  Okay.

25                   MR. CURRAN:  Well, no.  I'm not

25

1    minimizing it.  We say repeatedly it has to be by a

2    state actor.

3                      THE COURT:  Where is that in the

4    statute?

5                      MR. CURRAN:  That's in the TVPA.

6                      First of all, Your Honor has

7    acknowledged that the TVPA adopts the international law

8    norm against summary executions.  Also --

9                      THE COURT:  Does the statutory

10   definition of "extrajudicial killing" include a

11   requirement of state actors?

12                     MR. CURRAN:  I think it does because --

13                     THE COURT:  Does it include something

14   that uses those words?

15                     MR. CURRAN:  The TVPA language says

16   that the claim is only against agents acting under the

17   authority of a foreign government.

18                     THE COURT:  But the statute, 1605A, is

19   including material support --

20                     MR. CURRAN:  Okay.

21                     THE COURT:  -- state actors who provide

22   material support.

23                     Why does it say that material support

24   has to be to perpetrators who are also state actors?

25                     MR. CURRAN:  Because that's embedded in

26

1    the definition of extrajudicial killing. An

2    extrajudicial killing as defined under international law

3    by the U.N., acknowledged by Your Honor, acknowledged by

4    Judge Ellis across the river in the *Xe* case, I think

5    it's a uniform -- it's uniformly accepted in the case

6    law that extrajudicial killing, summary execution, are

7    by state actors and --

8                    THE COURT:  So Al Qaeda is not covered?

9                    MR. CURRAN:  Right.

10                   THE COURT:  You think 1605 is not

11   intended to reach situations where Hezbollah, Al Qaeda,

12   or other terrorist organizations have actually committed

13   the act, even if they receive substantial material

14   support from a state actor within 1605A.

15                   MR. CURRAN:  We're talking

16   specifically, Your Honor, about extrajudicial killing

17   and not the other predicate acts right now.

18                   THE COURT:  Yes.

19                   MR. CURRAN:  Yes, I do believe that.

20                   THE COURT:  Bombings.

21                   MR. CURRAN:  Absolutely, Your Honor.

22                   THE COURT:  That's what Congress knew

23   about when they were passing 1605A.  They knew about the

24   bombings in Beirut, which were not committed by state

25   actors.

27

1          MR. CURRAN:  Yeah.  And that's why,

2   Your Honor --

3          THE COURT:  You think Congress did not

4   intend to reach them.

5          MR. CURRAN:  I not only think that, I

6   know that because I read the legislative history.  When

7   Congress passed 1605A(7), they considered language that

8   made a predicate act terrorism, and they defined

9   "terrorism" as it is under the ATA to include bombings

10  and things.

11         And you know what happened?  The State

12  Department came up to Capitol Hill and said, "You can't

13  do that.  You can't have that as a predicate act."

14         That's not a violation of international

15  law.  Terrorism isn't even defined under international

16  law, to say nothing about the norms.

17         Therefore, Congress took out of the

18  bill the reference to terrorism and bombings.  It took

19  it out and limited the predicate act to extrajudicial

20  killing because extrajudicial killing is an

21  international law norm.

22         And what does that norm mean?  As

23  Your Honor and Judge Ellis and other courts have said,

24  that means a state actor executing someone without due

25  process.  That's what it means, and that's what 1605A

28

1    means.

2                          So yes, Your Honor, I do think Congress

3    meant that.

4                          THE COURT:  So let me return to the

5    question I asked with incredulity a moment ago.

6                          That means that 1605 doesn't reach --

7    1605A doesn't reach these incidents of bombings in

8    East Africa of the American Embassy.

9                          MR. CURRAN:  Right.

10                         THE COURT:  Doesn't reach it.

11                         MR. CURRAN:  This 1605A doesn't reach

12   them.  That's right.

13                         Your Honor, Congress isn't blind and

14   unsympathetic to such bombings.  It created a cause of

15   action for treble damages under the ATA.  In that

16   statute, it referenced bombings, and it referenced

17   embassies.  And it --

18                         THE COURT:  In the legislative history

19   of 1605A, it also references the bombings in Beirut.

20                         MR. CURRAN:  Are you referring to

21   Senator Lautenberg's comment?

22                         Okay.  He did not say that

23   "extrajudicial killing" means bombings.  He was

24   commenting on other --

25                         THE COURT:  There's no legislative

29

1   history that says extrajudicial killing does not mean

2   bombing.

3                    MR. CURRAN:  I think what I said before

4   stands and does establish that.  That was in the

5   legislative history of 1605A(7).  I think that's crystal

6   clear.

7                    And, Your Honor, again, the ATA --

8                    THE COURT:  It's amazing to me,

9   Mr. Curran, maybe you think I'm being totally unfair --

10  and if I am, I apologize for it -- but it's amazing to

11  me -- I read your briefs, your motion papers here.  I

12  read your D.C. Circuit brief.  I really don't see the

13  state actor issue being in neon lights the way you seem

14  to think it is in your papers.

15                   MR. CURRAN:  Well, maybe we should

16  emphasize it more.  But I think, Your Honor, if you go

17  back and you read our extrajudicial killing briefs

18  Ms. Erb has just handed me, like on page 19, the first

19  sentence, "Thus, in the years leading up to the passage

20  of the TVPA, the United Nations was leading an effort to

21  enforce the international law prohibition on

22  extrajudicial execution of individuals by state actors,"

23  I think you will see, Your Honor, in that section of the

24  brief, we used the term "by state actors" repeatedly,

25  and it's exactly for the reason that I'm talking about.

30

1      And one final point on the ATA,

2  Your Honor, because Congress did -- the plaintiffs in

3  this case have a cause of action under federal statute.

4  It's under the ATA.  It's for treble damages.  And the

5  ATA expressly says those claims cannot be against

6  foreign sovereigns.

7      So there is consistency in the U.S Code

8  on this, that foreign states are not civilly liable for

9  terrorism, broadly; bombings, bombings of embassies.

10      There are, of course, the predicate

11  acts under 1605A, and those are all, of course, the

12  basis for claims against foreign states, but none of

13  them are about bombings or terrorism generally.  They

14  are about specific acts:  torture, aircraft sabotage,

15  extrajudicial killing.

16      THE COURT:  What other argument on

17  extrajudicial killings do you have?

18      Is there anything else in your mind

19  that I need to consider with respect to extrajudicial

20  killings, or only that state actor point?

21      MR. CURRAN:  Well, no.  It's not just

22  the state actor point.  It's that -- it's a summary

23  execution, not a bombing.  It refers --

24      THE COURT:  Bombings aren't included?

25      MR. CURRAN:  Terrorism bombings --

31

1          THE COURT:  That means of killing is

2     not included?

3          MR. CURRAN:  I guess you probably could

4     have a bomb that targets a particular individual like a

5     car bomb that is going after a political enemy or

6     something like that.

7          THE COURT:  A truck bomb that's going

8     after a political enemy?

9          MR. CURRAN:  No.  I don't think that's

10    right.

11         THE COURT:  Oh.  Only a car bomb, not a

12    truck bomb?

13         I don't understand the distinction

14    you're making now.

15         MR. CURRAN:  Okay.  Let me take a crack

16    at that.

17         A car bomb is targeting a specific

18    individual and is tantamount to an assassination or a

19    summary execution.  It can be.  It can be, like, there

20    was a case in this Court --

21         THE COURT:  You're combining a lot of

22    things.  You're combining means of killing, a bomb, and

23    you're saying, well, a car bomb, maybe, but not a truck

24    bomb, or is it the target of the killing that you're

25    really focused on; that it has to be some specific

32

1    target?

2                    I mean, I'm trying to get exactly what

3    your arguments are.

4                    MR. CURRAN:  Yes.

5                    THE COURT:  Are you arguing first --

6    you've already told me about state actors -- are you

7    arguing that the means of using a bomb is not within

8    extrajudicial killing?

9                    MR. CURRAN:  I think it's conceivable

10   that a bomb could be used in an extrajudicial killing.

11                   THE COURT:  Are you arguing that

12   because it's multiple victims, it's not within

13   extrajudicial killing?

14                   MR. CURRAN:  I apologize.  It's

15   conceivable that an extrajudicial killing can result in

16   the killing of more than one person.

17                   THE COURT:  Are you arguing that

18   because the victim isn't precisely identified, it's not

19   extrajudicial killing?

20                   MR. CURRAN:  If the bombing is

21   indiscriminate in its killing of individuals, it's not

22   an extrajudicial killing under the meaning of

23   international law as adopted by Congress in the TVPA.

24                   THE COURT:  So agents from a foreign

25   state who learn that an American delegation is going to

33

1    be traveling on a train car, and they don't even know

2    exactly who is on that car, who else or who is in the

3    delegation, but they plant a bomb on the train with the

4    intent to kill the American delegation and -- whoever

5    else gets killed, so be it -- and they succeed, the fact

6    that they didn't know in advance exactly who the victims

7    would be means it's not an extrajudicial killing?

8                    MR. CURRAN:  I think that's probably

9    right.

10                   THE COURT:  "Probably right."

11                   On what do you base that position?

12                   MR. CURRAN:  Well, again, international

13   law, but also the word "deliberated" in the definition

14   of extrajudicial killing.

15                   THE COURT:  Why isn't that deliberated?

16   It's just as deliberated as if they knew that it was you

17   and only you.

18                   MR. CURRAN:  It's not just as

19   deliberated.  It's more deliberated, certainly, if you

20   are targeting a specific individual and kill them, him

21   or her.  That's very different from -- it's a spectrum

22   here.

23                   THE COURT:  It's intent to kill, isn't

24   it?

25                   MR. CURRAN:  Yes, they intend to kill.

34

1        THE COURT:  It's a clear intent to kill

2    specific categories of people.

3        MR. CURRAN:  Congress could have easily

4    made a predicate act murder, killing people.  It didn't.

5    It chose a term of art under international law.  They

6    knew what they were doing because it was debated

7    repeatedly.

8        THE COURT:  You're saying that under

9    international law, if a brutal regime drops a bomb on a

10   whole town because it considers that town to be a hotbed

11   of political opposition and the purpose is to kill as

12   many opponents as they can kill, that that is not an act

13   of extrajudicial killing?

14       MR. CURRAN:  That's not even close.

15   That's not even close to an act of extrajudicial killing

16   under international law or under the TVPA.

17            That sounds like an act of war, but the

18   best -- I don't know if "best" is the right term -- but

19   it may be certainly an act of terrorism; but it's not an

20   act of war -- but there's no way that that's an act of

21   extrajudicial killing.  That term has a specific

22   meaning.  It's a term of art.  Congress knew it, and

23   they put that in the statute in place of "terrorism."

24       THE COURT:  And that's the

25   international law concept of summary execution?

35

1              MR. CURRAN:  That's right.  That's

2     right.

3              THE COURT:  And so just to sum up, tell

4     me what it is you think takes this conduct outside of

5     that definition, the international law concept of

6     summary execution.

7              State actor, you told me.

8              MR. CURRAN:  Yes.

9              THE COURT:  What else?

10             MR. CURRAN:  The spectrum -- we're at

11    opposite ends of the spectrum.  Extrajudicial killing is

12    over here.  Indiscriminate terrorism bombing is over

13    here.

14             Your Honor is right that there are

15    places on the spectrum where things are not quite so

16    clear.  There are aspects where things become debatable.

17    But it's not really debatable about whether these

18    embassy bombings were extrajudicial killings or not

19    because it's too far away on the spectrum, in part

20    because --

21             THE COURT:  Why?

22             MR. CURRAN:  Because it is not a

23    targeted killing of an individual by state actors.

24             THE COURT:  So it's a targeted killing

25    of multiple individuals.

36

1              MR. CURRAN:  Indiscriminately.  We call

2      that "terrorism."

3                    That's what Congress knew.  That's

4      terrorism, Your Honor.  That's why we have the

5      Anti-Terrorism Act, the ATA.

6              THE COURT:  Well, okay.  So we get to

7      that argument.

8                    So part of your argument is that

9      Congress didn't pass or enact some all-purpose terrorism

10     exception?

11             MR. CURRAN:  No.  Now you're minimizing

12     my argument.  My argument is Congress thought about

13     doing it.  They had a bill that was going to do it, and

14     they replaced the specific language "terrorism" with

15     "extrajudicial killing."

16                   I think when Congress does something

17     like that when it's urged upon them by people in the

18     State Department and they make the statutory change and

19     they enact it in that revised form, that means that they

20     didn't want to include what they struck out.

21             THE COURT:  But there are a whole bunch

22     of things in the statute that often are terrorism,

23     you'll concede.

24             MR. CURRAN:  Absolutely.

25             THE COURT:  Extrajudicial killings,

37

1  maybe.  You're reluctant to concede that.

2  MR. CURRAN:  No, no.  I categorically

3  deny that.

4  THE COURT:  Torture can be terrorism,

5  and it's in the statute.

6  MR. CURRAN:  I don't think -- no, I

7  don't know that torture can be terrorism.  Torture is

8  defined with reference, again, to the TVPA and the

9  International Convention, Anti-Torture Convention.

10  That, again, is --

11  THE COURT:  How about aircraft

12  sabotage?  Can that be terrorism?  That's in the

13  statute.

14  MR. CURRAN:  I think that can be.  I

15  think that can be.  And I think the lobbyists --

16  THE COURT:  Hostage-taking, can that be

17  terrorism?  That's in the statute too.

18  MR. CURRAN:  But it's defined with

19  reference to the International Convention.  And,

20  Your Honor, I can't remember off the top of my head

21  whether an act of terrorism, hostage-taking, would fall

22  under that definition or not.  So I think you have to

23  look at each predicate act carefully and analyze what

24  Congress meant by that.

25  Aircraft sabotage, I do agree, would

38

1    include a bombing of an aircraft.  And that's one that

2    Congress debated and deliberately chose to include

3    because of the act of lobbying by victims of aircraft

4    sabotage.

5                    So that's the rough-and-tumble

6    legislative process.  It resulted in that cat's cradle

7    of predicate acts.  And extrajudicial killing does not

8    include a terrorist bombing like the one we have here.

9                    THE COURT:  Anything else on

10   extrajudicial killings?

11                   MR. CURRAN:  I don't think so.  We rely

12   on the statutory language, the legislative history, the

13   treatment by the courts, international law principles,

14   and the overall scheme of anti-terrorism rights of

15   action.

16                   THE COURT:  This issue was not raised

17   before me by Sudan in the jurisdictional motion back in

18   2005.

19                   MR. CURRAN:  I understand that, and

20   it's regrettable.

21                   THE COURT:  It was not raised in the

22   D.C. Circuit and the appeal from that.  The

23   jurisdictional issue still wasn't raised.

24                   MR. CURRAN:  Yes.

25                   THE COURT:  So are you handcuffed at

39

1    all by what the Supreme Court has said, for example, in

2    *Insurance Corporation of Ireland*, a party that has had

3    an opportunity to litigate the question of subject

4    matter jurisdiction may not reopen that question in a

5    collateral attack upon an adverse judgment?

6                    Does that handcuff you at all?

7                    MR. CURRAN:  At most, it would handcuff

8    us only in the *Owens* case.  Only in the original with

9    the original set of plaintiffs.

10                   THE COURT:  Well, it's like a

11   collateral estoppel also.  You can set that aside,

12   whether it would handcuff you in other cases or not.

13                   MR. CURRAN:  The case doesn't --

14   *Ireland* doesn't say anything about collateral estoppel.

15   So I would say that the handcuff would only be on the

16   original *Owens* case.

17                   And, of course, the issues were not

18   raised in any of the other cases or with respect to the

19   intervenors in the *Owens* case.

20                   Your Honor, I regret that things played

21   out the way they did with Sudan not appearing and

22   raising arguments at an earlier stage.  And we, of

23   course, don't fault Your Honor for not entertaining

24   those arguments when they weren't made.

25                   But what we're talking about now is

40

1    what's right; what's -- what is the subject matter

2    jurisdiction.

3            THE COURT:  And, Mr. Curran, I

4    understand that, and we're dealing with these issues,

5    and you've made some good points, but the one that I

6    most clearly agree with you on is the regret.

7            Next.

8            MR. CURRAN:  Okay.  Next, turning to

9    jurisdictional causation, that's another subject matter,

10    jurisdiction issue.

11            THE COURT:  Is there any difference

12    between the jurisdictional inquiry, this causation

13    jurisdictional inquiry under 1605A and the merits

14    inquiry with respect to causation under 1605A?

15            Any difference at all?

16            MR. CURRAN:  I can't think of one,

17    Your Honor.  I think they are conjoined.

18            THE COURT:  So get to -- a party, if

19    they participate in the litigation, they get to raise

20    this issue jurisdictionally in a motion to dismiss,

21    again after discovery and a motion for summary judgment,

22    and then again after trial saying the evidence came up

23    short on the jurisdictional basis in a post-trial

24    motion.

25            MR. CURRAN:  Yes.

41

1          THE COURT:  And a party who doesn't

2   participate in the litigation only loses out on the

3   summary judgment opportunity.  If they've come in and

4   participated just for the motion to dismiss, they still

5   get to raise the exact same issue because it's the exact

6   same examination --

7          MR. CURRAN:  Yes.

8          THE COURT:  -- as an attack through a

9   direct appeal or Rule 16?

10          MR. CURRAN:  That phenomenon only

11   exists with respect to foreign sovereigns under the

12   Foreign Sovereign Immunities Act.

13          THE COURT:  It does say some things

14   that seem to indicate some difference between

15   jurisdictional causation and what they call the

16   "substantive cause of action."

17          The court there said, "We underline

18   that the only issue before us here is jurisdictional

19   causation.  To succeed in the end, the plaintiff must go

20   beyond jurisdiction and provide proof satisfying a

21   substantive cause of action."

22          And then they talk about it, and this

23   case involved Libya.

24          "To go further as a matter of

25   jurisdiction to accept Libya's contention that the

42

1    statute requires a single causation statute -- standard

2    that is more restrictive than the baseline standard of

3    proximate cause runs afoul of the FSIA's injunction that

4    a nonimmune foreign state shall be liable in the same

5    manner and to the same extent as a private individual."

6              The Court seems to be saying that

7    there's a little bit of difference between -- and the

8    two terms they use are the "jurisdictional causation

9    determination" and the "substantive claim on the

10   merits."

11             MR. CURRAN:  If I remember correctly,

12   that case may have been under former 1605A(7) --

13             THE COURT:  1605A(7).  Absolutely.

14             MR. CURRAN:  -- and that's the critical

15   distinction, Your Honor.

16             THE COURT:  Because you think the cause

17   of action here is in the same language as the

18   jurisdictional examination?

19             MR. CURRAN:  Yes.

20             THE COURT:  But that's not the only

21   cause of action.  If you think of causes of action,

22   there are state causes of action that are pursued

23   through 1605A.

24             MR. CURRAN:  No.  I disagree with that,

25   Your Honor.

43

1           How can there be state causes of

2   action?  1605A(c) is the exclusive cause of action

3   against a foreign state under that terrorism exception.

4           Your Honor erred when you concluded

5   that D.C. law could apply to the foreign national

6   plaintiffs.  The gateway does not exist for 1605A.

7   Congress did not change the gateway.  The gateway only

8   applies to the old 1605 and 1607, but not 1605A.

9           THE COURT:  So you think that language

10  in *Kilbourne* is of no means here because it's an A(7)

11  case rather than the "A" case?

12          MR. CURRAN:  I do think that, yes.  As

13  I said, I do think that the jurisdictional inquiry and

14  the merits inquiry on causation are conjoined and may be

15  inseparable.

16          THE COURT:  So if you're right that

17  this is a jurisdictional inquiry, the evidentiary

18  sufficiency question, the jurisdictional inquiry, if

19  you're right and you win on that, you get no

20  res judicata effect from that determination because it's

21  a jurisdictional determination; right?

22          MR. CURRAN:  I hadn't thought about

23  that.

24          THE COURT:  That's right, isn't it?

25  Based on your theory, that's right.

44

1          MR. CURRAN:  There might be collateral

2     estoppel effect for the same plaintiff.

3          THE COURT:  I don't think that's how it

4     works, but go ahead.

5          MR. CURRAN:  I think it is how it

6     works.  I think that if a plaintiff in this case loses

7     under that, they can't bring another claim; they are

8     precluded from bringing another claim.

9          Anyway, Your Honor, I believe, and your

10    liability decision acknowledged that the causation

11    inquiry was jurisdictional.  I think that's right.  I

12    think that's necessarily the case.

13         Your Honor also correctly acknowledged

14    that the causation for jurisdiction and merits had to

15    be -- well, for jurisdiction had to be shown by evidence

16    satisfactory to the Court.

17         THE COURT:  So what's the result if I

18    agree with you?  And forget about the particular posture

19    in terms of where we are with the D.C. Circuit and

20    indicative rulings.  But if I or the D.C. Circuit

21    ultimately were to agree with you, that means that this

22    evidentiary issue -- forget about the other issues; just

23    focus on this one for a moment -- it means the cases are

24    all dismissed?  Is that what it means?

25         MR. CURRAN:  No.

45

1              THE COURT:  Or does it mean that the

2    plaintiffs get a chance --

3              MR. CURRAN:  The plaintiffs get a

4    chance to put in more, but now we're here --

5              THE COURT:  You have the burden on

6    this, and you put in no evidence.  Sudan has the

7    burden --

8              MR. CURRAN:  No, no, no.

9              THE COURT:  -- and they are putting in

10   no evidence.

11             MR. CURRAN:  Then I'm not being clear

12   about our position.

13             What we're doing now, we're challenging

14   whether there was sufficient evidence presented at the

15   hearing before Your Honor to support jurisdictional

16   causation.

17             We think that the evidence was not

18   substantial.  We think there was no admissible evidence

19   that supports --

20             THE COURT:  That's more than the

21   D.C Circuit already found sufficient for jurisdictional

22   causation.

23             MR. CURRAN:  No, no, no.  The

24   D.C Circuit was addressing the case on the 12(b)(6)

25   context or 12(b)(1), a motion to dismiss.

46

1          THE COURT:  12(b)(1).

2          MR. CURRAN:  12(b)(1).

3          *I think the D.C. Circuit acknowledged*

4   *that there would have to be evidence shown later to*

5   *support the claims.  So it doesn't add up to say that*

6   *the D.C. Circuit found that the pleading was sufficient*

7   *under Twombly and Iqbal*; and therefore, there was

8   evidence to support that.

9          THE COURT:  But the evidence --

10  certainly you'd have to agree that the evidence

11  supported what was pled.

12         MR. CURRAN:  No, no, no.  I don't think

13  there was any admissible evidence presented to

14  Your Honor.  I think there were experts who came -- the

15  main one was Coleman.  He read materials, came to

16  Your Honor, paraphrased them, often embellished them,

17  and that was it.

18         We think that that is not sufficient.

19         THE COURT:  That seems a little bit

20  odd, but I acknowledge that this is an odd circumstance,

21  and certainly jurisdiction is something that can be

22  examined at various stages.  But it's a little bit

23  inconsistent with the generalized concept that immunity

24  ought to be decided early on in the case.

25         MR. CURRAN:  Well, yeah.  But the FSIA

47

1    from the start, from 1976, said that this was the

2    standard.  The Court had to have a hearing; had to have

3    evidence presented before a default judgment can be

4    entered against a foreign sovereign.

5                        THE COURT:  But evidence has to come in

6    immediately after the judgments were entered.

7                        What if you waited another ten years?

8    You can still make these jurisdictional arguments?  Is

9    that your view?

10                       MR. CURRAN:  I think that reasonably

11   follows from *Practical Concepts*.

12                       THE COURT:  What kind of incentive is

13   that for foreign sovereigns in these kinds of cases?

14   Isn't that an incentive for them to sit on the sidelines

15   and not get involved and simply come in later on?

16                       I mean, basically, you're saying they

17   can make virtually the same arguments because most of

18   them are jurisdictional.

19                       What incentive is there for them to get

20   involved?

21                       MR. CURRAN:  No rational foreign

22   sovereign would sit back, let a case go that declares

23   them to be state sponsors of terrorism, have a

24   10.2 billion-dollar judgment, enforcement actions going

25   on, reputational damage beyond belief.  No foreign

48

1    sovereign would go through that voluntarily.

2                    The only way a foreign sovereign would

3    do that is if they, number one, were completely

4    distracted, say, by an internal civil war or didn't

5    understand what might happen.  That's what happens.

6                    I don't think -- I don't think there

7    needs to be more incentivizing of foreign sovereigns to

8    appear in these cases.

9                    And Sudan is here now and wants to

10   defend this case on the merits; wants to show that there

11   was no evidence to support the notion that Sudan

12   supported Al Qaeda.

13                   Sudan condemns --

14                   THE COURT:  In terms of the question

15   that I asked that I didn't let you answer, I think, and

16   that is if I were -- if I or the D.C. Circuit agrees

17   with you, does that mean these cases are dismissed, or

18   does that mean there's a further proceeding with respect

19   to the evidence?

20                   MR. CURRAN:  Sudan is here now.  We've

21   appeared.  If we win on the evidentiary point, before

22   even --

23                   THE COURT:  The evidentiary point as a

24   jurisdictional matter?

25                   MR. CURRAN:  As a jurisdictional

49

1    matter, yes.  If we win on that and we don't win on the

2    extrajudicial killing because the extrajudicial killing

3    would result in a dismissal with prejudice, but on the

4    evidentiary point, then we would be ready to go forward

5    with the case, defending --

6                    THE COURT:  Is that what happens?  Is

7    that logically what happens?  You would be winning on

8    this merits end-of-the-line determination with respect

9    to whether there's jurisdiction.

10                   MR. CURRAN:  No. we're not claiming

11   that the plaintiffs had the one shot and that was their

12   only shot to prove jurisdictional causation and that

13   they had the hearing and it didn't work and therefore,

14   their case is gone.  I'm not saying that, Your Honor.

15                   We're saying that that finding has to

16   be thrown out, and then Your Honor has to revisit the

17   issue.

18                   Now, if Sudan hadn't appeared and the

19   D.C. Circuit had found that the evidence was

20   insufficient, kind of the reverse of the *Kim* case -- in

21   the *Kim* case, the District Court found the evidence

22   wasn't sufficient, and the D.C. Circuit reversed -- if

23   we went the other way, I think the case would get

24   remanded for further development of the record.  The

25   plaintiffs would get another shot.

50

1          And that would be the case if Sudan

2    hadn't appeared.  Sudan is here now.  We want to clear

3    our name.  We want to put on our own evidence and show

4    that there was no material support given to Al Qaeda.

5                    THE COURT:  Let's talk about the

6    sufficiency of the evidence rather than jurisdictional

7    nature of that determination.

8                    This is a little different because of

9    1605 -- 1608E than other cases would be.  I mean, 1608E

10   says -- the Court just passed it; decided it as

11   satisfactory evidence.

12                   MR. CURRAN:  Okay.  You're not

13   embellishing it with what we've learned from *Kim* and

14   prior cases about what that means; but, yes.

15                   THE COURT:  *Kim* does say it means

16   something.  *Kim* says you don't have to have live

17   witnesses, right, because there were none with *Kim*.

18                   MR. CURRAN:  I don't know if those

19   experts testified live or not, but --

20                   THE COURT:  I don't think they did.

21                   MR. CURRAN:  Okay.

22                   THE COURT:  But no live witnesses.  We

23   have live witnesses here.

24                   MR. CURRAN:  Not percipient witnesses.

25                   THE COURT:  So what?

51

1          MR. CURRAN:  That's a big "so what,"

2    Your Honor.

3          THE COURT:  Why?  It's like a summary

4    judgment.  That's what most courts that have looked at

5    this have thought of it sort of in a summary judgment

6    sense.  It means something less than everything that's

7    required at trial.

8          One of the things is, you can look at

9    evidence from witnesses that might be a little different

10   than what you'd require at a trial.  If he had submitted

11   a sworn affidavit in the *Kim* case, it would have been

12   accepted.  Here, it was actual testimony; his actual

13   testimony in another case was accepted.

14         MR. CURRAN:  In another case where

15   Sudan was not present and no one with Sudan's interest

16   was cross-examining him.

17         And, Your Honor, in your decision, you

18   relied not so much on Al-Fadl, but you relied on Coleman

19   and the --

20         THE COURT:  We'll get to the experts in

21   a moment.

22         Now I'm talking about the -- these

23   three other witnesses, only two of whom really had

24   much --

25         MR. CURRAN:  Okay.  If I may address

52

1    Al-Fadl for a second.

2                    So your opinion -- and I guess the

3    argument of the plaintiffs was that Al-Fadl said there

4    was a letter of invitation to Osama Bin Laden to come

5    over.

6                    THE COURT:  But if with him, you can

7    use a sworn affidavit, why can't you use sworn

8    testimony?  Sworn testimony is even better than a sworn

9    affidavit.

10                    By the way, a sworn affidavit doesn't

11   have anyone cross-examining it.

12                    MR. CURRAN:  No.  In *Kim*, the decisive

13   fact -- and the D.C. Circuit's opinion says this in,

14   like, the second-to-the-last paragraph -- it said no

15   doubt this case would be different if we didn't have the

16   conviction of the North Korean agent for kidnapping

17   Mr. Kim.  That was hard evidence of wrongdoing by

18   North Korea.

19                    We got nothing like that here.  There

20   is no admissible evidence on which experts can then

21   opine --

22                    THE COURT:  That's the sufficiency

23   point that you just mentioned from *Kim*.

24                    MR. CURRAN:  Yes.

25                    THE COURT:  That's the ultimate

53

1    sufficiency.  That's not what can be looked at in terms

2    of evidence.

3                        I'm talking about right now, what can

4    be looked at in terms of evidence.

5                        MR. CURRAN:  Yes.  Your Honor, I read

6    *Kim* differently from what you do.  I read *Kim*, when it

7    says it's got to be admissible evidence, I think

8    affidavit evidence doesn't cut it.  I think there has to

9    be live witnesses in court so Your Honor can size up the

10   credibility of the witness.

11                       THE COURT:  Take that up with

12   Judge Tatel.

13                       MR. CURRAN:  I've read *Kim* multiple

14   times.  I don't think *Kim* necessarily says that the

15   testimony can be presented by affidavit.

16                       And in the *Kim* case --

17                       THE COURT:  Well, what *Kim* does say is

18   that 1608E means something, and it means that there's

19   some flexibility.  And other courts have said that as

20   well, and the Supreme Court has said that in a certain

21   context.

22                       So let's talk now about the experts for

23   a second.

24                       So your view on the experts is that

25   it's inappropriate -- well, is it inappropriate to rely

54

1    on the experts' ultimate conclusions?  Those are

2    opinions.  Is it inappropriate for a court to rely on

3    those?

4                    MR. CURRAN:  Opinions that are -- that

5    are founded on an admissible, factual predicate are

6    admissible under Rule 702.

7                    THE COURT:  And then your position is

8    that those conclusions are not ultimately worth anything

9    or inadmissible.  I think you used the term

10   "inadmissible" because they are based on unreliable,

11   inadmissible evidence.

12                   But isn't this setting with these kinds

13   of experts, like in *Kim*, the kind of setting where,

14   under Rule -- Federal Rule of Evidence 703, experts in

15   that field can rely on facts and data in forming an

16   opinion that don't need to be admissible for the opinion

17   to be admitted?  That's what 703 says.

18                   And this is one of those situations

19   that I think most properly is a setting where experts in

20   this field -- and I think that's what the courts have

21   said -- can gather those facts without them necessarily

22   all being admissible.  That happens all the time with

23   expert testimony.

24                   MR. CURRAN:  Yeah.  I agree with that,

25   and I agree that an expert where, in this field, it's

55

1   acceptable to rely on other materials, those materials

2   don't have to be admissible.

3                    But Your Honor in your opinion took as

4   fact statements that were stated only by the experts,

5   and there was no independent, admissible basis for those

6   facts, and that's something that can't be done.

7                    And that's what Rule 703 and the

8   commentary to it says.

9                    THE COURT:  But ultimately, when you

10  get to the sufficiency question as opposed to what

11  evidence is admissible, ultimately, if, based on

12  evidence that you really don't have a legitimate

13  challenge to, the opinions of the experts and at least

14  in my view the witness testimony and some reports that I

15  think would be admissible, if that's sufficient, then it

16  doesn't matter that some pieces of evidence might not be

17  admissible.

18                    Agreed?

19                    MR. CURRAN:  Well, I'm not sure I

20  understand that question.

21                    THE COURT:  Do you agree that it's

22  sufficient?

23                    MR. CURRAN:  Right.

24                    THE COURT:  But if I conclude that it's

25  sufficient, even excluding some pieces of evidence that

56

1    you've challenged, then under 1608E, it would be

2    evidence to satisfaction.

3                    MR. CURRAN:  You're saying if there was

4    sufficient evidence, was there sufficient evidence.  I

5    think I have to answer that yes.

6                    THE COURT:  Well, I understand that.

7    I'm saying a little bit more than that; a little bit

8    more specifically than that, Mr. Curran.

9                    You don't seem to have the same

10   challenge to some pieces of the evidence, the opinions

11   of the experts.  And in my view, the testimony from

12   Al-Fadl and the others and some of the reports, it's not

13   as if every piece of evidence that was considered by me

14   is out of bounds.

15                   If you take that position, I don't see

16   how you can square that with either 1608E or *Kim*.

17                   MR. CURRAN:  *Kim* says there has to be

18   nonhearsay evidence.  I don't think Your Honor relied on

19   any nonhearsay evidence.

20                   THE COURT:  Hearsay evidence, if that's

21   challenging -- they took -- *Kim* is based on affidavits.

22   Affidavits are by definition hearsay evidence.

23                   MR. CURRAN:  Well, again, from reading

24   *Kim*, I can't tell if those are affidavits or not.

25                   And, Your Honor, in that case,

57

1    North Korea did not appear.  So it was not there to say,

2    hey, the affidavit evidence, that shouldn't be allowed.

3                    Like in a lot of these foreign

4    sovereign cases, when there's no advocate there for the

5    foreign sovereign, sometimes not every issue gets

6    addressed.

7                    But *Kim*, and I think --

8                    THE COURT:  That's the same -- it's the

9    same setting that the D.C. Circuit would be reviewing

10   here as in *Kim*.  Sudan didn't appear.

11                   MR. CURRAN:  Yes.

12                   THE COURT:  So --

13                   MR. CURRAN:  Over a period now, they

14   raise the argument.

15                   THE COURT:  I don't see how you can

16   distinguish Kim on that basis.

17                   MR. CURRAN:  Kim, my point is --

18                   THE COURT:  North Korea didn't appear.

19                   MR. CURRAN:  My point is North Korea

20   didn't appear at the D.C. Circuit to raise the argument

21   about the affidavits being --

22                   THE COURT:  Okay.

23                   MR. CURRAN:  I think that's important

24   because *Kim* says it has to be nonhearsay evidence, and

25   *Kim* had some nonhearsay evidence.  It wasn't relying

58

1    just on the experts.  And, Your Honor --

2                 THE COURT:  I have a lot of latitude.

3    I'm not sure I have the latitude to say, D.C. Circuit,

4    what you say is wrong because you didn't have

5    North Korea appearing in the Circuit.

6                 MR. CURRAN:  I don't remember the *Kim*

7    case saying the District Court may rely upon affidavits;

8    you don't need to have a live witness.  I don't remember

9    *Kim* saying that.

10                THE COURT:  We'll look at it.

11                MR. CURRAN:  And here, we have opinions

12   which, without a factual predicate, have no weight.  We

13   have intelligence reports, many of which don't even

14   refer to Al Qaeda.

15                And, Your Honor, you were shown

16   declarations from former Ambassador Carney and the FBI

17   gentleman, Cloonan.  Those were presented to you by the

18   counsel for Sudan, and those were not considered in the

19   evidentiary hearing.

20                If evidence is allowable by affidavit,

21   then those should have been considered.

22                THE COURT:  What else do you want to

23   cover?

24                MR. CURRAN:  Well, maybe very quickly,

25   there are some additional points that have a big impact

59

1    on the damages:  Whether punitive damages are

2    appropriate in this case; whether foreign nationals can

3    recover or recover punitive damages; whether family

4    members have claims.  We dispute all of those based on

5    the statutory language.

6                    Maybe starting with punitive damages,

7    Your Honor, right, under *Landgraf*, there is a

8    presumption that statutory imposition of punitive

9    damages is not retroactive.

10                   Here, the punitive damages should not

11   be imposed retroactively unless Congress makes it

12   crystal clear that they should be.

13                   Here, 1605A does not say that the

14   punitive damages should be applied retroactively, so

15   they shouldn't.

16                   THE COURT:  So this is a 60(B)(6)

17   argument; right?

18                   MR. CURRAN:  Right.

19                   THE COURT:  Under 60(B)(6), you brought

20   that article.

21                   MR. CURRAN:  Or 60(B)(1), under

22   excusable neglect.  It's not jurisdictional.

23                   THE COURT:  Right.

24                   MR. CURRAN:  Yeah.

25                   THE COURT:  And you raise the argument

60

1    only in your reply brief in June of 2015, eleven months

2    after the entry of judgment that awarded punitive

3    damages --

4                    MR. CURRAN:  Yes.

5                    THE COURT:  -- notwithstanding having

6    the opportunity to raise it earlier.

7                    So if I look at the language of 60(B)

8    saying that a motion should be made within a reasonable

9    time, why shouldn't I look at this argument and say this

10   argument was not made within a reasonable time?

11                   You waited 11 months after the

12   judgment, notwithstanding having opportunities to do so

13   before you even raised it.

14                   And, of course, there is a general

15   proposition that something that's raised in a reply may

16   be forfeited anyway, but I'll put that aside.

17                   MR. CURRAN:  When you say "11 months,"

18   is that from the liability determination?

19                   THE COURT:  No, no, no.  From the entry

20   of judgment awarded to --

21                   MR. CURRAN:  Okay.  Well, first of all,

22   the plaintiffs have addressed this in their surreply

23   brief, so Your Honor, of course, has the discretion just

24   to entertain it all.  It's all been --

25                   THE COURT:  That doesn't go to the

1    timing question.  The timing question is different than

2    the fact that they've addressed it.

3                    MR. CURRAN:  So I'm not sure if you're

4    referring to the delay, the fact that it wasn't in our

5    motion to vacate or the longer delay to the liability

6    finding.

7                    But Sudan --

8                    THE COURT:  No, not referring to the

9    longer delay to the liability finding right now.  I'm

10   only referring to the 11 months from the entry of a

11   judgment with the punitive damages until you raised this

12   challenge and is that a reasonable time under

13   Rule 60(B).

14                   MR. CURRAN:  All I can say, Your Honor,

15   is we were retained in April, and we raised a wealth of

16   arguments quickly, and we have raised the punitive

17   damages argument quickly.  We're not aware of it being

18   raised before.  It's an argument that we identified

19   based on our research and analysis.  We think it's

20   correct, and --

21                   THE COURT:  If it's a Rule 60(B)(6)

22   argument, is it really an error that fits within

23   60(B)(6)?

24                   MR. CURRAN:  Well, again, I think

25   60(B)(1) still applies.

62

1            THE COURT:  60(B)(6) is not a vehicle

2    to, say, correct any mistake that's made.

3            MR. CURRAN:  But in the interests of --

4            THE COURT:  That's not what 60(B)(6)

5    is.

6            MR. CURRAN:  Yes, yes.  But most of the

7    damages that Your Honor awarded were punitive damages.

8    In fact, I guess most were punitive damages for foreign

9    nationals.

10           I think the interests of justice

11   suggests that a big award like that ought to be given

12   some scrutiny, even if a foreign sovereign is late

13   coming to defend itself.

14           THE COURT:  Well, not the lateness now,

15   but the question is whether it's within 60(B)(6).

16   Discretion on lateness, I think I do have.  I'm not sure

17   I have discretion on 60(B)(6) as to whether it's the

18   kind of thing that's within 60(B)(6).

19           But let me ask you one last question on

20   this, and that is any case that you can refer me to

21   where a foreign sovereign has successfully challenged a

22   statute on an ex post facto or other constitutional

23   ground?

24           MR. CURRAN:  Well --

25           THE COURT:  It's the problems with

63

1    those constitutional claims that are based on rights

2    given under the Constitution, under the due process or

3    Fourth Amendment, et cetera.

4                        But are you aware of any situation

5    where a foreign sovereign successfully has challenged a

6    statute on ex post facto or authority of Congress type

7    of --

8                        My answer to that is no, but.  Okay?

9                        No, I'm not aware of such a case, but

10   *Landgraf* makes it pretty clear that this notion of no

11   retroactivity of punitive damages is beyond a

12   constitutional issue, predates the Republic, and is a

13   fundamental concept in Anglo law.

14                       THE COURT:  I didn't think it was

15   anything at a higher level than constitutional,

16   Mr. Curran.

17                       MR. CURRAN:  Well, Justice Stevens said

18   there was.  And, of course, comity should be extended to

19   foreign sovereigns.

20                       And international law, of course,

21   adopts principles of -- that are widely recognized.

22                       So under those notions, there is a

23   basis to extend that fundamental protection to foreign

24   sovereigns, even beyond the protections afforded in the

25   U.S. Constitution.

64

1          THE COURT:  Anything else that you

2     think is crucial for you to point out right now?

3          MR. CURRAN:  While we're on punitive

4     damages, I mean, Your Honor awarded punitive damages

5     even to foreign claimants who you said had no cause of

6     action under 1605A(c).  But the only basis for punitive

7     damages is in 1605A(c).

8          So Your Honor looked at D.C. law to

9     award damages and punitive damages for the foreign

10    nationals, but the FSIA has a prohibition on punitive

11    damages except for the claim under 1605A(c).

12         THE COURT:  Where is that prohibition

13    found?

14         MR. CURRAN:  It's in 16 --

15         THE COURT:  -06?

16         MR. CURRAN:  Yes.

17         THE COURT:  The provision, as you say,

18    doesn't apply in another context?

19         MR. CURRAN:  Well, no, no.  I think the

20    prohibition on punitive damages is categorical and is

21    not just with reference to the sections that are cited,

22    1605 and 1607, so I don't think there's any

23    inconsistency there.

24         THE COURT:  Anything else you want to

25    touch on?  I don't want to preclude you from pointing

65

1   anything out.

2            I certainly read the papers.  I'm aware

3   of your statute of limitations argument, and I'm also

4   aware of the *Wong* case that pretty much undercuts any

5   jurisdictional claim as the statute of limitations.

6            But if I think you need to say anything

7   on that, go ahead.

8            MR. CURRAN:  Well, just speaking

9   broadly, Your Honor, if there's other issues that I --

10  that you're willing to hear --

11           THE COURT:  I'm only willing to hear

12  two more minutes, and then I'm going to turn it over to

13  the other side.

14           MR. CURRAN:  Okay.  Then what I'd like

15  to say -- then a couple of quick points.

16           Number one, obviously, we read 1605A to

17  not allow claims by family members; right?  Our view is

18  "claimants" is in there for a very specific reason, and

19  that's when the victim is dead or incapacitated, and

20  that's the most consistent and logical reading of 1605A.

21           And then with respect to the statute of

22  limitations, I might ask Ms. DeLelle -- if Your Honor

23  will allow, I'd like her to address the *Wong* case

24  because she's focused on the statute of limitations

25  issues.

66

1          THE COURT:  All right.  She's going to

2     have to talk quick.

3               Thank you, Your Honor, for your

4     indulgence.

5               THE COURT:  Thank you, Mr. Curran.

6               MS. DeLELLE:  Good morning, Your Honor.

7     Claire DeLelle, White & Case, for the Republic of the

8     Sudan.

9               You referenced the *Wong* case in

10    connection with our statute of limitations argument.

11    That case does not in any way, shape, or form undercut

12    the argument.

13              *Wong* deals with the claims barring

14    provision, Section 2401(b) of the FTCA.

15              THE COURT:  The tort claim provision.

16              MS. DeLELLE:  Correct, but it's claims

17    barring.  Above 2401(b) is 2401(a).  That is more akin

18    to the jurisdictional limitations provision if analogy

19    could be made in 1605A(b) because it talks in terms of

20    preclusion of the civil action.  That is more akin to

21    what we have in (b).

22              Now, D.C. Circuit law is clear that

23    2401(a) is a jurisdictional provision, and that is the

24    *Spanner* case from the D.C. Circuit in 1987, 824 --

25              THE COURT:  There's a lot of water

67

1    under the bridge with respect to what's jurisdictional

2    since 1987.

3                    MS. DeLELLE:  It has been recently

4    relied upon in 2013; also, decisions very recently, last

5    month, from this court in *Dovedale v. U.S. Customs and*

6    *Border Protection*, a case from Judge Cooper, 2015

7    Westlaw 2124937, May 2015.

8                    There was another one last month,

9    November 24th, also from this court, recognizing that

10   *Spanner* is still good law and 2401(a) is jurisdictional

11   in nature.  So we don't believe that *Wong* undercuts at

12   all.

13                   What was significant in *Wong* that the

14   justices reached the holding they did was that the

15   jurisdictional grant in the FTCA was an entirely

16   separate section from 2401.  It was in 1346.

17                   THE COURT:  What provides the statute

18   of limitations in most FSIA cases?

19                   State law, isn't it?

20                   MS. DeLELLE:  That's correct.  That's

21   correct.

22                   (Simultaneous discussion)

23                   THE COURT:  So -- if I talk, I get

24   first crack.

25                   MS. DeLELLE:  I apologize.

68

1          THE COURT:  So what you're arguing

2    ultimately is that there should be a jurisdictional

3    statute of limitations for these, I'll call them

4    terrorism cases; but for commercial cases under FSIA,

5    it's not a jurisdictional statute of limitations?

6          MS. DeLELLE:  Your Honor, that's

7    exactly how the statute was enacted.

8          And Your Honor found in

9    October 26, 2009 in the *Kalik* case that 1605A(b) as well

10   as 1083(c) were jurisdictional time limitations.

11         THE COURT:  Now, part of your argument

12   is based on *Noland*; right?

13         MS. DeLELLE:  That's correct.

14         THE COURT:  And in Noland, there was an

15   appeal taken.  It went to the D.C. Circuit.  And one

16   basis for Judge Collyer's decision was not challenged or

17   was not defended, really, and the D.C. Circuit treated

18   that as conceded.

19         And that's really the jurisdictional,

20   in your mind, statute of limitations issue.

21         MS. DeLELLE:  That's correct,

22   Your Honor.

23         THE COURT:  But -- so the D.C. Circuit

24   went ahead, and doesn't that mean that the D.C. Circuit

25   was treating that as not being jurisdictional?  If they

69

1    treat it as being jurisdictional, they would have had to

2    address it anyway.  The concession wouldn't be enough.

3                    MS. DeLELLE:  Your Honor, I believe

4    that it's not fair to infer from the court's silence on

5    the jurisdictional point that it in fact deems it

6    nonjurisdictional.  The issue was not before the Court.

7                    So far as I'm aware, they have no

8    cause --

9                    THE COURT:  What are courts for?

10                   MS. DeLELLE:  They have no cause to

11   determine squarely the jurisdictional question.

12                   *Simon* and --

13                   THE COURT:  The D.C. Circuit, all the

14   time, if someone is not pressing something that's

15   jurisdictional, says they have to deal with it anyway.

16                   But in that case, they didn't do that.

17   They went ahead and accepted the fact that it wasn't

18   defended.  And that, to me, means that they were

19   concluding that it was not jurisdictional.

20                   But let's go on and talk very briefly,

21   because then I need to turn over the lectern to your

22   opponents and talk about the same plaintiffs' argument.

23                   You believe that a related case has to

24   be brought by the same plaintiff?

25                   MS. DeLELLE:  That's correct.

70

1          THE COURT:  And you base that, again,

2   on the District Court decision in *Noland*?

3          MS. DeLELLE:  That's correct, but also

4   the text and the context of 1083 itself.  1083(c) is

5   titled --

6          THE COURT:  1083(c)?

7          MS. DeLELLE:  -- "Application to

8   pending cases."

9          THE COURT:  So deal with this for me:

10  The *Rader* case, are you familiar with that case?

11         MS. DeLELLE:  Yes, I am.

12         THE COURT:  A quote from the *Rader*

13  case, the section -- and that's 1083(c)(3), speaks of

14  any other action, and it turns on whether the new action

15  arises from the same actor incident, not on whether it

16  is identical to the prior suit or even brought by the

17  same plaintiff.

18         What do you do with that?

19         MS. DeLELLE:  Your Honor, I'm familiar

20  with the passage that you're referring to.  What was

21  happening in that opinion was the D.C. Circuit was

22  positing possible interpretations but then ultimately

23  deciding that it did not at that time have to make a

24  decision.

25         But two years later in the *Bachtiar v.*

71

1   *Iran* case, I would argue that the D.C. Circuit has

2   spoken more explicitly about its understanding of

3   1083(c).

4                    And everywhere it refers to the new law

5   setting forth three options for plaintiffs with pending

6   cases, the only cases that were pending or could be

7   pending at that time were necessarily 1605A(7) cases.

8                    THE COURT:  The same case was still

9   pending.

10                    MS. DeLELLE:  Sorry, Your Honor?

11                    THE COURT:  The *Owens* case was -- well,

12   maybe I'm mixing two different things for you.

13                    In any event, make a final sentence,

14   and then you're going to have to turn the lectern over.

15                    MS. DeLELLE:  I'd actually like to just

16   point out the *In re Iran* terrorism litigation,

17   Judge Lamberth actually in his opinion, I would say it

18   supports Sudan's position and analytically on 1083(C)

19   much more closely than Plaintiffs' position.

20                    For example, his heading --

21                    THE COURT:  We'll look at that.

22                    MS. DeLELLE:  -- deals with retroactive

23   application.

24                    THE COURT:  I said "one sentence."

25                    MS. DeLELLE:  Thank you, Your Honor.

72

1          THE COURT:  You want a brief break?

2          MR. NEWBERGER:  Yes, Your Honor.  I

3   think in light of the questions and observations of

4   counsel to your questions, it might be useful and

5   efficient for us to have just a few minutes to confer.

6          THE COURT:  Right.  Five minutes.

7          MR. NEWBERGER:  Thank you very much,

8   Your Honor.

9          (Recess)

10         MR. NEWBERGER:  Your Honor, we've had a

11  chance to talk, and I think we're going to be able to

12  shorten our presentations and even have one less person

13  have to address some issues that I think have been

14  adequately covered.

15         THE COURT:  Does that mean you're

16  sitting down?

17         MR. NEWBERGER:  I was expecting that.

18         I'm going to be very short, Your Honor,

19  and then I'm going to defer to Mr. Vail and two other

20  colleagues at the table.

21         I'm going to make a couple of points

22  that are not really in our brief, Your Honor.  When I

23  say "our brief," as you know, my firm represents the

24  Americans who were killed in the Nairobi attack, the

25  Aliganga-Bartley group.  Our clients are intervenors.

73

1    You granted intervention several years

2    ago to them in the *Owens* case.  I point that out because

3    of the discussion between the Court and Mr. Curran this

4    morning about the *Owens* case.

5    And there were certain things that

6    counsel for Sudan said about *Owens* that distinguished it

7    from the other cases.  I just point that out as

8    something in the record.

9    Number two, Your Honor, in this Rule 60

10   motion, it really applies to almost all the issues that

11   have been raised, not just particulars for one case, but

12   all generally.

13   Sudan is really asking you to do more

14   than to change an outcome in this case or these

15   consolidated cases.  Sudan is really asking you,

16   Your Honor, to really do two things:  Number one, force

17   not just all my clients who have now testified and gone

18   through the pain of having to present their case and

19   relive the horror of their families getting killed in

20   this bombing, but all of the people who were plaintiffs

21   and family members in this case.

22   I think your words to Mr. Curran were

23   "the consequences of granting the motion."  Well, that

24   is one of the consequences if the motion is granted.  I

25   think that all of our clients are going to have to

74

1    relive all over again the testimony that you've already

2    heard and the pain that that causes them.

3                    I merely point that out --

4                    THE COURT:   To the extent that these

5    are jurisdictional issues, isn't that going to be true

6    in the D.C. Circuit?

7                    Isn't the D.C. Circuit going to deal

8    with those jurisdictional issues?

9                    MR. NEWBERGER:   We, of course, differ

10   quite a bit with what the scope of jurisdictional issues

11   are, as you know, both in terms of what's in front of

12   the D.C. Circuit in the now stayed but pending appeals

13   of your earlier rulings and judgments and what's before

14   you now on the more discretionary, we would call it,

15   Rule 60 aspects of what they're asking you to do now.

16                    One of my colleagues is going to get

17   more into that and answer some of those questions,

18   Your Honor.

19                    But the other thing that Sudan is

20   asking you to do is, they are really asking you to

21   really overturn all the decisions that you and

22   effectively most of the members of this court have

23   entered on a lot of these issues which have come up, and

24   I'm not going to repeat those.

25                    THE COURT:   I understand that.   But if

75

1    I conclude that they are right on some issue, should I

2    not rule that way because I or others have ruled

3    differently in the past?

4                    MR. NEWBERGER:  Of course not,

5    Your Honor.  But they're not right.  And, as you know,

6    that's set forth in detail in our briefs, and you'll

7    hear a little bit more of that in a minute.

8                    I do note that you are the only judge

9    in this court who's heard other embassy bombing cases,

10   as you and I are both well aware, mostly from Lebanon

11   and the two bombings in Beirut in 1983 and 1984, a

12   series of cases with *Damerel*, *Dillon*, and all those that

13   you're very familiar with and, of course, I'm familiar

14   with as counsel in those cases.

15                   Your Honor asked one question, though,

16   which I thought was very important and I know is in some

17   ways a mention of those cases, which is if, under the

18   state actor issue, if Hezbollah carries it out on behalf

19   of Iran or Hammas carries it out on behalf of Iran, is

20   it any different than Al Qaeda carrying it out on behalf

21   of Iran or Sudan?

22                   And the answer is clearly no because of

23   the provision and material support provision in the

24   FSIA.  Congress was very clear about that.

25                   The other thing I'd mention --

76

1        THE COURT:  So this state actor

2   question with respect to extrajudicial killing --

3        MR. NEWBERGER:  Yes.

4        THE COURT:  -- is that something -- is

5   that something that you addressed in the briefs?

6        MR. NEWBERGER:  Yes.  But I do want to

7   just expand just for a second on that because I am going

8   to address the extrajudicial killing issue, and I

9   appreciate the opportunity for that, Your Honor.

10        Mr. Curran referred to 28 U.S.C. 1350

11   which, of course, is the definition from the TVPA which

12   Congress then in part then used in the FSIA.

13        THE COURT:  It's actually one provision

14   of the TVPA which isn't the exact same provision.

15        MR. NEWBERGER:  Correct, but they

16   looked to it.  We know that, and we can all agree on

17   that.

18        But, Your Honor, it goes to a point in

19   the discussion between Mr. Curran.

20        If you go to Section 3, which is the

21   definition section of 1350, which is the letter A,

22   "Extrajudicial Killing," the first sentence doesn't

23   mention state action, Your Honor.  It's silent on that.

24        THE COURT:  State actor?

25        MR. NEWBERGER:  State actor, state

77

action.  There are different -- "attribution" is the
word that's used in public international law.  It's the
same concept, the role of the state, which is, of
course, what we're here talking about today.

                    The first sentence of the definition
section of 1350, "Extrajudicial Killing," is silent on
that.  There's nothing at all that supports Sudan's
argument in that.

                    And then the second sentence is the
exception that says "but with regard to," and then it
very narrowly carves out, as you know, "such term,
however."  The "however" -- that's the exception -- does
not include any such killing that under international
law is lawfully carried out under the authority of a
foreign nation.

                    That's the only part of the definition
section fairly read in plain language that addresses the
state action attribution issue that has been raised by
Sudan.  The first sentence of the definition has nothing
to do with that.

                    So I think fairly read, if we're
looking at what Congress intended, not public
international law because we're here to talk about what
Congress intended, that is how we read it in the plain
language approach to the statute.

78

1    And we think that Congress had very

2    little trouble doing that when it then looked to the

3    statute to assemble both 1605A(7) and 1605A in 2008.

4    One other point about that, Your Honor,

5    the "Lautenberg Amendment," as it was called, the

6    "NDAA," in January of 2008, was -- by its sponsors in

7    Congress, it was made very clear that it was meant to

8    expand, not contract or narrow the rights of terrorist

9    victims under the FSIA.  That's all over the statute.  I

10   don't need to repeat it.  It's in our briefs, and

11   Your Honor is obviously very familiar with it.

12   It was not meant to narrow in any way

13   as Mr. Curran has suggested.  His argument is not

14   supported by the plain language of the statute or the

15   legislative history.

16   One last thing, Your Honor, and then

17   I'm going to sit down.  I understand other counsel

18   addressed the issue about excusable neglect and waiver,

19   which I know you and Mr. Curran discussed at length this

20   morning.

21   I just point out, Your Honor, we are,

22   of course, pleased and honored that His Excellency, the

23   Ambassador of Sudan, is attending today.  We think that

24   shows great respect for our court system, and we

25   appreciate that very, very much.

79

1              I would point out, however, that

2    separate from the long procedural history of Hunton &

3    Williams in this case and then defaulting and then other

4    counsel and now White & Case, the United States and

5    Sudan have maintained diplomatic relations, full

6    diplomatic relations throughout this entire time period.

7              The Republic of Sudan has had an

8    embassy here in Washington, D.C. during this entire time

9    frame.  That's something that wasn't mentioned by

10   Mr. Curran.

11             We think that's a very important

12   objective fact that Your Honor can bear in mind when

13   considering the arguments put forward by Sudan in its

14   Rule 60 motion.

15             Thank you, Your Honor.  I think at this

16   point, I can defer.

17             Unless you have questions of me,

18   Your Honor, I'll defer to Mr. Vail to address that.

19             THE COURT:  If he's deferring to others

20   on other issues, I'll wait to see what they have to say.

21             MR. NEWBERGER:  Thank you very much,

22   Your Honor.

23             MR. VAIL:  Your Honor, John Vail.

24             I have two initial points that are

25   particular to a couple of cases that arise because of

80

1    the way Sudan filed its reply brief as a consolidated

2    brief and not, as we did, initial briefs.  But two

3    important points.

4                   In the *Mowilla* and *Kalik* cases, Sudan

5    did not raise an issue of excusable neglect and

6    presumably because they were --

7                   THE COURT:  They were out of time?

8                   MR. VAIL:  -- out of time.  Yes.

9                   And the judicial killings argument,

10   extrajudicial killings argument, in the *Owens*, *Mowilla*,

11   and *Kalik* cases, that argument shows up for the first

12   time in the reply brief.  That was not briefed

13   initially.  And we say, therefore, under normal

14   precedent, it's waived.

15                  And waiver inducing -- talking about

16   waiver there --

17                  THE COURT:  The only problem I have

18   with that, do you think the D.C. Circuit is going to

19   consider it waived?

20                  They'll raise it full bore in the

21   D.C Circuit, and they are raising it as a jurisdictional

22   issue.

23                  MR. VAIL:  And let's go to that because

24   I think waiver -- waiver is exactly what I'm here to

25   address because the arguments that Sudan is making here

81

1   are not jurisdictional per se.  You pointed out the

2   *Kilbourne* case, about some difference between judicial

3   fact-finding -- jurisdictional fact-finding.

4                    THE COURT:  That's an evidentiary

5   issue.

6                    MR. VAIL:  Yes, exactly.

7                    THE COURT:  Good point.  It's not

8   really -- it wouldn't really address the extrajudicial

9   killing issue.

10                    MR. VAIL:  Well, it does in this sense

11   because I want to point you to 1605A(2), which no one

12   has discussed.  I don't know if -- but A(2) deals with

13   jurisdiction, and it tells the Court that the Court

14   shall hear a claim under this section.

15                    THE COURT:  What's the specific

16   provision?  1605A?

17                    MR. VAIL:  Big A, small a, 2.

18                    THE COURT:  So it's 1605A(a)(2)?

19                    MR. VAIL:  Yes.

20                    THE COURT:  Go ahead.

21                    MR. VAIL:  The Court shall hear a claim

22   under this section if three criteria are met:

23   Designated as a state sponsor, claimant or victim was a

24   national, and opportunity to arbitrate.  The Court shall

25   hear a claim.  That's mandatory, and that's clearly

82

1    jurisdictional in the normal sense of subject matter

2    jurisdiction.  The provisions about sovereign immunity

3    we know are subject to waiver because we also know, as

4    you alluded to, that the sovereign has an evidentiary

5    burden of establishing them.

6                    And remember that *TransAmerican* made

7    clear, this is an evidentiary burden.  It has the burden

8    of proof, the burden of persuasion, the burden of

9    establishing its claim of sovereign immunity.

10                   Now, of particular import in this case,

11   I'll point you to Document 49.  And in Document 49, one

12   of Sudan's early motions, as a factual matter, Sudan may

13   not be deprived of immunity because the evidence shows

14   that it did not engage in any of the acts listed,

15   including the act of extrajudicial killing.

16                   And it's at this point that Sudan

17   adduces evidence that it did not do those things.  Sudan

18   throughout this briefing says --

19                   THE COURT:  What, that they adduced

20   evidence?

21                   MR. VAIL:  This is Sudan's motion.

22   It's Document 49 at page 9.

23                   And this is where Sudan attaches its

24   affidavits to demonstrate that it did not participate in

25   these acts.

83

1          Now, Sudan --

2          THE COURT:  When you say "not

3  participate in these acts," what do you mean by that?

4          MR. VAIL:  The predicate acts for --

5          THE COURT:  Not the actual --

6          MR. VAIL:  For sovereign immunity.

7          THE COURT:  The acts of material

8  support?

9          MR. VAIL:  Material -- they say they

10  didn't give material support, and they didn't

11  participate in extrajudicial killing --

12          THE COURT:  Okay.

13          MR. VAIL:  -- specifically.

14          And they took their interlocutory

15  appeal and did not press the evidentiary issue on their

16  interlocutory appeal.

17          In the *Price* case -- *Price* is 294 F.3d

18  82 at 91 -- in that case, the terrorist defendant,

19  alleged terrorist defendant, only addressed their legal

20  challenges to the sovereign immunity, to jurisdictional

21  elements and to the sovereign immunity elements.

22          And they said at the Court of Appeals

23  that -- excuse me -- let me quote for you.  They

24  challenged the facts and then said that the Court of

25  Appeals was "required to reverse and remand for further

84

1   fact-finding; to remand it for purposes of allowing the

2   development of a factual issue in the case."

3                    The Court of Appeals said No, we don't

4   do that.  You've waived that in the normal course of

5   litigation.

6                    Sudan waived all the arguments we're

7   talking about here in the first *Owens* appeal, and the

8   *Owens* appeal is the law of this case.

9                    THE COURT:  Can they really -- they

10  didn't expressly waive, let's say, the extrajudicial

11  killings argument, which they --

12                   MR. VAIL:  Nor did they do so in *Price*.

13                   THE COURT:  -- which they say is a

14  jurisdictional argument.

15                   MR. VAIL:  Not precisely.  It's a

16  jurisdictional argument --

17                   THE COURT:  They say it is

18  jurisdictional.

19                   MR. VAIL:  Yes.  And I'm saying that

20  that's not right because it's not jurisdictional in the

21  prima facie sense.

22                   A better way to look at the order of

23  allocation of jurisdictional proof in these cases is to

24  say that you create a prima facie case of jurisdiction

25  that is then -- and the Court is seized with subject

85

matter jurisdiction at that time.  Of course, the Court

is also seized with jurisdiction to determine its

jurisdiction.  But that -- then the Court becomes seized

with jurisdiction, and there's a burden, that

evidentiary burden we talked about on the sovereign to

establish that it is immune and that establishing that

immunity destroys the subject matter jurisdiction that

did exist.

THE COURT:  Setting aside who has the

burden because sometimes to establish jurisdiction, the

plaintiff has a burden, setting that aside, do you

disagree with the proposition that -- let's pick the

jurisdictional causation question for a moment -- do you

disagree with the proposition that in the normal FSIA

case where a defendant is participating, that they can

raise and the Court will have to examine that at various

stages:  A motion to dismiss stage, perhaps again at a

summary judgment stage, and then again with respect to

the trial evidence?  They can, based on what happens at

the actual trial, they can argue in a posttrial motion,

let's say, that the jurisdictional causation requirement

was not satisfied, can't they?

MR. VAIL:  I don't think so,

Your Honor, because it's not a matter of satisfying it

ultimately.  It's a matter of stating a claim.  Subject

86

matter jurisdiction is established over a claim.  That's
related in the legislative history of the Foreign
Services Immunity Act itself.

          THE COURT:  But when the Court of
Appeals gets ahold of that case and they look at the
question of causation --

          MR. VAIL:  Yes.

          THE COURT:  -- if they say that the
proof at trial came up short of what is required, isn't
that a jurisdictional determination?

          MR. VAIL:  They could say then -- they
could say, if they chose to, that sovereign immunity was
established.

          But it was -- it's clear from the cases
that we see that the burden is not on the plaintiff to
establish the elements of sovereign immunity.  From
*TransAmerican* on, that burden very clearly rests with
the claimant of sovereign immunity.

          This makes the jurisdictional paradigm
very consistent to view it in that way.  Remember that
as -- there's confusion.  And the *Steel* case from -- the
*Steel Company* case from the Supreme Court that you've
been cited --

          THE COURT:  *Youngstown*?  Which case?

          MR. VAIL:  This is -- I have to find my

87

1    notes.  *Steel Company v. Citizens for a Better*

2    *Environment*.

3                    THE COURT:  Okay.  Not <u>Youngstown</u>.

4    Okay.

5                    MR. VAIL:  That makes -- excuse me,

6    Your Honor.  I lost my train of thought.

7                    But your question was, again?

8                    THE COURT:  I didn't -- my question was

9    quite a while ago, Mr. Vail.

10                   MR. VAIL:  The cases that precede the

11   enactment of 1605A used jurisdictional language in a way

12   that's criticized in *Steel Company*.  The Supreme Court

13   says it's used too loosely in some of these ways.

14                   THE COURT:  There's --

15                   MR. VAIL:  In the 1605A(7) cases, the

16   courts are struggling about what's a jurisdictional

17   provision and what's a cause of action.

18                   After the enactment of 1605A, that

19   becomes clear.  There's a cause of action section;

20   there's a straight jurisdictional section.

21                   THE COURT:  Well, they are pretty close

22   to the same words --

23                   MR. VAIL:  And there's the sovereign

24   immunity section.  Those words, the same language is

25   enacted in the sovereign immunity section.  But it's

88

1    clear that that goes to sovereign immunity, which is

2    waivable, which is a huge distinction between it and

3    subject matter jurisdictional.

4                    THE COURT:  So bottom line, what are

5    you saying, based on this?

6                    MR. VAIL:  I am saying that Sudan

7    waived its arguments about developing a factual record

8    on jurisdiction.

9                    THE COURT:  Even if that's a

10   jurisdictional argument, it's waived and can't be

11   pursued either here or in the D.C. Circuit?

12                   MR. VAIL:  I would make -- yes.

13                   THE COURT:  All right.

14                   MR. VAIL:  I mean, it can be pursued.

15   We can make the same argument, but that was subject to

16   waiver because they are elements of sovereign immunity,

17   not per se elements of subject matter jurisdiction.

18                   Sudan also waived -- waived its

19   sovereign immunity entirely by participating in this

20   case in the way that it did with counsel for five years,

21   consciously abandoning the litigation of this case.

22                   And then -- and now it seeks to come

23   in --

24                   THE COURT:  Do you think the

25   D.C Circuit's decision with respect to Sudan's earlier

89

1    appeal reflects a view that that's the end of the

2    jurisdictional inquiry with respect to causation?

3                    MR. VAIL:  Because *Owens* undertook a

4    factual attack on jurisdiction in this court, yes, I

5    think it does.  I think that's what --

6                    THE COURT:  I --

7                    MR. VAIL:  *That's what the Price* case

8    says.

9                    THE COURT:  I was asking whether you

10   think the D.C. Circuit's decision reflects that, as

11   opposed to whether you think that should be --

12                   MR. VAIL:  The D.C. Circuit's decision

13   doesn't reflect that because those issues were not

14   brought before the Circuit.

15                   THE COURT:  All right.

16                   MR. VAIL:  *Price* makes pretty clear

17   what would happen with them if they had been brought

18   before the circuit.

19                   THE COURT:  Okay.  Go ahead.

20                   MR. VAIL:  I think that's all I have,

21   Your Honor, on the waiver issues.

22                   THE COURT:  All right.  What else are

23   you addressing?

24                   You're not addressing the sufficiency

25   of the evidence?

90

1                  MR. MILLER:  No.  That would be a

2    wonderful segue to my colleague, Mr. MacAllister.

3                  THE COURT:  Okay.

4                  MR. MAC ALLISTER:  Good morning,

5    Your Honor.  Edward MacAllister.

6                  THE COURT:  Good morning.

7                  MR. MAC ALLISTER:  I'd like to start by

8    addressing the excusable neglect argument.

9                   And Sudan this morning said that we're

10    here under some kind of 62.1, some kind of 62.1 context.

11    But Rule 62.1(a)(2) allows you to deny the motion, so

12    you're not bound to make an indicative ruling.  You can

13    go further and deny the motion.

14                   Sudan also tries to argue that 60(B)

15    should be liberally applied in this circuit, but the

16    case they cite to is *Jackson v. Beech*, which is a

17    classic default judgment setting.

18                   In a classic default judgment setting,

19    obviously, you go upon the well, plead a complaint, you

20    enter a damages order, and then you enforce the damages.

21                   That doesn't apply to a case like this

22    where it's a five-year adjudication, three days of

23    evidentiary testimony, and then three years where seven

24    special masters heard the claims and testimony of 500

25    different people.  This is not a classic default

91

1    judgment.  *Jackson v. Beech* doesn't apply, but Sudan

2    tries to bootstrap it into other cases.

3                    They only cite a single case where a

4    60(B)(1) motion was used to vacate a judgment, and

5    that's *FG Hemispheres*.  And, of course, the equities in

6    that case are much different.

7                    The *Practical Concepts* case is not a

8    60(B)(1) case, nor did they vacate a judgment in that

9    case.  In that case, the D.C. Circuit reversed a trial

10   court which dismissed an action, and they mention

11   Rule 60(B)(6), but they did not vacate a judgment.

12                   So when Sudan says that courts in this

13   circuit vacate default judgments many times in FSIA

14   cases, they are wrong, and they can only cite one case,

15   which is *FG Hemispheres*.

16                   *Practical Concepts*, I believe, only

17   stands for when a foreign sovereign appears with a 60(B)

18   defense, that defense should be carefully heard.

19                   The amicus statement by the U.S.

20   government says the same thing.  When they come in later

21   and choose to challenge jurisdiction, thereby foregoing

22   the merits determination, they should be carefully

23   heard.  It doesn't say that the judgment should be

24   vacated liberally.

25                   So, as you know, this is an equitable

92

1    matter.  I'm not going to go over the four pioneer

2    factors, but Sudan arrived too late, and they willfully

3    defaulted.  Those are very important points which were

4    not present in the *FG Hemispheres* case.

5                    To start with, I think Sudan is per se

6    barred from raising its 60(B) motion under

7    Rule 60(C)(1), which requires them to file the motion

8    within a year.

9                    The motion that they filed

10   challenges --

11                   THE COURT:  Within a year of what?

12                   MR. MAC ALLISTER:  Within a year of

13   whatever order they are challenging.  The order that

14   they are challenging is the reliability determination,

15   which was served on them in 2012.  That's three years

16   ago.

17                   THE COURT:  Are you aware of any case

18   where there's a separate liability determination and

19   then a later judgment entered on the basis of a

20   liability determination and extensive damages

21   determination?

22                   Are you aware of any case under

23   Rule 60(B) that triggers the time period from that

24   earlier liability determination?

25                   MR. MAC ALLISTER:  Your Honor, I'm not.

93

1    But earlier today, you were asking them questions about

2    why did they raise their punitive damages argument at

3    such a late stage and out of time to Rule 60(C)(1).  So

4    I think the rule applies there.

5                    There's never been a case on this fact

6    pattern.  This would be the first case.  I think they

7    are per se barred from raising 60(B)(1).  Even if they

8    are not per se barred, under Rule 60(C)(1), they have to

9    file the motion within a reasonable period of time.

10                   As we know, they filed a notice of

11   appeal within 30 days of your final judgment on damages.

12   They waited nine months before they filed the 60(B)

13   motion.

14                   And in the Hilliard case, the court

15   said yes, you filed a day short of a year, but it's not

16   within a reasonable time because the defendant never

17   indicated why they took so long to file the motion.

18   They never said, We just found out about this.

19                   In Sudan's case, they were represented

20   the entire time.  In fact, before you issued your

21   damages award in this case -- because they appealed the

22   Owens decision which came out a couple of months before

23   the Amdiso [phon.] decision -- they never explained why

24   they took nine months.  In their motion, they have a

25   single sentence that says, We filed within a year;

94

1    therefore, it's timely.  That does not meet the burden

2    under Rule 60(C)(1).  And they did not respond to this

3    argument in their reply either.

4                    So, as Your Honor mentioned, this is a

5    willful default.  This is not a mistake.

6                    In the single case that Sudan cites,

7    *FG Hemispheres*, the DRC made a well-intentioned mistake.

8    The papers were delivered to them in the wrong language.

9    They immediately hired counsel and appeared to wipe out

10   a two-month adjudicatory process.

11                   Here, Sudan is trying to wipe out a

12   five-year adjudicatory process based upon a willful

13   default.  And in their motion, they write that there

14   will be no prejudice.

15                   I beg to differ.  Clients came here

16   from Kenya to testify.  Clients also submitted -- as

17   Mr. Newberger said, clients submitted to questioning so

18   they could -- to describe their damages to the Court.

19   500 clients.  I think there would be a great prejudice

20   if there were --

21                   THE COURT:  That's an interesting

22   question.  And maybe I'll ask Mr. Curran that with

23   respect to the prejudice Plaintiffs suffer.  If they are

24   arguing that there has to be a full new liability

25   determination based on a new record of evidence and that

95

1    if liability is then found, it would have to be new,

2    full damages proceedings, I'd like to know that.

3              MR. MAC ALLISTER:  Well, Your Honor, we

4    would argue that the plaintiffs, we would request that

5    if there were to be interlocutory, that it be

6    conditioned on the plaintiffs not having to testify

7    again; to relive the horror.  If they were forced to do

8    that, that would be a great prejudice.

9              In the *DRC* case, all the witnesses were

10   located in the United States.  Here, the witnesses are

11   scattered across the globe.  Some of the experts are now

12   in government or could be when this comes up again.

13   This is prejudice to the clients, not to mention the

14   fact, as we mentioned in our briefs, over 25 clients

15   have died since the time the suit has been filed.

16             If we are forced to relitigate this

17   case, it will take another three or four years at best,

18   and more clients will die.  They won't be able to

19   testify, and they won't be able to see the order in this

20   case.

21             Sudan, again, does not reply to this

22   point in its reply brief.

23             They do enter a declaration to support

24   their burden, and the D.C. Circuit in the *Gates* case, a

25   case where 60(B)(4) motion was filed and denied against

96

1    a foreign sovereign, in the *Gates* case, the D.C. Circuit

2    says there is a burden on the foreign sovereign, and

3    they cite to a case which says it's a heavy burden.

4                What which have here is a very thin

5    declaration which has two points about why Sudan was not

6    in this case.

7                The first point is about a fundamental

8    lack of understanding which you questioned counsel

9    about, but I just want to point out that even if there

10   were communications problems later in the scope of the

11   representation, they entered the case after a full

12   briefing about what the consequences were if they did

13   not.

14               They entered the case to vacate the

15   default in this courtroom in the *Owens* case in 2004,

16   pleading good faith and that they wanted to participate

17   in the litigation.  They must have known at that time

18   what the consequences were of not entering the Foreign

19   Sovereign Immunities Act case, what counsel would have

20   talked about at the onset of the case.

21               And, finally, if they are in

22   Judge Doumar's court and they are saying they've been

23   instructed by the client, that means that there were

24   communications at different times.

25               There is not a full record in Sudan's

97

1    papers about when there was communications and when

2    there weren't, so I don't think Sudan can say now that

3    there was no communications after a certain time.  And

4    it's obviously belied by the fact that they said in

5    front of Judge Doumar that they've been instructed by

6    their client not to present defenses in 2009, which was

7    after the passage of the statute.

8              Regarding the civil unrest and

9    political turmoil, the problem with the declaration is

10   that there are no dates.  It doesn't explain when the

11   civil war started or ended, when were the floods, when

12   did they happen.  They seek to annul a five-year

13   adjudicatory process simply by saying there was civil

14   unrest and floods.

15             THE COURT:  What's the five-year

16   period?  Speaking of dates, what's the five-year period

17   that you're identifying?

18             MR. MAC ALLISTER:  From the entry of

19   default and three years since the liability judgment.

20             THE COURT:  All right.  Thank you.

21             MR. MAC ALLISTER:  Sorry, I'm trying

22   to -- I don't want to go over things that you've already

23   discussed.

24             In their brief, they indicate --

25             THE COURT:  We'll go over things that I

98

1    discussed with Mr. Curran.

2                    MR. MAC ALLISTER:  I don't want to

3    waste any of the Court's time.

4                    THE COURT:  Right.

5                    MR. MAC ALLISTER:  In their motion,

6    Sudan indicates that they had limited government

7    resources and they couldn't spare them, I guess, to

8    respond to this case.

9                    And they also cite to a case where a

10   court says it would take heavily the burden of deciding

11   whether or not to impose a multimillion-dollar judgment

12   on a struggling government.

13                   I think what they are trying to imply

14   here is they have scarce resources.  However, in 2004

15   and 2005 when they were before Your Honor pleading good

16   faith and that they were willing to participate in the

17   U.S. legal system, at the same time, they were partners

18   with the B&P Bank in New York in a vast criminal

19   conspiracy to flout U.S. law and money-launder billions

20   of dollars through New York, which involved Sudanese

21   government banks.

22                   I don't think that indicates good

23   faith, Your Honor.

24                   Sudan presents meritorious defenses.

25   Now, they don't need to be proven or not in this

99

1   setting, but their meritorious defenses just do not

2   work.

3                        They said the bombing did not occur in

4   Sudan.  That's not a defense to any of our claims.

5                        They also say that Sudan had

6   undisputedly expelled Al Qaeda from its territory by

7   1996.  No one has ever said that Al Qaeda was expelled

8   from Sudan's territory.  The evidence shows quite the

9   opposite.

10                       In 1998, senior Al Qaeda leaders were

11  visiting Khartoum, as Steve Simon testified.

12  Steve Simon was the senior director for combating

13  terrorism on the NSC at the time.

14                       This brings us back to the question of

15  the burden.  Sudan has the burden in this case, and they

16  have a declaration which gives you no information to

17  make --

18                       THE COURT:  Talking about excusable

19  neglect?

20                       MR. MAC ALLISTER:  Excusable neglect.

21                       Insufficient information make a ruling

22  under 60(B)(1).

23                       I think that's enough on 60(B)(1),

24  Your Honor.

25                       I'd like to move to 60(B)(4).

100

The burden of proof, again, is on Sudan in the 60(B)(4) setting.

Mr. Vail raised an interesting question which has not been touched on before because no one has looked at the language of 1605A.  There is a "Claim Heard" section.  There's also an "Immunity" section.

The Claim Heard section seems like a subject matter jurisdiction section.  Once you have subject matter jurisdiction, you hear the claim.  Then there's the question of immunity.

We have the initial burden of production, which we feel we've met and more at the merits hearing.

Sudan now has the burden of proof as *TransAmerican* states and *Prinze* later stated in 1994. And then the *Bell Helicopter* case, they said that the burden of persuasion is ultimately on the sovereign.

The declaration, which has a few vague paragraphs about why they couldn't be here today, says nothing about the bombing except we condemn the bombing, and we were not involved in that act.  That says nothing about the merits of this case.

They have presented no proof whatsoever on the question of were the bombings caused by the Sudan's material support.

101

1          Mr. Curran's -- sorry -- Sudan's

2   interpretation of the subject matter jurisdiction

3   provision does not make sense.

4          If we look at the language of the

5   Foreign Sovereign Immunities Act, it says literally the

6   immunity provision -- not the claim heard provision but

7   the immunity provision -- says that a claim -- all that

8   is required is a claim for money damages where a case of

9   material support caused a physical injury or death.  A

10  claim.

11         So what I think that means is that the

12  Court is required to not analyze the complaint to see

13  whether there's sufficient connection between the

14  material cause, the material support, and the death.

15  That's what the D.C. Circuit said in the *Owens* case.  In

16  the *Owens* case, the D.C. Circuit said, is there a

17  reasonable connection between the material support and

18  the injuries?

19         Now, that was a 12(B)(1) setting, but I

20  think it remains true that whether there is immunity is

21  decided by whether there's a reasonable claim for

22  material support causing personal injury or death.

23         The structure of the FSIA would not

24  allow for there to be two different tests for causation.

25  Sudan wants you to test causation at the subject matter

102

1   jurisdiction stage.  They want the Court to have a

2   merits hearing for subject matter jurisdiction.

3                  But the federal cause of action -- and

4   they say that there is no cause of action except for the

5   federal cause of action -- also has a causation element.

6   Why would you have to prove causation twice?  Congress

7   wouldn't require that.

8                  Most importantly, the purpose of the

9   FSIA is to protect the foreign sovereign from the

10  attendant burdens of litigation.  If that's the purpose

11  of the FSIA, why is there a merits hearing in the

12  jurisdictional causation?  Then there would have to be

13  more discovery.

14                 Courts have been loath to give

15  discovery to plaintiffs because they want to protect

16  them from the attendant burdens of litigation.  If you

17  have a merits hearing to determine subject matter

18  jurisdiction, there would have to be discovery.  This

19  turns the entire statute on its head.

20                 And, of course, the *Practical Concepts*

21  case says you can't relitigate the merits, which is hand

22  in hand with the *Steel Company* case which says a failure

23  of cause of action does not deny subject matter

24  jurisdiction.

25                 The *Kim* case is a very interesting

103

1    case.  In the *Kim* case, the Court was trying to decide

2    whether or not the merits had been established.  Here,

3    we are trying to decide whether the subject matter

4    jurisdiction of the Court has been established.

5                    Even if you assume Sudan is correct and

6    that some sort of evidence has to be produced at this

7    stage or at any stage to prove subject matter

8    jurisdiction and you have to do more than what was said

9    in the *Owens* case that you need to have a claim for with

10   a reasonable connection to the material support, even if

11   you think that there's something more than what the

12   D.C Circuit said in *Owens* and that you have to produce

13   evidence, admissible evidence, for a subject matter

14   jurisdiction finding, the *Kim* case found merits on a

15   much smaller evidentiary basis than we have in this

16   case.

17                    The *Kim* court had referenced two

18   experts, both of whom relied on hearsay.  And --

19                    THE COURT:  They didn't testify, did

20   they?

21                    MR. MAC ALLISTER:  I honestly don't

22   know, Your Honor.

23                    THE COURT:  The citations in the *Kim*

24   case -- and I think Mr. Curran should look at it -- the

25   citations in the *Kim* case are to declarations of these

104

1    experts.  They are citations to the declaration of

2    Professor Falk.  They are citations to the declaration

3    of Ernest Downs.  They are not citations to testimony.

4                    MR. MAC ALLISTER:  That sounds correct,

5    Your Honor.  I haven't looked at that, but these experts

6    explicitly relied on hearsay.  Neither of them testified

7    what happened to the victim.

8                    The *Kim* court ruled that it would not

9    require plaintiffs to prove exactly what happened to the

10   victim or when.  They relied on two experts who relied

11   on hearsay, inadmissible hearsay, such as Sudan.

12                   As Your Honor mentioned earlier, this

13   is what experts do.  They are allowed to rely on

14   inadmissible hearsay under the federal rules.  But the

15   *Kim* court allows it for a merits proceeding.

16                   Not only that, but the *Kim* court used

17   Rule 201 to take the content of a South Korean judgment

18   and use it as the truth.  This doesn't sound like how a

19   Rule 201 should normally be used.  But the *Kim* court

20   also said, as you mentioned earlier, the Supreme Court

21   has said that there is an obligation to adjust

22   evidentiary requirements to differing situations to

23   implement the goals of the statute.

24                   When the *Kim* court talks about indirect

25   evidence, perhaps this is what they are talking about.

1   They never make that clear.

2                  But it's clear that they said you have

3   to adjust the evidentiary requirements.  They relied on

4   two declarations by experts who relied on hearsay for

5   their testimony.

6                  In our case, we had four expert

7   witnesses.  We had Evan Coleman, who's been approved by

8   numerous circuits.  His methodology --

9                  THE COURT:  He's been criticized by

10  some courts.

11                 MR. MAC ALLISTER:  He's been criticized

12  in an opinion from the bench of the Eastern District of

13  Virginia.  The Fourth Circuit has twice ruled that his

14  methodology, education, and experience have been more

15  than sufficient.  I think that counts more.  They only

16  cited one decision that said that.

17                 More recently, in the *Lindy* case, which

18  is the *Air Bank* case in New York where he was, there was

19  a full *Daubert* hearing.  The court upheld his expertise.

20  And there are many more cases which I cited in our

21  opposition papers.  The balance is not equal.

22                 Also, there was Steve Simon, who was at

23  the time of the events in this case the senior director

24  for combating terrorism on the NSC.

25                 The *Kim* court looked at one of the

106

1   experts, and they approved of him.  They said two

2   experts, just the kind of experts whose testimony we

3   have credited in FSIA default actions.  They referenced

4   the *Kilbourne* case.

5                In the *Kilbourne* case, they relied upon

6   a declaration from Ambassador Oakley.  Ambassador Oakley

7   was an expert on terrorism, but he was also a man who

8   was there at the time of the incident and testified from

9   his knowledge.  He wasn't a percipient witness because

10  he wasn't in Libya; but under the rules, experts can

11  testify to things that they learn from others.  They are

12  not required to be percipient witnesses.  The two

13  experts in the *Kim* case were not percipient witnesses.

14               Nonetheless, their testimony was

15  accepted by the court, the D.C. Circuit, and used to

16  find a merits determination.

17               Sudan attacks Evan Coleman's expertise,

18  but Your Honor has the discretion to admit him as an

19  expert.  They never fully say that he's not an expert.

20  They just launch a few side attacks.  But the weight of

21  the courts that approve of his expertise is quite heavy,

22  and it's in our papers.

23               One of the specific pieces of testimony

24  that they disputed was an "extended narrative," as they

25  call it, by Evan Coleman.  He had spent -- there are

1   pages and pages in the transcript where he outlines his

2   expertise and the basis of his testimony and who he

3   interviewed and who he talked to and how he learned the

4   information, and his methodology, again, has been

5   approved by numerous circuit courts.

6                THE COURT:  Do you think any of the

7   experts' factual assertions are inadmissible hearsay and

8   that that taints their opinion?

9                MR. MAC ALLISTER:  Well, Your Honor, in

10  the -- I always say this wrong -- *Katanga* case in the

11  First Circuit, they distinguished the *Marvel Characters*

12  case which Sudan relies on heavily to say that you can't

13  be a conduit for hearsay.

14                In that case, they explicitly approved

15  an expert who testified about the appearance of a

16  roadblock.  This was based upon hearsay.  And they said

17  in that case -- it was about the Rwandan genocide -- in

18  a case such as this, it is appropriate to allow this,

19  and they approved the use of hearsay in that case

20  introduced by the expert.

21                If what their -- what Sudan is

22  objecting to --

23                THE COURT:  A case such as that.

24                What are the circumstances of that case

25  or the *Kim* case that are the same here?

108

1         MR. MAC ALLISTER:  Well, the *Kim* case

2    is under the same statute.

3         THE COURT:  Is that really what the key

4    is, or is the key the access to evidence?

5         MR. MAC ALLISTER:  The access to the

6    evidence is one of the points that the *Kim* court

7    discussed over and over again.  In this case, it's the

8    same.  Sudan is impenetrable to our team.  Sudan is not

9    going to give us evidence pursuant to discovery.

10        THE COURT:  And chose not to

11   participate in the case at any stage where discovery or

12   the obligation to come forward with evidence existed.

13        MR. MAC ALLISTER:  Yes.  They were

14   served a complaint.  They were served the liability

15   findings.  They only entered after there was a judgment

16   for damages.

17        But Sudan is also waging war on its own

18   people.  Call it what you want to call it, but witnesses

19   are not going to come forward and talk about what

20   happened.  That is just like North Korea.  This regime

21   is the same as North Korea.  The holdings in the *Kim*

22   case apply equally.

23        But to answer your question, the

24   Katanga case approves of what Sudan would call a

25   "conduit for hearsay," that though distinguished the

109

1  *Marvel Characters* case and they approved it in that

2  instance.

3              We think that the statute, as the *Kim*

4  court said, the evidentiary requirements should be

5  adjusted to implement the goals of the FSIA.

6              So certainly the *Katanga* case would be

7  approved of by the *Kim* court.  Furthermore, the *Kim*

8  court said, and I quote, Common experience tells us that

9  where a plaintiff has produced compelling admissible

10 evidence, that the regime abducted the victim, and that

11 it routinely tortures and kills the people that it

12 abducts, the courts can assume that the defendant

13 probably tortured and killed the victim.

14             The evidence in this case is that Sudan

15 was listed as a state sponsor of terrorism by

16 Warren Christopher in 1993.  The reason for that is

17 because --

18             THE COURT:  That's not a requirement.

19 It's a statute for 1605A even to apply.

20             MR. MAC ALLISTER:  It's a requirement.

21             But Steve Simon testified why that

22 happened.  Sudanese diplomats were involved in a

23 terrorist plot to attack -- the *Landmarks* case --

24 Americans on U.S. soil.  They were expelled from this

25 country.  Then Sudan was listed as a state sponsor of

110

1    terrorism.

2              Sudan was also denounced by the U.N.

3    for attempting to kill Mubarak.  The evidence in this

4    case is equally in weight to the *Kim* case where you have

5    a regime that routinely sponsors acts of terrorism.  You

6    can assume what happened next.  That's what the *Kim*

7    court said.

8              We proved what happened next, but the

9    *Kim* court allows the adjustment of the evidentiary

10   requirements.

11             Sudan, there's a page where Sudan

12   vaguely attacks roughly ten pages of your findings of

13   fact.  They say that the findings of fact relied upon

14   Steve Simon, who I remind the Court was the senior

15   director for combating terrorism on the NSC.

16             They also dispute the Al-Fadl

17   testimony.  We have briefed that extensively.  I believe

18   that the Al-Fadl testimony also comes in under judicial

19   notice as per the *Kim* court.

20             Furthermore, I think that the hearsay

21   is with the utmost reliability and is the most important

22   piece of evidence in this case, and it would come under

23   Rule 807, the residual exception.

24             In our opposition, we then pointed out

25   eight pieces of evidence that Sudan didn't even bother

1    to challenge.  The burden is on them.  They should have

2    challenged these pieces of evidence in their motion, but

3    they did not.

4              Principally, we're talking about the

5    conclusions of the various experts.  Their reply was

6    that the experts were relying on inadmissible evidence.

7    They are allowed to, under the rules.

8              They also said that the court did not

9    rely on Levitt's testimony regarding Sudan,

10   Dr. Matthew Levitt.  Dr. Matthew Levitt in his report

11   talked about Sudan's support for Al Qaeda.  He was

12   qualified as an expert in Al Qaeda in its operations.

13   He was qualified to testify, as he did, and he

14   corroborates everything that was said by Evan Coleman

15   and Steve Simon and Lawrence Vedino.

16             If we're in a de novo setting regarding

17   subject matter jurisdiction, the Court can certainly

18   take notice of what Dr. Levitt said, who has been called

19   the "gold standard" as an expert on international

20   terrorism.

21             There is also the issue of the

22   passports.  This was testimony by expert Steve Simon.

23   Sudan argues that he relied on inadmissible testimony.

24             Again, the rules allow an expert to

25   rely on inadmissible testimony.  D.C. Circuit opinions,

112

1    *United States v. Smith*.

2                    There is also the Al Qaeda video where

3    Sudan -- where an Al Qaeda member admits that they came

4    to Sudan to start war, et cetera.  This is a statement

5    against interest.  That's a hearsay exception.

6                    Your Honor, I think that's all I have

7    at this point.

8                    THE COURT:  Is someone else going to

9    address the indirect victims question and the punitive

10   damages question?

11                   MR. MILLER:  Yes, Your Honor.

12                   THE COURT:  All right.

13                   MR. MILLER:  That would be me,

14   Your Honor.  Good morning again.  Michael Miller.

15                   And I think as we look at those issues,

16   and I'm going to address the subject matter

17   jurisdiction, family members, and I'm going to address

18   the punitive damages issue, I think Your Honor hit the

19   nail on the head.

20                   Even if all the weight of authority in

21   this district and this circuit -- for that matter, the

22   entire country -- supports the plaintiff, but if the

23   defendant is right, this Court should go that way.

24                   So what we look at is whether the

25   defendants, a terrorist nation, Sudan, has met their

113

1    heavy burden; heavy burden under Rule 60 to prove to

2    this Court that they are right without one case to

3    support it.  So that's where we are.

4                    I spent a whole week thinking, Gosh,

5    I'm going to grab this book of cases, and I'm going to

6    quote these cases to His Honor.  But I don't think I

7    need to.  I can tell by the questions the Court has

8    asked that the Court has read our briefs.  I can tell --

9                    THE COURT:  One case I would like you

10   to address, and that is with respect to indirect

11   victims.

12                   The argument that Sudan makes is that

13   the foreign family members can't state an intentional

14   infliction of an emotional distress claim under D.C.

15   law, and that's because of the *Pitt* case.  I don't think

16   there's an S on the end of that case, the *Pitt* case,

17   dealing with the presence requirement.

18                   How -- on the merits, how do we get

19   around that?

20                   MR. MILLER:  I was going there. I

21   appreciate the setup.  The *Pitt* case is in stark

22   contrast to what we have here.

23                   Here is what the *Pitt* case is about:

24   The *Pitt* case is about a police officer who probably --

25   I know nobody is condoning his conduct -- but probably

114

1    planted some evidence to help his position.

2                    THE COURT:  You don't think the D.C.

3    Circuit, at least even if the D.C. Court of Appeals

4    hasn't, you don't think the D.C. Circuit at least has

5    said that under D.C. law, presence is required for an

6    IED claim?

7                    MR. MILLER:  I think it says under the

8    facts of the *Pitt* case, it is.  The facts of the *Pitt*

9    case as, Judge Lamberth has said very articulately in

10   *Heiser* and *Peterson* are simply not the kind -- we're

11   looking here at intentional killing of a mass amount of

12   people, versus the *Pitt* case where an officer planted a

13   little evidence so he could get a conviction where he

14   probably would have gotten one anyway.

15                   THE COURT:  It's an interesting

16   question, this presence question.

17                   And the statement talks about the

18   emotional harm being caused by harm to a third person

19   and notes that there is this growing body of law under

20   the Foreign Sovereign Immunities Act that have found an

21   exception to the presence or even the contemporary

22   exception requirement but casts some cold water on it,

23   if you will, saying that, your statement -- team is not

24   really sure if that's a proper or worthwhile development

25   in the law.

115

1          MR. MILLER:  Well, this statement, that

2     statement also says that they are open to the fact that

3     there would be other ways where a presence requirement

4     would not need to be filled.

5               And I think when the restatement wrote

6     that, they had no idea about the kind of conduct ISIS

7     would have and the kind of conduct that Sudan would have

8     when they provided material support to blow up so many

9     people at once.

10              I don't think that is -- can be

11    compared to the *Pitt* case, so I think we have a

12    factually different predicate.

13              Again, we had an officer planting some

14    evidence.  And that was, I think it's important to point

15    out, that was in 2007.  Since then and with the

16    knowledge of that Judge Lamberth, this Court in *Doe*,

17    this Court in this case, the *Heiser* case, and others

18    have all rejected it and, I think, appropriately.

19              I think they rejected it consistently.

20    Your Honor rejected it in *Doe* because this is extreme

21    conduct.  That's in stark contrast to the *Pitt* case, so

22    that would be our response.

23              THE COURT:  All right.

24              MR. MILLER:  So subject matter

25    jurisdiction over family members.  This Court got it

116

1    right in *Doe*.  The Court analyzed it.  They passed

2    through under 1605A.  They had a state cause of action

3    under D.C. law.

4              D.C. law is -- the Seventh Circuit, as

5    indicated in the *Liebovich* case, has one of the most

6    liberal positions in America on not needing presence.  I

7    could quote the case, but I think Your Honor has seen it

8    before.  And --

9              THE COURT:  I don't think you should

10   categorize the case you're relying on as "the most

11   liberal position."  You want to be -- you want it to be

12   more mainstream, I think.

13             MR. MILLER:  The first time I argued a

14   California case to a Virginia judge, I learned that

15   proposition, Your Honor, and I agree.

16             But I think it's important that the

17   Seventh Circuit looks and says the state law in the

18   District of Columbia is liberal on that point because it

19   is.  And I don't think that is a bad thing or a good

20   thing.  I think it's the state of law.

21             And perhaps it's the state of the cases

22   the D.C. courts have to grapple with.  These are heinous

23   crimes, and they are not compared to the routine,

24   intentional infliction of emotion case where someone,

25   perhaps a child, is hurt in a car accident and they are

117

1    across town and they may not be able to regain recovery.

2                    So sovereign immunity is waived for

3    family members on all claims, and the Court

4    appropriately applies the law in D.C.  And that's never

5    been challenged, nor should it be.

6                    It's clear that Congress was

7    intending -- you heard this before, and I don't want to

8    be repetitive --

9                    THE COURT:  We have to be careful about

10   the "never challenge" because, as we all know,

11   99 percent of these cases, Libya has been an exception

12   to some extent, but 99 percent of these cases involving

13   a foreign state, there is no challenge made because they

14   don't appear.

15                   MR. MILLER:  That's a fair point.  But

16   I don't think that the courts, including this Court,

17   when they analyze the facts, failed to take that into

18   account.

19                   I believe this Court in this case, this

20   Court in *Doe*, Judge Lamberth, even though the defendant

21   isn't there, I certainly think each jurist was sitting

22   and following the law and thinking about the law --

23                   THE COURT:  When you say

24   "Judge Lamberth," what case are you referring to?

25                   MR. MILLER:  *Peterson* and *Heiser*.

118

THE COURT:  *Peterson* says that
Judge Lamberth was relying -- I'm sorry, *Peterson*
doesn't say -- the restatement says Judge Lamberth was
relying on a trend that he identified of three courts
with respect to the presence.  But the restatement
points out that actually, it was only one court.

MR. MILLER:  I read that.  I don't know
what to comment on that, but I did read that, yes.  The
Court got it right.  I don't think anything that
Mr. Curran -- they wrote a fabulous brief.  Nothing to
work with, but a great brief.  But it didn't point out
anything, not one case.

Now, imagine they come in here with
this heavy burden and no cases to support them.  And so
I think they lose because of that because I think in
order to reach the, I'll call it an absurd result that
defendants are asking you to reach in this, you've got
to say to yourself that every judge that's looked at
this issue was wrong; that Congress really didn't mean
to broaden the rights of terrorist victims when they
passed 1605A; and I'm going to reinstitute a law from
1956 that you have to be right on the scene when your
relative is killed.

And I don't think this Court is
prepared to go there, nor should it be, the fundamental

119

1    case of where we are.

2                      Stare decisis means something, and I

3    think it means a lot here.

4                      THE COURT:  That's if you can get these

5    claims, these indirect claims by foreign nationals into

6    the 1605A category rather than ultimately being state

7    law claims.  If there's state law claims on intentional

8    infliction of emotional distress, there is a case, the

9    *Pitt* case, that's a problem.  You may find a way around

10   it, but it's a problem.

11                     MR. MILLER:  I see it as easily

12   distinguishable.  I think if Sudan had hid some evidence

13   about a small crime, then they would be squarely within

14   the *Pitt* case.  But when Sudan gave the harbor and

15   refuge to the largest, most vicious terrorist

16   organization in the world so that they could plant and

17   park themselves to go next door and kill all these

18   people in a dramatic fashion, they've taken themselves

19   way out of the *Pitt* case.

20                     THE COURT:  And the cases from this

21   court, I mean, the District Court here in D.C. or

22   something from the D.C. Circuit, do any of those cases

23   address D.C. law and the presence requirement?

24                     MR. MILLER:  I think they all do.  I

25   think they all say, as Your Honor analyzed --

120

1          THE COURT:  As opposed to addressing

2   the federal law claim?

3          MR. MILLER:  Yes, yes.

4          THE COURT:  Any of them grapple with

5   *Pitt*?

6          MR. MILLER:  I can't say that.  I don't

7   know for sure.

8          THE COURT:  All right.

9          Move on to punitive damages.

10         MR. MILLER:  Yes, Your Honor.  It's

11  time now.

12         Same sort of analysis.  The Court did

13  it in *Doe*, the Court did it here, and it's sound then,

14  and it's sound now.  They haven't met their heavy burden

15  to have the Court eviscerate all its logic in those

16  cases.

17         THE COURT:  You've got this

18  constitutional argument, this ex post facto argument,

19  made pretty late in the game but nonetheless made, and

20  so what do I do with that?

21         MR. MILLER:  I think you throw it out

22  procedurally, in the first instance, because it's made

23  too late.

24         In the second instance, it's a

25  constitutional argument.  Sudan is not a citizen of the

121

1    United States, and they do not have constitutional

2    rights.

3                    THE COURT:  So do you have any case

4    that stands for that proposition that on a

5    constitutional question of the authority of Congress,

6    that a foreign state cannot raise concern with respect

7    to a statute?

8                    MR. MILLER:  I don't think we've cited

9    it in our brief, Your Honor.  Not standing here

10   remembering it, to be honest with you.  I want to be

11   straight as I can.

12                   But I think it sounds -- in basic

13   constitutional law, the Constitution was written as a

14   social contract for those of us who live here in the

15   United States and its protection for the citizens of the

16   United States so that -- take the new visa controversy,

17   someone coming from overseas wanting to get into the

18   United States has no constitutional right to come in.

19   Constitution rights enure to people who have the

20   benefits of them.

21                   THE COURT:  But those are the rights

22   provisions, the provisions like due process --

23                   MR. MILLER:  Yes, Your Honor.

24                   THE COURT:  -- or even if you get into

25   context of the Fourth Amendment or other Fifth or

122

1    Sixth Amendment claims.  Those aren't situations of

2    power or separation of powers or issues like that.

3                    And that's -- what I want to know is

4    what authority do you rely on to say that in those

5    contexts, the specific context here being the

6    ex post facto clause, but in those kinds of contexts, a

7    foreign sovereign cannot raise a challenge to the

8    authority of Congress based on those constitutional

9    provisions?

10                   MR. MILLER:  Well, I suppose they can

11   always raise it procedurally if they do it at the right

12   time.  Sudan probably could have raised it, had they not

13   made the willful, conscious decision --

14                   THE COURT:  Your argument is twofold.

15   One is that they didn't raise it early enough.  But you

16   also say they can't raise it because they're a foreign

17   sovereign.

18                   MR. MILLER:  That's true.  Had they

19   timely raised it, that would have been our argument,

20   yes, Your Honor, that in fact those facts that enure to

21   them, that in fact in proper, they would be more

22   appropriate to raise international law, and we could

23   have briefed and responded to international law concerns

24   and claims had they decided, had they chosen to attend

25   and participate in these events.

123

1          But since they didn't, we can't do it

2     now, and the burden is on them to raise it now.  They

3     didn't, and so we can't respond.

4          I can't sit here and intelligently and

5     cogently respond to an international law argument they

6     never made during the case, nor did they make in their

7     Rule 60 motion.

8          THE COURT:  All right.

9          MR. MILLER:  And I would just point out

10    yet again, the courts that have looked at this issue

11    here in the Seventh Circuit have granted punitive

12    damages because, simply put, that's what Congress

13    intended.  They intended under 1605A, and the courts

14    have ruled that it's retroactive to apply.

15         THE COURT:  What court has ruled that

16    it's retroactive?  What Court has specifically addressed

17    that?

18         MR. MILLER:  I'm trying to get it

19    right.

20         THE COURT:  If you don't know, say you

21    don't know.

22         MR. MILLER:  I don't know.  I thought I

23    remembered reading it, but I'd better say I don't know.

24         THE COURT:  Fair enough.

25         MR. MILLER:  I'm going to reach an

124

1    issue that I don't think Your Honor is ever going to

2    reach if I could, and then I'm going to sit down.

3                  If, in the unlikely event the Court is

4    going to grant his motion and allow them to try this

5    case after these years they've chosen not to and put our

6    clients through hell again, if I could, a bond has to be

7    required.  A bond has to be required.

8                  These people have played fast and loose

9    with this Court.  They've played fast and loose with the

10   international community, and there's ample authority for

11   a bond and a large bond.  This is a very significant

12   case.  These have been horrific damages.

13                 THE COURT:  Are you aware of any case

14   in which a bond has been required of a foreign

15   sovereign?

16                 MR. MILLER:  *Sales v. Republic of*

17   *Uganda*, 1992 Westlaw 406482; *First Fidelity Bank v.*

18   *Antigua*.  It's a Second Circuit case, 877 F.2d 189.

19                 THE COURT:  Are those Foreign Sovereign

20   Immunity Act cases?

21                 MR. MILLER:  I don't know that.

22                 THE COURT:  They probably are because

23   it's hard to reach a foreign sovereign --

24                 MR. MILLER:  Probably.  I just -- the

25   only way I've been able to practice law for 35 years is

125

1  saying I don't know when I don't know.

2          THE COURT:  I appreciate it.

3          MR. MILLER:  I'd like the Court to deny

4  their motion.  It's time to close this case out.  Thank

5  you for your time, Your Honor.

6          THE COURT:  You're welcome.

7          Mr. Curran, you've got five minutes.

8          MR. CURRAN:  Okay, Your Honor.  In no

9  particular order, I'd like to respond to a number of

10  points that were made, maybe first addressing some

11  points that Your Honor commented on.

12          One, if Your Honor grants or gives an

13  indicative ruling that you are inclined to grant our

14  motion to vacate, we have no intention of requiring that

15  the plaintiffs' victims come and testify again.

16          THE COURT:  Are you going to challenge

17  damages?

18          MR. CURRAN:  We certainly challenge

19  punitive damages.

20          THE COURT:  I understand that.  Other

21  than the legal challenge to punitive damages, are you

22  going to challenge the damages awarded through extensive

23  proceedings?

24          MR. CURRAN:  I don't have client

25  authorization to relinquish that.

126

1          THE COURT:  I appreciate that and

2     understand that.

3          MR. CURRAN:  But I can assure you, you

4     will seriously entertain not disputing the quantum of

5     damages as opposed to, of course, the fact liability and

6     the legal question about punitive damages.

7          THE COURT:  Let's stay on that theme

8     for a second.  I mean, obviously, the liability

9     determination is one thing.  It was made without the

10    presence of all the claimants.

11         The damages determination made in

12    stages did involve lots and lots of testimony from

13    victims and claimants, whether they are the same or not.

14         MR. CURRAN:  To show my ignorance, to

15    Your Honor, or to the special masters?

16         THE COURT:  Some to me, some to the

17    special masters, but mainly to the special masters.

18         If prejudice is a relevant

19    consideration, and particularly the excusable neglect

20    assessment, that's -- to have to do that over again is a

21    pretty substantial prejudice to the plaintiff.

22         What I would ask you to begin with,

23    though, is why should I think of this in terms of the

24    excusable neglect?  Why should I think of it as if Sudan

25    came in promptly at some point?

127

1          The things that you've referred to as

2    distracting Sudan are really much more in the distant

3    past than they are in the post-2011 time period.  There

4    was a liability determination in 2011.  Where was Sudan?

5    They didn't come in.  There were frequent damages

6    determinations that were really publicized in the

7    newspapers and otherwise that occurred.  Sudan was

8    nowhere to be seen.

9          It looks very much, Mr. Curran, as if

10   the decision, a conscious decision, was made not to come

11   in until the final judgment, the end of the line, no

12   more evidentiary issues, the end of the line; and then

13   promptly, they come in.

14         What is it that should lead me to

15   conclude otherwise in the 2011-to-2014 time period?

16         MR. CURRAN:  Well, part of that I've

17   addressed already, talking about how -- the fact that

18   there was a referendum to split the country in half in

19   2011 doesn't mean that distractions dissipated

20   immediately.

21         THE COURT:  Well, but there are

22   distractions, and then there are distractions.  The

23   distractions that you can most rely on are really

24   distractions that were going down certainly, if not

25   ending, in the post-2011 time period.  You want to have

128

1   those distractions continue all the way up until almost

2   mid-2014 when Sudan first did anything, which was not

3   before me, and then to 2015 when Sudan first did

4   something before me.  I just don't see what you have to

5   rely on to justify the nonappearance post-2011.

6                   MR. CURRAN:  Well, again, part of it is

7   just political distraction.  Mr. MacAllister or one of

8   the plaintiffs' counsel was referring to other problems

9   involving Sudan, including the crisis in Darfur.

10                  There are -- this has been a country

11  besieged with crises and turmoil, and that didn't end

12  abruptly in 2011.  It did begin to dissipate, and that

13  ultimately led to the country appointing a responsible

14  person, a former judge of the international court of

15  justice, and to try to get their act together to be a

16  responsible litigant in this court and in the Court of

17  Appeals.

18                  They made some missteps, even at the

19  early stages.  They retained a lawyer who filed the

20  appeal in the D.C. Circuit and, Your Honor, he also

21  was -- entered a notice of appearance in the

22  Second Circuit and handled an argument.

23                  THE COURT:  He was in your firm?

24                  MR. CURRAN:  No, not in my firm.  He

25  was a solo practitioner, not a member of the D.C. bar,

129

1    but with an office here who filed the notices of appeal.

2                    He was asked by the Second Circuit, a

3    three-judge panel up there, how come you didn't move to

4    vacate the judgment if you think there was no subject

5    matter jurisdiction down in Washington?

6                    And the lawyer's response was, I don't

7    think that's an option available to a litigant.

8                    It was just ignorance.  They didn't

9    know what to do.

10                    We were retained in April.  By that

11   point, Your Honor, the notice of appeal, thankfully, had

12   been filed.

13                    THE COURT:  That's a pretty big load to

14   carry to say, well, geez, all the way up until we --

15   meaning your firm -- came in at the end of April of

16   2015, Sudan just didn't know what to do, and they just

17   weren't getting good legal advice, and geez, you ought

18   to excuse all that because that's excusable neglect.

19                    MR. CURRAN:  Well, that is our

20   argument, Your Honor.  And frankly, I think it's a very

21   strong argument.

22                    I can't think of another country, maybe

23   Iraq and maybe now Libya, but countries do get very

24   distracted by civil war and other upheavals.  They can't

25   be expected to attend to a foreign litigation that they

130

1    didn't understand.

2                    THE COURT:  It would be a pretty

3    dramatic conclusion because -- correct me if I'm

4    wrong -- there's no case that -- I think we said this

5    right at the outset -- there's no case that has excused

6    neglect for this period of time when, in addition, the

7    foreign sovereign had appeared for a number of years to

8    challenge jurisdiction and then chose -- for whatever

9    reason chose not to continue to appear.

10                    There's no case like that, is there?

11                    MR. CURRAN:  I think you're right.  The

12   confluence of those factors, I think, probably is

13   unique.

14                    THE COURT:  It would be -- the only

15   case you rely on is dealing with the Republic of Congo.

16   It's dramatically different than this case.

17                    MR. CURRAN:  Well, that's why we rely

18   on a handful of cases that we think establish the

19   broader point that there's excusable neglect here.

20                    And in any event, the Court is duty

21   bound to consider jurisdictional arguments.

22                    THE COURT:  You wanted to get a couple

23   of other points out.

24                    MR. CURRAN:  I do want to get to a

25   couple of other points, but I also want to make the

131

1    additional point that Your Honor may feel that

2    Your Honor was disrespected by the pursuit of the appeal

3    rather than coming here with a 60(B) motion.

4                    THE COURT:  I don't care about that.

5    There's no concern about being "disrespected."

6                    MR. CURRAN:  Well, we have that

7    concern, and Sudan has that concern now, Your Honor.

8                    So some of the points that were raised,

9    Mr. Newberger first addressed the TVPA and the

10   extrajudicial killing point, and he focused on the

11   language, and he said there's nothing in there about

12   state action and so forth.

13                   But, Your Honor, the act itself has the

14   title --

15                   THE COURT:  Which act are we talking

16   about?

17                   MR. CURRAN:  The TVPA.

18                   The title of the act on the bill is "To

19   carry out obligations of the United States under the

20   United Nations Charter and other international

21   agreements pertaining to the protection of human rights

22   by establishing a civil action for recovery of damages

23   from an individual who engages in torture or

24   extrajudicial killing."

25                   THE COURT:  What we're talking about

132

1    here is the -- sort of a cross-reference to adopt a

2    definition for purposes of extrajudicial killing under

3    1605A.  It's not adopting all of the TVPA.  It's just a

4    cross-reference to a definition.

5                    MR. CURRAN:  It's not that simple.

6                    THE COURT:  It's not even an adoption

7    of the definition.  It's a little less than that.

8                    MR. CURRAN:  But, Your Honor, the

9    cross-references to the definition, the definition

10   begins "For purposes of this act."  First of all, that's

11   referencing --

12                   THE COURT:  That's the TVPA.

13                   MR. CURRAN:  That's referencing the

14   context of the Act which, again, has the state actor

15   requirement.

16                   THE COURT:  There might be other

17   provisions in the TVPA that limit the ability to recover

18   under it, but the definitional provision is what -- and

19   only what -- needs to be looked at.

20                   MR. CURRAN:  Well, I think the

21   introductory language for purposes of this act is a

22   broader reference to the Act, and I don't think we can

23   be blind to the overall purposes of the Act.

24                   And the reference to international law,

25   okay, it's in the second sentence, not the first

133

1    sentence; but nonetheless --

2                    THE COURT:  There are lots of

3    situations, I believe -- and excuse me, I'm speaking off

4    the top of my head -- but I believe there are lots of

5    cross-references in the United States Code that adopt

6    definitions from other provisions of the United States

7    Code that aren't also adopting all the limitations and

8    purposes of that statute from which they are pulling out

9    just the definition.

10                   MR. CURRAN:  You're going farther than

11   I am.  I'm talking about the definition of extrajudicial

12   killing should be read in its context.  So if 1605A is

13   pulling the definition from the TVPA, it's appropriate

14   for us to consider what that term means in the context.

15                   THE COURT:  In the context of?

16                   MR. CURRAN:  Well, in the context of

17   the TVPA and in the context of international law and the

18   context of what did Congress mean when it was pulling

19   that term in.

20                   Again, the legislative history

21   establishes that Congress was purposefully limiting --

22   not expanding, but limiting -- and substituting an

23   extrajudicial killing for an act of terrorism.

24                   THE COURT:  I'll look at the state

25   actor, and I think it's better to call it "state actor"

134

1    than "state action provision."  But I am disappointed at

2    what I think is your major argument on the extrajudicial

3    killing jurisdictional point.  It was not really very

4    well developed in your papers, including in the Court of

5    Appeals -- although there, it's a little bit better

6    developed -- and therefore wasn't very well developed in

7    response to it either.  It seems to me that your

8    thinking sort of evolved along the way.

9                  MR. CURRAN:  I don't even know if

10   that's our major point.  Our major point is the

11   targeting and the distinction between an extrajudicial

12   killing by whomever and a terrorist bombing.

13                 THE COURT:  I'll look at all of them.

14                 MR. CURRAN:  I credit your comment.  Of

15   course, our thinking is evolving.  We were hired in

16   April, and we filed these briefs within about ten days,

17   and we haven't stopped thinking.  So we think about

18   these issues.

19                 THE COURT:  Good.

20                 MR. CURRAN:  I did --

21                 THE COURT:  If you stop thinking, I'll

22   be worried.

23                 MR. CURRAN:  I did refer earlier to an

24   earlier ruling by Your Honor.  You might have known what

25   I was referring to, the *Al-Aulaqi* case, that

1    727 F. Supp. 2d 1 where you referred to the customary

2    international law norm against state-sponsored

3    extrajudicial killings.

4                    So again, my point is that's what the

5    international law norm is.  That's what the TVPA was

6    adopting.  That's what 1605A was pulling in.

7                    I think you also refer to the *Xe* case,

8    which I think is the way you pronounce it, X-E, by

9    Judge Ellis, and that's at 665 F. Supp. 2d 569.

10                   A couple of other points.  I was handed

11   a note, Your Honor.  This is circling back to your first

12   point about, oh, so Sudan has this strategic approach

13   where finally things get final in this court and Sudan

14   shows up out of the blue and wants an appeal and a fresh

15   look.

16                   Well, Your Honor, Sudan, because of the

17   dissipation of these distractions, has appeared not just

18   in this case at this time; Sudan has hired -- we have

19   appeared in every case in the United States, regardless

20   of what status the case is at.  We're coming in,

21   asserting our defenses --

22                   THE COURT:  When is the first time that

23   you appeared in any case off of this hiring by Sudan?

24                   MR. CURRAN:  In April.  It may have

25   been in this -- in this case, but --

136

1          THE COURT:  Not before then?

2          MR. CURRAN:  Definitely not before

3    April.  We were retained in April, and we worked night

4    and day to get in the motions to vacate on a prompt

5    basis.

6          And, Your Honor, at that time, we

7    already had the briefing schedule from the D.C. Circuit.

8    And as Your Honor may know, the rules of -- the guidance

9    there is, don't come asking for an extension of time for

10   your appellate brief.  So we filed that appellate brief

11   in about one month after being retained despite the

12   voluminous record in this case.

13         But again, the basic point there is

14   it's not strategic.  We're coming in categorically

15   everywhere to clear Sudan's name.

16         And there were a lot of colorful

17   comments made by plaintiffs' counsel in their

18   presentations here about Sudan and its misconduct around

19   the world, and I think there was a comment that seemed

20   to equate Sudan to ISIS.

21         Of course, as Mr. Newberger pointed

22   out, Sudan has diplomatic relations with the U.S., and

23   that's continued uninterrupted.  I think Sudan does

24   deserve some credit as a member of the international

25   community that the United States has diplomatic

137

1    relations with.

2              But in any event, I don't think that

3    there's a basis, even crediting the testimony and

4    evidence that Your Honor entertained, that Sudan's

5    conduct is on that level.

6              The allegation here is material

7    support.  What exactly is it that Sudan did wrong that

8    led to the $10 billion of liability imposed by this

9    court?  Because Osama Bin Laden happened to live there

10   in the mid-90s before he was known as a terrorist?

11             THE COURT:  I think "happened to live

12   there" may be a little different than the facts.

13             MR. CURRAN:  Let's address that,

14   Your Honor, because Your Honor's opinion said that Sudan

15   sent a letter of invitation to Osama Bin Laden, and you

16   had witnesses, maybe in this courtroom, including

17   Mr. Coleman, testify under oath that that's what he

18   said.  You asked him, "What's your basis for that?" and

19   he said "Al-Fadl testimony."

20             The Al-Fadl testimony doesn't say that.

21   Coleman read that, interpreted it, and embellished it

22   and then presented it to Your Honor.  That's where the

23   problem is.  The evidence was hearsay, and it's

24   unreliable, and it was wrong.

25             And that's distinguished from the *Kim*

138

1  case.  I do see Your Honor's point that even though the

2  *Kim* case in the D.C. Circuit refers to testimony by

3  expert witnesses, the citations are in the declarations.

4  So it may well be the case that it was only in the form

5  of declarations that the evidence was presented.

6          But in any event, that case had

7  admissible, substantive evidence beyond the experts'

8  opinions; and the experts' opinions were admissible

9  opinions, not a regurgitation of hearsay evidence.

10  That's distinguished from this case where there's no

11  admissible evidence of any complicity by Sudan, and the

12  expert testimony that came in was a false regurgitation

13  of other statements.

14          The Al-Fadl -- we've looked at this

15  closely -- Al-Fadl never said that there was a letter of

16  invitation from the president of Sudan to Osama Bin

17  Laden.

18          By the way, that was in 1991, and

19  Coleman himself said Osama Bin Laden was nobody then,

20  and Al Qaeda, the idea of Al Qaeda doing anything was a

21  joke.

22          So even if there had been a letter, is

23  that damning of Sudan to invite someone who was a

24  businessman to come into their country to have

25  commercial activities?  No.

139

1        There was also a statement by Coleman

2   that Sudan provided weapons to Al Qaeda.  We have

3   searched Al-Fadl's testimony.  There was no comment like

4   that.  This expert was regurgitating false information,

5   and it was hearsay, and it was used in this case as a

6   substitute for actual evidence.  And that's what our

7   problem is.

8        THE COURT:  Well, your other problem is

9   that it's too bad that you weren't there to raise those

10  concerns.

11       MR. CURRAN:  Yes, it is, and we regret

12  that, Your Honor.

13       But there's a broader principle here

14  too.  Sudan is a sovereign country.  It has millions of

15  people, millions of innocent people.  Sudan has been

16  branded by this Court.  Granted, it's not without fault

17  for not appearing on a case that it did have notice of,

18  but it had distractions.  But it's been branded as

19  complicit with Al Qaeda.  That is an allegation that is

20  of sufficient weight.  It ought to be considered and

21  addressed in an adversarial setting with meticulous and

22  assiduous attention to the rules of evidence.

23       Another point, Your Honor.  There has

24  been some suggestion that regardless of what Congress

25  may have meant by "extrajudicial killing" in the TVPA

140

1   and in 1605A(7) when Congress reenacted 1605A, it must

2   have been endorsing necessarily the Court rulings, even

3   in the uncontested cases that extrajudicial killing

4   includes bombing.

5                I think there's Supreme Court precedent

6   that says no, no, no, no, no.  Just because Congress

7   reenacts or modifies to some extent a statute and

8   reenacts the terms, that doesn't mean Congress is

9   endorsing prior judicial decisions that have happened in

10  the meantime, specifically when Congress --

11               THE COURT:  Under a very specific and

12  very limited body of law that would support a

13  congressional ratification, if you will.  And I don't

14  think that the plaintiffs have pursued that --

15               MR. CURRAN:  Well, I do want to

16  identify a U.S. Supreme Court case, *Aaron v. SEC*,

17  446 U.S. 693, because I think that's on point saying

18  that a reenactment of a somewhat modified statute is not

19  properly viewed as an endorsement of intervening

20  judicial decisions, particularly when they are contrary

21  to the original intent of Congress.  Your Honor --

22               THE COURT:  Two minutes.

23               MR. CURRAN:  -- you acknowledged that

24  Osama Bin Laden was kicked out of Sudan in 1996.  That

25  was years -- not only years before the bombing, but it

141

1    was also years before Osama Bin Laden was designated as

2    a terrorist by our government.

3                    There was also evidence that was

4    presented to Your Honor that Sudan kicked out Osama Bin

5    Laden at the request of the United States.  That

6    evidence merits a full airing in this court.

7                    There's been some suggestion that Sudan

8    waived even jurisdictional defenses.  I think that

9    notion is contrary to basic principles of our civil

10   procedure including Rule 12(h), I think it is, that says

11   subject matter jurisdiction is not waived.  We believe

12   that that applies here.

13                   THE COURT:  There is that case that I

14   mentioned to you, I think, in the question that I asked

15   you earlier.

16                   I think it was the *Ireland* case.  That

17   does seem to indicate that if you get a crack at

18   jurisdiction -- *Insurance Corporation of Ireland* -- that

19   if you get a crack at subject matter jurisdiction and

20   you take that crack, you can't reopen that question

21   later on a collateral attack of an adverse judgment.

22                   MR. CURRAN:  Okay.  A collateral attack

23   of an adverse judgment.  That's not what we're doing.

24   But in any event --

25                   THE COURT:  Maybe Rule 60 -- maybe it's

142

1    not.  Maybe it's something different than a collateral

2    attack.  I'll look at that.

3                    MR. CURRAN:  I think it is.  I think

4    it's a direct attack.

5                    And immunity under the Foreign

6    Sovereign Immunities Act, of course, is a question of

7    subject matter jurisdiction.  So we think that --

8                    THE COURT:  What I just read to you

9    dealt with that.

10                   MR. CURRAN:  I can understand some

11   higher burden if a party has challenged subject matter

12   jurisdiction and lost and then it challenges it again at

13   the same stage of proceeding.

14                   Of course, the Court can have some

15   higher burden.  It's essentially a motion for

16   reconsideration.  A court shouldn't have to give a

17   fresh, detailed look every time.

18                   But as Your Honor suggested, I think,

19   in some of your questions, of course, subject matter

20   jurisdiction has to be considered at different levels of

21   the process in the District Court and at the Court of

22   Appeals.  That's incumbent upon the courts.

23                   THE COURT:  Well, once you've had a,

24   quote/unquote, trial, what's alleged in the complaint

25   and what may be in summary judgment filings is not the

143

1    record before the Court.  The record before the Court is

2    the trial, frankly.

3                        If, for some reason, the lawyers fall

4    flat on their face and do not produce any evidence, that

5    would be something the Court would have to look at.

6                        MR. CURRAN:  Your Honor, Ms. DeLelle

7    hands me *Bell Helicopter*, one of the cases we referred

8    to at some length.  It addressed this point about

9    whether there is -- you lose your challenge or there's a

10   different standard.  And the D.C. Circuit there rejected

11   the notion that there was a different standard, like no

12   arguable basis standard.  That appears to be at -- so

13   this is 734 F.3d, and it looks like it's at page 1180

14   where it addresses that point Your Honor just raised.

15                       Your Honor, Mr. MacAllister made the

16   point that --

17                       THE COURT:  I'm going to hold you to

18   those two minutes now.  Pick your point, and I'm going

19   to take 45 seconds of it.

20                       MR. CURRAN:  Okay.  I guess my last

21   point is Mr. MacAllister said all we're entitled to is

22   to be carefully heard by Your Honor on the 60(B) motion.

23   That's kind of what we're asking for.

24                       We appreciate very much your indulgence

25   with this argument, having the hearing, and obviously

144

1    the careful attention you've given to our arguments.

2    We're very grateful of that.

3                    We know that that's asking a lot, given

4    the late appearance.  But all I can say -- and this is

5    only an assertion or a representation; it cannot be more

6    than that, I know -- but Sudan desires to appear in the

7    court, defend itself on the merits if need be if we

8    don't win on extrajudicial killing.  Sudan wants to

9    clear its name.  It's willing to provide evidence to do

10   so, and that's why it's appearing in this court and all

11   the other courts in which it has actions where it has

12   been found liable or is subject to claims.

13                   THE COURT:  All right.  One question I

14   have for you is:  Why not a bond?

15                   MR. CURRAN:  Your Honor, first of all,

16   do I only have a minute for this?

17                   THE COURT:  Yes.

18                   MR. CURRAN:  Okay.  Because it's

19   unprecedented.  A bond --

20                   THE COURT:  They cited a couple of

21   cases where bonds have been ordered, presumably in FSIA

22   cases, with respect to the foreign states.

23                   MR. CURRAN:  My bond expert will

24   address the question in the one minute.

25                   MS. ERB:  Yes, in the one minute.

145

1        The reason it should not be a bond in

2   this case, Your Honor -- this is Nicole Erb from White &

3   Case, thank you, Your Honor -- is that it's clear under

4   the Foreign Sovereign Immunities Act that a bond would

5   constitute an impermissible prejudgment attachment.

6            And the Second Circuit has --

7            THE COURT:  There is a judgment here.

8            MS. ERB:  There is a judgment, but this

9   is about vacating that judgment.  And upon vacating that

10  judgment, we're in a prejudgment context.  The parties

11  will be prejudgment and, more importantly, what the

12  Second Circuit has said in *Stevens*, which is cited in

13  our papers and which postdates the cases that the

14  plaintiffs cite, *Sales* and *First Fidelity* were

15  pre-*Stevens*.

16           What *Stevens* makes clear is that you

17  need to look at the effect of what the procedural

18  mechanism is.  And in *Stevens* and in *Pine Top* in the

19  Seventh Circuit, both of those cases involve precluding

20  a presecurity attachment in the context of state

21  insurance laws.  And they find that a presecurity -- a

22  prejudgment security is tantamount to a prohibited

23  attachment under 1609 of the FSIA.

24           And the reason is because during the

25  time of that posting of that security, the foreign

146

1    sovereign would not have access to those funds for --

2    and as here, if Sudan is required to put money into the

3    court, it will lack access to those funds for an

4    indefinite time period.  And *Stevens* makes very clear

5    that that is not permitted under the FSIA.

6                    And I would just cite one more case,

7    which is the *SNS* case, which is also in our papers, even

8    finds that an injunction that would serve the same

9    purpose as an attachment is impermissible.

10                   So a court can't do by some other

11   procedural mechanism what is prohibited under 1609 as an

12   attachment.

13                   THE COURT:  All right.  Thank you very

14   much.  I apologize to the court reporter because I

15   probably caused her to talk very quickly.

16                   Thank you, Mr. Curran.

17                   Now I have one question for each side,

18   so maybe you should stand there and answer it,

19   Mr. Curran, and that is:  Is there any reason that you

20   think it would be advantageous for me to ask the

21   United States to submit a statement of interest?

22                   MR. CURRAN:  Yes.  I think it would be

23   advantageous.  I have no idea what position they may

24   take on these issues, but some of these issues are

25   weighty.  I think the Court -- and courts, plural --

147

1    would benefit from some authoritative rulings in the

2    contested case.  We want these cases heard and decided

3    correctly, and if that helps Your Honor do so, we

4    encourage it.

5                    THE COURT:  All right.

6                    From the plaintiffs' perspective?

7                    MR. NEWBERGER:  In my experience,

8    Your Honor -- and Mr. Curran may recall some of this --

9    in the Libya cases, the administration, through the

10   Department of Justice and the Department of State, did

11   participate at certain times both in statement of

12   interests that were submitted on their own or at the

13   request of the Court and also in mediations that were

14   conducted in the Court of Appeals.

15                    I mean, so I know that the executive

16   branch can and will participate, depending on what that

17   participation means.  But if it's the Court asking for

18   their views on a legal question as compared to some

19   other assistance that the administration or the

20   executive branch can apply, we certainly think that's a

21   good idea.

22                    Obviously, the fact that this is a case

23   where we have a sovereign, still designated as a state

24   sponsor of terrorism, but still with diplomatic

25   relations with an embassy here in Washington and the

148

1    like, that makes this a little different than some of

2    the other cases that this Court is familiar with.

3                    This is not Iran where there's no

4    diplomatic relations.  It's not even like Libya, where

5    there was no diplomatic relations until very later in

6    the process and North Korea where there were no

7    diplomatic relations.

8                    So we're in a bit of a unique

9    situation.  I think the fact that there were diplomatic

10   relations and have been throughout this time period for

11   the reasons I've addressed earlier, but also to answer

12   Your Honor's question, can never hurt.  And maybe it

13   would help.  I don't know.

14                    THE COURT:  All right.

15                    MR. NEWBERGER:  I also want to point

16   out, my colleague, Mr. MacAllister, has asked if he can

17   have a minute to reply to some things that were

18   discussed, but that's for Mr. MacAllister and the Court

19   to work out or not.

20                    MR. CURRAN:  Just so Your Honor is not

21   surprised, the U.S. Government has submitted an amicus

22   brief in support of Sudan in the *Harrison* case in the

23   Second Circuit.  I want you to be aware of that, but I

24   have not discussed this case with him.

25                    THE COURT:  Mr. MacAllister, what is it

149

1    that you want to address?

2                    MR. MAC ALLISTER:  Your Honor, there

3    were a couple of points that Sudan made in its response

4    that I need to clarify.  I'll make it very quick.

5                    THE COURT:  Go ahead.

6                    MR. MAC ALLISTER:  First of all, they

7    ended with a discussion of the *Bell Helicopter* case.

8    The arguable basis standard actually applies for *Owens*

9    and *Aliganga* because Sudan appeared at the beginning of

10   the case.  *Bell Helicopter* --

11                   THE COURT:  Wasn't exactly at the

12   beginning, but they appeared earlier in the case.

13                   MR. MAC ALLISTER:  They appeared early.

14                   But *Bell Helicopter* said no, there is

15   no arguable basis standard for Iran because Iran didn't

16   appear in the case.  This is a different circumstance.

17                   You asked questions about when did the

18   things happen which Sudan says prevented it from

19   participating.  Well, there are no dates in the

20   declaration.  The burden of proof is on Sudan.

21                   THE COURT:  You've already said that.

22                   MR. MAC ALLISTER:  Yes.  Sudan says

23   that the word "terrorism" is nowhere to be found in the

24   exception, but the exception is called the "terrorism

25   exception to foreign sovereign immunity."

150

1        The letter that Evan Coleman was

2   talking about, Steve Simon talked about this letter.

3   You know who he is?  He testified about it.

4        I also just would like to mention that

5   Sudan -- there's no question that Sudan provided safe

6   harbor to Al Qaeda.  That's enough for subject matter

7   jurisdiction under the statute.

8        They waffle between saying we're asking

9   for a merits proceeding and we also want a careful

10  hearing.  They asked a couple of times that they want to

11  present their evidence.

12       The time to present the evidence is

13  now.  The burden of proof is on them now, in this

14  hearing, to prove that there is no exception to the

15  immunity.

16       They have not met their burden.  They

17  have not produced any evidence whatsoever.

18       They also say that Osama Bin Laden was

19  kicked out in 1996.  Well, he wasn't the bomber.

20  Al Qaeda was in Sudan for many years, and that's when

21  the plot gestated.  That's when they put a cell in

22  Nairobi, and then the bombs went off and killed

23  everyone.  Kicking Osama Bin Laden out had nothing to do

24  with whether or not the plot would be successful.

25       Thank you, Your Honor.

151

1          THE COURT:  Thank you, Mr. MacAllister.

2          Thank you all very much.  There's a lot

3  to chew on here, and I'm not even sure which meal it is.

4          And I will contemplate first whether I

5  should ask the United States to express a statement of

6  interest, if they have one.  If I do that, then

7  obviously, we'll take a little bit of time, but it's

8  going to take me a little bit of time to churn something

9  out on these questions anyway.

10          So I appreciate the quality of the

11  presentations, both in writing and here this morning and

12  this afternoon, and we'll get to it.

13          Thank you.

14          (Proceedings adjourned at 12:29 P.M.)

15          * * * * * * * * * * * * * * *

16      CERTIFICATE OF OFFICIAL COURT REPORTER

17

18  I, Barbara DeVico, certify that the foregoing is a

19  correct transcript from the record of proceedings in the

20  above-entitled matter.

21

22

23

24  _____          12-21-15

25  SIGNATURE OF COURT REPORTER              DATE