UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                   :

UNITED STATES OF AMERICA

                                                                   :     14 Cr. _____ (LGS)

       -v.-

                                                                   :

BNP PARIBAS S.A.,

                                                                   :

         Defendant.

                                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF THE COURT'S ACCEPTANCE OF THE PLEA AGREEMENT**

**I.    Introduction**

        The Government writes in response to the Court's Order dated July 1, 2014 and in anticipation of the July 9, 2014 plea conference in this matter. As set forth more fully below, the Government respectfully submits that the resolution contemplated by the plea agreement in this matter, which was executed by the parties on June 30, 2014 (the "Plea Agreement," attached hereto as Exhibit A), is appropriate and reasonable, and should be accepted by the Court. Pursuant to the Plea Agreement and the Statement of Facts attached thereto, the defendant, BNP Paribas S.A. ("BNPP," or the "defendant"), has admitted its guilt to and taken responsibility for serious criminal conduct, agreed to forfeit the proceeds of its criminal scheme, agreed to pay a substantial fine in addition to forfeiture, and agreed to the maximum five-year term of probation, which will require BNPP to, among other things, enhance its compliance procedures and policies in accordance with settlement agreements BNPP has entered into with its principal U.S.

1

regulators, the Board of Governors of the Federal System (the "Federal Reserve") and the New York State Department of Financial Services ("NYSDFS"). This resolution is strongly in the public's interest, is amply supported by the factual record, and advances each of the principles of sentencing set forth in Title 18, United States Code, Section 3553(a).

Below, we discuss the key facts and procedural background of the case, including the criminal conduct of BNPP that precipitated this guilty plea, the principal terms of the Plea Agreement, and BNPP's concurrent resolution of criminal and regulatory actions brought by the New York County District Attorney's Office, the Federal Reserve, NYSDFS, and the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). We describe the legal standards applicable to the Court's consideration of the Plea Agreement, and set forth the principal reasons that the Plea Agreement should be accepted by the Court, including that the Agreement – with its requirements that BNPP admit to and take responsibility for years of serious criminal wrongdoing, undertake significant remedial measures, and pay unprecedented financial penalties – will appropriately punish the defendant and provide a powerful deterrent to financial institutions considering engaging in similar conduct. Finally, we set forth briefly the Government's view of the appropriate procedures for the plea proceeding scheduled for July 9.

## II.     Factual and Procedural Background

### A.     BNPP's Criminal Conduct

The criminal conduct that is the subject of the Plea Agreement is set forth in detail in the Statement of Facts, in which BNPP admits that it engaged in a long-running conspiracy, beginning in at least 2004 and continuing into 2012, to violate U.S. economic sanctions against

Sudan, Iran and Cuba. As set forth in the Statement of Facts, BNPP, through its agents and employees, knowingly and willfully moved approximately $8,833,600,000 through the U.S. financial system on behalf of banks and other entities located in Sudan, Iran and Cuba subject to U.S. sanctions ("Sanctioned Entities"), including more than $4.3 billion on behalf of Specially Designated Nationals ("SDNs"), which are specifically designated by OFAC in order to cut them off from the U.S. financial system. Statement of Facts ("S.F.") ¶¶ 14, 15.

BNPP evaded U.S. sanctions through several sophisticated and creative means, including by intentionally using a non-transparent method of payment messages, known as cover payments, to conceal the involvement of Sanctioned Entities in U.S. dollar transactions processed through financial institutions in the United States; by working with other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of Sanctioned Entities; and by instructing and following instructions from co-conspirators not to mention the names of Sanctioned Entities in U.S. dollar payment messages sent to financial institutions in the United States. S.F. ¶ 16.

BNPP's most egregious conduct, measured by dollar volume and role in undermining the U.S. embargo, involved its U.S. dollar transactions with Sudan. As set forth in the Statement of Facts, at the same time that both the United States and the international community were condemning Sudan for its role as a haven for terrorists and for its brutality against its own people, and when the United States tried to limit the violence and abuses by tightening its embargo against Sudan, BNPP stepped in to provide Sudan access to billions of U.S. dollars, in secret and deliberate ways specifically designed to evade detection by U.S. authorities. S.F. ¶¶

3

17-41. BNPP became Sudan's sole correspondent bank in Europe, and by 2006, letters of credit managed by BNPP represented a quarter of all exports and a fifth of all imports into and out of Sudan. S.F. ¶ 19. At one point, half of Sudan's entire foreign currency assets were held with BNPP. S.F. ¶ 19. In short, BNPP became, in effect, the global private banker for Sudan – unlawfully opening the door to the U.S. financial markets – even as BNPP's own internal documents made clear that Sudan was a "humanitarian catastrophe" that had "hosted Osama Bin Laden." S.F. ¶ 20.

Moreover, while initially individuals at BNPP advocated internally that U.S. sanctions laws, in their view, did not cover BNPP's conduct, by July 2006, BNPP had received legal opinions making it clear that the transactions being facilitated by BNPP did in fact violate U.S. sanctions and exposed BNPP to criminal liability. S.F. ¶¶ 34, 35. Despite receiving these opinions, and issuing a formal bank-wide policy that acknowledged the applicability of U.S. sanctions to BNPP, BNPP continued to process transactions involving Sudanese Sanctioned Entities for nearly another year. S.F. ¶ 35. In fact, BNPP did not cease its illicit U.S. dollar business with Sudan until June 2007, after officials at OFAC had launched an inquiry into BNPP's transactions with Sudan. S.F. ¶¶ 40, 41. All told, from July 2006 – by which time there was no longer any doubt within BNPP that its conduct was illegal – until BNPP ceased its U.S. dollar business with Sudan in June 2007, BNPP knowingly and willfully processed a total of approximately $6.4 billion in illicit U.S. dollar transactions involving Sudan. S.F. ¶ 41.

BNPP also knowingly and willfully processed approximately $686.6 million in illicit transactions with Iranian entities, in violation of U.S. sanctions with Iran. S.F. ¶ 44-48. These

4

transactions, which were done on behalf of two clients of BNPP – an Iranian oil company, and a petroleum company controlled by an Iranian energy group – took place from 2009 through 2012, well after it had become clear that the transactions were prohibited by U.S. law. S.F. ¶ 47-48. Indeed, the Iranian transactions continued even after the Government had launched its investigation into BNPP and BNPP had pledged to fully cooperate with U.S. authorities. S.F. ¶ 71.

Finally, BNPP also engaged in highly sophisticated efforts to undermine the U.S. embargo against Cuba. BNPP participated in several U.S. dollar-denominated credit facilities designed to provide financing to various Cuban entities (the "Cuban Credit Facilities"). S.F. ¶ 50. To carry out these transactions, BNPP employees directed BNPP's counterparties to omit references to Cuba in payment messages to prevent the transactions from being blocked when they entered the United States. S.F. ¶ 50. BNPP also employed a complicated "fronting" structure to disguise from U.S. banks the true nature of the transactions with Cuban parties. S.F. ¶ 50.

Moreover, while certain BNPP employees involved in these transactions claimed that they did not appreciate that U.S. sanctions laws applied to transactions run out of BNPP in Paris, by October 2004, BNPP had received and disseminated a legal opinion that made it clear that U.S. sanctions laws applied to BNPP when it processed transactions through its U.S. branch in New York ("BNPP New York"). S.F. ¶¶ 59, 60. Nevertheless, BNPP continued to process U.S. dollar transactions through BNPP New York, in direct contravention of the advice, for nearly six more years, into 2010. S.F. ¶ 60. In total, from October 2004 through early 2010,

5

BNPP knowingly and willfully processed illicit U.S. dollar transactions involving Cuba with a value of approximately $1.747 billion.  S.F. ¶ 70.

    **B.**    **The Plea Agreement**

Based on the conduct summarized above and set forth in detail in the Statement of Facts, on June 30, 2014, the Government and BNPP executed the Plea Agreement, pursuant to which BNPP agreed to the following principal terms.

First, BNPP agreed to take responsibility for its actions by admitting to the Statement of Facts and agreeing to plead guilty to a one-count Information charging BNPP with conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371. In particular, BNPP conspired to violate the International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Section 1701 et seq., and regulations issued thereunder, and the Trading with the Enemy Act ("TWEA"), codified at Title 50, United States Code Appendix, Section 1 et seq., and regulations issued thereunder. Under IEEPA, it is a crime, *inter alia,* to willfully engage in transactions that violate the U.S. embargoes against Sudan and Iran. Under TWEA, it is a crime, *inter alia,* to willfully engage in transactions that violate the U.S. embargo against Cuba.

Second, BNPP agreed to forfeit the full amount of proceeds tied to its criminal conduct – a total of $8,833,600,000, comprised of $6,400,000,000 in illicit transactions with Sudanese Sanctioned Entities, $686,600,000 in illicit transactions with Iranian entities, and $1,747,000,000 in illicit transactions with Cuban entities. These dollar values represent the proceeds of the conspiracy – *i.e.*, the amounts that BNPP's clients and co-conspirators were able to move

6

through the U.S. financial system to the benefit of Sanctioned Entities due to BNPP's willfully illicit conduct.[1]

Third, BNPP agreed to pay a fine of $140,000,000. That number is approximately twice the value of the direct pecuniary gain, or direct profit, to BNPP for the processing of transactions that violated U.S. sanctions laws. (*See* Plea Agreement at 4).

Fourth, BNPP agreed to a five-year term of probation in which BNPP will be subject to (a) the applicable mandatory conditions of probation described in Title 18, United States Code, Section 3563(a)(1) and Section 8D1.3(a) of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."); and (b) a requirement that BNPP enhance its compliance policies and procedures in accordance with its concurrent regulatory settlement agreements, including the imposition of a monitor for two additional years.

### C. BNPP's Resolution of Related Actions

As noted above and in the Government's letter to the Court dated June 30, 2014, the Plea Agreement was executed on the same date – June 30, 2014 – that BNPP resolved several parallel criminal and regulatory investigations related to the same conduct. (The relevant agreements are attached hereto as Exhibits B, C, D and E.) Specifically, BNPP (a) pled guilty in the Supreme Court of New York, New York County, to one count of falsifying business records in the first degree and one count of conspiracy in the fifth degree, and agreed to pay a forfeiture

---

[1] BNPP facilitated additional transactions in violation of U.S. sanctions laws in which BNPP's conduct was not provably willful.

7

amount totaling $2,243,400,000;[2] (b) entered into a Consent Order with the Federal Reserve that required the bank to pay a civil monetary penalty of $508,000,000 and a Cease and Desist Order with the Federal Reserve and BNPP's French regulator, the Autorite de Controle Prudentiel et de Resolution, that required BNPP to institute several remedial compliance measures; (c) entered into a Consent Order with NYSDFS that imposed a civil monetary penalty of $2,243,400,000, suspended BNPP's ability to conduct certain U.S. dollar clearing through its U.S. branch, and extended the term of a previously appointed independent consultant to oversee BNPP's remedial measures for a period of two years; and (d) entered into a settlement agreement with OFAC in which it agreed to a financial penalty of $963,619,900 that would be satisfied by BNPP's forfeiture payments in this matter.[3]

The Plea Agreement incorporates these concurrent resolutions in two ways. First, as noted above, a mandatory condition of the five-year probationary period is that BNPP comply with the remedial measures set forth in the bank's agreements with the Federal Reserve and NYSDFS, including the imposition of a monitor, whose reports would be submitted to the Government. Second, the Government has agreed to credit the payments BNPP makes in connection with its resolution of the State criminal charges and its settlement agreements with the Federal Reserve and NYSDFS against the total forfeiture amount, such that the total amount

---

[2] BNPP's plea agreement with the New York County District Attorney's Office specifies that BNPP's State court plea is contingent upon acceptance of the Plea Agreement by this Court.

[3] The different regulators calculated the total amount of sanctions violations differently than the Government (and each other), based on lower required levels of knowledge and each regulator's independent method of calculating what constitutes a sanctions violation for their specific regulatory purposes.

8

that BNPP will be required to pay in connection with its resolution of all of the criminal and regulatory actions is $8,833,600,000 in forfeiture, plus the criminal fine of $140,000,000.

### III. The Court Should Accept the Plea Agreement

#### A. Applicable Legal Standards

##### 1. Rule 11(c)(1)(C) Plea Agreements

The Plea Agreement in this case is submitted pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), under which the parties may agree to a specific sentence. Under Rule 11(c)(1)(C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report. Fed. R. Crim. P. 11(c)(3)(A). The court may not modify the agreement. *See United States v. Williams*, 260 F.3d 160, 165 (2d Cir. 2001) (discussing Rule 11(e)(1)(C), which was renumbered as Rule 11(c)(1)(C) in 2002).

In considering a plea agreement under Rule 11(c)(1)(C), "courts follow the framework provided by the United States Sentencing Guidelines, which are now advisory." *United States* v. *Wright*, 291 F.R.D. 85, 88 (E.D. Pa. 2013). Under the "governing policy statement" of U.S.S.G. § 6B1.2, the court may accept a plea agreement under Rule 11(c)(1)(C) "'only if the court is satisfied either that such sentence is an appropriate sentence within the applicable guideline range or, if not, that the sentence departs from the applicable guideline range for justifiable reasons.'" *Freeman* v. *United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion) (quoting U.S.S.G. § 6B1.2 cmt.); *see also United States* v. *Goodall*, 236 F.3d 700, 704 (D.C. Cir. 2001) (quoting U.S.S.G. § 6B1.2 cmt.). If the court accepts the plea agreement, it must inform the defendant that the agreed disposition will be included in the judgment. Fed. R. Crim. P. 11(c)(4). The court

9

may reject the agreement in the "exercise of sound judicial discretion." *United States v. Severino*, 800 F.2d 42, 45 (2d Cir. 1986).

### 2. Orders of Forfeiture

As noted above, a significant component of the Plea Agreement is BNPP's agreement to forfeit the full dollar value of the proceeds of the criminal conspiracy, $8,833,600,000 in United States currency, and the Government's agreement to credit against that amount the payments BNPP makes in connection with its related criminal and regulatory settlements.

Orders of forfeiture are governed by Title 18, United States Code, Section 3554, the applicable forfeiture statutes, and Federal Rule of Criminal Procedure 32.2. They are not subject to the Court's broader sentencing analysis required under Title 18, United States Code, Section 3553. *See United States* v. *Taggert*, 484 Fed. App'x 614, 615 n.2 (2d Cir. 2012) (recognizing that none of the relevant forfeiture provisions "incorporates or makes reference to the sentencing factors listed under § 3553(a)," and that it therefore is "not apparent that § 3553(a)(6) applies to an order of forfeiture"); U.S.S.G. § 5E1.4 (forfeiture "is to be imposed upon a convicted defendant as provided by statute").

The applicable forfeiture statutes in this case are Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).[4] Under these provisions, a

---

[4] Title 18, United States Code, Section 981(a)(1)(C) provides for civil forfeiture in cases involving, among other things, offenses constituting "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7). The definition of specified unlawful activity in Section 1956(c)(7)(D) includes offenses under IEEPA and TWEA. The civil forfeiture provision in Section 981(a)(1)(C) is made applicable to criminal cases through Title 28, United States Code, Section 2461(c).

10

defendant must forfeit "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable" to the commission of the charged offense. 18 U.S.C. § 981(a)(1)(C). Not only is specific property derived from a crime forfeitable, but the court may enter a money judgment against the defendant and in favor of the United States to permit the Government to recover the amount of the defendant's crime proceeds. *See, e.g.*, *United States* v. *Awad*, 598 F.3d 76, 79 (2d Cir. 2010) (affirming money judgment); *United States* v. *Kalish*, 626 F.3d 165, 169 (2d Cir. 2010) (same); *United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (same).

The amount of forfeiture is not limited to a defendant's own gain. A defendant is jointly and severally liable for all proceeds obtained by any of its co-conspirators during the commission of the charged offense, "provided the actions generating those proceeds were reasonably foreseeable to the defendant." *United States* v. *Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012).

Before accepting a Rule 11(c)(1)(C) plea agreement that contains a stipulation as to the amount of forfeiture, the court must find that "the defendant entered an agreement to forfeit assets knowingly and voluntarily." *Libretti* v. *United States*, 516 U.S. 29, 42 (1995). At the same time, the court has no obligation "to inquire into the factual basis for a stipulated forfeiture of assets embodied in a plea agreement." *Id.* at 51-52 (explaining that Federal Rule of Criminal Procedure 11(b)(3), which generally requires the court to determine that there is a factual basis for the plea, does not apply to forfeiture). Accordingly, a court may accept the stipulated amount of forfeiture so long as the defendant's stipulation "was informed and uncoerced." *Id.* at 42.

11

**B.     The Plea Agreement Sets Forth the Appropriate Resolution of this Case**

The resolution contemplated by the Plea Agreement is appropriate, reasonable, and strongly in the public's interest, for the following four reasons, among others.  First, the criminal charge to which BNPP has agreed to plead guilty – participating in a conspiracy to violate IEEPA and TWEA – is an appropriate criminal charge for the offense conduct in this case.  As set forth above and in the Statement of Facts, BNPP conspired with numerous financial institutions and other entities and individuals to violate U.S. economic sanctions by processing U.S. dollar transactions through the United States on behalf of clients in countries subject to U.S. embargo, in ways designed to conceal the involvement of Sanctioned Entities.  Pursuant to the Plea Agreement, BNPP will admit to and take responsibility for its criminal conduct, and by BNPP's admission to the Statement of Facts laying out BNPP's conduct in great detail, the public can see and understand how BNPP violated the law and why it is subject to such significant criminal penalties.  Indeed, the Statement of Facts provides both guidance and warning to other financial institutions, the individuals who work in and manage them, the attorneys who advise them, directors, shareholders, investors, clients and others.

Second, BNPP's agreement to forfeit the full amount of criminal proceeds that benefited Sanctioned Entities during the course of the conspiracy is consistent with the governing statutes and serves as a substantial deterrent to any person or entity contemplating violating U.S. sanctions laws and regulations.  The dollar amount BNPP has agreed to forfeit far exceeds, by several orders of magnitude, the direct profit BNPP made by processing these illicit transactions, as measured by the transaction fees it charged to its clients.  Such a penalty is appropriate, however,

12

because the relevant forfeiture laws clearly allow for it and because BNPP's actions enabled its co-conspirators access to billions of U.S. dollars – the proceeds of the criminal conspiracy – in violation of U.S. sanctions. These proceeds were reasonably foreseeable to BNPP, and the Court can confirm through its plea allocution that BNPP has agreed to the proposed forfeiture order knowingly and voluntarily. *Libretti*, 516 U.S. at 42.

In addition, the Government's agreement to credit the amounts paid by BNPP in connection with its concurrent resolution of state and regulatory actions ensures that BNPP is not penalized twice for the same conduct, and has helped to facilitate the global resolution of this matter. In particular, by working closely with BNPP's principal regulators and incorporating their settlement agreements into the Plea Agreement, the Government is able to impose an unprecedented set of penalties on BNPP commensurate with its criminal conduct, while also ensuring that the remedial actions identified by the regulators are subject to enforcement by the Court. To that end, the Government also agreed in this case to a plea agreement that recommends a specific sentence, pursuant to Fed. R. Crim. P. 11(c)(1)(C), in the interest of achieving a global resolution, and to provide greater certainty as to the full array of penalties BNPP faces as a result of its plea in this case and its resolutions of the related actions.

Third, the fine of $140 million set forth in the Plea Agreement is appropriate and fully consistent with Title 18, United States Code, Sections 3553 and 3572 and the Guidelines.[5] BNPP earned approximately $70 million in direct profits – as measured principally by the fees BNPP

---

[5] As set forth in the Plea Agreement, the Sentencing Guidelines provide that the Court should determine the appropriate fine in this case by applying the provisions of Title 18, United States Code, Sections 3553 and 3572. Plea Agreement at 3-4.

13

charged on the transactions – on all of the transactions processed by BNPP in violation of U.S. sanctions laws, including those that were not processed willfully. A fine representing twice the amount of those illicit profits is fair and reasonable in light of the conduct at issue and the much larger forfeiture amount, and serves as an additional deterrent to those who may believe it can be profitable to engage in prohibited transactions.

Finally, the probation term of five years set forth in the Plea Agreement, and the requirement that BNPP enhance its compliance measures in accordance with its settlements with the Federal Reserve and NYSDFS, will further the purposes of rehabilitation and specific deterrence, as BNPP will be required to take substantial remedial measures, under the supervision of a monitor for the first two years, whose reports will be submitted to the Government.

Accordingly, the resolution contemplated by the Plea Agreement furthers the interests of specific and general deterrence, reflects the seriousness of the offense, requires meaningful rehabilitation, and provides adequate punishment.

### III. Procedures for the Plea Proceeding

In light of the Government's well-supported view, set forth above, that the Court should accept the Plea Agreement, and to ensure that the rights of the defendant are properly protected, the Government respectfully requests that the following procedures be followed at the plea proceeding scheduled for July 9. As an initial matter, because BNPP is a corporation that will be represented at the plea proceeding by a duly-authorized corporate officer (the "Corporate Officer"), the Court should ensure that (a) the Corporate Officer is sworn in for the purposes of conducting an allocution; (b) the Corporate Officer is, in fact, an officer of BNPP who has been

14

authorized by a vote of BNPP's Board of Directors to speak and act on BNPP's behalf throughout the proceeding;[6] (c) the Corporate Officer and the Board of Directors understand what is happening in the proceeding; and (d) counsel for BNPP has explained to the Corporate Officer and to the Board of Directors the consequences that may flow from the proceeding.

Upon establishing the Corporate Officer's authority to represent and speak on behalf of BNPP in the proceeding, we respectfully request that the Court confirm BNPP's intention to waive indictment pursuant to Rule 7(b) of the Federal Rules of Criminal Procedure and permit the Government to proceed pursuant to an Information. We request that the Court then conduct a full allocution pursuant to Rule 11(b), including advising the defendant of the rights it is giving up by pleading guilty; establishing that the forfeiture order was agreed to knowingly and voluntarily, *Libretti*, 516 U.S. at 42; and establishing a factual basis for the plea by permitting the Corporate Officer, and if appropriate the Government, to address how the Bank's conduct meets all of the elements of the count charged in the Information. (On June 30, 2014, the Government submitted to the Court the Government's view of the necessary elements of the charged conspiracy.)

If the Court accepts the Plea Agreement and enters BNPP's plea of guilty in this matter, we respectfully request that the Court also enter the Consent Preliminary Order of Forfeiture/Money Judgment that was signed by the parties and attached to the Plea Agreement.

---

[6] Attached to the Plea Agreement is a "Limited Certificate of Corporate Resolution" signed by the Acting Corporate Secretary for BNPP's Board of Directors. We respectfully request that the Court have the Corporate Officer identify that document and indicate his understanding of its contents.

15

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court approve the Plea Agreement and accept BNPP's plea of guilty in this matter under the terms set forth in the Plea Agreement.

Respectfully submitted,

/s/
ANDREW D. GOLDSTEIN
MARTIN S. BELL
CHRISTINE I. MAGDO
MICAH W. J. SMITH
Assistant United States Attorneys
Tel.: (212) 637-1559 /2463

CRAIG TIMM
JENNIFER E. AMBUEHL
Trial Attorneys
Asset Forfeiture and Money Laundering Section, Criminal Division,
U.S. Department of Justice
(202) 514-1263

Cc: Karen Patton Seymour, Esq.
Sullivan & Cromwell LLP
Attorneys for BNP Paribas S.A.