**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **MILLY MIKALI AMDUSO,** *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) Case No. 08-cv-1361 (JDB) |
| v. | ) |
| | ) |
| **REPUBLIC OF SUDAN,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

### PLAINTIFFS' RENEWED MOTION TO COMPEL RULE 69 DISCOVERY FROM THE REPUBLIC OF SUDAN

Pursuant to Federal Rule of Civil Procedure Rule 69(a)(2) in aid of their final judgment against Sudan and the Court's March 31, 2017 Minute Order, Plaintiffs submit this Renewed Motion to Compel Discovery from judgment debtor the Government of Sudan and seek the following categories of information first outlined in Attachment A to Plaintiffs' October 2, 2015 Rule 69 Request for Production of Documents ("RPD[s]") ("October 2015 RPDs," Exhibit A).[1] The "Government of Sudan," which is defined in 28 U.S.C. § 1603 of the Foreign Sovereign Immunities Act ("FSIA"), refers to all political subdivisions, agencies and instrumentalities of the Sudanese government, including all entities owned or controlled by the Government of Sudan such as the entities the United States Government has determined meet this definition on its Specially Designated Nationals ("SDN") List (*e.g.*, the Sudanese National Petroleum Corporation ("Sudapet") and Sudatel).

Consistent with the FSIA and the U.S. Government's determinations of the entities owned or controlled by the Government of Sudan as set forth on the SDN List (*See* Exhibit E), Plaintiffs request a factual finding from this Court that for purposes of responding to Plaintiffs'

---

[1] A draft proposed order is attached to this motion.

Rule 69 discovery requests the Government of Sudan includes all ministries and agencies of the

Sudanese Government as well as all entities on the SDN list with the designation "[SUDAN]."

Plaintiffs also request an order from this Court compelling Sudan to provide documents

and information to Plaintiffs with respect to the following requests:

1.      As outlined in Requests 1 through 3 of Plaintiffs' October 2015 RPDs, all documents, communications and electronically stored information sufficient to identify all accounts; investments; securities; credits; assets; real, personal, or intangible property; and any interest in property (of any nature whatsoever, direct or indirect) of the Government of Sudan or the Central Bank of Sudan, which, during the period November 1, 1997 through the Present, is or was (i) present within the United States, (ii) transferred through the United States, or (iii) within the full or partial custody, control, management, supervision, or possession of a United States person.

2.      As specified in Requests 4, 5, 7, 10 through 12, and 14 of Plaintiffs' October 2015 RPDs, all documents, communications and electronically stored information sufficient to identify Sudan's concealment of its assets around the world as outlined in the guilty plea by BNP Paribas in *United States v. BNP Paribas, S.A.*, 14-cr-00460-LGS (S.D.N.Y. 2014).

3.      As specified in Requests 6, 8, 9, 13 through 17 of Plaintiffs' October 2015 RPDs, all documents, communications and electronically stored information sufficient to identify Sudan's concealment of its assets around the world in response to the imposition of U.S. sanctions during the period November 1, 1997 through October 31, 2001.

4.      As outlined in Plaintiffs' January 8, 2016 Notice Pursuant to Rule 30(b)(6) (Exhibit C), the identification and production of a witness to address each of these categories.[2]

Plaintiffs first filed their Motion to Compel on April 6, 2016 (Dkt. 307).  To date, Sudan

has not produced any documents or information within the requested categories in response to

the requests.  In response to the Court's instruction at a motion hearing on November 18, 2016

(Dkt. 319) and an Order by the Court on February 28, 2017 (Dkt. 322), Sudan provided a

declaration providing incomplete information regarding its assets and transfer of funds through

---

[2] As outlined in Plaintiffs' Original Reply Brief in Support of the Motion to Compel (Dkt. 314 at fn. 1), Plaintiffs withdrew their original Notice of Deposition to obviate the need for litigation regarding a protective order but re-affirmed their intention to re-serve those requests upon further order of the Court.  Sudan has repeatedly stated that it will not agree to the production of any 30(b)(6) witness for deposition.  Thus, the issue is properly before the Court.

the United States both at the present time and during the period November 1997 through the present.[3]  Moreover, as outlined below, the Sudanese Sanctions Regulations have materially changed since Plaintiffs' initial motion to compel.  Thus, the likelihood that Sudan has knowledge of assets potentially subject to attachment in the United States is much greater than ever before, and a declaration from the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding this topic can no longer be considered authoritative.

In its last minute effort to vacate the Court's judgment in this case, Sudan previously represented that it was finally willing to appear before the Court and play by the rules:

> Sudan desires to appear in the court, defend itself on the merits if need be . . .Sudan wants to clear its name. It's willing to provide evidence to do so . . . .

Exhibit C; Hearing Transcript Excerpts, December 18, 2015 Transcript at 144:6-12.

Yet its conduct to date suggests the opposite.  Sudan's conduct since its re-entry into the case suggests it simply does not intend to comply with its discovery obligations in this matter. Or rather, Sudan will participate provided it is not required to satisfy any of its obligations in this litigation.  Accordingly, Plaintiffs now file this renewed motion to compel.

## I.      INTRODUCTION AND BACKGROUND

Plaintiffs initially served narrowly defined discovery requests upon Sudan in their October 2015 RPDs.  A year and a half later, Sudan has still not produced a single document in response to Plaintiffs' requests.  The only item Sudan has yet produced in response to a direct order by the Court was a rigidly narrow Declaration which omits several important categories of relevant information.  Sudan's refusal to be guided by the rules of discovery is premised on the argument that Plaintiffs are only entitled to information relating to a very narrow subset of assets

---

[3] On April 28, 2017, Plaintiffs met with counsel for Sudan at its offices in Washington, DC to discuss the Ahmad Declaration and raised their concerns regarding its completeness ("April 28 Meet-and-Confer").  The April 28 Meet-and-Confer is referred to throughout this motion.

the Sudanese Government *currently* has in the *United States* and, therefore, "all of its attachable assets may be obtained from the Office of Foreign Assets Control (OFAC)."  (Dkt. 322 at 1).  Sudan cannot cite any authority that supports this limited approach to Rule 69 discovery.

As outlined in Plaintiffs' original motion, "[t]he rules governing discovery in post-judgment execution proceedings are quite permissive." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2254 (2014).  Federal Rule of Civil Procedure 69(a)(2) states that, "[i]n aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person—including the judgment debtor—as provided in the rules or by the procedure of the state where the court is located.'" *Id.*  Thus, the right of a party to conduct discovery "applies both before and after judgment." *Credit Lyonnais, S.A. v. SGC International, Inc*., 160 F.3d 428, 430 (8th Cir. 1998); *United States v. McWhirter*, 376 F.2d 102, 106 (5th Cir. 1967).

Plaintiffs are entitled to a "thorough examination of a judgment debtor with respect to its assets, including discovery [of] the identity and location of any of the judgment debtor's assets, wherever located." *British Int'l Ins. Co. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370, 2000 WL 713057, at *5 (S.D.N.Y. June 2, 2000). As federal courts have routinely found "the judgment creditor must be given the freedom to make a broad inquiry to discover hidden or concealed assets of the judgment debtor.'" *1ST Technology,* No. No. 06-cv-01110, 2007 WL 5596692, at *4 (D. Nev. Nov. 13, 2007) (quoting *British International II,* 200 F.R.D. at 589).

Moreover, Sudan's suggestion that OFAC would have information on all of its assets in the United States which Sudan has affirmatively sought to conceal since 1997 is facially absurd since Sudan successfully concealed its assets from the United States Government for decades with the assistance of financial institutions such as BNP Paribas.  In any event, the original premise of Sudan's assertion (with which Plaintiffs continue to disagree) is moot—it no longer

applies in the wake of the recent general license issued by OFAC on January 17, 2017, *see* Executive Order 13,761 (January 13, 2017), under the Sudanese Sanctions Regulations, 31 C.F.R. § 538.540.  This license means that the Government of Sudan's assets in the United States, including the assets of all of the entities it owns and controls,  are no longer subject to blocking and these entities are authorized to do business in the United States.  Thus, the need for documents and information from Sudan is much greater than it was at the time of Plaintiffs' initial motion.

The parties appeared before the Court on November 18, 2016 for a motion hearing during which Sudan reiterated that, consistent with its opposition to Plaintiffs' original motion, Plaintiffs were not entitled to any discovery from Sudan despite the clear requirements of Rule 69(a)(2) and governing case law including the Supreme Court's decision in *NML Capital, Ltd.*, 134 S. Ct. at  2254.  Sudan rejected its obligation to provide either current or historical information regarding its assets, claiming again that OFAC was allegedly a better source of information regarding Sudan's *own* assets than Sudan.  Plaintiffs had previously requested and received information from OFAC (the "OFAC Production") which provided extremely limited information regarding Sudan's assets that had been blocked by U.S. financial institutions.

In an Order issued on February 28, 2017 (Dkt. 322), the Court modified its protective order to allow Plaintiffs to provide the OFAC Production to Sudan's counsel and ordered "representatives of Sudan to review OFAC's production and determine whether OFAC's records contained a complete list of Sudan's assets available for attachment" and supplement this information if this review reveals "OFAC's records are incomplete." Dkt. 322 at 1.  On March 28, 2017, Sudan provided a Declaration from Hazem Abdel Kader Ahmad,[4] the recently-

---

[4] Mr. Ahmad was appointed Governor of the Central Bank of Sudan on December 28, 2016.  (Exhibit D, filed under seal).  The bank's website lists his name as Hazim Abdegadir Ahmed Babiker. Notably, Mr. Ahmad had only held

appointed Governor of the Central Bank of Sudan ("Ahmad Declaration").  As outlined in more detail below, the Ahmad Declaration is incomplete and further highlights the need for an Order compelling Sudan to comply with its discovery obligations.

During the parties April 28 Meet-and-Confer, Sudan confirmed that it believes that this deficient declaration represents the outer bounds of its discovery obligations in this case.  It does not.  To date, the incomplete and potentially erroneous declaration by Mr. Ahmad is the *only* information that Sudan has provided the Plaintiffs regarding its assets and the declaration itself was only in response to a direct order by the Court.  For all the reasons stated herein, Plaintiffs file this renewed Motion to Compel and request an order compelling production of the categories of information 1-4 set forth above.[5]

## II.    ARGUMENT

### A.    The Ahmad Declaration Does Not Relieve Sudan Of Having To Produce Documents Relevant To Identifying its Assets And Its Efforts to Conceal Those Assets

According to his declaration, Mr. Ahmad was asked to work with representatives of the Sudanese government and the Central Bank of Sudan to identify any Sudanese assets located in the United States. *Id*. at ¶ 2.  Mr. Ahmad claims that: (1) the OFAC information was not useful and he could not connect its data with any transactions in the records of the Sudanese government or the Central Bank of Sudan and; (2) the Sudanese government did not have any assets in the United States other than diplomatic assets.  *Id*.  Mr. Ahmad's declaration states that it was limited to *current* assets inside the United States and did not include information regarding any assets previously within the United States or assets that transferred through the United

---

for three (3) months prior to signing off on the accuracy and completeness of the OFAC information in the Declaration provided in response to the Court's February 27, 2017 Order.

[5] In further support of the renewed motion, Plaintiffs hereby incorporate its arguments in its initial Motion to Compel [Dkt. 307], Reply Memorandum in support of Motion to Compel [Dkt. 314], Supplemental Memorandum in support of Motion to Compel [Dkt. 317] and at oral argument on November 21, 2016. [Dkt. 319].

States.  But based upon the parties' meet-and-confer on April 28, 2017, it is clear that the declaration actually does not cover that topic either.  Instead, it is merely a recitation of assets previously blocked by U.S. banks, from the late 1990s onward, which belonged to the Central Bank of Sudan.  Accordingly, the declaration suffers from a number of deficiencies.

### 1.   Assets of Entities Owned and Controlled by the Government of Sudan are Subject to Discovery Under Rule 69

Mr. Ahmad's Declaration fails to provide any information on the assets of the "Government of Sudan," which is defined in 28 U.S.C. § 1603 and refers to all political subdivisions, agencies and instrumentalities of the Sudanese government, including all entities owned or controlled by the Government of Sudan such as the entities the United States Government has determined meet this definition on its Specially Designated Nationals (*e.g.*, Sudapet and Sudatel).  For instance, Sudapet is the Sudanese government owned company that exists to administer all revenues from oil concessions granted to foreign individuals and companies in Sudan.  It is 100% owned by Sudan's Ministry of Energy and acts as an arm of the Sudanese government.  Sudatel is the company that maintains Sudan's national telecommunications infrastructure.  The chairman of Sudatel is Dr. Abd Al Rahman Mohamed Darar, a minister of Sudan's ministry of Finance and National Economy.

Under the FSIA, "[a] 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state *or an agency or instrumentality of a foreign state* as defined in subsection (b)."   28 U.S.C. § 1603(a) (emphasis added).   "An 'agency or instrumentality of a foreign state' means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country."

28 U.S.C. § 1603(b).

The Sudanese Sanctions Regulations define the Government of Sudan in a very similar way:

> "The term *Government of Sudan* includes:
>
> > (a) The state and the Government of Sudan, *as well as any political subdivision, agency, or instrumentality thereof, including the Central Bank of Sudan;*
> >
> > *(b) Any entity owned or controlled by the foregoing;*
> >
> > (c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and
> >
> > (d) Any other person determined by the Director of the Office of Foreign Assets Control to be included within paragraphs (a)(1) through (a)(3) of this section."

31 C.F.R. 538.305 (emphasis added).

Note 2 to the Section 538.305 further provides that individuals should "refer to the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List ("SDN List") for a non-exhaustive listing of persons determined to fall within this definition" 31 C.F.R. 538.305, Note 2. Thus, all of the entities on the SDN list with the designation "[SUDAN]" are recognized by the U.S. Government: (1) as the Government of Sudan; (2) owned or controlled by the Government of Sudan; or (3) acting on behalf of the Government of Sudan.[6] For example,

---

[6] Plaintiffs recognize that some of the entities on the SDN list may be acting on behalf of the Government of Sudan but may not be owned or controlled by it. Because Sudan has provided no response to their requests, Plaintiffs are currently without information on which entities may fall within that category. Accordingly, if Sudan believes that some of the entities on the SDN should be excluded from the scope of discovery, it should proffer evidence or information explaining why they should not be included with the definition of the Government of Sudan.

the relevant portions of OFAC's SDN list  (Exhibit E) identifies all the following entities with the designation "[SUDAN]":

- "SUDAPET LTD. (aka Sudan Petroleum Corporation Limited) [SUDAN]"
- "SUDAN TELECOMMUNICATIONS COMPANY LIMITED (aka Sudatel) [SUDAN]"

At a minimum, Plaintiffs are entitled to discovery regarding the assets of all similar Sudanese governmental agencies and instrumentalities as well as entities owned or controlled by those agencies or instrumentalities. *See*, *e.g.*, *First City, Texas-Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 50 (2d Cir. 2002) (ordering district court to permit judgment creditor to "conduct full discovery" pursuant to Rule 69 against "alter ego" of sovereign instrumentality).  These include entities owned and controlled by the Government of Sudan and which carry on vital governmental functions such as Sudapet and Sudatel.

In a separate enforcement proceeding, Plaintiffs have received separate subpoena responses from a number of U.S. financial institutions. (*See*, *e.g.*, Sealed Exhibits F & G).[7]  The information  provided by these banks reveals that Sudapet and Sudatel maintained accounts at BNP Paribas (Suisse) S.A. and its predecessor the United Overseas Bank in Geneva dating back to 1997.  *Id*.  However, none of this information is reflected in Mr. Ahmad's declaration which purported to list all Sudanese assets in the United States dating back to 1997.

As discussed during the parties April 28 Meet-and-Confer Sudan places great weight on the fact that entities such as Sudapet are established as separate juridical entities.   But that reliance is misplaced.

<u>First</u>, and most importantly, Plaintiffs entitlement to discovery regarding Sudan's assets is entirely separate from whether those assets are ultimately subject to attachment.  Based on the

---

[7] Because of a protective order in place with respect to these documents, Plaintiffs have filed a separate motion to file these exhibits under seal.

Supreme Court's holding in *NML Capital*, whether an asset is ultimately subject to attachment is not relevant to the issue of discovery in this context and Plaintiffs need not demonstrate that a sovereign's assets are subject to attachment as prerequisite to attachment.  134 S. Ct. at 2256.

Second, even if attachability were relevant in this context, Plaintiffs are in fact entitled to attach assets belonging to these agencies and instrumentalities of Sudan.  There are at least three potential avenues to defeat attachment immunity that would allow Plaintiffs to attach assets belonging to the government of Sudan in this case: (1) the Terrorism Risk Insurance Act ("TRIA"); (2) the "terrorist activity exception" under 28 U.S.C. § 1610(g); and (3) the "commercial activity" exception under 28 U.S.C. § 1610(a)(7). *See*, *e.g.*, *Weinstein v. Islamic Republic of Iran* 831 F.3d 470, 482-486 (D.C. Cir. 2016)

In addition to TRIA which allows Plaintiffs to attach any blocked asset in satisfaction of their judgment, Section 1610(g)[8] of the FSIA provides, that: "a judgment under § 1605A have been rendered against the foreign state; in that event, both the property of the foreign state *and* the property of an agency or instrumentality of that state are subject to attachment and execution." *Bennett v. Islamic Republic of Iran*, 817 F.3d 1131, 1141 (9th Cir. 2016); *Heiser v.*

---

[8] "(g) Property in Certain Actions.—

    (1)In general.—Subject to paragraph (3) [a waiver by the President], the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations."

*Islamic Republic of Iran*, 735 F.3d 934, 937 (D.C. Cir. Nov. 19, 2013).  Thus Sudan is quite

incorrect when it argues that the property of a separate juridical entity is immune from Plaintiffs'

judgment enforcement against Sudan itself.

Similarly, Section 1610(a)(7) of the FSIA, the so-called "commercial activity exception,"

also contains an explicit provision for piercing through any corporate shell game:

> "The property in the United States of a foreign state ... used for a commercial
> activity in the United States, shall not be immune from attachment in aid of
> execution, or from execution, upon a judgment entered by a court of the United
> States or of a State ... if the judgment relates to a claim for which the foreign state
> is not immune under section 1605A or section 1605(a)(7) (as such section was in
> effect on January 27, 2008), regardless of whether the property is or was involved
> with the act upon which the claim is based."

28 U.S.C. § 1610(a)(7).

Thus, even if Sudan were correct that the ability to attach an asset was relevant to

discovery under Rule 69(a)(2), which Plaintiffs vigorously dispute, virtually all the assets on

which Plaintiffs seek discovery are subject to attachment.

### 2.    Mr. Ahmad's Declarations Fails to Identify Even Current Assets of the Government of Sudan in the United States

The Ahmad Declaration also fails to provide any meaningful information regarding what

it narrowly purports to cover—the current location of Sudan's assets inside the United States.

Paragraph 5 of the declaration simply lists funds that were previously owned or held by the

Central Bank of Sudan and blocked by U.S. banks since the initiation of the embargo in 1998.

Ahmad Declaration at ¶ 5.  ("I did however, identify assets (funds transfers) in the United States

belonging to the Central Bank totaling approximately $7 million that were blocked by banks in

the United States).  The Declaration does not even acknowledge the changes in the Sudanese

Sanctions Regulations, 31 C.F.R. § 538.540, which went into effect on January 17, 2017—more

than two months earlier—which authorize Sudan to do business in the United States and with

United States persons.  These change makes it highly likely that Sudan does have attachable assets in the United States—as well as outside the United States that are potentially subject to attachment—and that neither OFAC nor any other U.S. government agency would have information regarding such assets.

Sudan is required to produce responsive documents in their possession, custody or control. *See* Fed.R.Civ.P. 34(a). "For purposes of document discovery, '[c]ontrol' is defined as the legal right, authority or ability to obtain documents upon demand.'" *Owens-Hart v. Howard Univ.,* 317 F.R.D. 1, 6 (D.D.C. 2016); quoting *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C.Cir.2005) (citations omitted).  Sudan clearly has the ability to demand production of relevant documents from its wholly-owned entities, agencies and instrumentalities, including Sudapet. *See In re ATM Fee Antitrust Litig*., 233 F.R.D. 543, 544 (N.D. Cal. 2005)(finding "a parent company has control of documents in the custody and possession of its wholly owned subsidiary."); *Motorola Credit Corp. v. Uzan*, 2013 WL 6098388 at *3 (S.D.N.Y. Nov. 20, 2013)("a parent corporation has, practically speaking, sufficient control over its subsidiaries to require that it search them in compliance with a subpoena served on the parent.").  Thus, Sudan must disclose documents and information in the possession of its agencies and instrumentalities. *D.L. v. District of Columbia*, 251 F.R.D. 38, 46 (D.D.C. 2008)(ordering defendant District of Columbia to disclose any documents in its control "regardless of which agency of the District may be in actual possession of such documents.")[9]

---

[9] Sudapet would have responsive documents relating to Sudan's accounts with BNP Paribas. In 2004, a petroleum company requested a specific license from OFAC to authorize the release of a transfer of blocked funds sent for the benefit of the Sudanese Petroleum Corporation. *See* Exhibit H; Case No. 1:09-cv-02164.  OFAC's complete agency record demonstrates that: (1) Sudapet maintained accounts at BNP Paribas (Suisse) S.A.; and (2) the funds transferred to Sudapet were made in accordance with an Agreement between the petroleum company and **the Sudanese Ministry of Energy and Mining**. *Id*. at AR0000021.

**B.**  **Plaintiffs Must Be Permitted To Obtain Discovery Relating to Sudan's Relationship With BNP Paribas For The Entire Period of Their Concealment of Assets.**

Finally, the Ahmad Declaration fails to provide information on Sudan's efforts to conceal its assets around that world that might potentially be subject to attachment.  Sudan has an established history of concealing documents and information from U.S. authorities.  It also exercises power and control through a number of state owned and affiliated enterprises.  *See, e.g.*, Exhibit I; Sudan's Deep State. How Insiders Violently Privatized Sudan's Wealth, and How to Respond (April 2017).  As outlined in Plaintiffs' prior submissions, BNP and the U.S. Government identified Sudan, its instrumentalities, and its Central Bank as co-conspirators in a wide-ranging criminal conspiracy to violate U.S. sanctions, in connection with BNP's guilty plea in *United States v. BNP Paribas,* No. 14-CR-00460 (LGS) (S.D.N.Y. 2014).  The Statement of Facts in support of BNP Paribas' guilty plea states that in November 1997, "shortly after imposition of U.S. sanctions against Sudan," BNP stepped in and came to the assistance of the Government of Sudan to "become the sole correspondent bank in Europe" for the Sudanese Central Bank and "all major commercial banks located in Sudan." *See* Exhibit J: BNP Statement of Facts at ¶ 19.  Deposits by the Government of Sudan through its Central Bank at the Geneva branch of BNP Paribas alone came to "represent[] about 50% of Sudan's foreign currency assets." *Id*. "In short, BNP [Paribas] became, in effect, the global private banker for Sudan – unlawfully opening the door to the U.S. financial markets" at the same time the United States and the United Nations Security Council sought to heavily sanction Sudan to limit the Sudanese government's assistance for al-Qaeda and international terrorism. *See* Exhibit K: US. Government's Memorandum in Support of the Court's Acceptance of Plea Agreement, at 4.

As the recitation in support of BNP Paribas' guilty plea makes clear, Sudan was actively moving and concealing funds and assets in the wake of U.S. economic sanctions—beginning in the period 1997 through 2001. Sudan has been subject of comprehensive international sanctions since November 1997 for its support of international terrorism, and in that time it has become adept at concealing its assets lest they be seized or blocked.  Because of the sanctions regimes imposed against it, common sense dictates that Sudan has assets all over the world, including the United States, which are now carefully concealed or held through affiliates or agents.

Thus, discovery for the period 1997-2010 is arguably the most critical to uncovering where Sudan's executable assets reside now since the mechanisms of concealment were first implemented in that early time period.  The identity and actions of Sudan's co-conspirators in that time period are critical to Plaintiffs' enforcement program because it is likely that many of them continue to conceal Sudanese assets through the present day.  And if they do not, they will know how the scheme operated, which will provide Plaintiffs with further valuable information in devising their enforcement program.

The scope of post-judgment discovery under the Federal Rules is broad, permitting a judgment creditor to obtain discovery not only of the judgment debtor's current assets, but also information relating to past financial transactions which could reasonably lead to the discovery of concealed or fraudulently transferred assets. *See, e.g., Cont'l Transfer Technique, Ltd. v. Federal Government of Nigeria,* 308 F.R.D. 27, 37 (D.D.C. 2015); *ClearOne Commc'ns, Inc. v. Chiang*, 276 F.R.D. 402, 404 (D. Mass. 2011) (under Rule 69, "[t]he presumption is in favor of 'full discovery of any matters arguably related to the creditor's efforts to trace the debtor's assets and otherwise to enforce its judgment. . . .'")

The decision in *Symons Intern. Group v. Continental Cas. Co*., CA No. 1:01-cv-00799, 2015 WL 4392933 (S.D. Ind. July 15, 2015) further supports the production of documents from November 1997.  In *Symons*, the court permitted Rule 69 discovery for a period dating back fifteen (15) years. *Id*. at *3.  The court found that discovery dating back fifteen years was necessary so that the judgment-debtor could "follow the money in order to determine whether [the debtor's] assets have in fact dissipated, or whether, notwithstanding his representations – [he] still retains assets that [judgment-debtor] may collect."  *Id*. at *4; *see also Sberbank of Russia v. Traisman*, Case No. 3:14-cv-216, 2016 WL 4479533 (D. Conn. Aug. 23, 2016) (allowing broad discovery relating to the concealment and fraudulent transfer of assets by the judgment-debtor regardless of when the concealment occurred); *Allstate Insurance Co. v. Mirvis*, 2017 WL 384318 at *2 (E.D.N.Y. Jan. 25, 2017) (finding that plaintiffs are entitled to obtain discovery where evidence suggests that a third-party may have funneled money that is subject to judgment collection to other entities).

The admissions of BNP Paribas prove that Sudan has become adept at concealing its assets lest they be seized or blocked, and is a longtime participant in highly-sophisticated money laundering schemes.  Plaintiffs must be permitted to "follow the money" to test Sudan's contention that the only property and assets subject to execution in the United States are those that are identified by OFAC.  In sum, in order to follow the trail of Sudanese assets in the face of an extraordinary and undisputed pattern of concealment, Plaintiffs are entitled to documents relating to the beginning of the period for which the concealment began.

### C.    Plaintiffs Are Not Limited To Discovery of Assets Within the United States

The discovery rules that apply to foreign sovereigns are no different than those that apply to any other judgment debtor. "Congress kept in place a court's normal discovery apparatus in

FSIA proceedings." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 378 (D.C. Cir. 2011) (citing to H.R. Rep. No. 94-1487, at 23 (1976)); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 50 (2d Cir. 2002) (ordering district court to permit judgment creditor to "conduct full discovery" pursuant to Rule 69 against "alter ego" of sovereign instrumentality); *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1472 (9th Cir. 1992) (upholding district court's order granting discovery of "worldwide" assets of Chinese government instrumentality).

Indeed, in its recent decision in *Republic of Argentina v. NML Capital, Ltd.*, the U.S. Supreme Court affirmed that there is no provision in the FSIA "forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets" and therefore discovery is not limited by the FSIA. 134 S. Ct. at 2256. Sudan is not the first foreign sovereign to challenge post-judgment discovery in aid of execution on the grounds that it is entitled to special treatment—as a result of its sovereign status—with respect to requests for information regarding potentially attachable assets. But those arguments have been repeatedly and summarily rejected, and should be here as well. In light of the Supreme Court's clear language in *NML Capital*, there is no colorable argument to the contrary. In sum, "[f]oreign sovereigns enjoy no such 'discovery-in-aid-of-execution' immunity under the FSIA." *Continental Transfert Technique Ltd. v. Fed. Gov't of Nigeria,* 308 F.R.D. 27, 34 (D.D.C. 2015); *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 2016 U.S. Dist. LEXIS 95347, *11 n.35 (D. Utah 2016); *Thai Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*, 924 F. Supp. 2d 508, 519 (S.D.N.Y. Feb. 11, 2013) ("Forcing Petitioners to show that property is attachable before permitting them to gain any information about Respondent's assets would present an insurmountable Catch-22 for judgment creditors seeking to enforce a valid judgment.").

At the November 2016 hearing before the court and its prior pleadings, Sudan has erroneously attempted to conflate the issues of attachment or execution and discovery in aid of attachment or execution in its objections to Plaintiffs' discovery request. The Supreme Court has explicitly clarified that the question of whether an asset is ultimately determined to be attachable is not dispositive as to whether information about that asset is subject to discovery:

> Argentina maintains that, if a judgment creditor could not ultimately execute a judgment against certain property, then it has no business pursuing discovery of information pertaining to that property. But the reason for these subpoenas is that NML does not yet know what property Argentina has and where it is, let alone whether it is executable under the relevant jurisdiction's law. . . . They ask for information about Argentina's worldwide assets generally, so that NML can identify where Argentina may be holding property that is subject to execution. To be sure, that request is bound to turn up information about property that Argentina regards as immune. But NML may think the same property not immune. In which case, Argentina's self-serving legal assertion will not automatically prevail; the District Court will have to settle the matter.

*Id.* at 2257-58.

In other words, "whatever execution immunity [defendant] may possess under the FSIA, it currently poses no bar to the discovery [plaintiff] seeks." *Continental Transfer*, 308 F.R.D. at 34; *Em Ltd. v. Republic of Argentina*, 695 F. 3d 201, 209 (2d Cir. 2012) ("whether a particular sovereign asset is immune from attachment must be determined separately under the FSIA, but this determination does not affect discovery."); *Export-Import Bank of the Republic of China v. Grenada*, 768 F. 3d 75, 82 (2d Cir. 2014) (finding that the FSIA does not bar broad discovery in aid of executing a judgment against a sovereign).

At the November 18, 2016 motion hearing regarding this discovery dispute, Sudan rejected this line of decisions by citing to the Third Circuit's decision in *Ohntrup*. Sudan's reliance is misplaced. In *Ohntrup*, the district court ordered an "innocent third party" to produce documents regarding its agreements with and shipments to the judgment-debtor and information on the debtor's finances but denied additional discovery finding that it would pose an "undue

burden" on the third-party where discovery may be futile if the FSIA protects the targeted property from attachment.  *Ohntrup v. Makina Ve Kimya Endustrisi Kurumu*, 760 F. 3d 290, 296 (3d. Cir. 2014).  The Third Circuit found that the district court erred by finding that plaintiffs' "*potential* inability to show that the subject property is not immune from attachment is immaterial to the question of unreasonable burden." *Id*. (emphasis in original). The party objecting to the discovery would bear the burden of persuasion as to whether the targeted property was immune from attachment and, if the court "lacks sufficient information to reach a definitive conclusion on the issue before discovery, any speculation in that regard should not be a factor in the Court's unreasonable burden analysis." *Id*. at 297.[10]  Sudan has provided no such information, and instead seeks to twist *Ohntrup* into a bar against discovery of assets outside the United States.

Indeed, Plaintiffs "can seek to execute the judgment in whatever foreign courts have jurisdiction over [Sudan's] assets." *Richmark Corp. v. Timber Falling Consultants*, 959 F. 2d 1468, 1478 (9th Cir. 1992).  Sudan has failed to produce any evidence that the requested information could *not* possibly lead to executable assets. Indeed, Sudan refuses to produce any information, thereby preventing plaintiffs from even determining what property Sudan has and where it is. *See Continental Transfert Technique Ltd.*, 308 F.R.D. at 36 (rejecting argument that plaintiffs should only been permitted discovery that would be subject to execution where the discovery was for the very purpose of determining what assets may be attachable). "The possibility that [the judgment-debtor] may prevail in its defense, even if highly likely, is not sufficient to render the information sought 'useless.'" *Hemlock Semiconductor Corporation v. SolarWorld Industries*, 2016 WL 7239484 (E.D. Mich. Dec. 15, 2016).  The fact that Sudanese

---

[10] Upon remand, the third-party objecting to discovery produced sufficient evidence to the Court that the targeted property fell within the "military property" exception to attachment under 28 U.S.C. § 1611(b)(2). *In re Ohntrup*, 628 Fed. Appx. 809, 811-12 (3d. Cir. 2015).

assets may now be in other countries and jurisdictions is simply not a bar to discovery under Rule 69.

### E.    Plaintiffs' Requests are Proportional to the Needs of the Case

Sudan asserts that Plaintiffs' discovery requests are not proportional to the needs of the case.  As set forth below, all of the requests are entirely proportional to the needs of the Embassy Bombing victims to execute a multi-billion dollar judgment against Sudan, a known asset dissipater and concealer. Rule 26(b)(1) provides the guidance and direction in determining the proportionality of a discovery request.  Fed. R. Civ. P. 26(b)(1).  These factors all favor full and immediate production of the requested information by Sudan.

First, the "importance of the issues at stake" in this case and "the amount in controversy" are extraordinary.  Sudan assisted al Qaeda in perpetrating one of the largest terrorist attacks in history against U.S. Government employees. The Plaintiffs in this litigation suffered approximately $4.3 billion in compensatory damages alone—a damages amount that was determined by this Court after careful consideration of the evidence according to the rule of law.

Second, as the judgment-debtor, Sudan is the proper party to produce documents regarding the location and extent of its assets that passed through the United States in violation of economic sanctions.  Sudan's own review of the OFAC production, as evidenced in the Ahmad Declaration, clearly demonstrates that Plaintiffs cannot readily obtain the requested information directly from OFAC.  Even with the benefit of its own records, Sudan could not trace the assets identified by OFAC.

Neither OFAC, which only maintains records regarding Sudanese assets self-reported by financial institutions inside the United States, nor BNP Paribas, which only knows of the portions of the particular criminal conspiracy in which it played a role, can produce the entire set

of information Plaintiffs seek.  Plaintiffs have no access to this information and no alternative way to obtain the information.  In light of Sudan's longstanding efforts to conceal its assets, as exposed by BNP's criminal plea in 2015, even U.S. Government agencies such as the Departments of Justice and OFAC are unlikely to have this information and there is no reason to think that BNP Paribas was the only criminal facilitator of Sudan's money laundering schemes.

Third, the "importance of the discovery in resolving the issues" critical. Plaintiffs have no way of enforcing their judgments until they identify, locate, and understand the extent and nature of Sudan's concealed and unconcealed assets. The *Cont'l Transfer Technique, Ltd.* court found this circumstance to be very important in ruling the defendant should respond to judgment-enforcement discovery requests in that FSIA case.  308 F.R.D. at 38 ("It does not appear that Nigeria has paid anything towards satisfying the judgment, and without the discovery Continental seeks, there is little likelihood that Continental's efforts at recovery will be successful.").  The longer Sudan can delay providing this information, the longer these victims are forced to suffer and the greater ability Sudan has to further insulate its assets from recovery. The several months expended while Sudan composed Mr. Ahmad's Declaration is testament to Sudan's clear intention to refuse to produce any information outside a rigidly narrow scope of assets, which are no longer in the United States.

Finally, the "likely benefit" of this information is incalculable to the victims and severely outweighs any "burden or expense" of Sudan. Plaintiffs have had to expend substantial time and resources in obtaining their judgments against Sudan. Sudan has engaged in a decades-long criminal conspiracy and has knowingly and affirmatively decided not to defend its misconduct on the merits.  Nor has Sudan ever demonstrated any intention to pay these judgments. The only evidence of Sudan's willingness to litigate in good faith, its prior participation in the related case

*Owens v. Republic of Sudan*, No. 01-2244 (JDB), which ended after decisions were entered against it, demonstrate its lack of respect for this Court. At every step of the way, Sudan has been evasive or sought to delay the proceedings, including to this very moment.  The time for delay has come to an end.

## IV.    CONCLUSION

For the aforementioned reasons, the Court should enter the proposed attached order compelling Sudan to meet its discovery obligations in this matter.

Respectfully submitted,


**/s/ Michael J. Miller**
Michael J. Miller, Esq.  (D.C. Bar # 397689)
THE MILLER FIRM, LLC
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224
Fax: (540) 672-3055

**/s/ Steven R. Perles**
Steven R. Perles (No. 326975)
Edward B. MacAllister (No. 494558)
Joshua K. Perles
Perles Law Firm, PC
1050 Connecticut Avenue, N.W.
Suite 500
Washington, DC  20036
Tel: 202-955-9055

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2017, I electronically filed Plaintiffs' Renewed Motion to Compel with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**/s/ Michael J. Miller**
Michael J. Miller, Esq.
