

Violent Kleptocracy Series: East and Central Africa

# Sudan's Deep State

How Insiders Violently Privatized Sudan's Wealth, and How to Respond

By The Enough Project

April 2017

REUTERS / Alamy Stock Photo

enough



Violent Kleptocracy Series:
East & Central Africa

# Executive Summary

Sudan's government is a violent kleptocracy, a system of misrule characterized by state capture and co-opted institutions, where a small ruling group maintains power indefinitely through various forms of corruption and violence. Throughout his reign, President Omar al-Bashir has overseen the entrenchment of systemic looting, widespread impunity, political repression, and state violence so that he and his inner circle can maintain absolute authority and continue looting the state. The result of this process, on the one hand, has been the amassment of fortunes for the president and a number of elites, enablers, and facilitators, and on the other hand crushing poverty and underdevelopment for most Sudanese people.*

## A Failed State?

For nearly three decades, President al-Bashir has maintained his position at the pinnacle of Sudan's political order after seizing power through a military coup in 1989. During his rule, the government of Sudan has perhaps been best known for providing safe haven to Osama bin Laden and other Islamic militants in the 1990s, for committing genocide[1] and mass atrocities against its citizens in Darfur, for the secession of South Sudan in 2011, and for ongoing armed conflict—marked by the regime's aerial bombardment of civilian targets and humanitarian aid blockade—in South Kordofan and Blue Nile. Often portrayed as a country wracked by intractable violence and hampered by racial, religious, ethnic and social cleavages, Sudan ranks consistently among the most fragile or failed states.[2]

At the same time, Sudan has considerable natural resource wealth and significant economic potential. The country is also home to a celebrated culture that stresses the importance of family and education. In 1999, Sudan became a major oil-producing country, bringing billions of dollars in international investments. Agriculture and livestock remain staples of economic production, while a recent finding of substantial gold deposits has brought new hopes of prosperity. Despite these economic resources, Sudan remains an impoverished country marked by stark socioeconomic inequality. Nearly half of the population lives under the global poverty line, while a select few enjoy immense wealth and great power.

*Those involved in research, drafting, review, and editing this report include Suliman Baldo, Brad Brooks-Rubin, Omer Ismail, Jacinth Planer, and John Prendergast.*



Political standing and proximity to the country's ruling elites most often determines on which side of the poverty line a Sudanese citizen lives. The idea that Sudan is a classic failed state is not fully accurate. Sudan is a failed state for the millions of displaced people living in IDP camps in Darfur, for those living in conflict areas and cut off from humanitarian assistance in South Kordofan and Blue Nile, and for those struggling in marginalized communities in eastern Sudan or in the sprawling informal settlements outside Khartoum. However, Sudan is an incredibly successful state for a small group of ruling elites that have amassed great fortunes by looting the country's resources for personal gain. In that sense, Sudan is more of a hijacked state, working well for a small minority clique but failing by all other measures for the vast majority of the population.

## Conflict and Corruption

Armed conflict and corruption have featured prominently in the last two centuries of Sudanese political life. Atrocities and preventable famines occurred during Ottoman rule (the Turkiya era) and during a brief period of Sudanese rule (the Mahdist era) in the 19th century. Violence, subjugation, and exploitation likewise defined colonial rule during the Anglo-Egyptian Condominium in the 20th century. The Condominium also saw the implementation of divide-and-rule political tactics that established the exploitative economic patterns between Khartoum and the rural areas that persist today. Indeed, these patterns of marginalization and exploitation led to the First Sudanese Civil War, a brutal conflict that lasted from 1955 until 1972 and claimed half a million lives.

> Postcolonial Sudan has enjoyed a few fleeting years of democratic rule and peace, sandwiched between decades of authoritarianism and civil war.

Since winning independence in 1956, postcolonial Sudan has enjoyed a few fleeting years of democratic rule and peace, sandwiched between decades of authoritarianism and civil war. Corruption is hardly a new phenomenon. Writing in 1985, El-Wathig Kameir and Ibrahim Kursany observed: "Corruption in a Sudanese context can hardly be avoided. It touches upon the life of every citizen."[3]

The difference between past iterations of misrule in Sudan and that of the current regime is significant. While armed conflict and corruption certainly were prevalent before, al-Bashir's regime has used a degree of violence and state capture far exceeding that of its predecessors. Of course, not all members of the Sudanese government are corrupt, nor is all or even the majority of Sudan a conflict zone. Instead, a relatively small group of regime insiders, supported by domestic and foreign commercial partners, have captured and distorted key sectors of the Sudanese economy much more successfully than previous governments. The current regime has institutionalized corruption throughout government functions to an unprecedented degree. Also different is underlying ideology and the extent and purpose of violence that the current regime is willing to deploy against political challengers and citizens alike. Thus, in addition to committing mass atrocities in Sudan's rural areas, historian W.J. Berridge notes that perhaps the most significant reason for the longevity of the current Sudanese regime is "the ruthlessness with which it pursued its initial assault on the 'modern forces'



[Sudanese civil society, professionals, and labor unions]," as these forces had been the principal drivers for ousting authoritarian regimes in 1964 and 1985.[4] This is a key point, as the regime's initial tenacity in attacking, torturing, and killing members of the professional and working classes and purging the professional, technically competent civil service that could potentially ensure government function and check the regime's power established the precedent of impunity that continues today.

## Violent Kleptocracy

The system of rule by al-Bashir's regime in Sudan is best characterized as a violent kleptocracy, as its primary aims are self-enrichment and maintaining power indefinitely. To pursue these aims, the regime relies on a variety of tactics, including patronage and nepotism, the threat and use of political violence, and severe repression to co-opt or neutralize opponents and stifle dissent. Unlike many other corrupt or repressive governments, however, al-Bashir's regime is willing to engage in much more brutal tactics, such as ethnic cleansing, the use of starvation as a method of war, and the indiscriminate bombardment of civilian populations. It is this combination of extreme violence, authoritarian rule, and massive self-enrichment that qualifies the current system as a violent kleptocracy where state capture and hijacked institutions are the purpose and the rule, rather than the exception.

This report demonstrates that the Sudanese regime has perpetuated a system of violent kleptocracy with economic activities that have devastated the Sudanese economy and resulted in underdevelopment that will be very difficult to reverse. To substantiate this claim, this report analyzes Sudan's oil, gold, land, and weapons manufacturing sectors, showing how the regime has distorted each sector for personal gain and enrichment. Methodologically, this report relies on field research completed in Khartoum, Addis Ababa, and Kampala; participant interviews with Sudanese civil society, academics, and diaspora members; as well as economic research and political analysis.

> The Sudanese regime has perpetuated a system of violent kleptocracy with economic activities that have devastated the Sudanese economy.

This report also examines why past approaches for achieving peace in Sudan have failed and how a new approach, one in which a revitalized peace process receives missing leverage through the expanded use of modernized financial pressure policy tools, could succeed. The focus would be to promote lasting peace and also to disrupt and ultimately dismantle the most enduring root cause of continuing conflict and dictatorship: the violent kleptocratic system constructed by President al-Bashir and his inner circle.

Regime kleptocrats have thus far outwitted and outlasted all efforts to achieve peace in Sudan because they feel no pressure to act differently given the impunity that they have enjoyed for decades. Modernized financial pressures could alter this incentive structure and thus potentially influence the behavior of regime officials by more effectively freezing those individuals and entities



that are most responsible for mass atrocities and grand corruption out of the global financial system. Likewise, actions to fight money laundering, grand corruption, and illicit financial flows would make it much more difficult for these kleptocrats to access the global financial system, therefore curtailing their ability to fund conflict and engage in severe repression. If coupled with a robust foreign policy strategy that includes a revitalized international peace process for all Sudanese stakeholders, the use of financial pressure tools will equip negotiators with the leverage that they need to secure meaningful concessions from the regime toward establishing a lasting peace and supporting more representative, inclusive, and transparent governance in Sudan.

## Policy Recommendations

To more effectively support peace, human rights, and good governance in Sudan, policymakers should construct a new policy approach that attempts to counter and ultimately dismantle Sudan's violent kleptocracy. Summarized here but described in full in Part IV, this package of recommendations offers a new strategy to neutralize Sudan's kleptocrats and provide leverage to support a more inclusive international peace process when one is constructed.

### A More Comprehensive and Inclusive Peace Process and Constitutional Convention

A credible constitutional convention and internationally-supported peace process can lead to lasting peace in Sudan. Current mediation efforts to end Sudan's armed conflicts and bring peace to the country have not succeeded. These efforts include negotiations led by the African Union High-Level Implementation Panel for Sudan (AUHIP). Despite 12 rounds of meetings between 2011 and 2016 and the signing of the Roadmap Agreement in August 2016, the AUHIP negotiations have failed to secure a cessation of hostilities or improve humanitarian assistance for civilians. Despite the failure of these efforts to achieve peace, a stubborn persistence to keep trying these same approaches hinders real progress toward a lasting peace. The Sudanese government's National Dialogue has not resolved the country's numerous political issues. Significant opposition parties have boycotted this process, deeming it to lack credibility. They characterized the process as the government negotiating with itself, by including sympathetic parties. Instead of supporting processes that have failed, leaders should support a truly inclusive constitutional convention and peace process that progress in a sequence that is negotiated by Sudanese people. Whether a more comprehensive and inclusive peace process spurs a more comprehensive and inclusive constitutional convention or vice versa, both components are essential to restore peace, security, and good governance, and both require broader support and participation by more Sudanese people to become viable.

*International Peace Process*
Current and past peace processes have been piecemeal, stove-piped in scope, and have often have amounted to negotiations between belligerents. This approach only invites delay, further division, and obstruction. Sudan's violent kleptocracy continues in large part because a small group of elites wields a disproportionate amount of political and economic power, which allows for the subversion of peace initiatives through bureaucratic and diplomatic maneuvering. A comprehensive



and inclusive peace process with strong U.S., regional, and international support can check these maneuverings and allow internally-driven reforms to take hold. All Sudanese stakeholders should have a voice in resolving the country's numerous political, economic, and social issues and in outlining a plan for a transition to a peaceful and democratic country where groups share power in a governance structure that the public broadly accepts. This comprehensive peace process must also include diverse voices from civil society, professional organizations, student groups, community organizations, women, youth, and marginalized communities.

*Constitutional Convention*

Sudan's National Dialogue has failed because the process is controlled by President al-Bashir and the National Congress Party, providing no real room for debate within the ruling party, let alone among the country's different political movements and groups. Although the United States, United Nations, and African Union have pressed opposition political parties to join the National Dialogue, these Sudanese opposition parties have declined because they do not view the dialogue process as credible, and they consider that participating lends the process an undeserved degree of legitimacy. A constitutional convention could provide a new path for Sudanese people to discuss the governance and power-sharing questions that they most seek to resolve among themselves. Instead of supporting the National Dialogue process that lacks credibility and inclusivity, the United States and other interested partners should use their political influence to promote a constitutional convention in Sudan that is led by Sudanese stakeholders.

*Enhanced U.S. Diplomatic Engagement*

Strong U.S. diplomatic engagement with Sudan is necessary to advance an international peace process. To support this process, as well as to achieve important national security objectives, the Trump administration should appoint a new special envoy for Sudan and South Sudan. The appointment of a special envoy must be done in conjunction with a comprehensive plan for peace. Without a comprehensive diplomatic strategy that includes a willingness to use financial leverage to support the process, the appointment by itself of an envoy will not lead to progress in Sudan. Further, given the demands that both Sudan and South Sudan present for even the most experienced diplomat, the Trump administration should consider appointing a separate special envoy for each country as well as the requisite support staff. Likewise, the U.S. Department of State should increase its embassy staff in Khartoum, adding experienced political and economic officers with critical language skills. The department should also add additional staff to the Office of the Special Envoy.

**Financial Pressure**

*To provide the necessary leverage for a revitalized peace process and constitutional convention, Sudan's violent kleptocracy must be confronted directly. Accordingly, U.S. policymakers should use the enhanced diplomatic engagement measures outlined above to support a strategy of financial pressure and increased accountability that addresses the root causes of Sudan's violent kleptocracy. Five foreign policy objectives that support this broader strategy are discussed below. Further, this strategy can advance important U.S. national security goals, such as safeguarding the integrity*



*of the global financial system, combating corruption, deterring future support for terrorism, and strengthening human rights.*

*Stopping Illicit Financial Flows*

U.S. policymakers, regulators, and law enforcement officials should work together, and in concert with foreign government officials, to stop illicit financial flows from Sudan. Kleptocratic elites rely on illicit financial flows and international economic partners for personal enrichment and to ensure safe haven for their ill-gotten gains. More scrutiny is needed on the role Sudan's international economic partners play in diverting or enabling diversion of the country's wealth, with the complicity of Sudanese regime leaders. Disrupting the networks that allow illicit financial flows to enter the global financial system is crucial for bringing pressure to bear on Sudanese kleptocrats and for safeguarding the integrity of the U.S. and global financial systems. In Sudan, stopping these flows is paramount to reducing corruption and improving economic development outcomes. It is also essential for achieving peace, as war profiteers, enablers, and facilitators require access to the global economy to fund armed conflict. By enforcing anti-money laundering measures, developing stronger but more targeted sanctions, and eliminating regulatory loopholes, U.S. officials can better exclude these bad actors from the global financial system, thereby building leverage and creating incentives for peace. Congress should ensure that the U.S. Treasury Department has sufficient resources and direction to undertake investigations and enforcement in sub-Saharan Africa, especially in high-risk countries such as Sudan. As these investigations develop, U.S. officials should engage with appropriate foreign governments to ensure they are also taking necessary action.

1. **Enhancing and Enforcing Anti-Money Laundering Measures.** Strong anti-money laundering (AML) measures can help stop illicit financial flows. Given the consistent use of the U.S. dollar by violent kleptocrats in Sudan, U.S. agencies and financial institutions have the power to act. For example, the U.S. Treasury Department's Financial Crimes Enforcement Unit (FinCEN) should more aggressively counter money laundering involving regime elites and their entities, including companies that are owned and controlled by the National Intelligence and Security Service (NISS), by issuing a request under Section 314(a) of the Patriot Act. This request will trigger more rigorous reporting from banks and financial institutions, especially financial entities connected to Sudan via correspondent banking. FinCEN should also consider issuing an advisory to highlight the need for additional information and reporting of financial transactions involving Sudan's correspondent banking network where there is suspicious activity indicative of money laundering, such as through laundering the proceeds of corruption or illicit gold trade. Based on information gathered through the 314(a) and advisory processes, FinCEN can evaluate whether to designate any institutions, class of transactions, or accounts as "primary money laundering concerns" under Section 311 of the Patriot Act. Finally, Congress should provide FinCEN with greater support so that FinCEN can allocate more resources to addressing money-laundering activities in high-risk countries like Sudan. More robust enforcement of existing AML measures is also necessary. Over time, U.S. authorities should share information with foreign governments and enlist their assistance.

2. **Sharing Information and Supporting Multilateral Efforts.** U.S. officials can address illicit financial flows more effectively by sharing information with the Egmont Group and with foreign financial intelligence units (FIUs), particularly in the Middle East and Europe where Sudanese banking transactions tend to flow. U.S. officials should also continue to support the Financial Action Task Force (FATF), the leading intergovernmental body addressing money laundering and terrorist financing, and regional anti-money laundering organizations in their efforts to address concerns such as corruption and gold smuggling. Finally, Congress should continue to support the U.S. Africa Partnership on Illicit Finance (PIF). Launched at the U.S.-Africa Leaders Summit in 2014, PIF brings U.S. and African partners together to counter the generation and movement of proceeds from corruption and serious financial crime through the development, publication, and implementation of national action plans. These action plans provide strategies to stem illicit finance, combat corruption, and increase transparency and accountability. Participating in these efforts not only makes U.S. anti-money laundering actions more effective but also better distributes the bureaucratic burden and contributes to a growing cooperative effort to fight corruption across jurisdictions.

3. **Asset Recovery.** By looting Sudan's resource wealth and state assets, regime elites have amassed personal fortunes at the expense of the Sudanese people, often offshoring their assets in foreign jurisdictions. U.S. and foreign government officials should investigate these acts. After identifying tangible assets that are the proceeds of corruption, they should move to recover these assets, and, when possible, return them to the Sudanese people. The U.N. Convention against Corruption, World Bank Stolen Asset and Recovery Initiative, and U.S. Department of Justice Kleptocracy Asset Recovery Initiative all provide legal mechanisms to recover and return stolen assets to the people of countries affected by corruption. Whenever possible, U.S. and foreign officials should utilize these mechanisms to recover and return stolen assets to the people of Sudan.

*Implementing Modernized Sanctions to Create Leverage to Support Accountability and Advance Human Rights*

1. **Policymakers from the United States, the European Union, and other concerned stakeholders should construct and implement a modernized sanctions framework to target the assets of the individuals and entities most responsible for mass atrocities, serious human rights violations, and grand corruption within Sudan.** A modernized sanctions program narrowly targets individuals and entities, but with a broader array of tools that create real leverage, while also minimizing de-risking and encouraging financial inclusion. This approach balances the need to apply coercive economic pressure on the spoilers of peace, while avoiding unnecessary harm to the Sudanese people.

2. **Sectoral sanctions and sanctions on key regime institutions and entities, with a 25 percent threshold for ownership or control.** In addition to applying targeted sanctions on the networks of key individuals and entities, particularly the NISS, policymakers from the U.S. and other interested countries should impose sectoral sanctions on Sudan's gold and weapons sectors. Sectoral sanctions—as used against similarly corrupt and repressive



regimes in North Korea and Libya—allow for specific targeting of economic activities that directly contribute to violence and conflict, as these two economic sectors do in Sudan. In order to ensure that the sanctions affect the full networks of these entities, and to enhance enforcement, the U.S. Treasury Department should use a threshold of 25 percent ownership or control, consistent with general principles of beneficial ownership, for which entities are targeted. Sanctions authorities in other countries should also consider this 25 percent threshold principle as they consider crafting their own sanctions programs.

3. **Anti-Corruption Sanctions Designations.** Using the new authorities under the Global Magnitsky Human Rights and Accountability Act (a provision of the 2017 National Defense Authorization Act), U.S. congressional leaders should press the Trump administration to introduce anti-corruption sanctions designations for individuals and entities engaged in grand corruption within Sudan. This legislation grants the U.S. president the authority to freeze assets or to deny or revoke U.S. entry visas to foreign individuals who are deemed guilty of targeting human rights defenders and whistleblowers. This law could be used effectively toward Sudan. Similar legislation has been introduced in the U.K. Parliament.

4. **Mitigating the Unintended Negative Effects of Sanctions.** Policymakers should help to mitigate the unintended negative effects that financial pressures can have on the Sudanese people by promoting financial inclusion. To do so, U.S. officials should engage with other governments to agree on how best to expand the participation of banks and other financial service providers with Sudan while also ensuring that these financial institutions engage more responsibly in Sudan. Although ultimately a business decision, strong public messaging from regulators can alleviate industry concern and nudge banks and others financial services to avoid overcompliance. The United States and other governments should also consider publication of a "watch list" of companies that may be connected to sanctioned entities, in order to enhance the screening efforts by financial institutions and mitigate concerns about unintentional violations.

5.  **Transparency for Business Conducted in Sudan.** As a balance to promoting financial inclusion and to ensure that U.S. businesses are not financing the violent kleptocracy in Sudan, the U.S. government should require increased transparency of U.S. companies wishing to conduct business in Sudan. U.S. policymakers could model such a requirement on the measure implemented when sanctions were being eased in Myanmar (Burma). Any requirement related to Sudan should be triggered at a relatively low amount of business, such as $100,000 in gross sales. Public reporting should focus on any business conducted with the Sudanese ministries of defense, energy, and mining and with the NISS and Sudan Armed Forces (SAF) as well as the due diligence measures taken by the company to prevent contribution to conflict, human rights violations, corruption, or other concerns.

*Addressing Conflict-Affected Gold*

A sizeable part of Sudanese gold is conflict-affected, entailing a high risk for money laundering. To help address this concern, the U.S. Treasury Department should issue an advisory for Sudanese

gold, given the industry's extreme vulnerability to money laundering and smuggling. Issued in coordination with sectoral sanctions, such an advisory will exert substantial pressure on the Sudanese government to address this issue. This advisory should be rooted in the 2015 guidance provided by the Financial Action Taskforce (FATF), the international anti-money laundering body, on the ways the gold trade is connected to money laundering. By rooting the advisory in the FATF guidance, the U.S. government can then engage with other governments to issue and amplify other warnings.

1. **Private Sector Engagement.** The private sector, including trade groups such as the London Bullion Market Association, can also contribute to this effort by continuing to refuse to list Sudanese gold until the government addresses the conflict, smuggling, and money laundering concerns now present in Sudan. Provided that the Sudanese government begins to address these issues, industry leaders and development organizations should engage with artisanal miners and support the ethical development of this sector through sustainable practices that limit environmental harm and address health risks.

*Fighting Corruption Through Other Means*

1. **U.S. officials and leaders from the United Kingdom, European Union, and EU member states, along with other concerned countries and organizations, should prioritize combating corruption in Sudan.** Systemic corruption undermines peace and security and can even constitute a threat to national security. In Sudan, corruption is closely linked to armed conflict, massive human rights violations, underdevelopment, and poverty. U.S. and foreign officials should fight corruption through anti-corruption sanctions measures, as indicated above, and criminal prosecutions and by supporting Sudanese civil society and media, especially individuals and organizations that expose corruption and human rights abuses.

2. **Criminal Investigations and Prosecutions.** The Department of Justice should investigate and prosecute embezzlement, extortion, and other crimes related to corruption in Sudan. Although less relevant prior to the recent decision to ease U.S. sanctions toward Sudan, the FCPA is again an important tool for fighting corruption as U.S. commercial interests explore business opportunities in what remains one of the most corrupt countries in the world. The U.K. Bribery Act can also be a critical tool in the fight against corruption, including in cases that do not involve government officials.

3. **Supporting Sudanese Civil Society and Media.** Policymakers in the United States, United Kingdom, European Union, and other concerned governments, and multilateral donors, should provide a significant increase in funding to Sudanese civil society and media. Civil society leaders and local journalists are critical to a just, transparent society, and they deserve support and protection. They are often the target of state violence and repression. A significant increase in funding to these groups and individuals, coupled with strong statements of support by the U.S. government and others, will make clear to the Sudanese government that better relations and the path to normalization must include a free press and civil society.

*Engaging Sudan's Political and Financial Supporters*

1. **Policymakers should engage Sudan's political allies and financial supporters to pressure the Sudanese government to work toward a lasting peace.** The Sudanese government has reoriented its foreign policy to gain political and financial support from Arab Gulf states, the European Union, and others. U.S. policymakers should work with these entities to ensure that this financial support does not contribute to illicit activities, additional violence, or human rights violations. Without strong oversight and political pressure, historical examples suggest that al-Bashir's inner circle and regime elites will simply accumulate these resources and use them to ward off economic and political reform and to maintain political power indefinitely.

2. **U.K. and EU Support for Refugee and Migration Containment.** A recent decision by the United Kingdom and the European Union to provide the Sudanese government with substantial financial support to stem refugee and migration flows has emboldened the Sudanese government and a group called the Rapid Support Forces (RSF), a reconstituted Janjaweed force with a history of atrocities. This EU money risks equipping and empowering the latter. The German Corporation for International Cooperation (GIZ) administers this support through the Khartoum Process. Europe's strengthening of Sudan's violent kleptocracy will only continue to devastate Sudan, the Sudanese people, and those passing through Sudan. The EU policy will push more people to migrate or engage in crimes like human trafficking and smuggling, or in some cases, terrorism or armed resistance against the government.

# Chapter 1

Violent Kleptocracy Series:
East & Central Africa

# Overview of
# Violent Kleptocracy in
# Sudan

Violence and exploitation have dominated Sudanese political life since at least the Turkiya and Mahdist eras in the 19th century. These political tactics became even more prevalent during the colonial rule of the Anglo-Egyptian Condominium, which saw a hardening of the exploitative center-periphery relationship between Khartoum and Sudan's provincial cities and outlying rural areas. This period gave rise to the political logic of divide-and-rule and extreme economic marginalization that characterizes much of contemporary Sudanese power politics. Many of the worst aspects of British colonial rule persisted into independent Sudan, as the country oscillated between brief moments of democratic rule and longer periods of authoritarianism and civil war during the latter half of the 20th century.

In 1989, Sudan was again transformed, as Col. Omar al-Bashir and the National Islamic Front (NIF) leader Hassan al-Turabi led a successful coup that forever changed Sudan. Applying ruthless tactics and an extremist ideology, NIF worked relentlessly to transform Sudan into a radical Islamist state, stopping at nothing to neutralize its opposition and consolidate its power. The regime's ideology reflected a willingness to violently repress the civilian populations of ethnic groups who government officials believe support Sudan's armed opposition. A decade later, a split between al-Bashir and al-Turabi, combined with Sudan's sudden windfall of oil money, again changed Sudan. With al-Turabi sidelined and the revenues ballooning, patronage, self-enrichment, and other corrupt practices grew.

Sudan's loss of 75 percent of the oil wealth with South Sudan's secession in 2011 again altered the dynamics of power and patronage. The power structure was dominated by party loyalists and people with military or intelligence backgrounds. Loyalty to al-Bashir and his inner circle trumped all other considerations, as the regime entered survival mode. Attacks by the Sudanese regime and its allied forces on the marginalized Sudanese populations and opposition forces to the south and west intensified.

Al-Bashir's regime has used extreme violence and corruption to serve its short-term interests since it seized power. Like other spectacularly corrupt governments, al-Bashir's regime perpetuates a

and showing how it has manipulated and looted entire economic sectors to enrich itself. The report also provides historical context, discussing the roles of key actors, political parties, and state



*Beginning of the burning of the village of Um Zeifa in Darfur after the Janjaweed looted and attacked, December 2004.*

*Brian Steidle*

system of kleptocracy, with regime officials who seek power, domination, and personal enrichment above all else. Corruption is only part of the story, as the regime's orchestration of devastating violence and brutal repression targeting its civilians to maintain power demonstrates that the system it perpetuates in Sudan is best characterized as a violent kleptocracy.[5] A distinguishing feature of Sudan's system of violent kleptocracy is the current ruling regime's willingness to attack and violently repress ethnically diverse communities with unique languages, beliefs, livelihoods, traditions, and other ways of life. These populations include the Fur, Zaghawa, Masalit, Nubians, the many communities that had lived off of the land in the area around the Merowe Dam, among many others.

This report provides a detailed analysis of Sudan's system of violent kleptocracy, demonstrating the magnitude of the regime's corruption and violence,

institutions, to show how the current Sudanese regime and the opposition have evolved. This report offers ideas for new strategies to counter the corruption and violence that have defined al-Bashir's regime and caused great suffering for millions of Sudanese people.

## Theory of the case

Enough defines "violent kleptocracy" as a "system of state capture in which ruling networks and commercial partners hijack governing institutions for the purpose of resource extraction and for the security of the regime. Ruling networks utilize varying levels of violence to maintain power and repress dissenting voices. Terrorist organizations, militias, and rebel groups can also control territory in a similar manner."[6]

As kleptocratic leaders act to maximize personal enrichment and remain in power, they invert the government to serve themselves. The means of personal enrichment are state resources. The available resources vary across states but often involve extractive industries and natural resources. The political and economic arrangement of government offices and state institutions facilitates personal enrichment through state capture, corruption, patronage, and ultimately violence. Accordingly, corruption and violence move from minor aspects of political life to dominant traits of a state's economic functions and political process. Sarah Chayes, an anticorruption expert and senior scholar at the Carnegie Endowment for International Peace, notes, within a kleptocracy, corruption "is not some malfunction, or system failure"—"It is the system."[7] Groups in Sudan that challenge the kleptocratic regime's grip on power face attacks by the government military and government-supported militias which involve atrocity crimes as well as repression that can also be violent.

These conditions hold true in Sudan, where President Omar al-Bashir, National Congress Party (NCP) loyalists, and other political and military elites have manipulated Sudan's economy and diverted state assets for personal gain for

> **Since taking power, al-Bashir and his supporters have captured the state's political process and its institutions, effectively reconfiguring the state's economy for personal enrichment.**

more than two decades. These actors use stifling oppression and brutal violence to maintain political power and keep control of state institutions. Since taking power, al-Bashir and his supporters have captured the state's political process and its institutions, effectively reconfiguring the state's economy for personal enrichment. Within Sudan, the theft of state resources and corruption is legendary; the oil, gold, land, and weapons manufacturing sectors of the economy are among those that have been exploited most ruthlessly to benefit the regime. Further, through international entities, including friendly states, multinational corporations, and transnational networks, the regime has amassed great wealth which is held in foreign banks, high-value property held abroad, and other international venues.

## Historical Background

As with many postcolonial African states, Sudan's violent kleptocracy emerges from the exploitative center-periphery relationship imposed by foreign actors during the colonial era. Sudan expert James Copnall finds the historic roots of the center-periphery relationship in the Anglo-Egyptian Condominium, which dates back to the end of the 19th century and effectively annexed Sudan to the British Empire.[8] Copnall demonstrates how this relationship led to a history of exploitative economics between the capital and the outlying areas, as "Sudan's failure to spread its wealth in an equitable way has been one of its defining characteristics."[9]



*Omar al-Bashir, President of Sudan, pictured during the inaugural ceremony of Sudan's Government of National Unity in Khartoum, July 9, 2005.*

Evan Schneider, UN

The elite capture of state resources is the driving force in this inequitable distribution of wealth. Rather than equitably managing and sharing Sudan's considerable resource wealth, distributing the benefits widely, and reinvesting the revenues to strengthen other economic sectors to diversify and increase overall productivity of the economy, the regime has taken a different approach. Regime officials have captured resources and used them wastefully and to benefit narrow interests, causing deep resentment with the many populations that do not benefit from the country's resource wealth, particularly those outside the center of Khartoum. Historically, elite capture relied on personal connections to land and natural resources, given the importance of the agricultural and pastoral economies within Sudan. More recently, elite capture has evolved considerably through the establishment of parastatal entities, patronage posing as deregulation, sophisticated market manipulation, and other economic and legal practices that have both institutionalized and formalized these corrupt practices.[10]

Khartoum has long violently abused and exploited the people and resources in Sudan's southern and western regions. President al-Bashir's NCP has continued and worsened these abusive policies in almost three decades of rule.[11] The NCP emerged from the National Islamic Front, an organization that is a "direct descendant" of the Sudanese Muslim Brotherhood and became increasingly authoritarian and reckless while harboring international terrorists such as Osama bin Laden in the 1990s.[12] This regime has remained in power by cultivating loyalty through patronage networks and by waging war on its opponents by unleashing brutal violence targeting civilians.

Corruption and patronage extend throughout the current Sudanese regime, which uses family, ethnic, and religious ties to garner support for itself. The regime also manipulates and exploits

family, ethnic, and religious ties among people within the populations it seeks to weaken or abuse. Ostensibly Islamist policies, such as *tamkeen* ("consolidation" of regime sources of support and "empowerment" through the regime's strengthened ties with loyalists across multiple political, economic, and social sectors[13]), are used to institutionalize patronage and build a base of loyal supporters[14] while marginalizing those outside the inner circle of privilege. The center-periphery relationship repeats itself throughout all levels of government, as other state officials replicate the patronage patterns outside Khartoum.[15] This state-instituted abuse of resources has stoked violent opposition. Copnall concludes, "[i]n its corruption and self-interest, the Sudanese centre has consistently sent the message that the only way to attract the attention of Khartoum is to take up arms."[16] Corruption has become a rallying point for armed opposition groups with slogans that include *taqniin al-zoulm* ("Injustice has been made into law") and arguments that corruption has "become the state."[17]

## Function

The current Sudanese regime and its allies sustain this system of violent kleptocracy through state capture, corruption, patronage, and violent attacks. The regime's capture of state institutions, including the military, intelligence, and security services, is extensive. The regime has also maintained its rule by centralizing authority, including decision-making powers for development and service delivery.[18] The NCP has also become increasingly creative in its efforts to capture the Sudanese economy. For example, prominent Sudanese economist Siddig Ombadda has stated that the NCP owns over 500 companies that "control all financial and economic fields in the country."[19] This control includes the lucrative oil and gold sectors, as well as land deals and



*Vehicles the RSF claim to have seized from the rebel forces in East Jebel Marra, January 2, 2015.*

*Sudan Armed Forces*

the burgeoning weapons industry. According to Ombadda, Sudan's Auditor General "does not know anything about these commercial entities."[20]

The regime has also used non-state actors to serve its interests. Militias mobilized by the regime in Darfur have committed mass atrocities in the early 2000s and again in 2013 and 2014 as they enacted a "scorched-earth" policy on behalf of the regime.[21] When the United Nations ordered the regime to disband these militias, the government simply incorporated them into the national forces, in the Central Reserve Police and Border Guards units.[22] The Rapid Support Forces (RSF) were carved away from the Border Guards in 2013 and first brought under the command of the NISS. The RSF were then incorporated in early 2017 into the Sudan Armed Forces as an autonomous force that is answerable to the head of state, President al-Bashir. The Sudanese regime has deployed this force to an area in southern Sudan to conduct attacks that target civilians especially.[23]

The regime also maintains the system of violent kleptocracy in Sudan through repressive governance that forcibly stifles dissent, freedom of association, and press freedom. Sudanese forces censor and otherwise restrict journalists and media outlets that are not run by the state.

The National Intelligence and Security Services (NISS) in particularly tightly controls Sudanese and international journalists in Sudan.[24] NISS has intensified its crackdowns on the press, and often confiscates or suspends newspapers to create financial costs.[25]

## Reach

Corruption and violence touch virtually all aspects of the state in Sudan under al-Bashir's regime. NCP loyalty and patronage are pre-requisites for joining the civil service and advancing within the power structure.[26] The regime's control of the economy is also substantial. Through a diverse array of tactics, including privatizing public companies, purging "disloyal" government employees, confiscating prime agricultural land and real estate, self-interested deregulation, and reforming large development projects, the regime has fundamentally reshaped the economy to benefit its supporters.[27] Further, access to the government or state resources is almost entirely tied to "perceived loyalty to Khartoum" or "ties to individuals in power," instead of the actual needs of individuals or regions.[28]

> Corruption and violence touch virtually all aspects of the state in Sudan under al-Bashir's regime.

The kleptocracy also has obvious negative impacts on daily life in Sudan. Underqualified individuals receive economic benefits and professional opportunities that exceed their knowledge or training. Instead of expertise or ability, regime loyalty often is the only credential that matters. As Georgetown University Professor Harry Verhoeven notes, during the regime's *tamkeen* campaign, "[p]etty traders attending the right mosque suddenly controlled parastatals"

and "university graduates with Islamist credentials took over textile factories."[29] This unjust reality continues to permeate Sudanese society today, leading to considerable disillusionment.[30]

While the effects of the kleptocracy are visible throughout Sudan, they are most evident in the stark disparity between the center of Khartoum and Darfur, South Kordofan, and Blue Nile. Violence in these areas has devastated regional rural economies. Markets have readjusted and

totaled 75 percent of the budgetary expenditures for 2017. Other sectors, including the agricultural, industrial, public health, and public education sectors together were allocated only 6 percent of the 2017 expenditures.[32]

In contrast to its heavy military spending, the regime spent only 1.3 percent of its annual budget on public health and less than 1 percent on education for more than two decades.[33] Likewise, instead of investing in development, the regime squandered



*Left: Downtown Khartoum, April 30, 2014. Wikimedia Right: Zam Zam camp for Internally Displaced People (IDPs), North Darfur. April 3, 2014. Albert González Farran, UNAMID*

now as one analyst says, "guns are employed as means of livelihood, tools of prey in an austere environment of lawlessness."[31]

## Cost

The cost of armed conflict and the amount of state revenue lost to personal enrichment and corruption is immense, even though any estimates are almost certainly lower than the actual amounts given the secrecy of al-Bashir's regime and the difficulty of locating and verifying reliable figures. One leading Sudanese economist analyzed the 2017 budget and found that the budgetary allocation for the defense and security sector

its oil boom wealth on military spending or diverted this money for personal enrichment.[34] The Sudanese people have shouldered the brunt of these abusive practices. Thus, in 2010, when the regime's financial mismanagement became so bad that it could not borrow money from foreign creditors for four months, it imposed austerity measures that included deep cuts to the already massively underfunded public health and education sectors, even while the bloated military and security sectors escaped reductions.[35] This gross mismanagement of state wealth continues to plague Sudanese citizens. Many Sudanese people remain impoverished, displaced, and without the tools they need to provide for themselves.

**enough**

While these figures and policies demonstrate the cost of the kleptocracy and its negative impact on Sudanese civilians, rampant corruption suggests that the situation is actually much worse. Economic experts consider Sudan one of the most corrupt states in the world. Transparency International ranked Sudan 170 out of 176 states in its 2016 Corruption Perceptions Index, which measures perceived corruption within the public sector.[36] Similarly, Sudan ranks in the bottom of the World Bank's Control of Corruption index, which reflects the extent to which actors exercise public authority for private gain and state capture.[37] Sudan also ranks at the bottom of the World Bank's Rule of Law index.[38] Finally, Sudan scores in the bottom tier of the 2015 Open Budget Index, in the "scant or none" classification for effective budget oversight and public participation in the national budget decision-making process.[39] Researchers have demonstrated that such corruption threatens state stability and serves as a useful predictor for violent unrest.[40] Within Sudan, regime officials refuse to acknowledge the extent of corruption, while journalists receive death threats or are constantly harassed through repeated security detentions and summons, for reporting on this subject.[41]

The greatest cost of Sudan's violent kleptocracy remains the loss of life, suffering, and destruction that keeps more than half of the population in poverty and millions displaced. Within Sudan, economic inequality directly contributes to conflict.[42] Until these callous economic policies stop, the violent kleptocracy will enrich a few, kill many, and impoverish most.



*A woman is pictured next to her shelter in the new settlement in Zam Zam camp for Internally Displaced People (IDPs), North Darfur, April 2014.*

*Albert González Farran, UNAMID*

# Chapter 2

Violent Kleptocracy Series:
East & Central Africa

# Economic
# Snapshot

To appreciate the regime's distortion of the economy, as well as the country's economic fragility, it is first necessary to assess the overall health of the Sudan economy and significant trends. This section provides a brief snapshot of the Sudanese economy since the loss of oil reserves to South Sudan in 2011 and examines key economic trends including inflation, a high debt burden, and significant economic inequality throughout the country.

## Overview

The World Bank categorizes Sudan as a lower middle-income state with a 2015 GDP of $97.16 billion.[43] The CIA World Factbook provides a slightly lower $94.3 billion GDP for 2015.[44] The Sudanese economy has three key sectors: agriculture, industry, and services. Agriculture contributes 27.5 percent of GDP, while industry contributes 20.7 percent and services contributes 51.8 percent.[45] GNI per capita was $1,920 as of 2015.[46] Although Sudan has endured severe economic distress, the Economist Intelligence

Unit still predicts that Sudan's real GDP will grow by an average of 3.8 percent annually between 2017 and 2021.[47]

In January 2017, the outgoing administration of U.S. President Barack Obama eased the comprehensive U.S. sanctions on Sudan, which will be permanently revoked in July 2017 — unless U.S. government agencies report that the government of Sudan has not maintained a cessation of hostilities in conflict areas, improved humanitarian access throughout Sudan, and cooperated with the United States to address regional conflicts and terrorism.

## Key Sectors

Sudan lost nearly 75 percent of its oil production after South Sudan seceded in 2011.[48] Sudan has an estimated 1.5 billion barrels of proven oil reserves[49] and, according to its leaders, produces approximately 95,000 to 100,000 barrels of oil per day.[50] Sudan has relied on revenue from oil transit fees from South Sudan.[51] These revenues

**enough**                                                               Sudan's Deep State

dwindled, however, with declining oil production in South Sudan. Oil pumping in South Sudan was completely suspended for 15 months between January 2012 and March 2013 and then resumed at lower levels than those prior to the shutdown, before falling once again with the eruption of violence in Juba in December 2013 that has since continued and affected oil-producing areas in South Sudan. Sudan's loss of oil in 2011, reduced domestic levels of oil production, loss of oil transit fees from South Sudan, and struggle with lower global oil prices since 2015, have collectively weakened the oil-dependent aspect of the Sudanese economy.

Lost oil revenue was extremely detrimental to the Sudanese economy, however, the discovery of significant gold deposits in North Darfur has offset these negative effects to a considerable degree. President al-Bashir himself said, "we lost oil, we got gold,"[52] and gold revenue levels by some counts have come to rival oil revenue levels.[53] In response to the discovery of gold in North Darfur, the Sudanese government has increased investment in industrial mining.[54] A small fraction (an estimated 10 percent) of gold mining in Sudan is industrial, however; the rest is artisanal.[55] The Sudanese government has also sought to capture and control artisanal mining sites in Darfur and taken other steps to reframe its export economy around increased gold production,[56] including constructing in Khartoum one of the largest gold refineries in Africa.[57]

Oil and gold drive Sudan's export economy, but perhaps no economic sector is more important domestically than agriculture, which employs 80 percent of the labor force.[58] Livestock is also important, and when combined with agriculture comprises about 35 percent of GDP.[59] Moreover, the World Bank describes agriculture and livestock as "essential to Sudan's economic diversification."[60] The World Bank also finds that these sectors could contribute to Sudan's

medium-term macroeconomic stability.[61]

Lastly, Sudan is the world's largest exporter of gum arabic, accounting for between 75 and 80 percent of global output.[62] Gum arabic is a natural emulsifier used throughout the food and pharmaceutical industries for a variety of purposes. It is valued at around $3,000 per ton.[63] Gum arabic was exempt from U.S. sanctions,



*Workers sort, repack, and ship gum arabic lots in Al Obaied crop market, North Kordofan, March 17, 2013.*

Salahaldeen Nadir, World Bank

and the Sudanese government has committed to increasing production given high levels of demand in the United States and western Europe, as well as emerging opportunities in China and Japan.[64] While reliable export figures are difficult to ascertain, the Secretary-General of the state-run Gum Arabic Board hoped to export 120,000 metric tons of gum arabic in 2015, though some analysts consider this goal unrealistic.[65]

## Inequality

Perhaps the most telling trait of the Sudanese economy is the massive inequality that separates al-Bashir's regime, NCP loyalists, and political and military elites from the majority of the Sudanese

people, who remain severely impoverished.[66] Government policies perpetuate this poverty and severe inequality.[67] By pursuing military campaigns and spurning investment in infrastructure and public services, the Sudanese government inflicts severe destitution that brings early deaths from preventable diseases. The government also limits the opportunities Sudanese people have to reach levels of education and professional training that were once within the reach of many.

The World Bank notes that "Sudan has wide and deep swaths of poverty and stark inequality between regions."[68] This striking disparity is noticeable in Khartoum as well, where extreme opulence and extreme poverty exist side by side.[69] Again, this inequality stems from the regime's economic policies, which reinforce the abusive and exploitive center-periphery relationship between the regime based in Khartoum and the people in areas to the west and south especially. In its overview of Sudan, the World Bank notes:

> *"The near absence of inclusive public institutions that can adequately mediate demands for power and wealth sharing between the center and the periphery has been an underlying source of fragility and conflict in Sudan. The unequal allocation of public resources and access to natural resources are main drivers of conflict, feeding into a potent mix of ideology, ethnicity and socio-economic marginalization that threatens to pull the country further apart."[70]*



# Chapter 3

Violent Kleptocracy Series:
East & Central Africa

# Economic
# Sectors

While the Sudanese regime has moved to control all productive facets of the Sudanese economy,[71] it has arguably made some of its greatest gains in capturing the most profitable sectors. This section details how the regime has captured and exploited the oil, gold, land, and weapons manufacturing sectors of the economy for personal enrichment and political gain. Development has stagnated, and infrastructure has decayed, to the detriment of productivity and jobs; at the same time, socioeconomic inequality has increased, deepening popular grievances and resentment.

## Oil

### The Prime Mover of Conflict

No resource has proven more instrumental to the current Sudanese regime's grip on power—and the state violence and mass atrocities necessary to maintain this grip—than oil. Sudan became a major player in the international oil market in 1999, when the Marsa Bashayir tanker terminal opened south of Port Sudan.[72] This facility provided the terminal point for the 1,000-mile pipeline connecting rich oilfields in Heglig/Panthou and Unity state to the Red Sea.[73] Built by a consortium of Chinese, Canadian, and Malaysian interests, the pipeline had a planned carrying-capacity of 250,000 barrels of oil per day.[74] The pipeline provided nothing short of a lifeline to the Sudanese economy, as Sudan achieved its first trade surplus and a 6 percent economic growth rate the year following the pipeline's completion.[75]

This pipeline also provided al-Bashir's regime with the revenue it sought to purchase weapons and revitalize its armed forces.[76] There is a direct link between oil revenue and military spending in Sudan. As Sudan historian Robert Collins notes: "On the same day that Sudan loaded its first tanker of oil, a shipment of tanks arrived from Poland."[77] The revitalized armed forces and prolific military spending would provide the regime with the tools it needed to oppress and terrorize the marginalized areas that dared to challenge the regime and seek a more equitable share of the economic gains that oil production brought.



### International Oil and the Regime's Shifting Focus

In addition to using oil revenue to revamp its military and security forces, al-Bashir's regime also "weaponized" complicit multinational corporations driving oil production.[78] Luke Patey, a senior researcher at the Danish Institute for International Studies, has written extensively on the political economy of oil in Sudan and South Sudan.[79] Patey argues that within Sudan, economic activity driven by multinational corporations had "deadly consequences" and benefitted only a select few in an impoverished population.[80] He concludes that "[t]he activities of MNCs [multinational corporations] eventually provided Khartoum with a source of revenue to strengthen its brutal military machine."[81] During the north-south conflict from 1983 to 2005, both government and armed opposition actors "utilised private sector actors as vehicles to earn the needed revenue and establish the required international connections to access military arms and continue fighting."[82] Collins offers a similar conclusion, showing that militias and corporations cooperated to dispossess communities of land slated for oil production.[83] Later, the same militias provided security for oil companies.[84] Collins also shows how the government used oil company infrastructure, such as all-weather roads, to secure strategic military advantages.[85]

## There is a direct link between oil revenue and military spending in Sudan.

The completion in 1999 of the pipeline from Heglig/Panthou to Port Sudan marked the beginning of Sudan's oil boom and altered the regime's priorities. The opportunity to gain incredible financial windfalls turned the regime inward. The regime and its allies focused on personal enrichment by gaining and maintaining access to oil. The regime's resolve to remain in power hardened, and the allure of personal fortunes increased. The regime manipulated and distorted the Sudanese economy so that it could maximize personal profit.

### The Oil Boom: Personal Enrichment, Military Growth, and National Underdevelopment

Sudan's oil boom brought in wealth and also intensified patronage and corruption.[86] In addition to direct profits from oil, Sudan's oil revenue afforded the government access to new loans and investments.[87] Although the total sum of Sudan's oil income is difficult to quantify, opposition politician Hassan Satti estimates that between 1999 and 2011, the total income from petroleum, loans, and investments was $110 billion.[88]

The massive economic gains that the oil boom produced hardly benefited ordinary Sudanese citizens. Instead, al-Bashir's regime enriched itself while simply neglecting the rest of the country and other productive economic sectors.[89] Further, the few development projects that the NCP bothered to undertake only reinforced existing inequalities within Sudan.[90] This strategy of elite enrichment, center-periphery exploitation, and purposeful underdevelopment of Sudan's rural areas further delegitimized an already illegitimate regime.[91]

In order to maintain power and to continue amassing personal fortunes, the Sudanese regime used oil revenue for political patronage and securing the support of the military.[92] During the oil boom, the Sudanese government allocated at least 70 percent of oil profits to the military.[93] This huge sum of money gave key actors in the military incentives to perpetuate conflict. Allocating such a disproportionate share of the economy toward oil and such a large amount of the state budget toward military spending caused Sudan's other economic sectors and infrastructure to wither

and its already-poor service provision to decline. Sudanese development economist Hassan Ali Gadkarim argues that oil production both delayed development and prolonged conflict.[94] He also argues that the petroleum economy failed to contribute to the development of other economic sectors.[95] Similarly, Deputy Governor of the Central Bank of Sudan Elijah Aleng has said, "[W]hen you exploit oil and resources and nothing goes to the population, then you are financing the war against them with resources..."[96]

### The Oil Sector after Secession

The Sudanese economy suffered major losses after the secession of South Sudan in 2011. The most obvious setback was a 75 percent loss of oil reserves.[97] Oil export revenues fell from about $11 billion in 2010 to slightly less than $1.8 billion in 2012.[98] Oil exports also served as the main source of foreign currency and paid for food and other imports.[99] Sudan lost as much as 95 percent of its foreign currency immediately following secession.[100] The loss of oil revenue also led to an inflation rate of nearly 50 percent in 2014, causing the government to cut fuel subsidies.[101] This policy, along with the high cost of living within Sudan has intensified social unrest and sparked public protests, including those in September 2013, which prompted the Sudanese government to mobilize forces that violently suppressed the protests. More than 170 people were killed and many more were injured.[102]

While Sudan's oil sector experienced a huge loss after South Sudan's independence, oil still remains a key aspect of the Sudanese economy. Sudan was producing 105,000 barrels per day as of 2015.[103] The Sudanese government continues to drill new wells and encourage new exploratory studies.[104]

### Sudan's "Resource" Curse

The regime squandered most of the country's oil wealth on the military and security sectors to ensure that elite actors and regime insiders would reap the economic windfall that oil provided. Likewise, instead of improving infrastructure, paying down external debt, or making investments in education and public health that many Sudanese people badly needed, among the most readily apparent outcomes of the oil boom are inflation, crumbling infrastructure for other economic sectors, and the government's deeply resented austerity program intended to address the very inflation it created.[105]

The Sudanese regime's comprehensive mismanagement of the wealth that the oil boom produced and then its imposition of an austerity program on the citizens of Sudan that the boom largely did not help is perhaps the most telling example of its strategy for ruling, a strategy that aims above all else to enrich insiders and remain in power.

# Gold

### Gold Is the New Oil

Sudan's oil boom provided al-Bashir's regime with the revenue it sought to revitalize the military, revamp and expand intelligence and security services, and rally proxy militias. The oil boom supplied the regime with revenue for patronage networks to consolidate political and financial support. When South Sudan voted to secede, Sudan lost more than half of its total revenues and nearly two-thirds of foreign exchange earnings.[106] Having lost 75 percent of its oil reserves, the government abruptly faced an estimated $8 billion fiscal gap.[107] Although the regime had years to prepare for the possibility of secession, Sudanese officials admit that they did virtually nothing to prepare for this outcome.[108]

Large discoveries of gold in 2011 gave the regime a second economic lifeline.[109] The regime scrambled to try to capture this resource and quickly moved to reframe Sudan as an up-and-coming gold exporter. In 2012, President al-Bashir inaugurated one of the largest gold refineries in Africa, capable of producing 328 tonnes of gold annually.[110] In late January 2017, Sudanese authorities claimed the country had produced 500 tonnes between 2008 and 2015.[111] Gold revenues have increased substantially in recent years. In 2009, gold revenues ranged between $400 and $500 million.[112] By 2012, gold revenues had increased tremendously, topping out at around $2.5 billion.[113] After reporting a production of 71 tons in 2014, the government expects to produce even more gold in the future, with a target of 80 tons for 2015 and 100 tons for 2016.[114]

**Gold plays an increasingly large role in Sudan's economy and has largely replaced oil as the primary enabling resource driving violent kleptocracy.**

Many are concerned about how the regime will spend gold revenues. The regime squandered the opportunities created with oil revenues. Unfortunately, there is little indication that the regime will manage gold wealth differently.

The Sudanese regime is currently attempting to capture the gold wealth for its own use as a "new bonanza."[115] Control of gold production sites and of the wealth generated by gold has made some of Sudan's gold conflict-affected.[116] As Williams notes, "Inserted into a context where corrupt autocrats have the advantage, resources will strengthen their hand and generate grievances among those denied access to their benefits."[117] Gold plays an increasingly large role in Sudan's economy and it has largely replaced oil as the primary enabling resource driving violent kleptocracy in Sudan.

### Artisanal Mining

Most of Sudan's gold mining, including production around Sudan's newly-discovered gold in Darfur, is artisanal. Although there are commercial mining companies operating in this sector, they do not produce a significant amount of gold. For example, in 2013, Sudan produced over 50 tons of gold, but commercial mining companies contributed only 10 percent of this total.[118] Although it is difficult to obtain credible figures, researchers estimate that more than 1 million Sudanese people work as artisanal miners.[119] In April 2016, the Sudanese minister of finance and planning provided a similar figure, stating that there are 1 million miners in Sudan and that 95 percent work in the artisanal mining sector.[120] As one journalist notes: "Battles for control over mining areas between rival ethnic groups and occupying militias are further complicating the government's war against already splintered rebel groups and civilians."[121]

### Conflict in Darfur's Gold Mining Areas

Armed actors, including the SAF and government-supported militias, have used brutal tactics including murder, mass rape, and the burning of homes and crops to drive local communities away from resource-rich areas and secure important mining sites.[122] In 2013, fighting over the roughly 10-kilometer Jebel Amer gold mine in North Darfur resulted in the deaths of at least 839 people, mostly from the Beni Hussein group. This conflict and other conflicts in the area, including those between armed movements and the government, together displaced or severely affected 150,000 people in Darfur between January and March 2013.[123]



No Mining Activity

DigitalGlobe

Significant Number of Mines

Jebel 'Amer, North Darfur, Sudan
DigitalGlobe Natural Color Image, February 9, 2012

Jebel 'Amer, North Darfur, Sudan
DigitalGlobe Natural Color Image, January 13, 2013

*Increase of gold mines in Jebel 'Amer.  DigitalGlobe/Enough Project*

The dynamics among groups in Jebel Amer reflect violent and kleptocratic tendencies that play out at the sub-national level as powerful rivals collude and coerce, at times with violence, as they seek to manipulate the people of this area and exploit the wealth in ways that benefit the powerful.

The activities of Musa Hilal provide one illustration of this trend. Hilal orchestrated and led targeted attacks involving the commission of atrocities by the notorious Janjaweed militias in the early 2000s in Darfur.[124] Hilal was designated for sanctions by both the U.S. and the U.N. for his role in the commission of atrocity crimes.[125] Hilal returned to Darfur in 2013 after enjoying prominent government positions in Khartoum, including a role as a special advisor to the Ministry

of Federal Affairs.[126] Since returning to Darfur, Hilal defected from the NCP, founded the Sudanese Revolutionary Awakening Council (SARC), an umbrella group opposed to the NCP, and by exercising de facto control of four North Darfur localities in 2014 he established himself as the de facto ruler of the region.[127] Hilal, after expelling the commissioner of the town closest to Jebel Amer, had effectively "annexed the territory into his own fiefdom."[128]

Following these acts, Hilal's militias successfully repelled the government forces that had been sent to retake the town and the nearby gold mine and then confiscated their weapons and vehicles.[129] The same year, Hilal's SARC reached an agreement with the local Beni Hussein group

to establish a management board for gold mining in Jebel Amer.[130] Under this agreement, mining is controlled by the management board.[131] Further, SARC spokesperson Ahmed Mohamed Abakar stated that anyone interested in working in or even visiting Jebel Amer must first secure permission from the board.[132] Hilal confirmed this position in late July 2015, after RSF leader Mohammed Hamdan Dagolo, also known as "Hemmeti," visited the area along with representatives of a mining company owned by NISS.[133] Previously, Hilal had warned the MAM Group, a major Sudanese industrial firm, not to begin gold exploration in Jebel Amer after it won a concession from the Federal Ministry of Minerals.[134] In a local paper, Hilal simply proclaimed that "the current situation does not allow exploration in that region."[135]

Gold in Jebel Amer is controlled, and this control is at times challenged, by violent actors. Instead of bringing peace and prosperity to Darfur, gold has brought bouts of violence, destruction, and predation, while a large share of the proceeds benefit elites backed by armed groups.

### Distorted Economics

In addition to fueling conflict, the regime's gold policy further distorts an already distorted national economy. Sudanese economists Ibrahim Ahmed Elbadawi and Kabbashi Suliman found that the government's gold policy, which requires all gold traders to use the Khartoum refinery and the Central Bank of Sudan, caused short-term macroeconomic instability as well as negative longer-term consequences for the competitiveness of Sudan's economy.[136] Further, under this policy, the government struggles to collect taxes while also grappling with underreporting and smuggling.[137] This policy also introduces international price volatility into the domestic economy and makes Sudan extremely susceptible to inflation. As Elbadawi and Suliman

note, "[the central bank's] gold arbitraging rapidly transmits the volatility of the international gold price to the domestic economy and the high expected inflation raises the bank gold price and money supply."[138]

While the amount of gold lost to smuggling is difficult to verify, it is likely a very considerable amount. In a report published in September 2016, the U.N. Panel of Experts for Sudan found that at least 96,885 kg of gold was smuggled from

> Instead of bringing peace and prosperity to Darfur, gold has brought bouts of violence, destruction, and predation.

Khartoum to the United Arab Emirates between 2010 and 2014.[139] The panel estimated the value of this smuggled gold to be $4.6 billion.[140] The mere threat of smuggling is alone enough to contribute to Sudan's inflation. Initially, the central bank "printed money" to buy local gold at unofficial (black market) currency rates before selling gold for dollars in the global financial system at much lower rates.[141] In 2013, gold trading sources reported that the bank would pay artisanal miners more than 20 percent above the global gold price, as it was desperate to secure foreign currency.[142] The bank denied this practice.[143] However, this denial is not plausible, as Sudan experts have argued that the bank simply must raise its gold purchase price to remain competitive with smugglers.[144] Significant smuggling of gold out of Sudan remains a problem.

### Legislative Capture and Conflict-Affected Gold

The Sudanese government also continues to manipulate the legal system to extract the most revenue from the gold sector with the least amount of oversight. Currently, the 2007

Mineral Resources and Mining Development Act (MRMDA) is the controlling legislation for Sudan's mining industry. Under this act, owning land does not equate to owning mining rights to that land.[145] Although the MRMDA criminalizes artisanal mining and artisanal miners, researchers find that artisanal miners are "often unaware of or unconcerned about the bureaucratic intricacies set out by the legal act."[146] More importantly, this legislation allows for corruption and patronage given its centralization of regulatory authority. As Ille and Calkins note: "It [the commercial mining sector] is only regulated by the minister and is not delegated to lower levels in the hierarchy, a move that leads to the opacity and inscrutability of such mining deals."[147]

Nonetheless, the regime still wants more revenue and greater control and had planned to adopt a new mining code by the end of 2014 that would attempt to further reduce gold smuggling.[148] Although Sudanese legislators have not yet adopted this code, African Mining Intelligence

### "Gold is being used to produce weapons and to rent every criminal group and militia out there." *-Mohamed Abdulshaf*

reported that this legislation would tighten controls on producers and buyers, while "redoubling efforts" to gain certification from the London Bullion Market Association, thereby allowing Sudanese gold to reach a much larger market from a signature commercial venue.[149]

The prospect of Sudanese gold entering foreign markets and the global financial system is troublesome given already existing concerns over conflict-affected gold. Because gold in Sudan that comes into Khartoum is blended into a single product at the Khartoum refinery, gold buyers cannot distinguish between the conflict-affected

gold that is sourced from high-risk areas such as Jebel Amer and the relatively conflict-free gold sourced from other parts of the country, including northern Sudan.[150] As such, gold export buyers risk contributing to the perpetuation of conflict and corruption in Sudan even if indirectly. Mohamed Abdulshaf, a Sudanese scholar from Darfur formerly based with Sudan Democracy First Group, makes this point bluntly, stating: "Gold is being used to produce weapons and to rent every criminal group and militia out there."[151] Further, Abdulshaf notes that gold—not oil—now pays for the weapons that the government purchases to arm the military.[152]

### A War of Words

On September 22, 2016, the Sudan Panel of Experts Final Report for 2015 was finally released publicly.[153] In February 2016, the Russian government had used its position on the U.N. Security Council to block the report's publication by placing a hold on its release.[154] The Russian decision stemmed from a strong disagreement with the United States and the United Kingdom over findings within the report on conflict-affected gold.[155] Sudanese government officials also reacted harshly, summoning the U.S. chargé d'affairs in Khartoum over a proposed sanctions resolution that would have included references to conflict-affected gold.[156]

Despite this diplomatic firestorm, the panel's report largely confirmed what researchers and Security Council member states and staff already knew. The panel's findings reaffirmed that the Abbala armed group loyal to Musa Hilal controls the lucrative Jebel Amer gold mines.[157] It also concluded with greater than 99 percent certainty that artisanal gold mined at Jebel Amer is conflict-affected and that this tainted gold (or "unsterilized" gold, to use the IMF's term) is then brought into Sudan's gold supply and export system.[158]

The report also provided important findings regarding the value of these mines, as well as the specifics of Hilal's mining operation. After visiting Jebel Amer and meeting with Hilal, the panel found that the Jebel Amer gold mines yield 8,571 kg of gold per year, which equates to $422 million.[159] It also found that the Abbala armed group makes $28 million from taxing gold prospectors and supporting businesses, while earning an additional $17 million from its own prospecting activities.[160] Overall, the panel determined that the Abbala armed group under Hilal's control makes $54 million annually from gold trade and production, while Darfuri armed groups made $123 million between 2010 and 2014.[161] Finally, the panel found that individuals from different Rizeigat groups contribute to the larger Abbala armed group and that many of these individuals also serve in auxiliary government forces including the Border Guard, Central Reserve Police, and Popular Defense Forces.[162]

### Gold Funding and Enabling Violent Kleptocracy

Gold exports help drive Sudan's kleptocracy by sustaining the regime economically and by allowing the regime to continue its support of violent conflict through the purchase of weapons and the funding of the military, intelligence, and security sectors. Gold also provides revenue that allows for patronage and obtaining the support of armed proxies. Hamid Ali, a professor of public policy at American University of Cairo, finds that the Sudanese government has simply substituted gold for oil to continue funding armed conflict.[163] "Oil disappeared and [the] president intensified [the] search for gold."[164]

At the same time, gold has complicated Sudan's armed conflicts by dispersing a valuable resource rent to a wide array of actors. As de Waal notes, in contrast to oil, artisanal minerals tend to



Gold provides revenue that allows for patronage and obtaining the support of armed proxies.

decentralize political authority, and in Darfur this decentralization has empowered "potentates and military entrepreneurs."[165] Again, Musa Hilal's control of Jebel Amer illustrates this outcome, but the Panel of Experts' finding that various armed groups earned $123 million over four years shows that numerous actors benefit from this resource. Thus, the discovery of large deposits of gold in Darfur have produced two significant outcomes. First, this gold has provided the Sudanese regime with an unexpected and significant economic lifeline to counter the loss of oil revenues in 2011. Second, it has created further conflict and fostered violent kleptocracy at a local level within this region.

## Land

### Importance of Land and Historical Relation to Conflict

Perhaps more than any other factor, contested land use explains past conflict and current violence within Sudan. Historically, there is no resource more valuable in Sudan than land. Aside from obvious economic and material benefits, land is paramount to social and cultural values as well as understandings of identity and community.[166] Disrupting land use patterns and local land and resource governance has led to significant conflict, while grievances arising from land use continue to fuel local and regional conflict.[167] Land use was a major grievance during Egyptian rule in the 19th century and in the Anglo-Egyptian Condominium that followed. Within this colonial era, the private expropriation of public land and demanding land use taxes contributed to the center-periphery

relationship that remains in place in contemporary Sudan.[168]

In independent Sudan, land expropriation and the resulting displacement of local populations is a key factor in past and current conflict. For example, in the 1960s and 1970s state-led development projects for mechanized agricultural schemes in South Kordofan resulted in the dispossession of many farmers and pastoralists in the area. Sara Pantuliano argues that these land grabs and the displacement that followed were the "main reason" that South Kordofan residents joined the Sudan People's Liberation Movement (SPLM) in the late 1980s.[169] Likewise, Collins notes that these projects generated significant wealth for a class of "absentee landlords" whose only concern was to ensure the profitability of these ventures.[170] Land dispossession and displacement continued throughout the 1990s and as Pantuliano notes, land issues were "at the heart of the conflicts in eastern Sudan and Darfur."[171]

Currently, President al-Bashir, the NCP, and local elites utilize land allocation for personal enrichment and to marginalize opposition. This strategy often includes acts of violence that result in the dispossession of local populations and contribute to the systematic violence in Sudan's most conflict-prone areas. Guma Kunda Komey, a geography professor at the University of Bahri in Khartoum, notes that land is central to "contemporary Sudan's recurring local conflicts and their consequent protracted civil wars associated with internal tensions, disunity, and gross violation of human rights."[172] Likewise, USAID's most recent assessment of land tenure in Sudan states: "The Khartoum government's repressive appropriation of land and systemic abuse of local land rights were significant factors fueling the civil war."[173] In addition to the dispossession of local populations, land-grabbing strengthens the authority of local elites and their allies at the expense of rural communities.[174]

## Legal Framework

Sudan's legal framework allows for the inequitable use and misallocation of land. Further, Sudan's land law aligns more closely with colonial administration than it does with an independent legal system that allows citizens to benefit from their land. Rahhal and Abdel Salam show that despite several transformations under successive governments, Sudan land law remains an outgrowth of colonial legislation that was originally introduced with the aim of confiscating large areas of land for commercial farming, especially lucrative cotton production that benefited elites.[175]

After independence, several legislative acts increased the government's control of land use. Most notably, the 1970 Unregistered Land Act (ULA) transferred all unregistered land to the state.[176] Given the strength of customary law, the unfamiliarity of statutory law, and the numerous practical obstacles to land registration, very few Sudanese citizens registered their land. As a result, the state claimed legal ownership of over 90 percent of land practically overnight.[177] Further, the ability to allocate this massive amount of land led to government abuse almost immediately, particularly as this legislation "encouraged the patronage of land by the government as a means to secure political power."[178]

> Sudan's land law aligns more closely with colonial administration than it does with an independent legal system.

The dissolution in 1971 of the governance structure by which the national government devolved power to traditional leaders to manage local affairs allowed for an even greater concentration of central government authority.[179] Likewise, the 1984 Civil Transaction Act (CTA) furthered these

trends by prohibiting courts or other authorities from hearing challenges to state claims of land ownership arising under the ULA and dismissing all pending cases concerning state ownership of unregistered land.[180] The CTA also required registration of all land transactions.[181]

While land expropriation and attempts to undermine local authority certainly occurred before al-Bashir seized power in 1989, al-Bashir and the NIF/NCP accelerated these processes and implemented divisive policies at local and regional levels in ways that created "regional subcultures of ethnic violence."[182] These violent geographies persist, as al-Bashir's government, the NCP, and powerful elites continue these policies.

The subsequent manipulation of the legal system has allowed the central government to consolidate authority even further and to continue the marginalization of rural areas, which it treats as a peripheral matter.[183] For example, recent constitutional amendments allow the president to grant land for investment.[184] This function previously belonged individual states.[185] In 2015, Minister of Investment Mustafa Osman Ismail noted the establishment of a special body to grant land, order the removal of local populations, and determine compensation, while emphasizing that this body's decisions are not subject to appeal.[186] These legal maneuverings once again illustrate the regime's focus on consolidating power and evading accountability, which allows for more efficient theft of state resources and greater ease of personal enrichment.

### Extractive Governance and Rural Development

The legal framework that governs land use reflects the extractive governance model that defines Khartoum's relationship with the rural areas.[187] Under this model, the central government envisions rural areas as little more than a means from which to extract resources, generate wealth, and secure patronage. Historically, government officials have seldom considered the well-being of local populations affected by development projects within rural areas. As Sørbø and Strand note, "[f]rom the 1970s onward, the agricultural growth model adopted in Sudan gave little or no consideration to those who were displaced or otherwise affected, whether in Darfur, among the Nuba in southern Kordofan, or among the Beja in eastern Sudan."[188] Unsurprisingly, these same areas experienced the greatest violence during the Second Civil War (1983–2005) and continue to be the sites of ongoing military campaigns, local conflict, and displacement.[189]

Although this extractive governance model predates the NIF/NCP, al-Bashir's tightly controlled regime has strengthened the land laws and policies that allow for its continuation and the corresponding marginalization of Sudan's rural areas.[190] For example, as local governance practices and administration by traditional leaders made a slow return in 1980s and 1990s, the NIF undermined this process by corrupting traditional leaders and administrators through bribes and coercion or simply by dismissing administrators who were unsympathetic to NIF objectives.[191] As Rahhal and Abdel Salim note, under the NIF, "land registration descended into land looting," as al-Bashir's office and other powerful instruments of the government "allocated land without any process at all to cronies of the regime."[192] Researchers have also demonstrated that past and ongoing conflicts have weakened local institutions dedicated to land use and governance.[193] Weakened local institutions and an unclear governance structure exacerbate land disputes and may lead to further violence. Thus, the U.N. Environment Programme notes that within rural Sudan "multiple and parallel systems of natural resource management and governance" at both formal and informal levels combine with

**enough**   !                                                 Sudan's Deep State

other factors to create an environment where land use claims are often in dispute.[194]

### Livelihoods, Land Markets, and Land Commissions

Despite the land use challenges discussed above, land remains a central issue for rural and urban communities in Sudan.[195] The ability to access land is crucial to the livelihoods of most Sudanese citizens.[196] The agriculture sector alone accounts for the livelihoods of about two-thirds of the active labor force.[197] Nonetheless, Sudan's formal land market remains largely underdeveloped as only 10 percent of land has been surveyed and registered.[198] Urban cadastral information is "largely nonexistent or in disarray" and most land transactions remain informal and unregistered.[199] The lack of a formal land market benefits the regime by allowing actors to avoid legal and administrative checks to acquiring land. There are few surveys, registration documents, or land records. Powerful elites face little resistance to simply taking the land they want.

The government has not established a national land commission and state land commissions in South Kordofan and Blue Nile despite the requirement to do so in the 2005 Comprehensive Peace Agreement.[200] Intended to arbitrate land disputes, recommend land policy reforms, and identify a model for recognizing customary land rights, the commissions would lessen Khartoum's grip on the countryside.[201]

### Fueling the Violent Kleptocracy: Dispossession and Land Grabs

President al-Bashir's circle, NCP insiders, and connected elites use land in Sudan like they have used the country's oil and gold—to fuel the violent kleptocracy both directly through acts of dispossession and forced displacement, and indirectly, as a means to extract wealth and secure patronage.

Directly, the central government continues its violent interventions and disruption of land tenure and local land governance in rural areas, where the majority of state violence occurs.[202] The government also relies on corruption and



*A woman irrigates crops in Kabkabiya camp in North Darfur, October 2008.*

*USAID*

legal manipulation to obtain and sell land. A recent scandal involving the sale of land and property belonging to the Khartoum Bahri Evangelical Church provides a good example. Here, the Ministry of Endowments and Guidance reappointed members to the church's Community Council despite the church's election of a new council after persistent corruption accusations.[203] The reappointed council sold a substantial amount of church land and property after Sudanese police forces violently raided the church to disperse a sit-in challenging the reappointment of tainted council members.[204] Later, NISS agents detained two pastors who had protested these reappointments and the subsequent sale of church land and property.[205] These pastors faced the death penalty and were held at Kober Prison before a judge found them not guilty and ordered their release on August 5, 2015.[206]

Indirectly, the ability to allocate large amounts of land to domestic allies and foreign investors provides the regime with a key source of political support and financial capital. This strategy includes selling or leasing large amounts of farmland to foreign investors, even as local farmers show considerable anger over this policy.[207] The secrecy of the Sudanese government makes accurate assessments of foreign investment difficult to obtain, but most observers believe that the total is significant. For example, a Food and Agriculture Organization (FAO) report found that between 2004 and 2009, the Sudanese government approved agriculture projects covering 471,600 ha valued at $439.6 million.[208] USAID observes a similar level of large-scale agricultural leases and finds that even many domestic investments receive backing from foreign banks and organizations and that a lack of public notification and contradictory lease terms are common.[209] These land deals often grant investors generous tax and custom duty exemptions.[210] Finally, land disputes arising from the government's efforts to attract foreign investment are not limited to

rural and agricultural areas. For example, in December 2014, Sudanese citizens protested the government sale of land in Khartoum's El Shajara district.[211] Several protestors sustained serious injuries after the police dispersed protestors with tear gas and batons.[212] These protests erupted after state authorities announced the sale of this land to local investors.[213]

> The ability to allocate large amounts of land to domestic allies and foreign investors provides the regime with a key source of political support and financial capital.

Persistent land disputes and land insecurity stem from the land policies of al-Bashir's kleptocratic regime. The government prioritizes personal enrichment over community development or the national interest, and it faces few institutional or legal challenges to its pursuits. As only one example, under Sudanese law, the government continues to issue long-term leases to unregistered land. It does so without consulting local communities and often results in the eviction of smallholders and pastoralists "in favor of private investors, land speculators, military personnel and elites."[214]

## Weapons

### A Growth Industry

In the late 1990s and early 2000s, the Sudanese government prioritized manufacturing weapons and ammunition.[215] Since this time, Sudanese weapons manufacturers have developed a strong weapons industry, which sells arms and ammunition to the highest bidder, regardless of how these products are then used.[216] As Peter

**enough**                                              Sudan's Deep State

Dörrie noted in a 2015 report, "Armies and militants from the Ivory Coast to Somalia use Sudanese merchandise."[217]

Oil revenue and technical assistance from China and Iran were vital for establishing Sudan's weapons industry. A 2001 report noted the founding of three factories near Khartoum dedicated to the production of arms and ammunition.[218] These plants, in Kalakla, Chojeri, and Bageer, were built by Chinese companies using Chinese goods.[219] A 2008 report showed that these companies produced a variety of weapons, including heavy and light machine guns, rocket launchers, mortars, antitank weapons, and ammunition.[220] The involvement of foreign entities within Sudan's weapons industry is difficult to verify given the secrecy surrounding this industry and the limited amount of information that is publicly available, however, researchers have documented Iran's involvement, particularly with production and technical assistance, as recently as 2013.[221] This significant degree of investment and assistance includes Sudanese technicians receiving training in Iran.[222]

Sudan's weapons industry has evolved dramatically since its early stages. In 2007, the Minister of Defense, Abdel Rahim Mohamed Hussein, claimed that Sudan was Africa's third largest weapons manufacturer.[223] Recent research substantiates this claim, noting that only South Africa and Egypt produce more weapons.[224] A 2014 report by Small Arms Survey demonstrates the growth and comprehensiveness of Sudan's Military Industry Corporation (MIC).[225] This report details the six largest military-industrial complexes in Sudan.[226] Only one of these complexes predates the arrival of the current Sudanese regime and most are located in near Khartoum.[227]

### Partners and Profits

The operation and ownership of these military-industrial complexes reveal the close relationship between the Sudanese regime, the security sector, and the military. NISS operates the Yarmouk Industrial Complex, which houses five



*A child holds up bullets collected from the ground in Rounyn, a village about 15 kilometres from Shangil Tobaya, North Darfur, March 27, 2011.*

*Albert González Farran, UN*

factories and produces more than 30 military items.[228] The Yarmouk facility also has 35 percent Iranian ownership and employs about 300 Iranian technicians, including members of the Revolutionary Guard.[229] Similarly, the Defense Ministry has a 10 percent ownership share in the sprawling Saria Industrial Complex, which contains nine factories and produces about 60 military products.[230] These close relationships demonstrate the financial opportunities that security and military actors loyal to al-Bashir expect and receive.

The weapons industry has obvious strategic importance to the Sudanese government, as it helps to arm the soldiers and security forces that allow al-Bashir to remain in power. However, the industry is perhaps equally important for its ability to generate significant profits for the regime and its allies, particularly within the informal economy.[231] In addition to the informal economy, MIC has increased its efforts to attract legitimate foreign buyers. Most notably, MIC participated in the last two International Defence Exhibition and Conferences in Abu Dhabi, where analysts noted its impressive displays and push to become a global player.[232] President al-Bashir showed his support for MIC by attending the 2015 convention.[233] He was the only head of state to do so.[234] Moreover, in 2013, Ali Othman Mahmoud, MIC Director of External Relations, made Sudan's intentions clear by stating that in addition to supplying the needs of the Sudan Armed Forces, MIC hoped "to export surplus weapons to other countries, mainly African states."[235]

**enough**

# Chapter 4

Violent Kleptocracy Series:
East & Central Africa

# Strategy and Policy

This final section examines why past policy strategies have failed to create lasting peace in Sudan and considers what new policy approaches could yield long-term stability and sustained peace moving forward.

## Strategy: Past Approaches and New Opportunities

President al-Bashir's rule has been marked by armed conflict, mass atrocities, and severe repression for entire portions of the country's highly diverse population. Despite regional and international diplomatic engagement from external actors, al-Bashir and his inner circle have subverted peace processes in practice and continued to wage war on the Sudanese people. Sudanese government leaders have engaged in self-serving forms of what appears to be cooperation, along with delay tactics, and obstruction to undermine peace.

### Cooperation as Self-Preservation

Al-Bashir's regime has shown considerable aptitude for adapting to and capitalizing on changing political and economic conditions. The regime has taken an opportunistic approach with its external relations, pursuing better relationships with some parties and limiting its cooperation with others according to what is most advantageous. The regime has pursued cooperation with the United States in counterterrorism activities,[236] made a diplomatic turn toward Saudi Arabia and away from Iran,[237] and strategically positioned itself in a particular way on the issues of refugee movements, human trafficking, and migration to Europe.[238] In all three instances, the regime's calculations were made not to benefit the Sudanese people but to remain in power by presenting itself as a capable partner able to deliver value on a key foreign policy objective. In the case of the United States, particularly at the end of the Obama administration, this cooperation paved the way for broad sanctions easing, further benefiting the Sudanese regime.

The Sudanese regime's calculations underpinning counterterrorism cooperation, support for Saudi

Arabia, and migration activities were also made for economic reasons, as the regime needs financial relief after decades of economic mismanagement and its loss of oil revenue and foreign currency reserves. The Sudanese government's support of Saudi Arabia's military intervention in Yemen offers a telling example. After Sudanese soldiers joined the Saudi-led coalition against Houthi rebels in March 2015, Saudi Arabia reportedly deposited $1 billion into the Central Bank of Sudan.[239] Likewise, in February 2016, Saudi Arabia reportedly provided Sudan with $5 billion in military aid.[240] This arrangement suggests a "play-for-pay" dynamic in which the Sudanese government effectively rents its soldiers to Saudi Arabia in exchange for funds.

> In Sudan, the ruling government and its military provoke the conflict and insecurity that displaces populations and creates significant refugee flows.

The regime has adopted a similarly opportunistic and self-serving approach in its positioning on issues of refugee movements, human trafficking, and migration from the Sahel and the Horn of Africa to Europe. Sudan now benefits from millions of euros in financial assistance from the European Union. Funds from Europe will strengthen the capacities of Sudan's security and law enforcement agents, including a group known as the Rapid Support Forces (RSF). There are legitimate concerns that the EU-funded dual-use training and equipment will embolden and empower the agents of a regime that for almost three decades has used its power and resources to violently suppress Sudanese citizens. Resolving the migration and refugee crisis is a crucial humanitarian issue that requires significant cooperation, even with problematic governments.

However, in Sudan, the ruling government and its military provoke the conflict and insecurity that displaces populations and creates significant refugee flows.[241]

**The Art of Delay and Obstruction**

Just as the Sudanese regime has pursued a policy of self-interested and disingenuous cooperation to win political and financial support from foreign governments, the Sudanese regime has also proven itself adept at manipulating peace processes and political negotiations. Similarly, it has relied on a policy of obstructionism to undermine the implementation of peacekeeping operations. The regime has appeared to engage with international bodies and political opposition, while at the same time working to frustrate these efforts and maintain the unjust and violent status quo that characterizes its rule. As Aly Verjee, a longtime political analyst familiar with Sudan observes, "brinkmanship, delay and broken agreements" are "old traditions of Sudanese politics."[242]

Despite a large amount of diplomatic and political engagement, dozens of peace agreements, numerous peace processes, and several U.N. and regional interventions, peace in Sudan has remained elusive. The Sudanese government is committed to obstructing the activities of peacekeepers at best and hijacking the mission's presence for the regime's purpose at worst, and creating conditions that undermine peace and peacekeeping while claiming, contrary to the evidence,[243] that peacekeeping is now unnecessary[244] and conflict zones are secure. In May 2016, Sudanese Foreign Minister Kamal Ismail stated, "It is time to end the mission of UNAMID . . . There is no citizen in Darfur that is under threat and in need of protection."[245] This statement defied the basic reality that more than 3.2 million people at that time were displaced

throughout Sudan, and 2.6 million of them were displaced in Darfur.[246] Humanitarian needs in Darfur, particularly among displaced people, remain urgent and acute.

## Perpetual Negotiation, Perpetual Inaction

Al-Bashir's regime has engaged in delays and obstruction and created quid pro quo exchanges with select parties that divide the opposition groups and perpetuate inaction. The regime has succeeded in this approach because mediators typically lack the pressure or leverage to compel the government to take meaningful action or make compromises on political, economic, or social issues.

> Mediators typically lack the pressure or leverage to compel the government to take meaningful action.

The regime's approach toward peace talks brokered by the African Union High-Level Implementation Panel (AUHIP) for the 2016 Roadmap Agreement and with the Sudanese National Dialogue on internal governance questions offer two striking examples of the Sudanese regime's approach to engagement with opposition parties. In March 2016, the AUHIP delivered a peace proposal titled the Roadmap Agreement to the opposition parties as a take-it-or-leave-it deal with little time to review.[247] Although the substance of the Roadmap Agreement is relatively unobjectionable at a superficial level, it contains vague clauses that the opposition wished to clarify. The opposition also requested more than a few hours to review. Instead of accommodating these reasonable requests, the Sudanese government decried the opposition for refusing to sign immediately. The AUHIP then played into the regime's approach by

asking to meet with only one opposition party out of the group of multiple parties, thereby reinforcing the same divide-and-conquer negotiating tactics that undermine comprehensive peace.

The regime has used similar tactics in the National Dialogue, a political process designed to convince observers that the regime is engaging in meaningful debate and negotiation while the regime in fact engages in tactics that isolate and marginalize its political opposition. Despite two years of preparation, al-Bashir and the NCP handpicked participants, established the dialogue agenda unilaterally, and gave the president the authority to oversee this exercise.[248] The dialogue is more aptly described as a "national monologue."[249] Further, before the government finally began the National Dialogue, it rejected the African Union Peace and Security Council's request to hold a preparatory meeting.[250] Significant opposition parties refused to participate in this dialogue, as did foreign leaders and African Union officials.[251]

In sum, the Sudanese government effectively uses peace processes and political negotiations to divide opposition groups and undermine progress toward peace. Leading regime officials continue to benefit from the country's insecurity and absence of rule of law. This situation stems from the regime's authoritarian rule. Until the United States and others can enter negotiations with the regime with the leverage necessary to change the regime's calculations, there is little indication that this situation will improve.

## Countering the Violent Kleptocracy

The regime has used divisive tactics and self-serving foreign policy pivots to continue military campaigns, benefit its interests, evade accountability, and attempt to protect itself from the effects of economic catastrophe that are attributable to its grossly negligent spending

priorities as well as the unsustainable debt burden the regime has incurred. While these tactics have allowed the regime to forestall meaningful reform, the Sudanese people continue to suffer from state violence and largely avoidable economic hardship.

To counter the Sudanese regime, effective policy responses must target the financial activities that allow violent, kleptocratic leaders to remain in power and enjoy tremendous wealth while most Sudanese people struggle with increasingly desperate economic conditions. After almost three decades of violence and personal enrichment, there is no evidence that al-Bashir and regime insiders will respond to traditional diplomatic or political incentives to pursue peace. Nor is there any evidence that this regime will act with any consideration for the betterment of the country or its citizens.

## Past approaches to engagement with al-Bashir's regime often lacked the leverage necessary to secure meaningful concessions.

Accordingly, a refocused strategy toward Sudan must undo the U.S. government's sanctions easing by replacing the previous framework with a modernized system that more directly addresses the financial incentives that allow al-Bashir's regime to continue its campaign of violence, plunder, and marginalization, as well as by ensuring that the United Kingdom, European Union, United Nations, and other actors deploy similar tools. This strategy must allow for meaningful reform and economic development that benefits more than just a handful of elites. At the same time, an effective policy approach will provide publicly-minded political opposition and civil society actors with the training and support they need to develop participatory governance institutions, counter

corruption, and challenge human rights abuses.

A revitalized policy approach toward Sudan requires diplomats and policymakers who negotiate with the regime to have leverage. Past approaches to engagement with al-Bashir's regime often lacked the leverage necessary to secure meaningful concessions. In turn, ineffective policies and poorly implemented actions have only emboldened the regime, convincing its leadership that the regime can outlast U.S. and international pressure and will face no real consequences for its violent acts and continued belligerence.

## A New Policy Approach: Increasing Financial Pressure to Enhance Leverage for Peace

The following section summarizes a five-prong policy approach that provides an opportunity for developing the financial leverage needed to counter Sudan's violent kleptocracy. By weakening the financial position of al-Bashir and regime insiders, these policies can tip the bargaining power to the diplomats and officials negotiating with the regime. Although such changes will require time to take hold, barring an unforeseen change in Sudan's internal dynamics, these policies offer the best hope for a negotiated peace process that secures meaningful concessions and lasting peace. Moreover, this strategy can advance important U.S. national security goals, including safeguarding the integrity of the financial system, combating corruption, deterring future support for terrorism, and strengthening human rights.

### 1 - Stopping Illicit Financial Flows

Kleptocratic regimes like the one in Sudan rely on illicit financial flows for personal enrichment and to ensure their corrupt gains find safe haven outside the country. Globally, these financial flows deprive

citizens of trillions of dollars and are particularly harmful in developing countries.[252] Stopping illicit financial flows is key to reducing corruption, improving economic development, and ensuring stability. Illicit financial flows are some of the greatest enablers of grand corruption, which contributes to some of the most brutal conflict and dire poverty in the world, much of which occurs in conflict-affected and resource-dependent states, including Sudan. As such, addressing this issue is critical for mitigating security risks and development challenges in Sudan and throughout much of sub-Saharan Africa.

## Sudan's international economic partners play a role in diverting or enabling diversion of wealth.

Stopping illicit financial flows is also a key part of a concerted policy effort by U.S. policymakers, regulators, and law enforcement officials, working with foreign government officials, to bring financial pressure to bear on al-Bashir's regime. The Sudanese government is a violent kleptocracy, which means that its rule ultimately rests on its ability to unleash violence and to continue its looting and plunder of the country's wealth. Illicit financial flows provide the financial network that allows the latter to continue. Sudan's international economic partners play a role in diverting or enabling diversion of wealth. Accordingly, disrupting these networks will lessen the regime's grip on power and help to orient it toward the inclusive peace process described above.

### Anti-Money Laundering Measures
Anti-money laundering (AML) measures provide one of the best enforcement tools for addressing illicit financial flows and preventing bad actors from using the global financial system to secure

their ill-gotten gains. However, the primary U.S. agency targeting money laundering activities— the Treasury Department's Financial Crimes Enforcement Unit (FinCEN)—has historically spent little time addressing sub-Saharan Africa, unless in connection to a broader terrorism or narcotics concern. While these are critical national security concerns that FinCEN must prioritize, the agency should also employ its considerable tools to help address money laundering related to armed conflict and grand corruption in sub-Saharan Africa. For example, under Section 314(a) of the Patriot Act, FinCEN can conduct investigations into specific targets.[253] FinCEN can also use general authorities to issue an advisory, with either public or private distribution, through which it can alert financial institutions about specific types of financial activities that reflect money laundering. This action helps banks and financial institutions comply with their due diligence requirements, while also encouraging these entities to submit suspicious activity reports (SARs), which in turn help enforcement agencies address money laundering. Over time, U.S. authorities should share information, enlist support, and coordinate efforts with foreign governments.

Gold dealers also fall under FinCEN's authorities. As noted, Sudan's gold industry is extremely vulnerable to money laundering, given the predominantly artisanal character of the industry, persistent smuggling concerns, and the government's opaque involvement in purchasing, refining, and selling the gold. The Financial Action Task Force (FATF) only removed Sudan from its list of "high-risk and non-cooperative jurisdictions"[254] in late 2015,[255] suggesting that the country's overall anti-money laundering framework remains weak, particularly given well-known corruption issues throughout Sudan's political and economic systems. FinCEN should therefore issue an advisory for Sudanese gold. Depending on the results, FinCEN may prepare to assist in evaluating possible targets for future

related actions, including special measures set forth in Section 311 of the Patriot Act.[256] These efforts should be coordinated with international partners.

In addition to supporting the activation of these FinCEN measures, U.S. policymakers can work to stop illicit financial flows through other actions, including sharing information and supporting the Egmont Group and foreign financial intelligence units (FIUs).[257] U.S. policymakers should also continue to engage with and support FATF, the leading inter-governmental body that develops and promotes polices to combat money laundering and terrorist financing. Finally, the U.S. government should continue to support the U.S.-Africa Partnership on Illicit Finance (PIF) launched by President Obama in 2014.[258] Sudan is not yet a member of PIF.[259] By joining PIF and participating in a meaningful way, Sudanese leaders could demonstrate that they are serious about combatting illicit financial flows and addressing corruption.

### Multilateral and U.S. Asset Recovery Initiatives

The U.N. Convention against Corruption (UNCAC) is the first legally binding global anti-corruption agreement. The treaty entered into force on December 14, 2005, and there are currently 140 signatory states and 181 states parties to the convention.[260] Sudan signed the convention on January 14, 2005 and ratified it on September 5, 2014.[261] UNCAC requires both international cooperation among ratifying states and support for asset recovery. International cooperation involves working to prevent, investigate, and prosecute offenders. In addition, the treaty binds states to provide mutual legal assistance when gathering and transferring evidence, while also requiring signatories to undertake measures that support "the tracing, freezing, seizure, and confiscation of the proceeds of corruption."[262]

Further, a fundamental principle of UNCAC is asset recovery, which the U.N. Office on Drugs and Crime (UNODC) calls "a particularly important issue for many developing countries where high-level corruption has plundered the national wealth."[263] To this end, UNODC notes: "Effective asset-recovery provisions will support the efforts of countries to redress the worst effects of corruption while sending at the same time, a message to corrupt officials that there will be no place to hide their illicit assets."[264]

In 2007, UNODC partnered with the World Bank to create the Stolen Asset Recovery Initiative (StAR). StAR works with countries to fight grand corruption, "especially the theft of public assets by senior government officials and their collaborators."[265] Essentially a facilitating program, StAR provides policy guidance, case assistance, and capacity building to prevent laundering of the proceeds from corruption and to confiscate ill-gotten gains that are moved to foreign countries.[266] Although StAR does not act as a party to asset recovery cases, it assists national authorities by providing technical assistance, advisory services, and training.

In the United States, the U.S. Department of Justice announced the Kleptocracy Asset Recovery Initiative ("Kleptocracy Initiative") in November 2009 and launched the initiative in early 2010.[267] This cross-cutting initiative reflects the complexity of asset recovery investigations and legal proceedings, while also illustrating the requisite teamwork across agencies necessary to complete these processes successfully. Within the Justice Department, the Money Laundering and Asset Recovery Section (MLARS) leads the initiative, but the Office of International Affairs (OIA) also provides key assistance.[268] The initiative also relies on the Federal Bureau of Investigation (FBI) and the U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) at the U.S. Department of Homeland Security.[269] Like StAR, the Kleptocracy

Initiative supports the implementation of Chapter V of UNCAC.[270] Accordingly, the initiative promotes asset recovery policies at the multilateral level and supports key multilateral initiatives. Through this initiative, the United States is a partner of StAR and a member of the Camden Asset Recovery Interagency Network.[271]

Unlike StAR, the Kleptocracy Initiative does prosecute corrupt officials. Under this initiative, U.S. attorneys have won several cases that seized millions of dollars from corrupt officials, and attorneys hope to recover at least $1.5 billion.[272] In August 2014, the Kleptocracy Initiative won its largest forfeiture: $480 million that former Nigerian ruler Sani Abacha and his associates stole from the country while in office.[273] In this operation, FBI agents conducted the investigation, while the MLARS attorneys led the prosecution with assistance from OIA.[274] U.S. authorities also received extensive assistance from foreign governments where Abacha had hidden some of the money.[275] This operation provides one model for pursuing Sudanese government officials and any evidence of the diversion of public funds that may have ended up in offshore accounts and foreign assets. U.S. attorneys and investigators should consider conducting similar investigations in Sudan and working closely with foreign counterparts, particularly as more information regarding the Sudanese regime's practices becomes available.

## 2 - Implementing Modernized Sanctions to Create Leverage to Support Accountability and Advance Human Rights

Modernized sanctions, combined with strengthened diplomatic engagement, can provide policymakers with the leverage they need to support an inclusive and unified peace process led by Sudanese people that ends Sudan's armed conflicts and begins a peaceful transition toward democracy. The Obama administration's decision in January 2017 to issue a general license for the comprehensive sanctions that had been in place since 1997, and trigger a process that could see the elimination of sanctions in July 2017, ceded this leverage. A modernized sanctions program would reverse course.

### Financial Isolation and Unforeseen Opportunity

As discussed above, past peace processes have failed because the diplomats and officials negotiating with the regime have lacked the necessary leverage. Regime insiders have engaged in delays and obstruction, confident that they will outlast whatever official they are negotiating with or whatever process involves them. To date, the regime has largely been proven correct, as it has not faced pressure strong enough for it to change its behavior.

The weak implementation of the outdated sanctions regime was perhaps the best example of this outcome. The U.S. and U.N. sanctions should in theory have pressured the regime to cease its attacks against its citizens and to lessen its repressive grip on Sudanese society. In practice they failed to do so. Despite the measures that were robust on paper, the regime and its enablers had for years found ways to circumvent the coercive effects of sanctions, both through a network of correspondent banking to outmaneuver the sanctions and through strategic relationships with sanctions-busting allies that facilitated the regime's financial survival.

> To date, the Sudanese regime has not faced pressure strong enough for it to change its behavior.

Although seemingly insulated from the intended effect of U.S. sanctions, new types of sanctions

and tightened enforcement measures primarily intended for Iran started to affect the Sudanese regime. Following several years of significant U.S. government penalties against major global banks, principally for processing transactions related to Iran that were subject to U.S. sanctions, a 2015 plea agreement in U.S. federal court brought this enhanced enforcement effort to the Sudan sanctions program when it declared that the French-based bank BNP Paribas functioned essentially as the "central bank for the government of Sudan."[276] The bank's violations of the Sudan sanctions program, as well as the Iran sanctions, resulted in an $8.9 billion fine, the imposition of significantly enhanced due diligence procedures, and reputational costs that BNP Paribas is still addressing.[277]

In the wake of this decision, foreign banks moved quickly to reduce their exposure to risky accounts connected to Sudan and other high-risk jurisdictions. And, while these banking decisions typically focused first and foremost on Iran, given its large and potentially lucrative economy, the spillover effect of this trend created a significant impact on Sudan because of the comprehensive sanctions program that was in place. Although these sanctions had been in place for many years, it was not until the banks were forced to focus on enforcing sanctions that they really began to have an impact. In particular, greater due diligence and more stringent compliance from already risk-averse banks and financial institutions frustrated military, security, and political officials associated with the regime, leading the Sudanese government to elevate sanctions relief to its primary foreign policy objective.

In January 2017, the first step in this Sudanese government objective was realized, yet as indicated throughout this paper, without the requisite changes. To rectify this, policymakers can deploy a combination of increased financial pressure measures targeting regime elites, enablers, and facilitators, while also mitigating the negative effect of sanctions on the Sudanese people to the greatest extent possible, in order to force the Sudanese regime to participate in a comprehensive peace process. Once this peace process is established, the U.S. would ease and eventually remove sanctions after the verified implementation of key benchmarks. Although not another roadmap, this front-loaded process would provide incentives for continued implementation and compliance. Eventually, its successful completion could lead to the normalization of bilateral relations with the U.S. and U.S. support for Sudan's participation in the IMF Heavily Indebted Poor Countries Initiative.

The implementation of this policy would ideally occur through a new executive order, but it could also occur though legislation. Moreover, the participation of U.S. allies through establishing similar financial prohibitions would multiply financial pressure.

### Sectoral Sanctions and Designations on Key Regime Institutions

Sectoral sanctions[278] represent a type of financial pressure tool that simply did not exist when the U.S. government imposed sanctions on Sudan in 1997. Sectoral sanctions effectively target an entire sector of an economy that contributes to a foreign policy concern or national emergency. Most recently, the U.S. has applied sectoral sanctions with Libya, North Korea, and Russia. Building on this model, U.S. policymakers and their counterparts from other interested countries should apply sectoral sanctions to Sudan's weapons manufacturing and gold sectors. As discussed earlier in this report, these two economic sectors contribute to the ongoing conflict throughout Sudan and have strong links to senior military, intelligence, and government officials. Likewise, these two sectors provide the regime with key sources of revenue that allow it

**Placing sectoral sanctions on the weapons industry would also help regional security, as Sudanese arms continue to appear in conflict areas throughout the region.**

to perpetuate its rule. Placing sectoral sanctions on the weapons industry would also help regional security, as Sudanese arms continue to appear in conflict areas throughout the region.

In addition to applying sectoral sanctions, U.S. policymakers can increase the financial pressure on al-Bashir's regime simply by sanctioning key Sudanese corporate entities, such as those owned by the NISS, SAF, and senior government officials. In doing so, the U.S. should use a threshold of 25 percent ownership for entities that are sanctioned, in line with beneficial ownership principles. Sanctions authorities in other countries which are in the process of crafting their own sanctions programs should also consider this 25 percent threshold.

*Anti-corruption Sanctions Designations*

Corruption in Sudan facilitates patronage and distorts the country's economy. Corruption also allows for the continuation of severe human rights abuses and the culture of impunity that the regime has cultivated. At the same time, policymakers in the U.S. and globally have prioritized the need to address "grand corruption,"[279] not just as an economic development or a human rights issue, but as a national security threat, as corrupt governments often employ the same tactics that terrorist finance and narcotics traffickers do to undercut international security and global stability. The common strategy between these entities is the misuse of the global economy to launder money and hide assets. Within developing countries like Sudan, these effects are even more pernicious

because after plundering state resources, officials often stash their ill-gotten gains outside of the country, effectively permanently removing this capital from the country's economy.[280]

To address this threat, U.S. policymakers should introduce anti-corruption sanctions designations for the individuals and entities that facilitate corruption in Sudan. The Trump administration should issue targeted sanctions designation language modeled on Executive Order 13762, which addresses the continuing violence and instability in Libya.[281] This executive order provides sanctions designations for "actions that may lead to or result in the misappropriation of state assets in Libya" or "the illicit exploitation of crude oil or any other natural resources in Libya, including the illicit production, refining, brokering, sale, purchase, or export of Libyan oil."[282] Finally, after issuing a new executive order, U.S. Treasury Department officials should follow with immediate designations.

Targeting corruption related to the exploitation of natural resources is crucial to any effort to change the Sudanese regime's behavior, as it has used oil, gold, and other valuable resources to fund its violent acts, and help arm forces such as the Janjaweed and the Rapid Support Forces. Further, anti-corruption designation criteria already exist for sanctions programs in other states with troubled human rights records and repressive governments, such as Zimbabwe and Venezuela.[283] Like Sudan, these states feature kleptocratic governments that have used natural resource wealth to amass great personal wealth, while engaging in widespread human rights abuses and severe repression. By introducing anti-corruption sanctions designation criteria for Sudan, U.S. leaders can protect the integrity of the U.S. financial system while also taking action against official corruption that perpetuates violent conflict and human rights abuses in Sudan.

Separately, U.S. officials can use the sanctions authority adopted in late 2016 through the Global Magnitsky Human Rights Accountability Act.[284] This law allows the U.S. to impose "entry and property sanctions against foreign persons" for several reasons including committing serious human rights abuses and acts of significant corruption.[285] Importantly, these acts of corruption include "the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation or transfer of the proceeds of corruption to foreign jurisdictions."[286] Sudanese government officials have faced many accusations for these acts and similar acts of corruption. This U.S. legislation will allow the U.S. government to apply sanctions on officials who commit these acts.

### Mitigating the Unintended Negative Effects of U.S. Sanctions on the Sudanese People

In addition to ratcheting up financial pressure on the individuals and entities that are most responsible for Sudan's ongoing conflicts and serious human rights abuses, U.S. policymakers should also take actions to mitigate the unintended negative effects that modernized sanctions could have on the Sudanese people. The Sudanese regime, through its purposeful distortion of the country's economy and its gross misallocation of the country's resources, has been and will likely remain responsible for Sudan's economic struggles. But U.S. policymakers and international partners can take several measures to address de-risking and financial inclusion.

De-risking is a serious problem, especially for developing economies.[287] Essentially, de-risking amounts to overcompliance, when a bank or financial institution concerned with doing business in a risky market decides to forgo all business in that market. De-risking has taken on greater significance as policymakers more readily turn to anti-money laundering tools and

sanctions designations to combat transnational crime and terrorism. Barclays Bank, for example, announced in 2016 its intention to end all of its business operations in Africa[288] only two weeks after the bank agreed to pay a $2.5 million fine for violating U.S. sanctions on Zimbabwe.[289] Moreover, in this settlement, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) noted that Barclays' actions were non-egregious and that the sanctioned individuals were not publicly identified or designated on the Specially Designated Nationals (SDN) list.[290] Although Barclays did not attribute its decision to close its business operations in Africa solely to the OFAC penalty, in a *Financial Times* article the bank noted how the risk of corruption and misconduct had influenced its decision, stating "Barclays does not own all of the equity, but it owns 100 per cent of the risk if something goes wrong."[291]

**U.S. policymakers should also take actions to mitigate the unintended negative effects that modernized sanctions could have on the Sudanese people.**

As this example shows, de-risking is a business decision that follows the assessment of risk and reward. In a country like Sudan, where the business and investment climate is rife with corruption, logistical challenges, and reputational risk, the possibility of an OFAC penalty or money laundering violation can serve as too great a deterrent for conducting or continuing business. Ultimately, this decision rests with the bank or financial institution as to whether the business opportunity offsets the potential risks and costs, including the due diligence necessary to avoid a sanctions violation.

Although de-risking is a business decision for the private sector to address, U.S. policymakers

can minimize de-risking concerns by sending a strong message to the banking and financial communities that carefully details which activities are permissible and also explains how to obtain general and specific licenses if necessary.

Financial inclusion is an important aspect of achieving U.S. foreign policy objectives such as more developed and diversified economies through sub-Saharan Africa.[292] Admittedly, such messaging about permissible activities and licensing is not a panacea, and the business and investment climate in Sudan may dissuade many from doing business there. Still, by providing a strong message on de-risking, and by urging the financial community to comply, but not over-comply with sanctions, the United States can limit the effects of this problem. In addition to considering these measures, U.S. leaders should also coordinate their efforts with their counterparts in other governments and work together to determine how to expand banking and other financial services with Sudan while also ensuring that engagement is done more responsibly. An internationally maintained "watch list" of companies suspected of having connections to sanctioned entities could enhance screening by financial institutions and help mitigate concerns about unintentional violations or other adverse effects.

*Transparency for Business Conducted in Sudan*

In order to ensure that U.S. businesses do not finance or enable the violent kleptocracy in Sudan, OFAC should require companies that do business in Sudan to complete robust public reporting and disclosure when the transaction exceeds a certain amount of money, such as $100,000. These requirements, modeled off of the Burma Responsible Investment and Reporting Requirements,[293] would include due diligence reporting, whether the transaction involved NISS,

SAF, or NCP officials, and whether the transaction affected human rights. U.S. policymakers could review and amend these money amounts if necessary, but including a transaction amount and a series of transactions amounts helps ensure businesses do not circumvent the requirements by gaming the system, by, for example, making five transactions of $20,000.

### 3 - Addressing Conflict-Affected Gold

As explained above, Sudanese gold should be considered conflict-affected and high-risk because of the conflict conditions associated with a sizeable part of Sudan's gold, which enters and taints the country's gold sector as a whole. Direct outreach concerning this issue is critical. Because the gold industry is highly vulnerable to money laundering and smuggling, the U.S. Treasury Department should issue an advisory for Sudanese gold. Such an advisory, issued in coordination with sectoral sanctions, will exert significant pressure on the Sudanese government. If the advisory is grounded in the 2015 guidance issued by the Financial Action Taskforce (FATF) on the ways gold is tied to money laundering, U.S. engagement can involve other governments and expand the reach of the action.

**Because the gold industry is highly vulnerable to money laundering and smuggling, the U.S. Treasury Department should issue an advisory for Sudanese gold.**

U.S. officials should engage with the gold industry, including miners, traders, refiners, and end users, as well as gold industry associations, to stress the need for enhanced due diligence given the connection between Sudan's gold, violent conflict in parts of Sudan, and money laundering concerns.

More specifically, and as argued previously by the Enough Project, the U.S. Department of State Bureau of Economic and Business Affairs should urge the Organisation for Economic Co-operation and Development (OECD) Multi-Stakeholder Group on Responsible Mineral Supply Chains, as well as the World Gold Council, Conflict-Free Sourcing Initiative, London Bullion Market Association (LBMA), and Responsible Jewellery Council to designate Sudanese gold "high-risk" and "conflict-affected" when conducting their conflict-free audits.[294] Further, the LBMA and the Dubai Multi-Commodities Center should ensure that Sudan's state-owned refinery remains off its Good Delivery Lists.[295] Should the government of Sudan decide to take meaningful actions to address conflict-affected gold, particularly gold from Darfur, the International Conference on the Great Lakes Region (ICGLR) could help monitor Sudanese mining to promote a conflict-free gold supply chain. This outcome is difficult to envision with the ongoing conflict in Darfur and the regime's continued belligerence toward international and regional actors, but ICGLR officials should remind the regime that this outcome is possible should it change its behavior.

### 4 - Fighting Corruption Through Other Means

A number of additional policy measures and approaches to fight corruption should be applied to complement the anti-money laundering measures, a modernized sanctions program, and concerted diplomacy. Together these elements can create a comprehensive foreign policy that applies financial pressure to the Sudanese regime and creates leverage to support an inclusive peace process.

### Foreign Corrupt Practices Act

The Foreign Corrupt Practices Act (FCPA)[296] addresses corruption by requiring companies listed in the United States to meet accounting

provisions, including keeping accurate records and maintaining adequate internal accounting controls. The FCPA also criminalizes bribery of foreign officials. In 1988, Congress amended the act to apply the anti-bribery provision to foreign persons and foreign firms that cause a corrupt payment to occur in U.S. territory. As such, prosecutors can apply the FCPA to foreign nationals who bribe officials outside of the United States if during the planning or execution of the bribery scheme the perpetrators entered U.S. territory or utilized the U.S. financial system. Given the widespread use of U.S. currency in transactions throughout the global financial system—if only for an instant, such as during a wire transfer or currency conversion using U.S. dollars—this amendment can allow for far-reaching prosecutions where foreign nationals did not even physically enter U.S. territory.[297]

Given the comprehensive U.S. sanctions that had been in place with Sudan for close to two decades, FCPA prosecutions against U.S. citizens engaging in business in Sudan are likely to be minimal for now. Following sanctions easing, however, this activity may increase. U.S. investigators and regulators should investigate and take appropriate action if U.S. citizens, Sudanese nationals, or other foreign nationals engage in business activities in or concerning Sudan that violate the FCPA. Convictions and findings of liability on these issues serve as a reminder that corruption, though a systemic problem, is ultimately an illegal act undertaken by individuals.

### Asset Recovery

By looting Sudan's natural resource wealth and plundering its state assets, regime insiders and well-connected elites have amassed personal fortunes at the expense of the Sudanese people. In several instances, these actors have offshored their assets in foreign jurisdictions, thereby compounding the already negative effect of these acts by keeping the wealth outside the Sudanese economy. As U.S. and foreign governments

identify tangible assets that are the proceeds of corruption, they should act to recover these assets.[298] When possible, returning these assets to the Sudanese people is the ideal outcome. However, given the obvious issues of returning stolen assets to the government that initially stole them, seizing and freezing assets until improved political conditions allow for their return is an alternate option. In addition to ensuring the integrity of the global financial system, seizing and freezing assets helps increase the financial pressure on the regime by depriving it of some of its ill-gotten gains.

*Supporting Civil Society and Media*

Finally, it is imperative that policymakers from the United States, United Kingdom, European Union, and other concerned governments and multilateral donors support independent civil society actors and journalists in Sudan. Corruption remains an extremely sensitive issue for al-Bashir's regime, given the public's underlying resentment of the country's purposeful underdevelopment and the massive economic inequality between regime insiders and the overwhelming majority of the Sudanese people. Corruption is a "red-line" topic in Sudanese media, alongside other particularly sensitive issues including President al-Bashir's International Criminal Court arrest warrants and security matters.[299] Publishing articles that address these topics typically results in NISS confiscating the offending newspaper's print run, as well as the harassment and unjustified firings of journalists.[300] Likewise, civil society actors working to document or address corruption often face harassment, intimidation, and even violence. U.S. leaders and foreign partners must send a clear and unequivocal message to the regime about the importance of rights protections for a free press and civil society for improved diplomatic relations with Sudan.

While there are a number of ways to support this objective, two important examples include

stronger promotion of the World Bank's Global Partnership for Social Accountability program[301] and ensuring that the United States Institute of Peace's (USIP) Sudanese and South Sudanese Youth Leaders Program[302] includes education and training on corruption, particularly with respect to how this issue affects their peacebuilding efforts in Sudan. Likewise, this USIP program offers a tremendous opportunity for senior U.S. officials and the policy community in Washington, DC to learn about corruption in Sudan. Lastly, capacity building and education is critical to addressing corruption, but it is difficult to undertake in a sensitive and heavily surveilled environment such as the one in Sudan. Accordingly, U.S. policymakers, development agencies, most notably USAID, and international civil society organizations working in East Africa such as the Open Society Institute, should prioritize this issue in their outreach and programming and consider hosting these trainings in regional locations outside of Sudan where a more blunt assessment of corruption and local strategies to fight it is possible.

## 5 - Engaging Sudan's Political and Financial Supporters

U.S. policymakers should work with Arab Gulf states, the European Union, and others to ensure that any financial support provided to Sudan does not contribute to the violent kleptocracy. Without meaningful oversight and engagement, history indicates that al-Bashir's inner circle and regime elites will simply amass resources and use them to ward off economic and political reform and to maintain political power indefinitely. For example, the decision by the United Kingdom and the European Union to provide the Sudanese government with substantial financial support to stem refugee and migration flows has emboldened the Sudanese government, and the United States should engage to ensure these decisions do not undermine the effort to support peace in Sudan.

Violent Kleptocracy Series:
East & Central Africa

# Conclusion

President al-Bashir and his ruling National Congress Party have transformed Sudan into a system of violent kleptocracy that has endured now for almost three decades. Regime elites, along with their enablers and facilitators, have amassed personal fortunes by looting the country's oil, gold, and land resources in particular, along with other natural resource wealth, productive sectors of the economy, state assets, and the governing institutions that had been in place and largely functioned before this regime took power. The regime responds with violence and repression to any significant opposition and to any attempts to disrupt the capture and looting of Sudan's resources or hold accountable those responsible for these abuses. There are several active armed conflicts in Sudan. The regime's progress in resolving these conflicts has been lacking. The government has a terrible human rights record and represses many different groups. And Sudan is one of the most corrupt countries in the world. Despite these factors, the U.S. government eased nearly all U.S. sanctions and with them the leverage on the regime to end its conflicts peacefully, sustain gains on countering terrorism, and to allow for greater civil and political freedoms culminating in a path toward inclusive, democratic governance. The easing of U.S. sanctions also greatly increased the risk of illicit financial flows and money laundering, thus undermining the integrity of the international financial system. The Sudanese regime now has a much clearer path to reentering the financial system and turning ill-gotten gains into wealth for itself or weapons to wage war in its south and west.

To more effectively support peace, human rights, and good governance in Sudan, U.S. policymakers should work with a range of Sudanese and other international partners to construct a new policy approach to counter Sudan's system of violent kleptocracy. This approach should include support for a truly credible peace process that enjoys broad support within Sudan among the many diverse stakeholders to address in a comprehensive manner the root causes of violent conflict in Sudan. This policy approach to support peace in Sudan should likewise support an inclusive and comprehensive constitutional convention to address a range of governance questions that are critical to many different groups in Sudan. Increased diplomatic engagement can support these efforts and counter some of the current difficulties with an African Union peace process that has failed and the Sudanese National Dialogue that is structurally doomed. There is a need for a fresh strategy and a new mediation backed by U.S.-led financial leverage.

The diplomatic leverage that the U.S. government relinquished in January 2017 when it eased comprehensive sanctions on Sudan citing "positive actions" by Khartoum that have not materialized



for most Sudanese people needs to be enhanced to restore the Sudanese regime's incentives to make concessions for lasting peace in Sudan. To wield the leverage needed to support a peace in Sudan, U.S. policymakers and a coalition of international partners should directly confront Sudan's system of violent kleptocracy with the use of several policy approaches. Measures to stop illicit financial flows, including with anti-money laundering tools, a modernized sanctions regime that narrowly targets wrongdoers and mitigates harm to others, specific steps to address conflict-affected gold, a range of other measures to fight corruption, and engagement with Sudan's political and financial supporters are all crucial dimensions of a policy approach that can more comprehensively and effectively counter a system of violent kleptocracy in Sudan.

Violent Kleptocracy Series:
East & Central Africa

# Endnotes

1        Genocide, under article 2 of the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, refers to acts committed with "intent to destroy, in whole or in part, a national, ethnical, racial or religious group." These acts mean any of the following:
"(a) Killing members of the group;
(b) Causing serious bodily or mental harm to members of the group;
(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
(d) Imposing measures intended to prevent births within the group;
(e) Forcibly transferring children of the group to another group."

Convention on the Prevention and Punishment of the Crime of Genocide, 1948, available at https://treaties.un.org/doc/publication/unts/volume%2078/volume-78-i-1021-english.pdf.

The question of "intent to destroy" is key to the determination of genocide, and it can be contentious, as it is with the situation in Darfur. The U.S. government, the International Criminal Court, and others found evidence of genocide in Darfur. Others stopped short of calling what happened in Darfur genocide. A great deal of time and energy went into the debate about what to call it rather than the policy for what to do about it. The Enough Project has characterized what the government of Sudan did in Darfur as genocide, but we recognize that this term remains a source of contention.

2        Fund for Peace, 2016 Failed State Index, available at http://fsi.fundforpeace.org/2016-sudan (last accessed April 2017). Sudan was one of eight states that Fund for Peace placed on "very high alert" for state failure in 2016. Overall, FFP ranked Sudan the fourth most fragile state in the world.

3        El-Wathig Kameir and Ibrahim Kursany, "Corruption as the 'Fifth' Factor of Production in the Sudan," p. 7 (Uppsala: The Scandinavian Institute of African Studies, 1985).

4        W.J. Berridge, *Civil Uprisings in Modern Sudan: The 'Khartoum Springs' of 1964 and 1985* (London: Bloomsbury Academic, 2015), p. 206.

5        The Enough Project defines a violent kleptocracy as "a system of state capture in which ruling networks and commercial partners hijack governing institutions for the purpose of resource extraction and for the security of the regime. Ruling networks utilize varying levels of violence to maintain power and repress dissenting voices. Terrorist organizations, militias, and rebel groups can also control territory in a similar manner." Ken Menkhaus and John Prendergast, "Defining Violent Kleptocracy in East and Central Africa," The Enough Project, October 20, 2016, available at http://www.enoughproject.org/blogs/defining-violent-kleptocracy-east-and-central-africa.

6        Menkhaus and Prendergast, "Defining Violent Kleptocracy in East and Central Africa."

7        Sarah Chayes, *Thieves of State: Why Corruption Threatens Global Security* (New York: W.V. Norton & Co., 2015); Carnegie Endowment for International Peace, Working Group on Corruption and Security, "The Unrecognized Threat to International Security" (Washington: June 2014), available at http://carnegieendowment.org/files/corruption_and_security.pdf.

8        James Copnall, A *Poisonous Thorn in Our Hearts: Sudan and South Sudan's Bitter and Incomplete Divorce* (London: Hurst & Co., 2014), pp. 116–17.

9        Ibid, pp. 78–79, 112.

10      Harry Verhoeven, *Water, Civilisation and Power in Sudan: The Political Economy of Military-Islamist State Building* (Cambridge: Cambridge University Press, 2015), p. 113.

11      Robert O. Collins, *A History of Modern Sudan* (Cambridge: Cambridge University Press, 2014), pp. 170, 185.

12      Carolyn Fluehr-Lobban and Richard Lobban, "The Sudan since 1989: National Islamic Front Rule," *Arab Studies Quarterly* 23 (2) (2001): 1–9, pp. 1, 4–5.

13      Suliman Baldo, "Khartoum's Economic Achilles' Heel: The intersection of war, profit, and greed," p. 6 (Washington: The Enough Project, August 2016), available at http://www.enoughproject.org/reports/khartoum%E2%80%99s-economic-achilles%E2%80%99-heel-intersection-war-profit-and-greed.

14      Verhoeven, *Water, Civilisation and Power in Sudan*, p. 112.

15      Copnall, *A Poisonous Thorn in Our Hearts*, p. 123.

16      Ibid, pp. 119–120.

17      Caity Bolton, "JEM's Black Book and the Language of Resistance: Transcribing Tyranny," African Arguments, June 8, 2010, available at http://africanarguments.org/2010/06/08/transcribing-tyranny/ (noting "patterns of exploitative governance between the center and periphery" and that "inequalities of development that persisted after colonialism").

18      Hassan Ali Gadkarim, "Oil, Peace and Development: The Sudanese Impasse," p. 5 (Geneva: Chr. Michelsen Institute, 2010), available at http://www.cmi.no/publications/file/3793-oil-peace-and-development-the-sudanese-impasse.pdf.

19      Dabanga, "'Ruling party manages Sudan through private companies': economist," October 26, 2014, available at https://www.dabangasudan.org/en/all-news/article/ruling-party-manages-sudan-through-private-companies-economist.

20      Ibid.

21      Ahmed Hussain Adam, "In Sudan, the Janjaweed Rides Again," *The New York Times*, July 16, 2014, available at http://www.nytimes.com/2014/07/17/opinion/in-sudan-the-janjaweed-rides-again.html.

22      Ibid.

23      For ongoing coverage and reports, see Nuba Reports, available at https://www.nubareports.org/. See also Nicholas Kristof, "A Rain of Bombs in the Nuba Mountains," *The New York Times*, June 20, 2015, available at http://www.nytimes.com/2015/06/21/opinion/sunday/nicholas-kristof-a-rain-of-bombs-in-the-nuba-mountains.html.

24      Sudan Tribune, "Sudan remains defiant after clampdown on 14 newspapers," February 17, 2015, available at http://sudantribune.com/spip.php?article54010.

25      Ibid. See also Sudan Tribune, "Sudanese security seizes three dailies over 'breaches,'" February 20, 2015, available at http://www.sudantribune.com/spip.php?article50035.

26      Copnall, *A Poisonous Thorn in Our Hearts*, p. 113.

27      Verhoeven, *Water, Civilisation and Power in Sudan*, pp. 113–14.

28      Copnall, *A Poisonous Thorn in Our Hearts*, p. 113.

29      Verhoeven, *Water, Civilisation and Power in Sudan*, p. 113.

30      Albrecht Hofheinz, "Brave New Sudan," The New Middle East Blog, April 25, 2015, available at https://newmeast.wordpress.com/2015/04/25/brave-new-sudan/.

31      Magdi el Gizouli, "Himeidti and His President: War as Livelihood," Still Sudan, May 8, 2015, available at http://stillsudan.blogspot.com/2015/05/himeidti-and-his-president-war-as.html.

32      Dr. Eltigani Eltayeb Ibrahim, "The 2017 budget: circling around the vicious circle," Al-Rakoba, in Arabic, February 15, 2017, available at www.alrakoba.net/news-action-show-id-264886.htm.

33      Hamid E. Ali, "Estimate of the Economic Cost of Armed Conflict: A Case Study from Darfur," *Defence and Peace Economics* 24 (6) (2013): 503–519, pp. 512–13. See also Copnall, A Poisonous Thorn in Our Hearts, pp. 112–13.

34      Hamid Eltgani Ali, "Opportunity to End al-Bashir Rule in Sudan?," *The Cairo Review of Global Affairs*, April 10, 2011, available at http://www.aucegypt.edu/gapp/cairoreview/pages/articleDetails.aspx?aid=46.

35      Ibid.

36      Transparency International, "Sudan," available at https://www.transparency.org/country/SDN (last accessed March 2017).

37      The World Bank, Worldwide Governance Indicators, "Country Data Report for Sudan, 1996–2013," p. 7, available at http://info.worldbank.org/governance/wgi/pdf/c191.pdf. See also The World Bank, "Worldwide Governance Indicators," available at http://info.worldbank.org/governance/wgi/#reports (last accessed April 2017).

38      The World Bank, Worldwide Governance Indicators, "Country Data Report for Sudan, 1996–2013," p. 6.

39      International Budget Partnership, "Open Budget Index 2015," available at http://www.internationalbudget.org/wp-content/uploads/OBS2015-OBI-Rankings-English.pdf.

40      Stella Dawson, "Corruption is leading indicator for political unrest, study finds," Reuters, May 28, 2015, available at http://www.reuters.com/article/2015/05/28/us-corruption-peace-index-idUSKBN0OD23X20150528 ("Corruption is a leading indicator for political instability and 64 countries where fraud and bribery are widespread risk falling into violent upheaval, a global think tank said in a new report.").

41      Copnall, *A Poisonous Thorn in Our Hearts*, p. 113.

42      Ibid., p. 112.

43      The World Bank, "Sudan: Data," available at http://data.worldbank.org/country/sudan (last accessed March 2017)

44      Central Intelligence Agency, "The World Factbook: Sudan," last updated on January 12, 2017, available at https://www.cia.gov/library/publications/the-world-factbook/geos/su.html (last accessed April 2017).

45      Ibid.

46      The World Bank, "Sudan: Data."

47      The Economist Intelligence Unit, "Sudan: In Brief," available at http://country.eiu.com/sudan (last accessed March 2017)

48      Ibrahim Ahmed Elbadawi and Kabbashi Suliman,

"The Macroeconomics of the Gold Economy in Sudan," (December 2014), p. 2.

49      "BP Statistical Review of World Energy," p. 6, June 2016, available at https://www.bp.com/content/dam/bp/pdf/energy-economics/statistical-review-2016/bp-statistical-review-of-world-energy-2016-full-report.pdf; Samuel Gebre and Okech Francis, "Revival Beckons for Sudan as U.S. Lifts Economic Sanctions," Bloomberg News, January 29, 2017, available at https://www.bloomberg.com/news/articles/2017-01-30/economic-revival-beckons-for-sudan-after-u-s-lifts-sanctions.

50      Dabanga, "Sudan's oil production drops as price dips," November 2, 2016, available at https://www.dabangasudan.org/en/all-news/article/sudan-s-oil-production-drops-as-price-dips.

51      Juba pays Khartoum a fixed fee of $24 per barrel—$9.1 in oil transit and transportation and $15 for a transitional financial arrangement—as part of an agreement signed in 2012. Agreement between The Government of the Republic of South Sudan and the Government of the Republic of Sudan on Oil and Related Economic Matters, arts. 4.1, 4.1, 4.4.1, September 27, 2012, Addis Ababa, Ethiopia, available at http://peacemaker.un.org/sites/peacemaker.un.org/files/SD%20SS_120927_Agreement%20on%20oil%20and%20related%20economic%20matters.pdf.

52      Dabanga, "'Sudan regime keeps to its principles': Al Bashir," September 28, 2014, available at https://www.dabangasudan.org/en/all-news/article/sudan-regime-keeps-to-its-principles-al-bashir.

53      Baldo, "Khartoum's Economic Achilles' Heel," p. 13.

54      See, among recent accounts, Al-Sammani Awadallah, "Three Agreements Signed with National Companies for Exploring Gold in Red Sea," *Sudan Vision*, February 21, 2017, available at http://news.sudanvisiondaily.com/index.php/new-posts/local-news/5095-three-agreements-signed-with-national-companies-for-exploring-gold-in-red-sea; Sudan News Agency, "Ministry of Minerals Signs Two New Agreements On Gold Mining in South Kordofan and Red Sea States," January 23, 2017; Ahmed Younis "Ahmed al-Karuri: 'Sudan's Gold Reserves Amounts to 1,550 Tons,'" *Asharq al-Awsat*, January 12, 2017, available at http://english.aawsat.com/ahmedyounis/interviews/ahmed-al-karuri-sudans-reserves-gold-amounts-1550-tons; Sudan News Agency, "Ministry of Minerals Signs Three Agreements On Gold Exploration Northern and Red Sea States," August 15, 2016; Sudan News Agency, "Ministry of Minerals: over 45 tons of gold, the country production in six months," July 11, 2016; Reuters,

"Sudan buys Sawiris stake in Ariab Mining Company for $100 mln," April 16, 2015, available at http://af.reuters.com/article/investingNews/idAFKBN0N70Q720150416.

55    Elbadawi and Suliman, "The Macroeconomics of the Gold Economy in Sudan," pp. 2, 5; Sudan Tribune, "Sudan predicted to be Africa's largest gold producer by 2018," July 7, 2014, available at http://sudantribune.com/spip.php?iframe&page=imprimable&id_article=51609; Sudanow, "Sudan produces 73.3 tons of gold," January 28, 2015, available at http://sudanow.info.sd/sudan-produces-73-3-tons-of-gold/.

56    See, among more recent accounts, Sudan Tribune, "Sudan asks gold companies to speed up production," June 7, 2016, available at http://www.sudantribune.com/spip.php?article59209; Sudan News Agency, "Bashir Heads the First Meeting of the Higher Council for Mining," June 6, 2016; Sudan Tribune, "Sudan gold revenue reaches $903m in three months," June 1, 2016, available at http://www.sudantribune.com/spip.php?article59153.

57    Johnny Magdaleno, "As gold fuels Darfur conflict, activists push for more Sudan sanctions," Al Jazeera America, April 19, 2015, available at http://america.aljazeera.com/articles/2015/4/19/sudan-gold-sanction-proposal-could-save-darfur.html.

58    Central Intelligence Agency, "The World Factbook: Sudan."

59    The World Bank, "Sudan: Sudan Overview," available at http://www.worldbank.org/en/country/sudan/overview (last accessed April 2017).

60    Ibid.

61    Ibid.

62    Central Intelligence Agency, "The World Factbook: Sudan."

63    Michael Gunn, "Sudan Boosts Gum-Arabic Exports 20% as Far East Demand Grows," Bloomberg Business, March 15, 2013, available at http://www.bloomberg.com/news/articles/2013-03-14/sudan-to-boost-gum-arabic-exports-20-on-higher-far-east-demand.

64    Bassem Abo Alabass Mohammed, "Sudan Sees Gum-Arabic Exports Up on U.S. Rule, China Demand," Bloomberg Business, June 15, 2015, available at http://www.bloomberg.com/news/articles/2015-06-14/sudan-sees-gum-arabic-exports-rising-on-u-s-rule-china-demand.

65    Ibid.

66    Suliman Baldo, "Exodus from Sudan: The flight of human capital and the growth of a parasitic economy," Sudan Tribune, November 21, 2016, available at http://www.sudantribune.com/spip.php?article57123; Suliman Baldo, "Beyond the Façades of Khartoum: The rise of Sudan's 'nouveau riche' and increased economic disparity," Sudan Tribune, November 22, 2016, available at http://www.sudantribune.com/spip.php?article57132.

67    Central Intelligence Agency, "The World Factbook: Sudan."

68    See, for example, Stephanie McCrummen, "Sudan, in Mud Brick and Marble," The Washington Post, February 26, 2007, available at http://www.washingtonpost.com/wp-dyn/content/article/2007/02/25/AR2007022501341.html. See also The World Bank, "Sudan: Sudan Overview."

69    Baldo, "Exodus from Sudan"; Baldo, "Beyond the Façades of Khartoum."

70    The World Bank, "Sudan: Sudan Overview."

71    Omer Ismail, "Flour Power: Bread crisis, a cash crunch, and Sudan's shrinking private sector," Sudan Tribune, January 7, 2016, available at http://www.sudantribune.com/spip.php?article57617.

72    Collins, A History of Modern Sudan, p. 228.

73    Ibid.

74    Ibid., pp. 228–29.

75    Ibid., p. 229.

76    Ibid., pp. 232, 252.

77    Ibid., p. 253.

78    Luke Anthony Patey, "State Rules: oil companies and armed conflict in Sudan," Third World Quarterly 28 (5) (2007): 997–1016, p. 1002 ("International oil companies were seen as complicit in the violence and displacement, providing the government with revenues for large military purchases.").

79    Luke Patey, The New Kings of Crude: China, India, and the Global Struggle for Oil in Sudan and South Sudan (London: Hurst & Co., 2014).

80      Patey, "State rules: oil companies and armed conflict in Sudan," p. 997.

81      Ibid., p. 998.

82      Ibid., p. 999.

83      Collins, *A History of Modern Sudan*, p. 233.

84      Ibid.

85      Ibid., p. 258.

86      Copnall, *A Poisonous Thorn in Our Hearts*, p. 77.

87      As Patey notes, Chinese investors favored offering Sudan "soft loans" as well as access to military arms to secure lucrative oil concessions. Patey, "State rules: oil companies and armed conflict in Sudan," p. 1010.

88      Copnall, *A Poisonous Thorn in Our Hearts*, pp. 81–82.

89      Ibid., p. 81. See also Patey, "State rules: oil companies and armed conflict in Sudan," p. 999. ("[T]he private sector has provided a source of self-enrichment for ruling elites, which in many cases has magnified the political and social grievances that brought on conflict in the first place.").

90      Copnall, *A Poisonous Thorn in Our Hearts*, p. 120.

91      Patey, "State rules: oil companies and armed conflict in Sudan," pp. 1000–01.

92      Copnall, *A Poisonous Thorn in Our Hearts*, p. 82.

93      Human Rights First, "Investing in Tragedy: China's Money, Arms, and Politics in Sudan" (March 2008), pp. 4, 7, available at https://www.humanrightsfirst.org/wp-content/uploads/pdf/080311-cah-investing-in-tragedy-report.pdf. Former Sudan Finance Minister Abda Yahia El-Mahdi stated that 70 percent of oil revenue went to the supporting the Sudanese military. See Jeffrey Gettleman, "Far away from Darfur's agony, Khartoum is booming," *The New York Times*, October 23, 2006, available at http://www.nytimes.com/2006/10/23/world/africa/23iht-web.1024sudan.3262080.html. See also Copnall, *A Poisonous Thorn in Our Hearts*, p. 79.

94      Gadkarim, "Oil, Peace and Development," p. 1.

95      Ibid., p. 8.

96      Human Rights First, "Investing in Tragedy: China's Money, Arms, and Politics in Sudan," p. 3.

97      Sudan Tribune, "Sudan contains 762 million barrel in oil reserves: official," November 12, 2012, available at http://www.sudantribune.com/spip.php?article44518.

98      United States Energy Information Administration, "Country Analysis Brief: Sudan and South Sudan" (September 2014), p. 1, available at http://www.eia.gov/beta/international/analysis_includes/countries_long/Sudan_and_South_Sudan/sudan.pdf.

99      Reuters, "Sudan to drill hundreds of wells to boost oil, gas reserves – state media," December 16, 2014, available at http://af.reuters.com/article/energyOilNews/idAFL6N0U04DR20141216.

100     Ibrahim al-Jack, "95% of Foreign Currency Lost Due to Loss of Oil Revenues, Interview" Sudan Net, available at http://www.sudan.net/printnewsdetail.php?nsid=4415.

101     Reuters, "Sudan to drill hundreds of wells to boost oil, gas reserves – state media."

102     Human Rights Watch, "'We Stood, They Opened Fire': Killings and Arrests by Sudan's Security Forces During the September Protests, " p. 11 (New York, April 2014), available at https://www.hrw.org/sites/default/files/reports/sudan0414_ForUpload.pdf; Amnesty International, "Sudan Escalates Mass Arrests of Activists Amid Protest Crackdown," Press release, October 2, 2013, available at https://www.amnesty.org/en/press-releases/2013/10/sudan-escalates-mass-arrests-activists-amid-protest-crackdown/.

103     BP Statistical Review of World Energy, p. 8 (June 2016), available at http://www.bp.com/content/dam/bp/pdf/energy-economics/statistical-review-2016/bp-statistical-review-of-world-energy-2016-full-report.pdf.

104     "Sudan to boost oil output with new wells," Arab News, March 19, 2015, available at http://www.arabnews.com/news/720586 S. See also Reuters, "Sudan to drill hundreds of wells to boost oil, gas reserves – state media" (noting that the government planned to drill 253 exploratory wells in 2015 to attract foreign investment and pay down the country's debt). Copnall, *A Poisonous Thorn in Our Hearts,* p. 80.

105     Copnall, *A Poisonous Thorn in Our Hearts*, pp. 82–86.

106     Katrina Manson, "Sudan looks to fill coffers with gold," *Financial Times*, July 17, 2012, available by

subscription at http://www.ft.com/cms/s/0/40fe5280-cc34-11e1-839a-00144feabdc0.html#axzz3e0C9oUHx.

107     Ibid.

108     Ibid.

109     Omer Ismail and Akshaya Kumar, "Darfur's Gold Rush: State-Sponsored Atrocities 10 Years After the Genocide" (Washington: Enough Project, Satellite Sentinel Project, DigitalGlobe, May 2013), available at http://www.enoughproject.org/files/Darfur_Gold_Rush.pdf.

110     BBC News, "Sudan's al-Bashir opens large gold refinery in Khartoum," September 20, 2012, available at http://www.bbc.com/news/world-africa-19656106.

111     Economist Intelligence Unit, "Minerals minister visits North Darfur gold-mining area," March 2, 2017, on file with Enough.

112     Copnall, *A Poisonous Thorn in Our Hearts*, p. 6.

113     Ibid.

114     Sudan Tribune, "Sudan expects spike in gold production," March 19, 2015, available at http://www.sudantribune.com/spip.php?article54334.

115     African Mining Intelligence, "Nuggets No. 338," February 10, 2015, available by subscription at http://www.africaintelligence.com/AMA/nuggets/2015/02/10/khartoum-multiplies-gold-agreements,108060655-BRE.

116     U.N. Security Council, "Final report of the Panel of Experts submitted in accordance with paragraph 2 of resolution 2200 (2015)," S/2016/805, pp. 5, 45, September 22, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/805.

117     Paul D. Williams, *War & Conflict in Africa* (Cambridge, UK and Malden, Massachusetts: Polity Press, 2011), p. 113.

118     African Mining Intelligence, "Exploration & Production No. 331," October 28, 2014, available by subscription at http://www.africaintelligence.com/AMA/exploration-production/2014/10/28/khartoum-wants-tighter-hold-on%C2%A0gold-bonanza,108044533-GRA.

119     Sudan Tribune, "Sudan says foreign groups seek a ban on gold exports," June 2, 2015, available at http://www.sudantribune.com/spip.php?article55184. See also Sudan Tribune, "Sudan says 2015 YTD gold production reached 54 tonnes," September 10, 2015, available at http://www.sudantribune.com/spip.php?article56336 ("It is believed that traditional mining employs more than a million Sudanese but it is still difficult to obtain credible data.").

120     Sudanese Minister of Finance and Economic Planning Badr-Eddin Mahmoud Abbas made this statement during a moderated discussion at the U.S. Institute of Peace on April 19, 2016.

121     Magdaleno, "As gold fuels Darfur conflict, activists push for more Sudan sanctions."

122     Steven Spittaels and Yannick Weyns, "Mapping Conflict Motives: the Sudan-South Sudan border" (Antwerp: International Peace Information Service, January 2014), available at https://docs.google.com/viewer?url=http://ipisresearch.eu/download.php?id%3D440; Africa Intelligence, "Gold a target for SAF and SPLM-N in south," March 4, 2014, available by subscription at http://www.africaintelligence.com/AMA/exploration-production/2015/07/28/gold-a-target-for-saf-and-splm-n-in-south,108010586-ART.

123     Dabanga, "'Gold tax to recompense 839 Abbala-Beni Hussein dead': North Darfur Minister," August 22, 2013, available at https://www.dabangasudan.org/en/all-news/article/gold-tax-to-recompense-839-abbala-beni-hussein-dead-north-darfur-minister; U.N. Office for the Coordination of Humanitarian Affairs, "Sudan: Humanitarian Snapshot," March 31, 2013, available at http://reliefweb.int/sites/reliefweb.int/files/resources/sud07_humanitariansnapshot_a3_31%20Mar%2013.pdf.

124     In its January 2005 report, the International Commission of Inquiry on Darfur noted that it "does recognise that in some instances individuals, including Government officials, may commit acts with genocidal intent. Whether this was the case in Darfur, however, is a determination that only a competent court can make on a case by case basis." "Report of the International Commission of Inquiry on Darfur to the United Nations Secretary-General Pursuant to Security Council Resolution 1564 of 18 September 2004," January 25, 2005, available at http://www.un.org/news/dh/sudan/com_inq_darfur.pdf. For more on Musa Hilal and his ties to attacks involving atrocity crimes see Samantha Power, "Dying in Darfur: Can the Ethnic Cleansing in Sudan be Stopped?" *The New Yorker,* August 30, 2004, available at http://www.newyorker.com/magazine/2004/08/30/dying-in-darfur; Human Rights Watch, "Video Transcript: Exclusive Video Interview with Alleged Janjaweed Leader," March 2, 2005, available at https://www.hrw.org/news/2005/03/02/video-transcript-exclusive-video-interview-alleged-janjaweed-leader; Human Rights Watch, "Darfur: Militia Leader Implicates Khartoum: Janjaweed Chief Says Sudan Government

Backed Attacks," March 2, 2005, available at https://www.hrw.org/news/2005/03/02/darfur-militia-leader-implicates-khartoum; Rebecca Hamilton, "The Monster of Darfur," *New Republic*, December 3, 2009, available at http://www.newrepublic.com/article/economy/the-monster-darfur.

125    Hamilton, "The Monster of Darfur."

126    Ibid.

127    Sudan Tribune, "Janjaweed leader defects from NCP, establishes new political movement," January 5, 2014, available at http://www.sudantribune.com/spip.php?article49444; Sudan Tribune, "Ex-Janjaweed leader sponsors tribal reconciliation conference in North Darfur," September 26, 2014, available at http://www.sudantribune.com/spip.php?article52540.

128    Jérôme Tubiana, "Out for Gold and Blood in Sudan: Letter from Jebel Amir," *Foreign Affairs*, May 1, 2014, available at https://www.foreignaffairs.com/articles/sudan/2014-05-01/out-gold-and-blood-sudan.

129    Tubiana, "Out for Gold and Blood in Sudan: Letter from Jebel Amir."

130    Dabanga, "Musa Hilal's Council forms 'Jebel 'Amer Administration', calls for intifada in Sudan," December 16, 2014, available at https://www.dabangasudan.org/en/all-news/article/musa-hilal-s-council-forms-jebel-amer-administration-calls-for-intifada-in-sudan.

131    Ibid.

132    Ibid.

133    Dabanga, "Revolutionary Council takes control of North Darfur gold mine," July 23, 2015, available at https://www.dabangasudan.org/en/all-news/article/revolutionary-council-takes-control-of-north-darfur-gold-mine.

134    Dabanga, "Darfur gold concession winner warned-off by Hilal," April 17, 2014, available at https://www.dabangasudan.org/en/all-news/article/darfur-gold-concession-winner-warned-off-by-hilal.

135    Ibid.

136    Elbadawi and Suliman, "The Macroeconomics of the Gold Economy in Sudan," p. 18.

137    Ibid., p. 20.

138    Ibid., p. 16.

139    U.N. Security Council, "Final report of the Panel of Experts submitted in accordance with paragraph 2 of resolution 2200 (2015)," S/2016/805, p. 42, para. 142, September 22, 2016.

140    Ibid.

141    African Mining Intelligence, "Exploration & Production No. 331."

142    Ulf Laessing, "Special Report: The Darfur conflict's deadly gold rush," Reuters, October 8, 2013, available at http://www.reuters.com/article/2013/10/08/us-sudan-darfur-gold-idUSBRE99707G20131008

143    Laessing, "Special Report: The Darfur conflict's deadly gold rush."

144    Copnall, *A Poisonous Thorn in Our Hearts*, p. 87.

145    Enrico Ille and Sandra Calkins, "Gold mining concessions in Sudan's written laws, and practices of gold extraction in the Nuba Mountains." In Elke Grawert, ed., *Forging Two Nations: Insights on Sudan and South Sudan* (Addis Ababa: Organization for Social Science Research in Eastern and Southern Africa, 2014), p. 115.

146    Ibid., p. 120. Under paragraph 24 of this act, mining without a license is also illegal. Ibid., p. 115.

147    Ibid., p. 115.

148    African Mining Intelligence, "Exploration & Production No. 331."

149    Ibid.

150    Magdaleno, "As gold fuels Darfur conflict, activists push for more Sudan sanctions."

151    Ibid.

152    Ibid.

153    U.N. Security Council, "Final report of the Panel of Experts submitted in accordance with paragraph 2 of resolution 2200 (2015)," S/2016/805, September 22, 2016.

154    Colum Lynch, "Russia Blocks U.N. Report Linking Alleged Sudanese War Criminal to Gold Profiteering," Foreign Policy, April 4, 2016, available at http://foreignpolicy.com/2016/04/04/russia-blocks-u-n-report-linking-alleged-sudanese-war-criminal-to-gold-profiteering/.

155    Ibid.

156    Reuters, "Sudan summons U.S. envoy over Darfur sanctions draft resolution," February 10, 2016, available at http://www.reuters.com/article/us-sudan-diplomacy-usa-idUSKCN0VJ1XE.

157    U.N. Security Council, "Final report of the Panel of Experts submitted in accordance with paragraph 2 of resolution 2200 (2015)," S/2016/805, September 22, 2016, p. 37, para 131; p. 38, para. 131(c).

158    Ibid., p. 45, para. 153.

159    Ibid., p. 38, para. 132.

160    Ibid., p. 39, para. 134; p. 40, para 135.

161    Ibid., p. 41, para. 138; p. 42, para. 142

162    Ibid., Final Report, p. 38, para. 131(b).

163    Hamid E. Ali, interview with Enough Project staff, Washington, DC, May 20, 2015. [Skype].

164    Ibid.

165    Alex de Waal, *The Real Politics of the Horn of Africa: Money, War and the Business of Power* (Cambridge, Massachusetts: Polity Press, 2015), p. 176.

166    Sara Pantuliano, "The land question: Sudan's peace nemesis," Humanitarian Policy Group Working Paper (Overseas Development Institute, 2007), p. 3, available at http://www.unhcr.org/refworld/docid/4a5b32c75.html; see also U.N. Environment Programme, "Natural Resource Management & Land Tenure in the Rangelands: Lessons Learned from Kenya and Tanzania, with Implications for Darfur" (January 2014), p. 7, available at http://www.unep.org/disastersandconflicts/portals/155/countries/Sudan/pdf/Learning_Routes_Rangelands.pdf

167    Gunnar M. Sørbø and Arne Strand, "Land Issues and Poverty Reduction: Requirements for Lasting Peace in Sudan and Afghanistan." In, *The Poorest and the Hungry: Assessments, Analyses, and Actions* (Washington: International Food Policy Research Institute, 2009), p. 220, available at http://www.cmi.no/publications/file/3514-land-issues-and-poverty-reduction.pdf.

168    "Sudan: Land grabbing and displacement," *New African Magazine*, May 11, 2015, available at http://newafricanmagazine.com/sudan-land-grabbing-and-displacement/ ("Land grabbing is not a new phenomenon in Sudan. The antagonism between private property and customary approaches to land ownership stretches back

through the post-independence period and into the colonial era.").

169    Pantuliano, "The land question," p. 3; Guma Kunda Komey, "Communal Land Rights, Identities and Conflicts in Sudan: The Nuba Question." Conference Paper (The Human Rights Dimensions of Land in the Middle East and North Africa, MENA Land Forum Founding Conference [Cairo]: 2009), pp. 10–14, available at http://www.researchgate.net/publication/274073748_Communal_Land_Rights_Identities_and_Conflicts_in_Sudan_The_Nuba_Question (noting that "several published works have pointed to the land factor, in its wider context, as the single biggest issue that triggered Nuba moves to join the war in the middle of the 1980s").

170    Collins, *A History of Modern Sudan*, p. 90; see also Komey, p. 11 ("In the process of schemes allocation, local communities and their native institutions were hardly engaged. As a result, many entrepreneurs ended up acquiring land which they had never even seen.").

171    Pantuliano, "The land question," p. 3; Jon Unruh and Musa Adam Abdul-Jalil, "Land rights in Darfur: Institutional flexibility, policy and adaptation to environmental change," *Natural Resources Forum* 36 (4) (2012): 274–284, p. 280 (noting that the use of statutory law in Darfur allowed outside actors to gain control over land, which contributed to the conflict in the region).

172    Komey, "Communal Land Rights, Identities and Conflicts in Sudan," p. 15.

173    U.S. Agency for International Development, "USAID Country Profile, Property Rights and Resource Governance: Sudan," (May 2013), p. 1, available at http://usaidlandtenure.net/sites/default/files/country-profiles/full-reports/USAID_Land_Tenure_Sudan_Profile.pdf.

174    Komey, "Communal Land Rights, Identities and Conflicts in Sudan," p. 11.

175    Suleiman Rahhal and A. H. Abdel Salam, "Land Rights, Natural Resources Tenure and Land Reform," (Committee of the Civil Project), p.1, available at http://justiceafrica.org/wp-content/uploads/2014/03/CivilProject_IssuePaperE2_Land.pdf. See also Omer Egemi, "Land and peace processes in Sudan," *Accord 18* (2006), p. 54, available at http://www.c-r.org/sites/default/files/Accord18_18LandandpeaceprocessesinSudan_2006_ENG.pdf ("Since the colonial period, successive laws and decrees have undermined the land rights of rural communities, small farmers and pastoralists.").

176    Ibid. Under Section 4 of this act, the state

gained full ownership of all unregistered land. Mohyeldeen E. Taha, "Land Use, Ownership and Allocation in Sudan: The challenge of corruption and lack of transparency," p. 12 (Kampala: Sudan Democracy First Group, September 2016), available at http://www.democracyfirstgroup.org/wp-content/uploads/2016/10/Land-Use-Ownership-and-Allocation-in-Sudan.pdf.

177     Researchers estimates that the government owns as much as 95 percent of all land. See Lorenzo Cotula, Sonja Vermeulen, Rebeca Leonard, and James Keeley, *Land grab or development opportunity?: Agricultural investment and international land deals in Africa* (Food and Agriculture Organization, International Institute for Environment and Development, and International Fund for Agricultural Development, 2009), p. 75, available at http://www.fao.org/3/a-ak241e.pdf.

178     Egemi, "Land and peace processes in Sudan," p. 54.

179     Unruh and Abdul-Jalil, "Land rights in Darfur," p. 279. The 1970 Unregistered Land Act foreshadowed the end of traditional local leadership, a system that had served an important function for regulating land use and managing conflict. See Mona Ayoub, "Land and Conflict in Sudan," *Accord 18* (2006), p. 15, available at http://www.c-r.org/sites/default/files/Accord18_4LandandconflictinSudan_2006_ENG.pdf.

180     Rahhal and Salam, "Land Rights, Natural Resources Tenure and Land Reform," pp. 3, 11.

181     U.S. Agency for International Development, "USAID Country Profile," p. 11; "Sudan: Land grabbing and displacement" (noting that the 1970 Unregistered Land Act and the 1984 Civil Transaction Act "facilitated elites to purchase rural land at relatively low prices, with profound implications for Sudanese small farmers, peasants, and pastoral communities.").

182     Sørbø and Strand, "Land Issues and Poverty Reduction," p. 221.

183     Unruh and Abdul-Jalil, "Land rights in Darfur," p. 280.

184     Sudan Tribune, "Sudan offers 6 free zones for investment to Saudi businessmen," February 8, 2015, available at http://www.sudantribune.com/spip.php?article53922.

185     Ibid.

186     Ibid.

187     Rahhal and Salam, "Land Rights, Natural Resources Tenure and Land Reform," p. 4 ("Since Independence, the state has remained ready to confiscate land, while wealthy and powerful individuals, usually with connection to government, have also made use of the colonial and post-colonial land laws to acquire large areas of land.").

188     Sørbø and Strand, "Land Issues and Poverty Reduction," p. 220.

189     Ibid., p. 221 (noting that this agricultural development approach had the greatest impact in South Kordofan, southern Darfur, and Blue Nile and resulted in "the dispossession of smallholder farmers from their customary rights to land, the erosion of the land-use rights of pastoralists, and the creation of a large force of agricultural wage laborers whose numbers were increased through displacement by drought and war in the 1980s and 1990s." Further, while creating "important benefits for a key political constituency, mainly in Khartoum," this development approach also "created serious structural problems in the agricultural sector." Ibid.

190     Rahhal and Salam, "Land Rights, Natural Resources Tenure and Land Reform," p. 4 ("Successive legislation on land, up to the 1990 amendment to the Civil Transactions Act, has not changed this fundamental aspect of Sudanese land law, but on the contrary strengthened the privileges of the state and those with access to it, at the expense of rural people.").

191     Rahhal and Salam, "Land Rights, Natural Resources Tenure and Land Reform," p. 4. The Sudanese government reinstated the practice of local leaders managing local affairs through a law called the Native Administration Act in 1986. See U.S. Agency for International Development, "USAID Country Profile," p. 11. However, the reinstated practice of local administration featured significantly weakened power for local leaders as well as a lack of credibility with local populations. See Ayoub, "Land and Conflict in Sudan," p. 15.

192     Rahhal and Salam, "Land Rights, Natural Resources Tenure and Land Reform," p. 7.

193     U.N. Environment Programme, "Natural Resource Management & Land Tenure in the Rangelands," p. 7 (noting that areas such as Darfur show "considerably and systematically weakened institutions and governance systems).

194     U.N. Environment Programme, "Natural Resource Management & Land Tenure in the Rangelands,"

p. 7.

195      Pantuliano, "The land question," p. 3.

196      Ibid.

197      Food and Agricultural Organization of the United Nations, "Sudan: Sudan at a Glance," available at http://www.fao.org/sudan/fao-in-sudan/sudan-at-a-glance/en/ (last accessed April 2017).

198      U.S. Agency for International Development, "USAID Country Profile," p. 11.

199      Ibid.

200      Ibid. See also Egemi, "Land and peace processes in Sudan," p. 55 (noting the failures of the 2005 Comprehensive Peace Agreement and the 2006 Darfur Peace Agreement to address land issues in a satisfactory manner). In contrast to South Kordofan and Blue Nile, officials established a well-regarded land commission in Darfur. This commission stabilized under the 2006 Darfur Peace Agreement and continued its work under the 2011 Doha Document for Peace. Although regarded, the commission has limited its activities to research and surveying.

201      U.S. Agency for International Development, "USAID Country Profile," p. 1.

202      Sørbø and Strand, "Land Issues and Poverty Reduction," p. 221.

203      African Centre for Justice and Peace Studies, "Two South Sudanese Pastors face death penalty for voicing opposition to corruption scandal at Khartoum Bahri Church," June 2, 2015, available at http://www.acjps.org/two-south-sudanese-pastors-face-death-penalty-for-voicing-opposition-to-corruption-scandal-at-khartoum-bahri-church/.

204      Ibid.

205      Ibid.

206      Ibid., Radio Tamazuj, "Two pastors detained in Khartoum finally allowed to return to South Sudan," August 19, 2015, available at https://radiotamazuj.org/en/article/two-pastors-detained-khartoum-finally-allowed-return-south-sudan.

207      Al Jazeera, "Sudan farmers fear land grab by foreigners," January 1, 2012, available at http://www.aljazeera.com/news/africa/2012/01/201211142114188969.html.

208      Cotula, Vermeulen, Leonard, and Keeley, *Land grab or development opportunity?*, p. 42.

209      U.S. Agency for International Development, "USAID Country Profile," p. 11 ("Since 2007, it is estimated that the [Government of Sudan] has commercially leased out approximately 3.9 million hectares. This figure is in addition to the roughly 12.5 million hectares of land commercially leased out by the government prior to 2005.").

210      Cotula, Vermeulen, Leonard, and Keeley, *Land grab or development opportunity?*, p. 80.

211      Dabanga, "Land rights protesters wounded in Sudan's capital," December 14, 2014, available at https://www.dabangasudan.org/en/all-news/article/land-rights-protesters-wounded-in-sudan-s-capital.

212      Ibid.

213      Ibid.

214      U.S. Agency for International Development, "USAID Country Profile," p. 11.

215      Gettleman, "Far away from Darfur's agony, Khartoum is booming."

216      Peter Dörrie, "Sudan Is Arming Africa and No One Cares, War Is Boring, February 6, 2015, available at https://medium.com/war-is-boring/sudan-is-arming-africa-and-no-one-cares-3bf740d47304.

217      Ibid.

218      Georgette Gagnon and John Ryle, "Report of an Investigation into Oil Development, Conflict and Displacement in Western Upper Nile, Sudan" (October 2001), p. 4, available at http://www.ecosonline.org/reports/2001/SudanReportGagnon103001.pdf.

219      Ibid.

220      Human Rights First, "Investing in Tragedy: China's Money, Arms, and Politics in Sudan," p. 15.

221      Small Arms Survey, "Human Security Baseline Assessment (HSBA) for Sudan and South Sudan: 'The Military Industry Corporation (MIC)'" p. 4, July 2014, available at http://www.smallarmssurveysudan.org/fileadmin/docs/facts-figures/sudan/HSBA-MIC-Open-Source-Review-2014.pdf.

222       Ibid.

223       Al Arabiya, "Sudan reveals synthesized drones and intention missile production; The defense minister says he is the third African country in the military industry," September 3, 2007, available at http://www.alarabiya.net/articles/2007/09/03/38638.html (translated from Arabic).

224       Bernd Debusmann Jr., "Sudan emerging as a major weapon producer," Khaleej Times, February 24, 2015, available at http://www.khaleejtimes.com/biz/inside.asp?xfile=/data/biztalk/2015/February/biztalk_February1.xml&section=biztalk.

225       Small Arms Survey, "Human Security Baseline Assessment (HSBA) for Sudan and South Sudan: 'The Military Industry Corporation (MIC),'" pp. 1–6. See also Dörrie, "Sudan Is Arming Africa and No One Cares" ("At the heart of Sudan's arms distribution network sits the Military Industry Corporation, a government-owned weapons manufacturer.").

226       Small Arms Survey, "Human Security Baseline Assessment (HSBA) for Sudan and South Sudan: 'The Military Industry Corporation (MIC),'" p. 1.

227       Ibid., pp. 1–3.

228       Ibid., p. 1.

229       Ibid., p. 2.

230       Ibid., p. 3.

231       Dörrie, "Sudan Is Arming Africa and No One Cares" ("Sudan has little in the way of competitive industry, and suffers the huge costs of fighting multiple civil wars at once, making the entry into the black market a financially-enticing affair.").

232       Debusmann Jr., "Sudan emerging as a major weapon producer."

233       BBC News, "Sudan's President Bashir attends arms fair Idex in UAE," February 27, 2015, available at http://www.bbc.com/news/business-31658182.

234       Radio Tamazuj, "Sudan 'stepping up efforts' to sell weapons abroad: report," March 9, 2015, available at https://radiotamazuj.org/en/article/sudan-stepping-up-efforts-sell-weapons-abroad-report.

235       Small Arms Survey, "Human Security Baseline Assessment (HSBA) for Sudan and South Sudan: 'The

Military Industry Corporation (MIC),'" p. 6.

236       Sudan Tribune, "U.S. affirms Sudan's cooperation on counter-terrorism efforts for 2014," June 20, 2015, available at http://www.sudantribune.com/spip.php?article55404.

237       Agence France-Presse, "Why has Sudan ditched Iran in favour of Saudi Arabia?" The Guardian, January 12, 2016, available at http://www.theguardian.com/world/2016/jan/12/sudan-siding-with-saudi-arabia-long-term-ally-iran. See also Omer Ismail, "The Many Faces of al-Bashir: Sudan's Persian Gulf Power Games" (Washington: The Enough Project, June 2015), available at http://www.enoughproject.org/reports/many-faces-al-bashir.

238       Jürgen Dahlkamp and Maximilian Popp, "Questionable Deal: EU to Work with African Despot to Keep Refugees Out," Der Spiegel, May 13, 2016, available at http://www.spiegel.de/international/world/eu-to-work-with-despot-in-sudan-to-keep-refugees-out-a-1092328.html.

239       Gulf News Sudan, "Saudi Arabia deposits $1b in Sudan central bank," August 13, 2015, available at http://gulfnews.com/news/mena/sudan/saudi-arabia-deposits-1b-in-sudan-central-bank-1.1566103.

240       Ibid.

241       Nanjala Nyabola and Obi Anyadike, "Why the EU migration deal with Sudan is so dodgy," Integrated Regional Information Network (IRIN), May 26, 2016, available at http://www.irinnews.org/analysis/2016/05/26/why-eu-migration-deal-sudan-so-dodgy.

242       Aly Verjee, "Race Against Time: The countdown to the referenda in Southern Sudan and Abyei," Rift Valley Institute, October 2010, p. 9, available at http://riftvalley.net/publication/race-against-time#.V1d8M_krIdV.

243       In 2015, UNAMID staff reportedly faced a 225 percent increase in attacks. Conflict in Jebel Marra (central Darfur) has continued, and displaced an estimated 129,000 people in 2016 alone. Lynch, "Russia Blocks U.N. Report Linking Alleged Sudanese War Criminal to Gold Profiteering." U.N. Office for the Coordination of Humanitarian Affairs (OCHA), "Jebel Marra Crisis Fact Sheet," Issue No. 5, March 24, 2016, available at http://reliefweb.int/sites/reliefweb.int/files/resources/Jebel_Marra_Crisis_Fact_Sheet_24_Mar_2016.pdf.

244       Dabanga, "Insecurity, Unamid exit concerns El Salam's displaced," May 20, 2016, available at https://www.dabangasudan.org/en/all-news/article/insecurity-unamid-

exit-concerns-kalma-s-displaced.

245      Ibid.

246      U.N. High Commissioner for Refugees (UNHCR), "Sudan: Refugees, asylum-seekers, IDPs and others of concern to UNHCR by State as of 30 April 2016," May 13, 2016, available at http://www.refworld.org/docid/573ad3274.html.

247      Sudan Tribune, "Arman renews SPLM-N rejection of Sudan Roadmap Agreement," March 31, 2016, available at http://www.sudantribune.com/spip.php?article58481; Dabanga, "'Opposition will not bend to pressure to sign AUHIP roadmap': Agar," March 28, 2016, available at https://www.dabangasudan.org/en/all-news/article/opposition-will-not-bend-to-pressure-to-sign-auhip-roadmap-agar; Sudan Democracy First Group, "A continuation of Failure: The AUHIP sign a Unilateral Road Map Agreement with the NCP," March 22, 2016, available at http://www.democracyfirstgroup.org/a-continuation-of-failure-the-auhip-sign-a-unilateral-road-map-agreement-with-the-ncp/.

248      Omer Ismail, "Sudan's National 'Monologue,'" *Sudan Tribune*, October 24, 2015, available at http://www.sudantribune.com/spip.php?article56827.

249      Ismail, "Sudan's National 'Monologue.'"

250      Dabanga, "Sudan's Al Bashir defies AU meeting proposal," August 31, 2015, available at https://www.dabangasudan.org/en/all-news/article/sudan-s-al-bashir-defies-au-meeting-proposal.

251      Dabanga, "Sudanese Dialogue boycott 'larger than expected,'" October 12, 2015, available at https://www.dabangasudan.org/en/all-news/article/sudanese-dialogue-boycott-larger-than-expected.

252      Channing May, "Transnational Crime and the Developing World" (Washington: Global Financial Integrity, March 2017), available at http://www.gfintegrity.org/wp-content/uploads/2017/03/Transnational_Crime-final.pdf; Global Financial Integrity, "Illicit Financial Flows," available at http://www.gfintegrity.org/issue/illicit-financial-flows/ (last accessed April 2017).

253      Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56, § 314, 115 Stat. 272 (2001) [hereinafter USA PATRIOT Act].

254      Financial Action Task Force (FATF), "High-risk and non-cooperative jurisdictions," available at http://

www.fatf-gafi.org/publications/high-riskandnon-cooperativejurisdictions/?hf=10&b=0&s=desc(fatf_releasedate) (last accessed April 2017).

255      U.S. Treasury Department Financial Crimes Advisory Network (FinCEN), "Advisory on the FATF-Identified Jurisdictions with AML/CFT Deficiencies," FIN-2016-A001, January 19, 2016, available at https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2016-a001; Samuel Rubenfeld, "Ecuador, Sudan Removed From Money Laundering Blacklist," Wall Street Journal Risk and Compliance Blog, October 26, 2015, available at http://blogs.wsj.com/riskandcompliance/2015/10/26/ecuador-sudan-removed-from-money-laundering-blacklist/.

256      USA PATRIOT Act, §311.

257      The Egmont Group of Financial Intelligence Units, available at http://www.egmontgroup.org/ (last accessed April 2017).

258      The [Obama] White House, "FACT SHEET: Financing for Development -- U.S. Government Development Priorities," July 15, 2015, available at https://obamawhitehouse.archives.gov/the-press-office/2015/07/15/fact-sheet-financing-development-us-government-development-priorities.

259      Ibid.

260      U.N. Office on Drugs and Crime, United Nations Convention against Corruption Signature and Ratification Status as of 12 December 2016, available at https://www.unodc.org/unodc/en/treaties/CAC/signatories.html (last accessed April 2017).

261      Ibid.

262      U.N. Office on Drugs and Crime, United Nations Convention against Corruption, Convention Highlights, available at https://www.unodc.org/unodc/en/treaties/CAC/convention-highlights.html (last accessed April 2017).

263      Ibid.

264      Ibid.

265      Stolen Asset Recovery Initiative, "Our Vision and Mission," available at http://star.worldbank.org/star/about-us/our-vision (last accessed April 2017).

266      Ibid.

267      U.S. Department of State, "U.S. Asset Recovery Tools & Procedures: A Practical Guide for International

Cooperation," May 2012, p. 1, available at http://www.state.gov/documents/organization/190690.pdf.

268     Ibid.

269     Ibid.

270     Ibid., p. 2.

271     Ibid., p. 1

272     Leslie Wayne, "Wanted by U.S.: The Stolen Millions of Despots and Crooked Elites," *The New York Times*, February 16, 2016, available at http://www.nytimes.com/2016/02/17/business/wanted-by-the-us-the-stolen-millions-of-despots-and-crooked-elites.html (noting that "25 cases have been brought against 20 foreign officials under the Kleptocracy Initiative, and the government is seeking to seize $1.5 billion").

273     U.S. Department of Justice, Office of Public Affairs, "U.S. Forfeits Over $480 Million Stolen by Former Nigerian Dictator in Largest Forfeiture Ever Obtained Through a Kleptocracy Action," Press release, August 7, 2014, available at http://www.justice.gov/opa/pr/us-forfeits-over-480-million-stolen-former-nigerian-dictator-largest-forfeiture-ever-obtained.

274     Ibid.

275     Ibid.

276     Nate Raymond, "BNP Paribas sentenced in $8.9 billion accord over sanctions violations," Reuters, May 1, 2015, available at http://www.reuters.com/article/us-bnp-paribas-settlement-sentencing-idUSKBN0NM41K20150501.

277     Ibid.

278     Jamie L. Boucher, Khalil N. Maalouf, Katherine Nakazono, Lindsey F. Randall, and D. Taylor Tipton, "Sectoral Sanctions Add New Layer of Complexity to OFAC Sanctions," Skadden's 2015 Insights – Financial Regulation, January 2015, available at https://www.skadden.com/sites/default/files/publications/Sectoral_Sanctions_Add_New_Layer_of_Complexity_to_OFAC_Sanctions.pdf ("In July 2014, however, the U.S. government created an entirely new type of sanctions regime, the 'sectoral sanctions' that aims to limit certain sectors of the Russian economy from gaining access to U.S. capital and debt markets, as well as U.S. technology and expertise in the energy sector.").

279     Thomas de Waal, "Fighting a Culture of Corruption in Ukraine," Carnegie Europe, April 19, 2016,

p. 2, available at http://carnegieendowment.org/files/Fighting_a_Culture_of_Corruption_in_Ukraine_deWaal.pdf (defining grand corruption as "the abuse by leading officials of their public positions for personal enrichment").

280     In contrast, more traditional types of corruption, such as patronage, bribery, and kickbacks, at least recirculate the money back into local economies. Although less than ideal, these acts of corruption may lead to the misallocation of resources and certainly undermines some principles of fairness and the rule of law; but by keeping the money in the economy, they at least contribute to local development and economic growth. Further, in the wider Muslim-majority world, complex kinship ties and indebted personal relationships may require acts that seem "corrupt" to those unfamiliar with these societies. Lawrence Rosen, "Understanding Corruption," *The American Interest*, Vol. 5, No. 4, Spring (March/April) 2010, pp. 1–5. "Theirs is a world in which the defining feature of a man is that he has formed a web of indebtedness, a network of obligations that prove his capacity to maneuver in a world of relentless uncertainty. It is a world in which the separation of impersonal institutions from personal attachments is very scarce. Failure to service such attachments is thus regarded as not only stupid but corrupt." Ibid., 1.

281     U.S. President (Barack Obama), Executive Order 13726, "Blocking Property and Suspending Entry into the United States of Persons Contributing to the Situation in Libya," April 19, 2016, available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/libya_eo_20160419.pdf.

282     Ibid., sections 1(a)(i)(C); 1(a)(iv).

283     U.S. President (George W. Bush) Executive Order 13469, "Blocking Property of Additional Persons Undermining Democratic Processes or Institutions in Zimbabwe," July 25, 2008, available at https://www.treasury.gov/resource-center/sanctions/Documents/13469.pdf; U.S. President (Barack Obama) Executive Order 13692, "Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela," March 8, 2015, available at https://www.treasury.gov/resourcecenter/sanctions/Programs/Documents/venezuela_eo.pdf.

284     H.R.1735 - National Defense Authorization Act for Fiscal Year 2016 114th Congress (2015-2016), available at https://www.congress.gov/bill/114th-congress/house-bill/1735/text.

285     S.284, § 3.

286     S.284, § 3.

287    Naki B. Mendoza, "How banks de-risking can undermine development," Devex Impact, May 31, 2016, available at https://www.devex.com/news/how-banks-de-risking-can-undermine-development-88227; Center for Global Development, "Unintended Consequences of Anti–Money Laundering Policies for Poor Countries: A CGD Working Group Paper" (Washington: November 9, 2015), available at http://www.cgdev.org/publication/unintended-consequences-anti-money-laundering-policies-poor-countries ("Money laundering, terrorism financing and sanctions violations by individuals, banks and other financial entities are serious offenses with significant negative consequences for rich and poor countries alike. . . . But the policies that have been put in place to counter financial crimes may also have unintentional and costly consequences, in particular for people in poor countries.").

288    Martin Arnold and Patrick Jenkins, "Barclays set to exit African business," Financial Times, February 26, 2016, available at http://www.ft.com/intl/cms/s/0/01d64502-dca4-11e5-827d-4dfbe0213e07.html.

289    Samuel Rubenfeld, "Barclays Pays $2.5 Million over Zimbabwe Sanctions Breaches," Wall Street Journal, February 8, 2016, available at http://blogs.wsj.com/riskandcompliance/2016/02/08/barclays-pays-2-5-million-over-zimbabwe-sanctions-breaches/.

290    U.S. Treasury Department, "Enforcement Information for February 8, 2016," available at https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160208_barclays.pdf.

291    Arnold and Jenkins, "Barclays set to exit African business."

292    IT News Africa, "Financial inclusion is still met with a number of challenges in Africa," November 26, 2015, available at http://www.itnewsafrica.com/2015/11/financial-inclusion-is-still-met-with-a-number-of-challenges-in-africa/.

293    Responsible Investment and Reporting Requirements, available at http://www.humanrights.gov/wp-content/uploads/2013/05/responsible-investment-reporting-requirements-final.pdf (last accessed April 2017).

294    Akshaya Kumar, "Fool's Gold: The Case for Scrutinizing Sudan's Conflict Gold Trade," p. 6 (Washington: The Enough Project, March 2015), available at http://www.enoughproject.org/files/Sudan%20Fools%20Gold%20Report.pdf.

295    Ibid.

296    Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, et seq (1977).

297    See, e.g., Arnold & Porter Advisory, "The Extraterritorial Reach of the FCPA and the UK Bribery Act: Implications for International Business" (March 2012), p. 2, available at http://files.arnoldporter.com/advisory%20extraterritorial_reach_fcpa_and_uk_bribery%20act_implications_international_business.pdf ("The FCPA applies broadly to numerous categories of US and non-US persons and businesses, and in many cases can give rise to liability even where the corrupt act takes place entirely or mostly outside the United States.").

298    It is necessary to maintain realistic expectations concerning the efficacy and overall impact of asset recovery initiatives. Experts estimate that the proceeds of crime, corruption, and tax evasion amount to between $1.6 trillion and $2.2 trillion annually, while in the last 15 years officials have repatriated only $5 billion. Offshoring assets through a web of legal and accounting procedures, such as the use of shell companies, hide ownership and mislead investigators. Further, due process is necessary to confirm that officials acquired assets through corruption and significant political will is crucial to obtain control over assets in foreign jurisdictions. These efforts remain essential but are still in the early stages of development, as are questions about what to do once assets are recovered. May, "Transnational Crime and the Developing World"; Luke T. Cadigan and Laura C. Preiston, "Returning Libya's Wealth," The Sovereign Wealth Fund Initiative, December 2011, available at http://fletcher.tufts.edu/~/media/Fletcher/Microsites/swfi/pdfs/Libya.pdf; Open Society Justice Initiative, "Repatriating Stolen Assets: Potential Funding for Sustainable Development," July 2015, p. 2, available at https://www.opensocietyfoundations.org/sites/default/files/repatriating-stolen-assets-background-20150727.pdf.

299    Nuba Reports, "Little to Celebrate in Sudan on World Press Freedom Day," May 6, 2016, available at http://nubareports.org/little-to-celebrate-in-sudan-on-world-press-freedom-day/.

300    Ibid.

301    The Global Partnership for Social Accountability, https://www.thegpsa.org/sa/ (last accessed April 2017).

302    U.S. Institute of Peace, "Sudanese and South Sudanese Youth Leaders Program," available at http://www.usip.org/programs/projects/sudanese-and-south-sudanese-youth-leaders-program (last accessed April 2017).