UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILLY MIKALI AMDUSO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> REPUBLIC OF SUDAN, et al., <br><br> Defendants. | Civil Action No. 08-1361 (JDB) |

# MEMORANDUM OPINION

Currently before the Court is [325] plaintiffs' renewed motion to compel post-judgment discovery from Sudan. For the reasons that follow, the motion will be granted as to the narrowed set of requests laid out in plaintiffs' reply brief and June 21, 2017 proposed order.

## I. BACKGROUND

This discovery request stems from a default judgment issued against Sudan under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA). Six years ago, this Court found Sudan liable for plaintiffs' injuries in connection with the 1998 bombings of the U.S. embassies in Kenya and Tanzania. Order of Nov. 28, 2011 [ECF No. 62] at 2. The Court entered judgment in favor of plaintiffs for approximately $878 million in compensatory damages and interest, Order of July 25, 2014 [ECF No. 254], part of a combined $5.9 billion damages award in several consolidated cases that the D.C. Circuit has since upheld, see Owens v. Republic of Sudan, 864 F.3d 751, 767, 825 (D.C. Cir. 2017).[1] Plaintiffs now seek to collect on their judgment.

Plaintiffs initially sought broad discovery of Sudan's assets both here and abroad. Sudan contended that discovery was unnecessary because records of all of its attachable assets may be

---
[1] The Court also awarded $4.3 billion in punitive damages to the victims of the embassy bombings; however, the D.C. Circuit vacated the punitive damages award. Owens, 864 F.3d at 767, 825.

obtained from the Treasury Department's Office of Foreign Assets Control (OFAC). OFAC had already agreed to produce its records regarding Sudan in a companion case, subject to a protective order. See Protective Order, Wamai v. Republic of Sudan, No. 08-CV-1349 (JDB) (D.D.C. May 2, 2016) [ECF No. 287]. At a hearing held on November 18, 2016, the parties and the Court reached an interim agreement under which the Court would modify the protective order in Wamai. Representatives of Sudan would review OFAC's production and determine whether OFAC's records contained a complete list of Sudan's assets available for attachment; if Sudan's representatives determined during this review that OFAC's records were incomplete, Sudan was to supplement OFAC's information.

The Court proceeded to modify the Wamai protective order. See Amended Protective Order, Wamai, No. 08-cv-1349 [ECF No. 290]. On March 28, 2017, the Governor of the Central Bank of Sudan executed a declaration responding to and supplementing the resulting disclosures from OFAC. Decl. of Hazem Abdel Kader Ahmad ("Ahmad declaration") [ECF No. 324-3 *SEALED*]. The declaration stated that Sudanese officials looked only for assets owned directly by the Sudanese government or central bank, and attempted without success to cross-reference OFAC's information with Sudanese governmental information. Id. ¶¶ 3, 5. The assets identified by Sudan as currently in the United States are worth only $7 million, a mere fraction of plaintiffs' judgment. Id. ¶ 5. Sudan now argues that the Ahmad declaration is all that it must provide under Rule 69 of the Federal Rules of Civil Procedure, and that plaintiffs are not entitled to any further discovery. Defs.' Mem. in Opp'n to Pls.' Renewed Mot. to Compel Post-J. Discovery ("Opp'n") [ECF No. 327] at 4–6. Plaintiffs, on the other hand, urge that the Ahmad declaration is woefully insufficient, and have moved for discovery reaching back to 1997 from Sudan and its agencies and

instrumentalities. Pls.' Renewed Mot. to Compel Rule 69 Discovery from the Republic of Sudan ("Pls.' Mot.") [ECF No. 325] at 2–4.

## II. <u>DISCUSSION</u>

Plaintiffs' initial discovery requests sought financial information from a large number of Sudanese entities stretching back over the last twenty years. <u>See</u> Pls.' Req. for Produc. of Docs. and Electronically Stored Information from J. Debtor Republic of Sudan ("Disc. Req.") [ECF No. 325-1]. The parties have engaged in a spirited and largely uncompromising debate over the legality of those requests. However, this debate has since lost much of its potency, because in their reply brief plaintiffs considerably narrowed their initial discovery request. <u>See</u> Reply in Further Supp. of Pls.' Renewed Mot. to Compel Rule 69 Disc. From the Republic of Sudan ("Reply") [ECF No. 328] at 19–20; <u>accord</u> Proposed Order [ECF No. 328-3]. Plaintiffs now ask for four categories of information: (1) the identities of and principal points of contact for all regional and satellite banks used by Sudan and BNP Paribas (BNPP) to make transfers or payment through the United States after the implementation of U.S. sanctions in November 1997; (2) the identities of and principal points of contact for Sudanese banks directed or instructed to use BNPP as their correspondent bank in Europe after November 1997; (3) information regarding transactions through Sudanese state-owned or controlled financial institutions from January 17, 2017 to the present that had certain connections to the United States; and (4) the identities of and certain information about any Sudanese governmental agencies and instrumentalities that have done business in the U.S. or with U.S. persons since January 17, 2017 or that plan to do so in 2017 or 2018. Proposed Order at 1–2. Plaintiffs also ask Sudan to produce one or more witnesses to testify as to each category of information. <u>Id.</u> at 3. The Federal Rules of Civil Procedure allow plaintiffs to make these requests.

As a general rule, legal victors may engage in broad post-judgment discovery. A judgment creditor, "[i]n aid of the judgment or execution, . . . may obtain discovery from any person—including the judgment debtor—as provided in [the Federal Rules of Civil Procedure] or by the procedure of the state where the court is located." Fed. R. Civ. P. 69. The Federal Rules allow for discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Thus, the standards for receiving post-judgment discovery "are quite permissive." Republic of Argentina v. NML Capital, Ltd., 134 S. Ct. 2250, 2254 (2014). That defendant here is a foreign government sued under the Foreign Sovereign Immunities Act (FSIA), rather than a private party sued under some other legal authority, does not alter these standards. See id. at 2256–58.

Sudan raises four arguments in opposition to plaintiffs' renewed motion to compel, but all four are either fatally diminished in force by plaintiffs' narrowing of their discovery request or are otherwise unavailing. Sudan's first—and farthest-reaching—claim is that the Ahmad declaration gave plaintiffs all of the information to which they are legally entitled, and that plaintiffs are precluded from seeking anything more. Opp'n at 4–11. That is not the case. The declaration indicates that Governor Ahmad could not cross-reference any of the assets that OFAC listed as blocked with Sudanese records, which itself suggests that Sudanese officials may not have conducted a thorough investigation. Ahmad Decl. ¶¶ 3–4.[2] The declaration also states that the Sudanese officials conducting the search looked only at assets owned directly by the Sudanese government or its central bank—and not, therefore, at assets owned by the government's agencies and instrumentalities. Id. ¶ 5; see Opp'n at 6.

---

[2] Sudan points out that this is because OFAC provides the current value of assets, whereas Sudan's records show the original value of the transactions at issue without factoring in interest. Ahmad Decl. ¶ 4. However, the fact remains that Governor Ahmad's search could not locate the transactions OFAC listed as blocked, rendering the search itself incomplete.

4

Perhaps most importantly, while Governor Ahmad asserts that he was asked to "identify any assets located in the United States owned by the Sudanese government," Ahmad Decl. ¶ 2, his discussion of his ultimate findings mentioned only funds that were "blocked by banks in the United States," id. ¶ 5. Yet BNP Paribas has admitted to working with the Sudanese government to route monetary transfers through the United States in defiance of sanctions. See Statement of Facts, United States v. BNP Paribas, S.A., No. 14-CR-00460 (LGS) (S.D.N.Y. July 10, 2014) (Exh. J, Pls.' Mot. [ECF No. 325-10]) ¶ 14. Given that fact, plaintiffs are justified in their concern that Governor Ahmad's enumeration only of blocked assets—an enumeration that also does not include assets owned by Sudanese government agencies—may not provide a full accounting of Sudan's assets in the United States. Nor does the declaration, which was signed on March 28, 2017, account for any Sudanese assets that may have entered the United States in the intervening months, now freed by the temporary lifting of sanctions on Sudan in January 2017 and the further, permanent extension of that order in October 2017. See Exec. Order 13,761, 82 Fed. Reg. 5331 (Jan. 13, 2017); Notice Regarding Positive Actions by the Government of Sudan, 82 Fed. Reg. 47,287 (Oct. 11, 2017).

Sudan responds that it has no duty to collect information about its agencies and instrumentalities; that the Ahmad declaration, issued two months after the U.S. lifted sanctions, would have taken into account any effect that change would have had on Sudanese assets in the U.S.; and that plaintiffs cannot base discovery requests on the U.S. government's Specially Designated Nationals List ("SDN"), as plaintiffs suggest, because the SDN's definition of agencies and instrumentalities is broader than that used in the FSIA. See Opp'n at 6–10. These arguments are unavailing. None of these objections apply to the first two categories of information plaintiffs seek, which involve only the identities of banks Sudan and its central bank used to evade sanctions.

5

See Reply at 3.³ And while Governor Ahmad may have been able to speak to any transactions entered into as of late March, more than eight months have gone by since, and any transactions in which Sudan or its agencies or instrumentalities may have engaged in the intervening time are quite relevant to determining Sudan's potentially attachable assets. It is reasonable to assume that Sudanese entities may be engaging in such transactions now, even if they were not in March—particularly since the United States recently made permanent what was originally temporary sanctions relief, thereby reducing the risk that any money transferred into the United States would become blocked by OFAC at a later date. See 82 Fed. Reg. 47287.

The Federal Rules also allow plaintiffs to request discovery from Sudan regarding recent and planned transactions by Sudan's agencies and instrumentalities. Certainly Sudan cannot complain about requests for discovery from any political subdivisions or government agencies that are not separate juridical entities, or with whom Sudan enjoys a principal-agent relationship, since these are considered to be part of the government of Sudan itself. See, e.g., McKesson Corp. v. Islamic Republic of Iran, 185 F.R.D. 70, 78 (D.D.C. 1999). As to any other Sudanese instrumentalities, plaintiffs ask Sudan only for any information it might have in its own "possession, custody, or control" regarding those entities' recent transactions in the United States. Fed. R. Civ. P. 34(a)(1); see Reply at 7. If Sudan owns or controls a particular entity, any documents in that entity's possession are likely also within Sudan's control and therefore subject to discovery. See, e.g., Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 138 (2d Cir. 2007) ("[I]f a party has access and the practical ability to possess documents not available to the

---

³ Conversely, Sudan's argument that it should not have to provide data on twenty years' worth of transactions with BNPP, see Opp'n at 10–11, now applies only to these first two categories of information, since plaintiffs have narrowed their requests for information regarding financial transactions down to the period since January 17, 2017, see Reply at 3. The only information plaintiffs now seek that stretches back to November 1997 is the identity of certain banks that engaged in the evasion of sanctions. See id. This is a relatively un-intrusive request, and is designed to uncover the location and amount of current attachable assets.

party seeking them, production may be required."); DL v. District of Columbia, 251 F.R.D. 38, 46 (D.D.C. 2008) ("'With regards to the term "control," it has been well established that the test for control is not defined as mere possession, but as the legal right to obtain such documents on demand.' . . . Defendant District of Columbia has such control with respect to documents in the possession of its agencies . . . ." (citation omitted)); McKesson Corp., 185 F.R.D. at 78. If there are responsive documents that are not within Sudan's control—either because Sudan does not exercise control over a particular entity, or because it has no "legal right to obtain [those] documents on demand," DL, 251 F.R.D. at 46—it can provide an explanation in lieu of the documents.

This is also why Sudan's objection regarding plaintiffs' use of the SDN as a guidepost is out of place. It is reasonable for plaintiffs to rely on the SDN list as a preliminary assessment of which entities may have Sudanese assets subject to attachment. Federal regulation imposed sanctions on (1) the government of Sudan, including its subdivisions, agencies or instrumentalities; (2) entities owned or controlled by the government of Sudan as so defined; and (3) people acting on behalf of the foregoing. 31 C.F.R. § 538.305. This list well defines the set of entities that may hold Sudanese government assets and over whose documents Sudan would be in a position to exercise control. The regulation also looked to the SDN to provide a non-exhaustive list of entities meeting those definitions. Id. § 538.305 note 2. Thus, Sudan can likely exercise control over responsive documents that these entities possess. Again, however, plaintiffs ask only for documents that are actually within Sudan's control, Reply at 7; Sudan may provide a reasoned explanation as to why it does not exercise control over a given entity or set of documents in response to plaintiffs' discovery request. That request, particularly with its newly narrowed time period, is well within the range of reasonable discovery in cases such as this one. See, e.g.,

7

Aurelius Capital Master, Ltd. v. Republic of Argentina, 589 Fed. App'x 16, 18 (2d Cir. 2014) (allowing discovery against several hundred Argentinian entities that were legally separate from Argentina because they "may nevertheless hold attachable assets on behalf of Argentina" or "may possess information about Argentina's assets, even if [they do] not own or hold those assets [themselves]").[4]

This principal argument resolved, Sudan's remaining three assertions are more easily dispatched. Sudan's second argument is that plaintiffs have not made a sufficient showing that they are entitled to worldwide discovery of Sudan's assets. See Opp'n at 11–16. This objection was questionable even as to plaintiffs' original, more expansive discovery request. Plaintiffs did not ask for information on all of Sudan's "worldwide assets generally," as Sudan claims, and as the plaintiff did successfully in NML Capital. 134 S. Ct. at 2258. Rather, plaintiffs requested information on transactions that had some nexus to the United States, even if the assets involved are no longer located here. See Pls.' Mot. at 2.

Sudan states that plaintiffs may only seek information that will lead to attachable property currently in the United States. See Opp'n at 12–13. "That argument, however, has already been rejected by the Supreme Court." Aurelius, 589 F. App'x at 17. Whether the FSIA itself only permits attachment of property in the United States to enforce judgments under the statute's

---

[4] Sudan also object to plaintiffs' use of the SDN because plaintiffs may not be able to execute against the property of all of the entities on the list, Opp'n at 9, and because any assets these entities had in the United States will have been blocked by OFAC, id. at 9–10. The Court has already explained above why the latter argument does not hold water. As for the ultimate ability to attach property, the 2008 amendments to the FSIA greatly increased the set of government instrumentalities to whom judgment creditors may look for the judgment debtor's attachable assets. See 28 U.S.C. § 1610(g). As long as the judgment debtor "has at least some ownership interest in" the property at issue directly or through an instrumentality, Weinstein v. Islamic Republic of Iran, 831 F.3d 470, 483 (D.C. Cir. 2016), as determined under the appropriate federal rule of decision, see Heiser v. Islamic Republic of Iran, 735 F.3d 934, 940–41 (D.C. Cir. 2013), then § 1610(g) allows attachment from an agency or instrumentality regardless of whether it is the sovereign's alter ego, see Estate of Heiser v. Islamic Republic of Iran, 885 F. Supp. 2d 429, 442 (D.D.C. 2012), aff'd sub nom. Heiser, 735 F.3d 934. Regardless, plaintiffs can seek discovery wider than the scope of what is ultimately attachable, since they "do[] not yet know what property [Sudan] has and where it is, let alone whether it is executable under the relevant jurisdiction's law." NML Capital, 134 S. Ct. at 2257.

terrorism exception is a question currently before the Supreme Court. See Rubin v. Islamic Republic of Iran, No. 16-534 (U.S. argued Dec. 4, 2017). The D.C. Circuit appears to have decided the question in the negative. See Weinstein, 831 F.3d at 483 ("Once a section 1605A judgment is obtained, section 1610(g) strips execution immunity from all property of a defendant sovereign."). Whatever the FSIA ultimately allows plaintiffs to attach, however, it is not "unusual for the judgment creditor to seek disclosure related to assets held outside the jurisdiction of the court where the discovery request is made." EM Ltd. v. Republic of Argentina, 695 F.3d 201, 208 (2d Cir. 2012), aff'd sub nom. NML Capital, 134 S. Ct. 2250. District courts may order discovery related to assets abroad, even though plaintiffs may have to seek execution on those assets from a foreign court. See id.; see also FG Hemisphere Assocs., LLC v. Democratic Republic of Congo, 637 F.3d 373, 378 (D.C. Cir. 2011) ("Congress kept in place a court's normal discovery apparatus in FSIA proceedings.").[5]

Unlike in the hypothetical posed by the Supreme Court in NML Capital, 134 S. Ct. at 2257, plaintiffs do not ask solely for information about a set of assets that the FSIA and international law render immune from attachment. Rather, like the plaintiff in NML Capital, plaintiffs here "do[] not yet know what property [Sudan] has and where it is, let alone whether it is executable under the relevant jurisdiction's law." Id. Their narrowed request now seeks information only on recent transactions, and does so in a manner designed to discover assets that are in the United States or that otherwise might be attachable. If Sudan ultimately believes some of the discovered assets are immune from attachment, it will have the opportunity to make that argument at the execution stage.

---

[5] The Supreme Court declined to decide whether, but cast some doubt on the argument that, Rule 69 prohibits discovery of assets upon which United States courts cannot execute. See NML Capital, 134 S. Ct. at 2254–55 & n.2.

9

Sudan's third and fourth arguments—that plaintiffs' requests are duplicative, unduly burdensome, and disproportionate to the needs of the case, see Opp'n at 17–20, and that plaintiffs' motion should be denied for the sake of international comity, see id. at 20–22—retain little force in light of the narrowed discovery requests in plaintiffs' reply brief. All of the proportionality factors the court must consider favor broad discovery here: (1) the issue in this case—payment of a judgment for involvement in destructive acts of terrorism—is of great importance; (2) the amount in controversy ($878 million) is unusually high; (3) although plaintiffs have obtained some information through third-party subpoenas, Sudan still has far greater access to its own history of financial transactions than plaintiffs do; (4) Sudan, as a sovereign state, has significantly greater resources than plaintiffs do; (5) since the Ahmad declaration points to only $7 million in attachable assets, discovery is vital to determining whether plaintiffs can collect on their judgment; and (6) particularly given the narrower scope of plaintiffs' revised request, the burden on Sudan to comply is outweighed by the benefit to plaintiffs' effort to obtain relief. See Fed. R. Civ. P. 26(b)(1). Sudan's assertions that discovery would be duplicative and overbroad, meanwhile, rely on arguments the Court has already rejected: that plaintiffs already have all the information they could hope to get, and that Sudan would have to collect documents over which it may not have control. Hence, Rule 26(b) supports rather than impedes the discovery request at issue. See, e.g., Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria, 308 F.R.D. 27, 37–38 (D.D.C. 2015).

Finally, while courts "may appropriately consider comity interests and the burden that the discovery might cause to the foreign state," NML Capital, 134 S. Ct. at 2258 n.6, comity is only one among many considerations that play into a district court's discovery decisions. All other relevant considerations weigh in favor of discovery here, and the relatively limited discovery plaintiffs now seek demonstrates due respect for Sudan's sovereignty. It is also relevant that

Congress has determined that limiting sovereign immunity for state sponsors of terrorism is worth the potential disruption to international relations, see 28 U.S.C. § 1605A; NML Capital, 134 S. Ct. at 2258, and that the United States has not filed any document in this Court suggesting that this case "involves sensitive diplomatic considerations," FG Hemisphere, 637 F.3d at 380. Nor does Sudan provide any specific cause for international concern if the Court were to grant plaintiffs' limited discovery request. "The broad, generic argument that [Sudan] offers here seems . . . to be appropriately presented to Congress—not [this Court]." Id.

## CONCLUSION

For the foregoing reasons, [325] plaintiffs' motion to compel discovery, as amended in [328] plaintiffs' reply brief and [328-3] their new proposed order, is granted. A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: December 21, 2017

11